**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| ***Defendants.*** | | |

## PLAINTIFFS' AMENDED MOTION TO REMAND AND REQUEST FOR EXPEDITED CONSIDERATION

All Plaintiffs and Intervenors/Plaintiffs ("Plaintiffs") move to remand this case to the Harris County District Court, request that the Court hear this motion on an expedited basis, and seek their fees and expenses under 28 U.S.C. § 1447(c) for the reasons set forth below.[1]

## INTRODUCTION

Five years after this case was filed and less than three weeks before a preferentially set jury trial before Judge Rabeea Sultan Collier, Defendants removed this case to federal court, claiming that this Court has subject-matter jurisdiction because it "arises under" federal law, namely 28 U.S.C. § 1331. They attach

[1] The amendment is to add an attorney declaration that was inadvertently omitted from the prior filing and also modifies the amount of fees and costs sought.

amended state-court petitions[2] that make only claims under the Texas common law—negligence, negligence per se, and gross negligence—and seek damages and exemplary damages, not any form of equitable relief.

This case involves wrongful death and personal injury claims because four men were exposed to deadly levels of carbon dioxide when they opened a sealed tank trailer ("Tanker") that should have been emptied of hazardous waste. Plaintiffs have referenced, among others, multiple violations of the "federal Resource Conservation and Recovery Act's ('RCRA') 'cradle to grave' comprehensive federal regulatory scheme" as grounds for their Texas common law claims. NOR.2. But no amount of alchemy can transform these common law claims into ones "arising under" federal law such that Section 1331's very limited grant of subject-matter jurisdiction would allow for removal here.

Even if there were a colorable claim of "arising under" jurisdiction, Defendants are far too late to remove. The RCRA duties claimed to support federal jurisdiction have been known to all parties for years. Appendix 1 to this motion details the voluminous references to the EPA's "cradle to grave" regulations under RCRA that are contained in the court filings, disclosures, and other discovery dating back to April 2021. On this basis alone, the Court should remand.

The stunning combination of baselessness and untimeliness of the removal

[2] *See* NOR.Exs.B-4,B-5&B-6 ("Petitions").

also warrants awarding Plaintiffs attorneys' fees and expenses under 28 U.S.C. § 1446(c). The self-evident and singular purpose of the eleventh-hour removal was to derail the preferentially set September 15, 2025, trial setting—which Defendants accomplished, as the state court has taken this case off the trial docket. Notably, Defendants waited until the night before they were set to re-depose one of Plaintiffs' key causation experts to remove. As a result, Plaintiffs had to expend unnecessary time and expense in preparing the expert only to have Defendants "pull the plug" with their removal. And even though Plaintiffs offered to present this witness by agreement, Defendants needlessly claimed that they were unable to go forward because of the removal. Their answer lays bare their real motive.

This case does not belong in federal court and was untimely removed for one-sided strategic reasons, not jurisdictional concerns. As a result, Plaintiffs have lost a preferential trial setting that they were prepared to go forward after five years of discovery and pretrial preparation. They are being denied their day in court based on Defendants' improper trial-avoidance maneuver. Accordingly, Plaintiffs respectfully request that the Court:

- hear this motion on an expedited basis;
- remand the case to the 113th Judicial District Court of Harris County, Texas, so that it can be placed back on the trial docket at that court's earliest convenience; and
- award Plaintiffs their costs and expenses, including attorneys' fees, under 28 U.S.C. § 1447(c) for the patently improper removal designed solely to derail the September 15, 2025, preferential trial setting.

## ARGUMENT AND AUTHORITIES

Federal courts are courts of limited jurisdiction. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). "Thus, a federal court 'must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum.'" *Petrie v. Wells Fargo Bank, N.A.*, Civil Action No. H-1201453, 2012 WL 13050526, at *1 (S.D. Tex. July 23, 2012) (quoting *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001)). "'[A]ny doubt about propriety of removal must be resolved in favor of remand.'" (quoting *Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 281-82 (5th Cir. 2007)).

The removing Defendants bear the burden of establishing both this Court's subject-matter jurisdiction and that removal was proper. *Royal Canin*, 604 U.S. at 25; *see also Tex. Brine Co. v. Am. Arbitration Ass'n, Inc.*, 955 F.3d 482, 485 (5th Cir. 2020) (citing *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 722-23 (5th Cir. 2002)). Defendants cannot establish either.

Most "arising under" cases find jurisdiction under Section 1331 "'when federal law creates the cause of action asserted.'" *Royal Canin*, 604 U.S. at 26 (quoting *Gunn v. Minton*, 568 U.S. 251, 257 (2013)). "On rare occasions, the grant also covers a suit containing state-law claims alone, because one or more of them

'necessarily raise[s]' a 'substantial' and 'actually disputed' federal question." *Id.* (quoting *Gunn*, 568 U.S at 258). Federal law does not create the negligence-based Texas causes of action Plaintiffs have asserted. And this is not one of those "rare occasions" in which the state law claims "necessarily raise" a substantial federal question.

**A. Plaintiffs' claims do not "arise under" federal law.**

Subject-matter jurisdiction is determined from Plaintiffs' pleading, not any defense raised by an opposing party. *Id.* (citing *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9-10 (1983)); *see id.* at 35 ("The plaintiff is 'the master of the complaint,' and therefore controls much about her suit." (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987)). "That longstanding rule makes the [state-court petition]—the plaintiff's own claims and allegations—the key to 'arising under' jurisdiction." *Id.* at 26. The Petitions do not state claims arising under federal law.

**1. Plaintiffs do not seek relief under RCRA.**

Plaintiffs have alleged RCRA violations in their Petitions as a basis for some of the duties that Defendants breached. *See generally* NOR.Exs.B-4,B-5&B-6. They seek damages and exemplary damages, as well as interest and court costs, as relief. *E.g.*, NOR.Ex.B-4 at ¶¶ 11.1-11.10.[3] The RCRA violations are self-evidently tort

[3] The three petitions in this case contain similar allegations. *See* NOR.Ex.B-

duties for purposes of Plaintiffs' common law claims of negligence, negligence per se, and gross negligence—Plaintiffs have not pled a claim for relief under RCRA.

Congress enacted RCRA, 42 U.S.C. §§ 6901–6992, in 1976 "to promote the protection of health and the environment...." 42 U.S.C. § 6902(a). The statute "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (citation omitted). Under its authority, the EPA promulgated compliance and corrective action regulations for hazardous waste monitoring and disposal pursuant to HSWA and enforceable by the EPA Administrator. *See id*. at 483-84; 40 C.F.R. §§ 264.90-264.100. The EPA Administrator monitors disposal and corrective action through use of a permit system. *See* 42 U.S.C. § 6925.

Although RCRA provides for a citizen suit to enforce hazardous-waste handling violations in some circumstances, *Id*. § 6972, Plaintiffs have not made any such claims in this lawsuit. *See generally* NOR.Exs.B-4,B-5&B-6. RCRA only affords prospective, equitable relief for such claims. *Id.* § 6972(a)(1)(B). Neither RCRA nor the EPA regulations promulgated under its authority permits private persons to sue in tort for money damages. *Meghrig*, 516 U.S. at 484 (RCRA citizen-suit provision does not prescribe damages). As was the case with the *Merrell Dow*

---

4,B.5&B.6. Plaintiffs cite to the Brown and Lozano *Plaintiffs' Ninth Amended Petition* for simplification of reference.

*Pharmas., Inc. v. Thompson*, Congress chose not to provide the remedy that Plaintiffs seek. 478 U.S. 804, 808 (1986); *see also Bratton*, 2021 WL 5177063, at *1 (finding plaintiffs had not pled a RCRA claim because "RCRA doesn't provide a remedy for personal injury claims" and "that's all that is asserted here").

Further, RCRA has a savings clause providing that:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency).

42 U.S.C. § 6972(f). The clause expressly reserves state law claims, such as those for money damages, for resolution in state courts. *See Bratton*, 2021 WL 5177063, at *1 ("As such, Plaintiffs may choose to rely upon their viable state-law claim alone to defeat attempts at removal." (internal quotations and citation omitted)); *see also Miss. ex. rel. Hood v. Meritor, Inc.*, Civil Action, No. 4:17CV74-SA-JMV, 2018 WL 1309722, at *5 (N.D. Miss. Mar. 13, 2018) (This "savings clause undercuts the Defendants' argument that, though artfully pled, the Plaintiff's complaint raises actually disputed substantial federal questions [because t]he Act contemplates recovery beyond EPA regulation, as evidenced by Section 6972."); *Salvation Army v. Union Pac. R.R.., Inc.*, Civil Action No. 6:16-CV-0347, 2016 WL 5798987, at *6 (W.D. La. June 23, 2016) (savings clause "preserved state law remedies to the

plaintiffs" (citing *McCastle v. Rollins Envtl. Servs.*, 514 F.Supp. 936, 939 (M.D. La. 1981)).

Additionally, § 6972(b) outlines procedural requirements and limitations for citizen suits, including pre-suit notice to the violator, the state, and the EPA. 42 U.S.C. § 6972(b). No such notice has been provided in this case because Plaintiffs are not seeking relief under RCRA or its regulations. *See Bratton*, 2021 WL 5177063, at *1 ("Plaintiffs haven't observed the RCRA's notice requirement because their suit doesn't proceed under it.").

It is simply impossible to derive an RCRA claim from the allegations pled.

**2. The RCRA violations are predicates for negligence per se claims and do not raise any substantial federal question.**

Defendants cite the U.S. Supreme Court's opinion in *Grable & Sons Metal Prods., Inc., v. Darue Eng. & Mfg.* as support for the removal under their "substantial federal question" argument. NOR.4 (citing *Grable*, 545 U.S. 308, 314 (2005)). But *Grable* does not support a conclusion that Plaintiffs' claims arise under federal law.

*Grable* involved a trespass to try title of land that was acquired through a federal tax sale. 545 U.S. at 310. The "substantial federal question" was "a disputed issue of federal title law." *Id.* The Court observed that "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court [because] [t]he Government has a strong interest in the prompt and certain collection of delinquent taxes." *Id.* at 315 (internal citations and quotations omitted).

The *Grable* Court contrasted the case presented with the "treatment of federal violations generally in garden variety state tort law" where "'[t]he violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings.'" *Id.* at 318-19 (quoting Restatement (Third) of Torts § 14, Reporters' Note, Comment a, p. 195 (Tent. Draft No. 1, Mar. 28, 2001)); *see also Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699-701 (2006) (federal jurisdiction unavailable where: (1) the dispute was between private parties, (2) the resolution of the federal issue was not case dispositive, and (3) the claim was 'fact-bound and situation-specific."); *see also Geiger v. Cavanaugh*, Civ. A. No. H–87–1200, 1987 WL 11715, at *1 (S.D. Tex. May 21, 1987) ("The existence of a duty to the Plaintiff is but one element in a negligence cause of action. A complaint relying on a federal statute or regulation as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treaties of the United States.'" (quoting 28 U.S.C. § 1331, and citing *Merrell Dow*, 478 U.S. at 805)); *see also Thomas v. Friends Rehab. Program, Inc.*, No. Civ.A.04-4288, 2005 WL 1625054, at *3 (E.D. Pa. July 11, 2005) ("[T]he Supreme Court has recently referred to a state-law negligence claim that cites a federal statute to establish a defendant's duty to the plaintiff as the classic example of what does *not* raise a federal question." (citing *Grable,* 545 U.S. at 318-19) (emphasis in orig.)).

This contrasted situation—the "garden variety state tort law" claim, *Grable*, 545 U.S. at 318—accurately describes Plaintiffs' claims here—they are simply not federal. *See, e.g.*, *Kimondale Inc. v. Chevron USA Inc.*, No. 3:16-CV-02133-N, 2016 WL 9559911, at *2 (N.D. Tex. Oct. 5, 2016) ("At best, Plaintiffs reference [RCRA] as evidence of Chevron's alleged duty and subsequent breach, which is likewise insufficient to raise a federal question." (citing *Abarca v. Chevron U.S.A., Inc.*, 75 F. Supp. 2d 566, 571 (E.D. Tex. 1999)); *Janik v. City of Dall.*, No. Civ. A. 3:95-CV-2594, 1998 WL 249213, at *1 (N.D. Tex. May 12, 1998) ("[S]howing one or more statutory [RCRA] standard violations so that the Clean Water Act and/or RCRA statutory violations convert[s] the plaintiffs' *common law nuisance* claims into … *nuisance per se* claims" and "hold[ing] that plaintiffs have not alleged a separate RCRA cause of action." (emphasis in original; internal quotations and citation omitted).[4]

---

[4] Federal courts have uniformly ruled that a plaintiff's reference to federal regulations within the context of state law negligence claims is insufficient to confer federal question jurisdiction. *See, e.g., Glenn v. Tyson Foods, Inc.*, 554 F. Supp. 3d 858, 869 (E.D. Tex. 2021) (references to federal regulations and guidance, CDC guidelines, and OSHA standards held not to confer federal question jurisdiction for negligence, wrongful death, and premises claims under Texas law); *Henry v. Bank of Am., N.A.*, No. 4:12-CV-786-A, 2012 WL 6730718, at *5 (N.D. Tex. Dec. 28, 2012) (violations of federal regulations pled as part of plaintiffs' Texas contract claims held insufficient to raise a substantial federal question); *Lewis v. Melbourne Hous. Auth.*, No. 6:09-CV-1457-Orl-28DAB, 2009 WL 2988899, at *3 (M.D. Fla Sept. 17, 2009) ("[S]tate tort law causes of action ... do not morph into federal claims simply because they look to federal regulations as setting the standard of care."); *Abarca v. Chevron U.S.A., Inc.*, 75 F.Supp.2d 566, 571 (E.D. Tex. 1999) (violation

### 3. Established case law rules out RCRA preemption.

Because Plaintiffs seek no direct action under RCRA, preemption is the only vehicle through which the claims could conceivably "arise under" federal law. But notably, Defendants have not claimed that Plaintiffs' claims are preempted by RCRA in their removal. Their Notice of Removal does not mention the word "preemption" in any iteration. Presumably, that is because federal courts have repeatedly rejected the notion that RCRA completely preempts state law. *See, e.g.*, *Hood*, 2018 WL 1309722, at *6 ("Ultimately, asserting compliance with federal [RCRA] regulations serves as a defense to Plaintiff's state-law claims. Therefore, Defendants['] arguments result in an application of ordinary preemption principals that do not merit removal jurisdiction."); *Bratton*, 2021 WL 5177063, at *1 (noting that defendant had "candidly acknowledged that the RCRA isn't a statute establishing complete preemption"); *Salvation Army*, 2016 WL 5798987, at *4 (noting that defendants had cited no "cases where RCRA was found to completely preempt state law claims").

### 4. Plaintiffs' claims "arise under" Texas common law.

Contrary to Defendants' assertion, Plaintiffs rely on both Texas common law and federal RCRA standards to show a duty Defendants owed to Shawn Jarmail

---

of a federal statute may be evidence of negligence but it is "but one element" of a Texas common-law tort claim "for a jury to consider" and does not support federal jurisdiction).

Brown and Sidarieus Lozano ("Plaintiffs-Decedents"), who died inside the Tanker, and Roy Robison, and Kyle Williams ("Injury Plaintiffs"), who were seriously injured trying to save their co-workers. *E.g.*, NOR.Ex.B-4 at ¶¶ 6.5-6.17. That is enough to preclude a substantial federal question. *See Goffney v. Bank of Am., N.A.*, 897 F. Supp. 2d 520, 526 (S.D. Tex 2012) ("When a claim can be supported by alternative and independent theories of recovery, one based on state law and the other on federal law, that claim may not form the basis for federal question jurisdiction because federal law is not a 'necessary' element of the claim." (quoting *Willy v. Coastal Corp.*, 855 F.2d 1160, 1170-71 (5th Cir. 1988)).

Separate and apart from the EPA's "cradle-to-grave" regulatory requirements for hazardous waste materials, the improper handling and disposal of hazardous waste can give rise to claims for damages under common law theories such as nuisance, trespass, and negligence. *E.g.*, *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 824 (2014) (analyzing damages models for such claims based on hazardous waste contamination).

Texas imposes a common law duty on parties whose affirmative acts create "terrible risk to innocent parties" that are obvious and foreseeable. For example, in *United Rentals N. Am., Inc. v. Evans*, the Supreme Court of Texas recognized a common law duty when a company renting commercial trucks created a danger by allowing a piece of equipment that was far too tall to be loaded on a regular flatbed

trailer to be transported on the public highways where it caused a deadly accident. 668 S.W.3d 627, 639 (Tex. 2023). Foreseeability was the key: "Here, the foreseeability of the terrible risk to innocent parties posed by loading unduly tall loads onto trucks bound for an interstate highway ought to be so obvious as to go without saying." *Id.* A "party who takes affirmative acts that create a danger on a public highway can be held responsible for the results of those actions, along with other responsible actors." *Id.* (quoting *United Rentals N. Am., Inc. v. Evans* 608 S.W.3d 449, 463 (Tex. App.—Dallas 2020), *aff'd in relevant part*, 668 S.W.3d 627). Such facts give rise to a duty "to refrain from 'negligently creat[ing] a dangerous situation'" *Id.* (quoting *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000)).

The fact that statutes or regulations might give rise to additional tort duties is irrelevant. The plaintiffs in that case were "seek[ing] to hold United Rentals liable, under the common law, for the foreseeable consequences of its own negligence, which contributed to the unsafe loading of the boom lift and thereby to Davis's death." *Id.* at 640. As a result, the Supreme Court held that, under the facts presented, "United Rentals owed a duty to [the plaintiff] and other drivers to refrain from 'negligently create[ing] a dangerous situation' on the highway." *Id.* at 639 (quoting *Torrington*, 46 S.W.3d at 837); *see also SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995) ("'[I]f a party negligently creates a dangerous situation

it then becomes his duty to do something about it to prevent injury if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby.'" (quoting *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942)).

Although the accident in this case did not occur on a public highway, these principles transfer easily to the facts presented here. Defendants Dow and Union Carbide produced vinyl acetate monomer ("VAM") that is used for manufacturing industrial coatings to prevent corrosion at its facility in Texas City, Texas. During the manufacturing process of VAM, Dow/UCC generates waste streams consisting of vinyl acetate polymer—a/k/a vinyl acetate waste, residue, or by-product. *E.g.*, NOR.Ex.B-4 at ¶ 5.3. Vinyl acetate waste is extremely hazardous and must be disposed of under strict federal regulation requirements. *Id.* Carbon monoxide is a decomposition or reaction by product for the hazardous waste produced by the VAM process. *Id.* at ¶ 6.7.

Dow/UCC loaded its hazardous waste "hot" into the Tanker for disposal, and did not do anything to specifically cool it down before transporting it to another facility for disposal. *Id.* Superheating these particular chemicals enhances their decomposition, making toxic byproducts like carbon monoxide. *Id.* at ¶ 6.6. When Performance expressed concern before the accident about the high temperatures of the waste, Dow/UCC proposed that the parties not sample the waste, and Performance agreed. *Id.* at ¶¶ 6.6, 6.11.

Dow/UCC contracted with Defendant Sprint Transport to transport the hot hazardous waste in a sealed Tanker, owned by Defendant Mobile Mini. *Id.* at ¶ 5.4. Another subsidiary of Dow, Defendant Performance Materials, NA, Inc., operates a kiln at its facility in Orange, Texas, where it was supposed to empty the Tanker of the vinyl acetate waste. *Id.* at ¶¶ 5.4-5.6. Performance pumped the substance out of the Tanker and to its massive kiln and superheated the waste to dispose of it. *Id.* at ¶ 5.4. It then placed a "nitrogen blanket"[5] in the Tanker, which sat at Performance's facility for a couple of weeks afterward. *Id.*

Defendants collectively knew that the hazardous waste was being transported for final disposal and that the Tanker would need to be cleaned once the waste was removed. *Id.* at ¶ 5.5. But neither Dow/UCC nor Performance ever sampled or identified what exactly was placed in the Tanker. *Id.* at ¶ 5.7. In fact, they had an agreement not to do so. *Id.* at ¶¶ 6.6, 6.11. At UCC/Dow and Mobile Mini's direction, Sprint Transport transported the Tanker to Quala Rail & Specialty for cleaning. *Id.* at ¶¶ 5.7, 5.10. It was there that the Tanker was first unsealed and the Plaintiffs-Decedents and Injury Plaintiffs were overcome with lethal levels (at least 2,000 ppm) of carbon monoxide gas. *Id.* at ¶¶ 5.13-5.15.

It is undisputed that the Plaintiffs-Decedents and Injury Plaintiffs died of and

---

[5] Nitrogen tank blanketing, also referred to as nitrogen padding, is a process where gaseous nitrogen is introduced into an empty or partially filled storage tank or container. NOR.Ex.B-4 at ¶ 5.4.

were seriously injured by carbon monoxide exposure. *Id.* at ¶ 5.15. It is also undisputed that carbon monoxide was not disclosed as being a substance that would be inside the Tanker. *Id.* And no one seriously disputes that carbon monoxide was not supposed to be inside the Tanker. *Id.* Plaintiffs allege that Defendants who were knowingly transporting hazardous waste failed to exercise due care in handling the waste and the Tanker containing it and also failed to communicate important information about the Tanker's contents and possible contents to one another. *See generally id.* at ¶¶ 5.1-5.15, 6.1-6.19.

These facts give rise to a tort duty because Defendants negligently created a dangerous situation "so obvious as to go without saying," *United Rentals*, 668 S.W.3d at 639, and failed to "do something about it to prevent injury" to reasonably foreseeable workers in the chain of handling the hazardous waste sealed into the Tanker. Thus, the RCRA duties are in addition—not in substitution—to tort duties under the Texas common law. These allegations do not support the exercise of federal subject-matter jurisdiction over this wrongful death/personal injury lawsuit.

**B. Defendants' removal comes far too late.**

Independently, the Court should remand because Defendants waited too long to remove. A defendant must remove within 30 days after receiving the first pleading or other paper setting forth a basis for removal. 28 U.S.C. § 1446(b). This deadline must be strictly construed. Removal raises significant federalism concerns, and any

doubts or ambiguities are resolved against removal and in favor of remand. *Vantage Drilling Co. v. Hsin-Chi Su*, 741 F.3d 535, 537 (5th Cir. 2014) (per curiam). Even a month beyond that deadline is enough to preclude removal. *See, e.g.*, *Drouilhet v. Berkowitz*, Civil Action No. 24-367, 2024 WL 1231328, at *5 (E.D. La. Mar. 22, 2024) (Where defendants received plaintiff's settlement demand for $800,000 in December 2023 but did not remove until February, the removal was untimely and remand required without reaching the issue of subject-matter jurisdiction.).

In this case, Defendants have been on notice since 2021 that Plaintiffs were relying upon RCRA standards through Plaintiffs' discovery requests regarding multiple government agencies, including the EPA—which has been delegated the authority under RCRA to control hazardous waste. *See* Ex.1 at 1 (first bullet). RCRA standards were also discussed in the deposition of a defense expert, Elena Labrador on May 10, 2022. *Id.* at 1 (second bullet).

If there were any doubt, Plaintiffs' expert, John Cayias, detailed the RCRA violations on which his opinions were premised in his report of September 21, 2023. *Id.* at 1-2 (third bullet). Another Plaintiffs' expert, Robert A. Richard, also set out his reliance on RCRA standards to support his opinions. *Id.* at 2 (first bullet). And Dr. Cayias' deposition in January 2024 further confirmed that Plaintiffs were relying on the "cradle to grave" regulations of RCRA for their negligence-based claims. *Id.* at 3 (first bullet). Likewise, Dr. Richard's deposition in January 2024 further

substantiated Plaintiffs' reliance on RCRA standards. *Id.* at 3 (second bullet).

In fact, Defendants designated their own expert, Zdenek Hejzlar, in November 2023 to provide opinions about RCRA, as he indicated in his power-point presentation:




*Id.* at 2-3 (second bullet). And again, on February 26, 2024, Plaintiffs indicated they were relying on the same "cradle to grave" standards in briefing as to their motion to compel. *Id.* at 3 (third bullet).

These and other instances of "other papers" detailed in Appendix 1 show that Defendants were far too late in removing, and on that basis alone, the Court should remand. 28 U.S.C. § §1446(b)(3) & 1447(c).

### C. Plaintiffs should recover their fees and costs because the removal lacked any "objectively reasonable basis."

Plaintiffs ask the Court to award them their costs and attorneys' fees incurred

as a result of Defendants' improper removal. *See Id*. § 1447(c). The remand statute provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." *Id.* Although this provision is not automatic, it is triggered where, the removing party "lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).

Defendants' inappropriate removal "lack[s] an objectively reasonable basis for seeking removal." *Id.* As demonstrated above at parts A & B, they have no arguable basis for finding federal subject matter jurisdiction under § 1331, and no credible argument that the removal is timely. Either basis, standing alone, requires remand. Together, they compel a finding that costs, including Plaintiffs' attorneys' fees are appropriate under § 1447(c). The fact that the removal occurred five years into the lawsuit, three weeks before a preferential trial setting (which was immediately lost, as Defendants planned), and the night before Defendants had noticed a second deposition of Plaintiffs' expert, Dr. Cayias, *see* Ex.2-A ¶ 9,[6] makes such an award all the more compelling.

Exhibit 2, incorporated by reference, contains the declarations of Plaintiffs' attorneys substantiating the fees and other costs they incurred for both the

---

[6] As noted previously, Plaintiffs offered to go forward with the deposition by agreement, but Defendants refused to do so, stating that the deposition had not been properly noticed in this Court. Ex.2-A ¶ 9.

improvident removal and preparing for the second deposition of Dr. Cayias. These fees and expenses total $83,062.50, and Plaintiffs ask the Court to award them against the Defendants jointly and severally, as they all signed the Notice of Removal.

## PRAYER

For these reasons, Plaintiffs/Intervenors request that the Court: (1) expedite consideration of this amended motion to remand; (2) remand this case to the 113th District Court of Harris County, Texas; (3) grant Plaintiffs/Intervenors their attorneys' fees and costs incurred in obtaining remand and preparing Dr. Cayias for his deposition; and (4) grant such other relief to which Plaintiffs are entitled.

Respectfully submitted,

**AMARO LAW FIRM**

Matthew A. Elwell
Attorney-in-Charge
State Bar No. 24082962
S.D. Tex. Id. 3163125
2500 E. T C Jester Blvd., Ste. 525
Houston, Texas 77008
Telephone: (713) 864-1941
Facsimile: (713) 864-1942
E-filing: fax@amarolawfirm.com

OF COUNSEL:
R. James Amaro
State Bar No. 24036134
S.D. Tex. Id. 36070
AMARO LAW FIRM
2500 E. T C Jester Blvd., Ste. 525
Houston, Texas 77008
Telephone: (713) 864-1941
Facsimile: (713) 864-1942
E-filing: fax@amarolawfirm.com

ATTORNEYS FOR PLAINTIFFS CHAUMEIKA BUSSEY, INDIVIDUALLY, AND AS NEXT FRIEND OF JB AND AB, MINOR CHILDREN, and W. TIMOTHY WEAVER, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED

**-AND-**

*/s/ Scott C. Greenlee*_______
Scott C. Greenlee
Attorney-in-Charge
State Bar No. 24007270
S.D. Tex. Id. 435236
scott@daxgarzalaw.com
DAX F. GARZA, P.C.
1021 Main Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 522-3000
Facsimile: (713) 522-3001

OF COUNSEL:
Dax F. Garza
State Bar No. 24030514
S.D. Tex. Id. 29404
dax@daxgarzalaw.com
DAX F. GARZA, P.C.
1021 Main Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 522-3000
Facsimile: (713) 522-3001

ATTORNEYS FOR INTERVENORS SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ANYIA BROWN, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED

**-AND-**

*/s/ Byron C. Alfred*
Byron C. Alfred
Attorney-in-Charge
State Bar No. 24084507
S.D. Tex. Id. 2217637
Byron@alfredfirm.com
THE ALFRED FIRM
2211 Norfolk Street, Ste. 803
Houston, Texas 77098
Telephone: (713) 470-9714
Facsimile: (877) 751-7453

ATTORNEYS FOR PLAINTIFF FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO (DECEASED), LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINORS, CYNTHIA RICHARDSON, and

KYLE WILLIAMS

**-AND-**

<u>*/s/ Charles F. Herd, Jr.*</u>
Charles F. Herd, Jr.
Attorney-in-Charge
State Bar No. 09504480
S.D. Tex. Id. No. 2793
Charles.Herd@HerdlawFirm.com
HERD LAW FIRM, PLLC
19500 Tomball Parkway, Suite 250
Houston, Texas 77070
Telephone: (713) 955-3699
Facsimile: (281) 462-5180

OF COUNSEL:
Patrick O'Hara
State Bar No. 24060353
S.D. Tex. Id. No. 930973
service@oharaattorney.com
14550 Torrey Chase Blvd Ste 260
Houston, TX 77014
Telephone: (281) 919-2073

ATTORNEYS FOR PLAINTIFF
ROY ROBINSON

**-AND-**

<u>*/s/ Hamilton G. Rucker*</u>
Hamilton G. Rucker
Attorney-in-Charge
State Bar No. 24067850
S.D. Tex. Id. No. 1128791
hgr@ruckerfirm.com
HAMILTON RUCKER, PC
Heights Mansion
540 Heights Blvd, Suite 112
Houston, Texas 77007

Telephone: (713) 589-2960
Facsimile: (713) 583-3980

ATTORNEYS FOR INTERVENOR KYLE WILLIAMS

OF COUNSEL:
Marcy Hogan Greer
Texas Bar No. 08417650
S.D. Tex. Id. No. 12657
mgreer@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

ATTORNEYS FOR PLAINTIFFS
AND INTERVENORS

## CERTIFICATE OF CONFERENCE

Pursuant to S.D. Loc. R. 7.1(D), I certify that I conferred with the following Attorneys-in-Charge for the Defendants on September 15, 2025:

| | |
|---|---|
| Michael Brem | Defendant Union Carbide |
| Randy E. Moore | Defendant The Dow Chemical Company |
| Kevin Jordan | Defendant Performance Materials, NA, Inc. |
| James M. Kimbell | Defendant Sprint Transport, LLC |
| Karen Bennett | Defendant Mobile Mini Tank and Pump Solutions |

The parties cannot agree about the disposition of this motion to remand.

*/s/Marcy Hogan Greer*
Marcy Hogan Greer

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing instrument has been e-served on all counsel of record in accordance with the Texas Rules of Civil Procedure on this the 16th day of September, 2025.

/s/Marcy Hogan Greer
Marcy Hogan Greer

Exhibit 1

## Timeline to Support Motion to Remand

- Defendants became aware of Plaintiffs' reliance of RCRA standards as early as April 13, 2021 through Plaintiffs' requests regarding multiple governmental agencies, including the United States Environmental Protection Agency, which is given the authority under the Resource Conservation and Recovery Act to control hazardous waste from "the cradle-to-grave".[1]

> 118. Any and all company handbooks, manuals, videos, pamphlets, bulletins, alerts, instructions, policy guidelines, training materials, or any other written documents regarding safety, security, maintenance, monitoring, investigating incidents, and/or registering/recording complaints as it relates to your company and services provided to you from December 28, 2000 to the present from regulatory agencies, including but not limited to those from OSHA, U.S EPA, U.S. Department of Transportation, U.S. Federal Rail Administration, Texas Commission on Environmental Quality, Association of American Railroads.

- Defendants were, again, notified of Plaintiffs' reliance on RCRA standards on May 10, 2022 during the deposition of Elena Labrador, who was employed by Defendant Performance Materials NA, Inc.[2] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was June 10, 2022.

- Defendants were provided further notice of Plaintiffs' reliance on the RCRA standards on September 21, 2023 in Plaintiffs' Expert John Cayias' expert report, which indicated his reliance on the RCRA standards to support his opinions.[3] Defendants' deadline to remove,

[1] *See* Request for Production #118 of **Chaumeika Bussey's First Requests for Production, First Interrogatories, and First Request for Admissions to Defendant Sprint Transport, LLC.**
[2] *See* **Deposition of Elena Labrador** at 43/2-25; 50/23 - 51/5; 63/7-18; and 136/7 - 139/1.
[3] *See* **Excerpts from the Expert Report of Dr. John Cayias**.

albeit an improper basis for removal, based on this notice was October 21, 2023.

> 5. Dow/Union Carbide had a duty and failed to follow EPA requirements under RCRA for the proper characterization of the hazardous waste it created. Dow/Union Carbide failed to identify all of the decomposition products in its hazardous waste, in particular, the 79 ppm of hydrogen sulfide that was generated from their hazardous waste along with the carbon monoxide that it shipped to Performance Materials and, subsequently, to Quala.

> The Environmental Protection Agency ("EPA") under the Resources Conservation and Recovery Act ("RCRA") is given the authority to control hazardous waste from the cradle to the grave (40 CFR parts 260-273). This includes the generation, transportation, treatment, storage, and disposal of hazardous waste. For this reason, in this Incident, Dow, who was the generator of the waste, was responsible for insuring the safe handling and had the ultimate responsibility for the handling of the hazardous waste and its safe disposal.

- Defendants were provided additional notice of Plaintiffs' reliance on the RCRA standards on September 21, 2023 when Plaintiffs provided Plaintiffs' Expert Robert A. Richards' expert report, which indicated his reliance on the RCRA standards to support his opinions.[4] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was October 21, 2023.

- Defendants were evidently aware of Plaintiffs' reliance on the Resource Conservation and Recovery Act and standards when they designated Expert Zdenek Hejzlar to review and analyze the topic of the RCRA as a portion of one of three topics.[5] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was December 13, 2023.

---

[4] *See* **Excerpts from the Expert Report of Robert A Richard.**

[5] *See* **Defendants' Expert Designation**, Dated November 13, 2023.




- Defendants were provided notice of Plaintiffs' reliance on the RCRA and RCRA standards, including the "cradle to grave" language on January 9, 2024 during the deposition of Plaintiffs' Expert John Cayias.[6] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was February 8, 2024.

- Defendants were provided notice of Plaintiffs' reliance on RCRA standards on January 10, 2024 during the deposition of Plaintiffs' Expert Robert A. Richard.[7] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was February 9, 2024.

- Plaintiffs indicated their reliance on RCRA standards, including the "cradle to grave" language, and Dr. Cayias' opinions in that regard on February 26, 2024.[8]

---

[6] *See* **Deposition of John Cayias** at 48/15-20 and 132/22 - 133/18.
[7] *See* **Deposition of Robert A. Richard** at 72/14 - 75/1; 114/14 - 116/7; 122/19-25; 129/1-11; 264/11-15; and 266/11-18.
[8] *See* Intervenors' Reply To Union Carbide Corporation's Response to Intervenors' Motion To Compel Discovery Responses at 2-3.

- Defendants, again, were notified of Plaintiffs' reliance on RCRA standards on July 15, 2025, during the deposition of Defendants' Expert Zdenek Hejzlar.[9] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was August 14 2025.

- Defendants were reminded of Plaintiffs' reliance on RCRA standards on July 22, 2025, during the deposition of Defendants' Expert Jason R. Babcock.[10] Defendants' deadline to remove, albeit an improper basis for removal, based on this notice was August 21 2025.

- Defendants were aware of Plaintiffs' reliance on the Resource Conservation and Recovery Act and standards on July 29, 2025 when Defendants supplemented Defendants' Expert Dr. David Anderson to include that Anderson is expected to "opine as to the regulations applicable to waste disposal companies under RCRA…".[11] This conflicts with Defendants' assertion that they only became aware of Plaintiffs' reliance on RCRA standards on August 15, 2025.

> Dr. Anderson is expected to testify as to the standards and procedures, including OSHA regulations, applicable to confined space entry and training employees for same. He will provide opinions as to the lack of training provided by Quala and the errors made by Plaintiffs and Intervenors on the night in question. He will further opine as to regulations applicable to waste disposal companies under RCRA and any duties PMNAI may have had pursuant to those regulations. Lastly, Dr. Anderson may provide information concerning the air supply and respiratory protection issues at Quala.

- Defendants were aware of Plaintiffs' reliance on the Resource Conservation and Recovery Act and standards on August 4, 2025 when Plaintiffs discussed the RCRA and RCRA standards in the Plaintiffs' Omnibus Response to Defendants Motions for Summary

[9] *See* **Deposition of Zdenek Hejzlar** at 88/20-89/9.
[10] *See* **Deposition of Jason Babcock** at 29/14-18
[11] *See* **Defendants' Supplemental Designation of Dr. David Anderson**, which was produced on July 29, 2025.

Judgment.[12] This, again, conflicts with Defendants' assertion that they only became aware of Plaintiffs' reliance on the RCRA and RCRA standards on August 15, 2025.

## Verification

Pursuant to 28 U.S.C. § 1746, I Byron C. Alfred, declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the records and materials in this file.

I am counsel of record for Plaintiffs FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO (DECEASED), LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINORS, CYNTHIA RICHARDSON, in Cause No. 2020-13324, in the 113th Judicial District Court of Harris County, Texas, which was removed to this Court by the Defendants on August 26, 2025, and assigned Civil Action No. 4:25-cv-004037. In that capacity, I have personal knowledge of the events described above, and they are true and correct.

EXECUTED in Houston, Harris County, State of Texas, on the 15 th day of September, 2025.

Byron C. Alfred

[12] *See* **Plaintiffs' Omnibus Response to Defendants' Motions for Summary Judgment**, filed in the state court action on August 4, 2025.

# Attachment 1-A

CAUSE NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF JB AND AB, MINOR CHILDREN, | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B., a MINOR, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED | § | |
| AND | § | |
| KYLE WILLIAMS | § | |
| Intervenors, | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, STEVEN DODDS, MOBILE MINI TANK AND PUMP SOLUTIONS, INC., UNION CARBIDE CORPORATION, AND THE DOW CHEMICAL COMPANY, | § | |
| *Defendants*. | § | 113TH JUDICIAL DISTRICT |

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION, FIRST INTERROGATORIES, AND FIRST REQUESTS FOR ADMISSIONS TO DEFENDANT SPRINT TRANSPORT, LLC**

TO: Defendant Sprint Transport LLC, by and through its attorney of record, James S. Kimbell, CLARK HILL STRASBURGER, 909 Fannin St. Suite 2300, Houston, Texas 77010-3033.

COMES NOW PLAINTIFF and propounds her First Requests for Production, First Interrogatories, and First Request for Admissions to Defendant Sprint Transport, LLC (hereinafter "Sprint"), in accordance with the Texas Rules of Civil Procedure. Plaintiff requests that Defendants' responses be served on counsel for Plaintiff on or before the expiration of thirty (30) days from the service of said discovery requests pursuant to the Rules.

Respectfully submitted,

**THE AMARO LAW FIRM**

M. Elwell

R. James Amaro
SBN: 24036134
Matthew A. Elwell
SBN: 24082962
2500 E. T C Jester Blvd., Ste. 525
Houston, Texas 77008
713.864.1941 tel.
713.864.1942 fax
E-filing: fax@amarolawfirm.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing instrument has been served on the following counsel of record on **April 13, 2021.**

***Via e-filing Service:***
Mr. David Brenner
dbrenner@bajb.com
Belinda May Arambula
barambula@bajb.com
Burns Anderson Jury & Brenner, L.L.P.
P.O. Box 26300 Austin, Texas 78755
***Attorneys for Defendant, Alpha Technical Services Corporation, LC d/b/a Quala Rail and Specialty and Qualawash Holdings LLC***

***Via e-filing Service:***
Mr. Jay Aldis
jay.aldis@breacewell.com
Mr. Kevin D. Collins
Kevin.collins@bracewell.com
Bracewell LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
***Attorneys for Defendant Steve Dodds***

***Via e-filing Service:***
Mr. Randy E. Moore
The Moore Law Firm
#7 West Way Court, Suite C
Lake Jackson, Texas 77566
rmoore@moore-law.us
***Attorneys for Defendants, Union Carbide Corporation and The Dow Chemical Company***

***Via e-filing Service:***
Michael B. Jolly
michaelbjolly@gmail.com
Hamilton G. Rucker
hgr@ruckerfirm.com
405 Main St., Suite 200
Houston, Texas 77002
***Attorneys for Intervenor Kyle Williams***

***Via e-filing Service:***
Dax F. Garza
Texas Bar No. 24030514
1021 Main Street, Suite 1400
Houston, Texas 77002
(713) 522-3000
(713) 522-3001 Fax
dax@daxgarzalaw.com
***Attorneys for the Shawn Brown Intervenors***

***Via e-filing service:***
Kevin Jordan
Callan Edquist
Jordan, Lynch & Cancienne, PLLC
1980 Post Oak Blvd., Suite 300
Houston, Texas 77056
(713)955.4022
(713)955.9644
kjordan@jlcfirm.com
cedquist@jlcfirm.com
***Attorneys for Performance Materials NA, Inc.***

***Via e-filing Service:***
Byron C. Alfred
Johnny Alfred III
The Alfred Firm
2211 Norfolk Street
Houston, Texas 77098
byron@alfredfirm.com
johnny@alfredfirm.com
***Attorneys for "Sheppard" Plaintiffs***

***Via e-filing Service:***
Anthony T. Simmons
Attorney Anthony T. Simmons, P.C.
2128 Aldine Bender Rd.
Houston, Texas 77032
simmonslaw@me.com
***Attorneys for "Sheppard" Plaintiffs***

M. Elwell
Matthew A. Elwell

## I. INSTRUCTIONS & DEFINITION FOR PLAINTIFF'S REQUESTS FOR PRODUCTION, INTERROGATORIES, AND REQUESTS FOR ADMISSIONS

### A. Instructions

1.1 Answer each request for documents separately by listing the documents and by describing them as defined below. If documents produced in response to this request are numbered for production, in each response provide both the information that identifies the document and the document's number.

1.2 For a document that no longer exists or that cannot be located, identify the document, state how and when it passed out of existence, or when it could no longer be located, and the reasons for the disappearance. Also, identify each person having knowledge about the disposition or loss of the document, and identify any other document evidencing the lost document's existence or any facts about the lost document.

a. When identifying the document, you must state the following:

(1) The nature of the document (*e.g.*, letter, handwritten note).
(2) The title or heading that appears on the document.
(3) The date of the document and the date of each addendum, supplement, or other addition or change.
(4) The identity of the author and of the signer of the document, and of the person on whose behalf or at whose request or direction the document was prepared or delivered.

b. When identifying the person, you must state the following:

(1) The full name.
(2) The present or last known residential address and telephone number.
(3) The present or last known office address and office telephone number.
(4) The present occupation, job title, employer, and employer's address.

1.3 **PRIVILEGE LOG:** Pursuant to Texas Rule of Civil Procedure 193.3, if information or material is being withheld under claims of privilege the party must state in the

response: (1) information or material responsive to the request that has been withheld; (2) the request to which the information or material relates; and (3) the privilege or privileges asserted.

1.4 For each interrogatory answered, please state the person answering the interrogatory and also identify any person providing information on which the answer is based.

1.5 For any requested information about a document that no longer exists or cannot be located, identify the document, state how and when it passed out of existence or when it could no longer be located, and give the reasons for the disappearance. Also, identify each person having knowledge about the disposition or loss, and identify each document evidencing the existence or nonexistence of each document that cannot be located.

## B. Definitions

1.6 The following definitions shall have the following meanings, unless the context requires otherwise:

a. "Plaintiff" or "Defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, means the party, and where applicable, the party's agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with the party or under the party's control, whether directly or indirectly, including any attorney.

b. Unless indicated otherwise, the terms "you" or "your" means you, the Defendant named in this lawsuit and served with the respectively designated discovery, and her/his/its present and former officers, agents, employees, and all other persons acting on behalf of Defendant.

c. "Possession, custody, or control" of an item means that the person either has physical possession of the item or has a right to possession equal or superior to that of the person who has physical possession of the item.

d. "Person" means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

e. "Mobile device" means cellular telephone, satellite telephone, pager, personal digital assistant, handheld computer, electronic rolodex, walkie-talkie, or any combination of these devices.

f. "Subject Incident," "Occurrence," and/or "Incident" refers to the chemical exposure and resulting death of Shawn Jarmail Brown at the Quala Rail & Specialty Facility on December 28, 2019 that forms the basis of this lawsuit.

g. As used herein, the terms "referring to" and "relating to" (or any form thereof) mean constituting, reflecting, respecting, mentioning, describing, pertaining to, connected with, supporting, contradicting, stating, recording, noting, embodying, containing, studying, analyzing, discussing, regarding or evaluating.

h. As used herein, the term "identify" means, when used in reference to a natural person, her or his: (a) full name; (b) home address and telephone number; (c) business address and telephone number; (d) present or last known position, business affiliation and job description; and (e) business position at the time of the transaction covered by the interrogatory answer.

i. The term "document" shall mean all writings and means of communication of any kind, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise. The term "document" shall include without limitation, letters, correspondence, memoranda, notes, diaries, statistics, telegrams, minutes, expert reports, studies, texts, statements, receipts, returns, summaries, pamphlets, books, booklets, periodicals, prospectuses, interoffice and/or intraoffice communications, offers, acceptances, approvals, notations, recordings, transcripts of any sort of conversations, telephone calls, meeting or other communications, bulletins, printed matters, computer printouts, teletypes, telefaxes, invoices, work sheets, counterparts, appointment books, charts, graphs, indices, data sheets, data processing cards, data processing tapes, ledgers, financial statements, notes or memoranda of understandings, agreements, working papers, instructions, checks, financial instruments or statements and documents reflecting financing and any and all drafts, alterations, modifications, changes and amendments of any of the foregoing categories of documents. In addition, the term "document" shall mean graphic or aural records and oral presentations of any kind, including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures, computer tapes, computer diskettes or computer cards and any electronic, mechanical or electric recordings of any kind, including without limitation, tapes, cassettes, films, discs, recordings and transcriptions of any audio, video or other recordings.

j. As used herein, the term "identify," when used in reference to a document, means:

(1) its description (e.g., letter memorandum, report, etc.);
(2) its date (if no date appears on the document, then the date of its preparation);
(3) the number of pages;

(4) its subject matter;
(5) the number and subject matter of attachments, if any;
(6) the identity of its author, signor or any person who participated in the preparation;
(7) the identity of its addressee or recipient;
(8) the identity of each person to whom copies were sent and each person by whom copies were received;
(9) its present location; and
(10) the identity of its custodians. (If any such document was, but is no longer, in your possession or control, state what disposition was made on it and when.)

k. "Subject Tank" or "Subject Truck" shall mean the commercial motor vehicle and its component parts *possibly* owned by Defendant Sprint Transport, LLC as specified herein at the time of the Incident.

l. The term "employee" means, without limitation, any current or former officer, director, executive, manager, supervisor, secretary, staff member, messenger, agent, or other person who is or was employed by, subcontracted by Defendants and/or for whose services/work Defendants paid.

m. The term "government" or "governmental" means or refers to, without limitation, any branch, department, or agency of federal or state government, including, but not limited to, the Occupational Safety and Health Administration ("OSHA"), the Federal Motor Carrier Safety Administration ("FMCSA"), Texas Department of Family and Protective Services ("DFPS"), Texas Child Protective Services ("CPS"), Texas Department of Public Safety ("DPS") together with all current or former officials, directors, staff members, or other persons employed by the government or any such governmental agency or purporting to act on its behalf.

n. "Subject Property" shall mean the Quala Rail & Specialty facility located at 5100 Underwood Road, Pasadena, Texas 77507.

o. The term "file" means any collection or group of documents maintained, held, stored, or used, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, electronic or other devices used for separating and/or organizing documents.

p. The term "communication" means any oral or written communication of which Defendant has knowledge, information, or belief.

1.7 These Definitions and Instructions are incorporated by reference herein and are applicable to each of the discovery requests propounded herewith.

## II. PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANT SPRINT

### GENERAL

1. A copy of each document utilized by you in any way in responding to Plaintiff's First Interrogatories to you.

2. Copies of all reservation of rights letters and/or agreements regarding insurance coverage for the Subject Incident.

3. Copies of all denials of insurance letters regarding insurance coverage for the Subject Incident.

4. A copy of your insurance Claim File for the Incident, excluding any privileged documents.

5. Copies of all documents constituting a reservation of rights agreement, a non-waiver agreement, or any documentation reflecting that anything other than a full and unqualified defense has been tendered to Defendant Sprint or any other Defendant in this action.

6. Copies of all documents constituting any notice letters that have been sent by or on behalf of STEVEN DODDS, WAYNE BUTLER, SHAWN BROWN, ROY ROBINSON, SIDARIEUS LOZANO, AND THADDEUS WILLIAMS, DEFENDANT ATS/QUALA, and Defendant to this litigation, and/or any Plaintiff/claimant/intervenor to this litigation to you or any other person or entity, placing such other person or entity, including insurers, on notice of the Subject Incident.

7. Any and all documents, memos, reports, correspondence, notes, and written impressions contained in the claims file of any liability insurance carrier acting on your behalf relating to the Incident from the date of the collision to the date you anticipated litigation in this matter.

8. Any and all correspondence, emails, or letters to or from any liability insurance carrier relating to the Incident, including but limited to reservation of rights or correspondence denying insurance coverage.

9. If you, your agents, workers, managers, supervisors, or employees provided any written or orally recorded statement to any insurance company regarding the Incident, produce copies of any all statements.

10. Copies of each and every insurance policy and/or indemnity agreement, including any and all umbrella or excess insurance policy(ies), which may be required to satisfy all or part of a judgment rendered against you in this action.

11. The indemnity agreement between you and any other third-party relating to this lawsuit.

12. Any and all correspondence, including emails, between 1) you and your representatives,

agents, insurance adjusters, attorneys and 2) any third party, their employees, agents, representatives, attorneys, and/or insurance adjusters regarding or pertaining in any way to the Incident, the parties, and/or the indemnity arrangement between the parties. *This is a request for communications with third parties by you and/or your agents.*

13. Documents which evidence the date you anticipated litigation.

**EMPLOYEES**

14. The complete and unaltered *personnel* file of each employee you have identified in any of your responses to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones.

15. The complete and unaltered *employment*-related file of each employee you have identified in any of your responses to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones.

16. All writings containing the results of any drug and/or alcohol test that was administered to anyone you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones as a result of (at any time), in connection with (at any time), and/or within twenty-four (24) hours after the Subject Incident.

17. Rommel Sevilla and Edwin Martinez's complete and unaltered driver qualification file, 49 CFR 391.51, which should include, pursuant to statute, but not be limited to:

    a. Employee's application;

    b. List of his previous employers for the ten (10) years preceding the date of application;

    c. The reasons for leaving said employments;

    d. Medical examiner's certificate;

    e. A note showing when and who reviewed the driver's record with him/her for each year of employment, 49 § CFR 391.25;

    f. A list of certificates showing all violations of motor vehicle laws and ordinances, 49 § CFR 391.27;

    g. Responses from state agencies, private companies, and employers to your inquiries about his employment and driving records, see 49 § CFR 391.23;

    h. Certificate of road test, 49 CFR § 391.31(e);

i. Records of drug and alcohol tests;

j. An accident register listing all DOT recordable preventable accidents, to include the folder in which it is contained together with all writing contained thereon;

k. A copy of his road test results and certificate, 49 CFR § 391.31 and 391.33, and 391.11(b)(8);

l. Any documents showing he signed for any copy of the Federal Motor Carrier Safety Regulations, Company handbook, or company safety manual prior to the collision; and

m. Color copies of all pages of the actual folder which contains the driver's qualification file.

18. Copies of signed receipts for any materials, brochures, books, policies, standards, safety matters, or other written material provided by you to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones.

19. Any and all documents which were signed by any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones during his/her employment with you regarding employee safety, training, and/or applications for employment.

20. Copies of the payroll information for any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones for the six (6) months prior and the two (2) months subsequent to the Subject Incident and his/her pay check for the time period covering the date of the Subject Incident.

21. Copies of all documents or materials of any kind received from any person or company, or generated by you or your agents, relative to the performance, appraisals, criticisms, reprimands, infractions, or company violations in the last 7 years up to the date of trial committed by any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones.

22. All documents you have received from any other party (besides this Plaintiff) to this litigation.

23. Produce copies of any documentation evidencing the completion, non-completion or failure of any training programs, orientation programs, safe programs or tests taken by any

of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones in your possession.

24. All certificates, diplomas, correspondence, writings, and/or documents regarding any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones's attendance at any safety class, seminar, training, course, or seminar in the three (3) years prior to the Subject Incident.

25. All documents setting forth the relationship between you and any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones. This includes, but is not limited to all agreements, employment contracts, and/or independent contractor agreements and other contracts, agreements, memorandum and the like.

26. A copy of all documents comprising all billing records for all radios, or hand-held phones, portable or cellular phones or communication devices owned by, given to or entrusted to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones, for use in connection with their employment with you, for the period beginning one month before the Subject Incident and ending one month after the Subject Incident.

27. Please produce any and all documentation, including detailed billing reports, in connection with any cellular telephones, car telephones and/or Nextel hand-held radios used by any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones between one month before the Subject Incident and ending one month after the Subject Incident.

28. All documents that relate in any way to your orientation or on-boarding process.

29. Any and all documentation showing any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones attended employee safety training for you and the training materials, tests, and test results for the same.

30. Any and all tests administered to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones by you pertaining to their job duties and/or performance and the results of such tests at any time while they were employed by you.

31. Any and all training notes, certificates and attendance lists relative to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones, regardless of the date issued or the originator of such certificates.

32. All documents of any kind that relate to any action (formal or informal) by any supervisor or manager or anyone working by or on behalf of you directed to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones for the purpose of teaching, counseling, disciplining, correcting or otherwise managing in any way relating to their work.

33. All correspondence and other communications of any kind between you and any third-party relating to the Subject Incident.

34. All correspondence and other communications of any kind related to this incident, the tanker trailer, the alleged substance(s) or residues inside the tanker trailer (whether before or after the incident), the workers involved in the incident, your response to the Subject Incident, work orders related to this incident, safety data sheet(s), hazardous waste manifest(s), between you and any of your workers/employees or between you and any other Defendant in this case.

35. Copies of all safety and log audits of Rommel Sevilla and Edwin Martinez for the year of the Subject Incident and the year prior.

36. Copies of the safety and log audits for the incident/trip in question.

37. A copy of all trip reports for the trip Rommel Sevilla and Edwin Martinez was on at the time of the Subject Incident.

38. A copy of the front and back of Rommel Sevilla and Edwin Martinez's commercial driver's licenses at the time of the Subject Incident.

39. All writings giving notification to you of Rommel Sevilla and Edwin Martinez's convictions or suspensions for violating a state or local law. 49 CFR § 383.31.

40. All writings containing the results of any drug and/or alcohol test that was administered to Rommel Sevilla and Edwin Martinez as a result of (at any time), in connection with (at any time), and/or within twenty-four (24) hours after the Subject Incident. 49 CFR § 382.303.

## LOAD

41. All documents that relate, refer and/or discuss in any way the load Rommel Sevilla and Edwin Martinez hauled at the time of the Subject Incident, including, by way of example and without limitation, all manifests, bills of lading, weight receipts, dispatch documents,

content summaries, and documents that address the contents, ownership, pick-up, detainment, and delivery of the load.

42. Any and all trip and/or operational documents pertaining to the movement of cargo by Rommel Sevilla and Edwin Martinez for the trip during which the Incident occurred.

## INVESTIGATION AND FACTS

43. Copies of all photographs, still or motion pictures, plans, drawings, blueprints, sketches, diagrams, computer simulations, or any other demonstrative evidence or visual reproductions in your possession or control concerning the Subject Incident, the accident scene, the tanker trailer, the area involved, the subjects/persons involved, the parties, the injuries alleged by any party, or any issue relevant to this lawsuit.

44. Any and all unaltered photographs, slides, videotapes, motion pictures, and/or other photographic medium taken of the Incident, the tanker trailer, the parties involved in the Incident, witnesses to the Incident, or the scene of the Incident from the date the Incident occurred through the present. This request includes true and complete copies of all surveillance reports, investigative notes, photographs, movies, and/or videotapes taken during any investigation of the Incident or surveillance of Plaintiff(s) at any time prior to the trial of this case.

45. Copies of all accident or incident reports, other than the police report, involving the Subject Incident.

46. A copy of all correspondence and other communications (including e-mail) that you have had with any person other than your lawyer that in any way involves the Subject Incident.

47. All documents you have produced to or received from OSHA as a result of this incident.

48. Copies of all witness statements obtained from any person about any information relevant to any issue in this lawsuit, including, but not limited to, the issue of liability or damages.

49. Copies of all e-mails or electronic correspondence between any of the Defendants and any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones for the seven (7) days prior to the Subject Incident, the day of the Subject Incident, and the day after the Subject Incident.

50. A copy of each non-privileged memorandum, letter, document, e-mail, or report sent by you to any person or entity regarding the Subject Incident.

51. Transcripts or recordings of all depositions given by you and through your employees, representatives, officers, or agents including but not limited to your company, in any other claim or lawsuit in the last three years, as a party, expert witness, fact witness, or a non-party involving company safety policies and/or training, supervision, retention, or safety.

52. Any reports, notes, correspondences, records or other documents or items whatsoever made by or within the control or possession of any detective, investigator, etc., having anything whatsoever to do with this Subject Incident, the damages, the injuries, or any aspect of this lawsuit whatsoever.

53. All tapes and transcripts of conversations, interviews, statements, etc., of any witness, party, or any other entity or person whatsoever regarding any aspect of the Subject Incident, the events leading up to the incident, the injuries or damages resulting therefrom, or this lawsuit, to include statements from any person who arrived shortly after the Subject Incident, or who may have knowledge of facts concerning the Subject Incident; or whom you expect to call as an expert witness at trial.

54. If an Accident Review Board or similar entity, whether internal or externally commissioned, reviewed the Subject Incident, produce the following:

   a. A copy of all documents (as defined) and other materials of any kind reviewed by said board or entity;

   b. A copy of all reports and documents (as defined) of any kind produced by said board or entity;

   c. Documents evidencing who was on the board;

   d. Documents evidencing all criteria for review; and

   e. Determination of preventability and all other conclusions reached by said board or entity.

## SUBJECT INCIDENT

55. Copies of all documents in your possession, custody and/or control relating in any way to the Subject Incident.

56. Copies of all documents sent by you to any person or entity (other than your attorney(s)), regarding the Subject Incident and/or describing the Subject Incident.

57. A copy of every document related to any investigation done by or on behalf of you of the scene of the Subject Incident or the tanker trailer.

58. All documents that set forth any facts leading up to the Subject Incident.

59. All documents that explain what caused the Subject Incident.

60. All documents assessing preventability of and/or fault for the Subject Incident.

61. A copy of all correspondence and other communications (including e-mail) that you have had with any person other than your lawyer involving the Subject Incident.

62. All tapes and/or transcripts of conversations, interviews, statements, etc. of any witness, party or any other entity whatsoever regarding any aspect of the Subject Incident, the injuries or damages resulting therefrom, or this lawsuit.

63. Any and all written or recorded statements, reports, or memoranda regarding the Subject Incident.

64. Copies of all photographs, video, computer simulations, and any other image depicting:

  a. Any person involved in the Subject Incident;

  b. Your or any other person's response to the Subject Incident;

  c. The scene of the Subject Incident; and/or

  d. Any evidence relevant to the Subject Incident.

65. Copies of all reports relating to the subject incident in your possession custody and/or control.

## SAFETY

66. A copy of all company manuals covering safety, maintenance, employee safety, safety programs, and employee standards, handbooks, in effect on the date of the Subject Incident.

67. Copies of any company manuals covering safety, maintenance, employee safety, safety programs, and employee standards, handbooks, provided to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones prior to the date of the Subject Incident, if different than what was in effect at the time of the Subject Incident.

68. A copy of all of your policies, procedures, internal operating procedures, directives, instructions, guidelines and other compilations of corporate policies and procedures that were in effect at the time of the Subject Incident that relate in any way to the following subjects:

  a. Safety;

  b. Hazard recognition;

  c. Compliance with the Governmental, State, and/or Federal Regulations;

d. Accident investigation;

e. Accident review boards;

f. Determination of preventability of accidents; and

g. Hiring, training and supervising employees.

69. If any of the policies, procedures, internal operating procedures, directives, instructions, guidelines and other compilations of corporate policies and procedures addressing the areas listed in the above request have been modified or changed in any way since the Subject Incident, provide a copy of all changes.

70. If any of the policies, procedures, internal operating procedures, directives, instructions, guidelines and other compilations of corporate policies and procedures addressing the areas listed in the above request had been modified or changed in any way in the two (2) years before the Subject Incident, provide a copy of all changes.

71. A copy of the index of the policies and procedure manual, internal operating procedures, or other compilation of corporate policies and procedures to specifically include the positions of safety director, safety committee, risk manager, and risk management committee, effective on the date of the Subject Incident.

72. A complete copy of, or in the alternative, access to, each safety training film, video, videotape, videocassette, audio cassette, computer program, simulator, diagnostic record or test, maintained by your company, or used by your company its personnel, agents, or employees during the year of the Subject Incident and three (3) years prior.

73. A copy of all articles, texts, or other documents or pages of documents or writings you prepared, contributed to, used, adopted, read, or relied upon, relevant to the your position or opinion on issues pertaining to industry standards on safety, regulations and compliance and non-compliance therewith.

74. A copy of all articles, texts, or other documents or pages of documents or writings you prepared, contributed to, used, adopted, read, or relied upon, that support your position or opinion on any issue pertaining to liability or causation in this matter.

75. A copy of all articles, texts, other documents or pages of documents, or writings, you prepared, contributed to, used, adopted, read, or relied upon, relating to qualification, testing, and retention of employees or workers.

76. A copy of all materials obtained by you, by and through its employees, representatives, officers, or agents, including but not limited to your company, at any safety seminar or continuing education course in the five (5) years prior to the day of the Subject Incident.

77. All certificates, writings, documents, invoices, decals, and membership cards that certify

or attest that you are and/or have been a member of any safety organization in the last ten (10) years. You may provide a list of each such organization and dates of membership in lieu of providing the requested documents.

78. All of your officers, executives, or administrator's notices, directives, bulletins, publications, or manuals, or other written instructions concerning day to day operating and safety procedures to be followed by their personnel managers, supervisors, and employees, including all versions of any document(s) relative to disciplinary policies or procedures regarding safety, maintenance, or failure to comply with industry standards in existence and effective at the company from five (5) years before the Subject Incident through the present.

79. All company newsletters for the five (5) years prior to the Subject Incident, to specifically include any newsletter or publication involving safety.

80. Copies of all handbooks and manuals provided to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones by you at any time.

81. Copies of all policies, procedures, rules, guidelines, directives, and instructions ever given to any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones by you.

82. A copy of your document retention policy, including its document retention policy.

## COMPANY

83. Copies of the organizational charts and lists identifying the divisions and management structure for you, your subsidiaries, parents, or affiliates of the year of the Subject Incident and two (2) years prior.

84. Copies of all documents relating to any arrest, indictment, deferral, or criminal conviction against any of your workers/employees you have identified in response to any request for disclosure in this litigation as well as Rommel Sevilla, Edwin Martinez, Cody Howard, Edgardo Fajardo, Matt McFerren, and Megan Jones and his/her direct supervisor for the ten years prior to the Subject Incident to the present.

## TRIP IN QUESTION

85. COLOR COPIES of front and back of all of Rommel Sevilla and Edwin Martinez driver's logs (i.e., records of duty status), whether kept officially or unofficially, for six (6) months prior to the collision and thirty (30) days after the collision. 49 CFR § 395. If copies are produced, Plaintiff requests color copies, reserving the right to request originals.

86. A copy of all lease and trip lease contracts between you and the truck/trailer owner and operator involved in the Subject Incident.

87. Copies of any contract under which your company was operating the truck in question at the time of the Subject Incident.

88. Copies of all bills of lading for truck involved in the Subject Incident for the seven days prior to the Subject Incident, the day of the Subject Incident, and the day after the Subject Incident.

## EXPERTS

89. With respect to each expert witness who may provide testimony at the trial of this case, provide:

    a. A copy of all documents (as that term is defined above) and items of any kind produced **to** said expert;

    b. A copy of all documents (as that term is defined above) and items of any kind generated or produced **by** said expert;

    c. A copy of the entire file of said expert;

    d. A current résumé or curriculum vitae for said expert; and

    e. All billing records and work logs for said expert.

## LITIGATION

90. Any and all documents, including but not limited to purchase orders, invoices, estimates, instructions, bids, or receipts, relating to the tanker trailer and the chemical(s) and/or residue therein.

91. Any documents relating to daily toolbox meetings, JSAs, work order warnings, and/or permit procedures relating to the tanker trailer, the chemical(s), gases, or residue contained therein, and hazardous waste manifest(s).

92. Any and all documents not yet produced relating to the MSA meter entries, atmospheric testing results, SAF 003A, and confined-space-entry permits relating to the tanker trailer and/or this Subject Incident.

93. Produce all documents in your possession related to the MSDS for the Subject Tank/Truck as well as all documents related to the information forming the basis for the fulfillment or completion of the MSDS document related to the Subject Incident.

94. A copy of any and all materials which support any contention that the Subject Incident was

the fault of anyone other than you.

95. COLOR copies of all exhibits, diagrams, graphs, illustrations, photographs, charts, pictures, models, blow-ups, or any other document or thing, including electronically created charts, animations, or data that you intend to utilize as an exhibit, demonstrative exhibit, or aid in the trial of this case not previously supplied.

96. Please produce for copying, photographing and/or inspection all physical evidence that you have preserved arising from the Incident.

97. All scientific tests, experiments or demonstrations which you either intend to place into evidence at the trial of this cause or demonstrate to the court or jury, irrespective of whether you intend to introduce same into evidence.

98. Copies of any medical, educational, employment, and all other records which have been obtained by you or your counsel regarding Plaintiff(s).

99. All reports, publications and/or other documents evidencing any safety standards, laws, regulations, ordinances, or industry standards that you contend or will contend at trial that your company and employees have complied with, or that Plaintiff(s) failed to comply with.

100. Produce all books, documents and/or other tangible things which prove support, or may constitute evidence of any facts or circumstances upon which you base the defenses and allegations in your Answer, or referred to in your responses to any of the foregoing Interrogatories.

101. Produce any document or thing which you contend is evidence, proof, or support of your claims on any issue of negligence or causation as to the Subject Incident, including but not limited to admissions of fault, engineering analysis, scientific tests, and official or unofficial reports.

**MISCELLANEOUS**

102. Produce any document or thing that you contend evidences or supports your denial of any of Plaintiff's Requests for Admissions.

103. Any and all records obtained by you pertaining to Plaintiff.

104. Any and all e-mails, electronic messages, letters, memos, or other documents concerning the Subject Incident created by anyone. This request specifically excludes communications between you and your attorney.

105. Any and all computer, electronic, or e-mail messages related to the Subject Incident created in the first forty-eight (48) hours immediately after the Subject Incident by and between you and any other third-party, including but not limited to the communications made to

law enforcement on the date of the Incident.

106. Any and all social media posts, including all text, video, or photographic posts regarding the Subject Incident made by or on behalf of any party and/or that party's agents, employees, or servants. This request includes your social media posts.

107. Any and all social media posts, including all text, video, or photographic posts regarding the Incident in your possession made by or on behalf of any third-party, including, but not limited to, any media outlet, law enforcement department or officer, private investigator, or insurance adjuster.

108. Please produce a color copy of all news articles that you obtained regarding the Incident.

109. Please produce a copy of all 911 tapes, dashcams, body cams, transcripts, and/or call logs pertaining to the Incident.

110. The entry permit for the Subject Tank/Truck in which Mr. Brown died.

111. The Material Safety and Data Sheet ("MSDS") for the Subject Tank/Truck in which Mr. Brown died.

112. Any and all downloads, prints, testing results from any chemical or atmospheric testing monitors on the date of the Subject Incident.

113. Produce true and correct copies of any and all agreements, contracts, and other documents (with exhibits and attachments) which form the basis of the relationship between you and any other named defendant or designated responsible third party in place on the date of the Subject Incident and for the five (5) years prior to the date of the incident through the time of trial in this matter.

114. Any and all reports prepared or created by any governmental agency, potential party, or third party relating to the Subject Incident.

115. Any and all documents, correspondence, and/or emails exchanged between you and any municipal, county, state, or federal government agency, including but not limited to OSHA, that relates to the Subject Incident.

116. Any and all documents, manuals, guidelines, books, handbooks, safety meetings, "tool box talks," procedures, policies, and/or safety bulletins relating to or pertaining to cleaning of tanks, including the Subject Tank/Truck, for the five (5) years prior to the Subject Incident through the time of trial.

117. Produce true and correct copies of any emails, letters, or other correspondences between you and any private investigator in relation to the Subject Incident.

118. Any and all company handbooks, manuals, videos, pamphlets, bulletins, alerts, instructions, policy guidelines, training materials, or any other written documents regarding safety, security, maintenance, monitoring, investigating incidents, and/or registering/recording complaints as it relates to your company and services provided to you from December 28, 2000 to the present from regulatory agencies, including but not limited to those from OSHA, U.S EPA, U.S. Department of Transportation, U.S. Federal Rail Administration, Texas Commission on Environmental Quality, Association of American Railroads.

119. Any and all company handbooks, manuals, videos, pamphlets, bulletins, alerts, instructions, policy guidelines, training materials, or any other written documents regarding safety, security, maintenance, monitoring, investigating incidents, and/or registering/recording complaints as it relates to your company and services provided to you from December 28, 2000 to the present from any associations, trade groups, or organizations, including but not limited to JJ Keller, National Tank Truck Carriers, Houston Transportation Professional Association, Transportation Club of America, Texas Association of Environmental Professionals, Institute of Hazardous Materials Management, Association of Chemical Industries of Texas, Air & Waste Management Association, Association of Bayport Companies, Houston Area Contractors Safety Council, National Industrial Transportation League, the Sulfur Institute, or Bay Area Community Advisory Panel (BAYCAP).

120. The complete and unaltered personnel file of each employee who was responsible for delivering the Subject Tank to the Subject Property on the day of the Subject Incident.

121. If you had a written policy that was in effect on the date of the Subject Incident instructing your employees, agents, and/or servants on how to warn individuals of the hazards and/or dangers of chemical exposure and/or confined space work, please produce the policy.

122. If you had a written policy that was in effect on the date of the Subject Incident instructing your employees, agents, and/or servants on how to report the existence of hazards in the Subject Tank, please produce the policy.

123. Your Mission Statement.

124. If you contend that that the death of Shawn Jarmail Brown was caused in whole or in part to any other pre-existing injury, incident, or through his own contributing acts of negligence, please produce all documents in your possession that support this contention.

125. Any and all documents indicating ownership of the Subject Tank.

126. Any and all contracts concerning the maintenance, cleaning, operation on, and/or handling of tanker trucks, including the Subject Tank/Truck on the Subject Property.

127. If you contend any other named Defendant is responsible for the Subject Incident, produce any and all supporting documentation and/or materials.

## III. PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANTS SPRINT

1. Identify (name, job title, driver's license number, job description, address, telephone number) all persons who prepared or in any way assisted in preparing the answers to these interrogatories and your responses to requests for disclosure and requests for production.

2. Please identify by name, complete address, and phone number each and every person known to you or your attorneys who either witnessed or claimed to have witnessed the Subject Incident, claims to have knowledge of how the Subject Incident occurred, and/or claims to have information related to the cause of the Subject Incident. Please also state whether such individuals are employed by you, if they were, in fact, employed by you. For each such individual, identify his or her job title and job or function which was being performed at the time of the Subject Incident and whether they are still employed by you.

3. At the time of the Subject Incident, do you contend that any person or entity other than you, should have provided supervision, training, equipment, instrumentalities, and/or guidance to the persons involved in the Subject Incident, including Shawn Jarmail Brown, and, if so, state each and every fact upon which you base the contention and identify the proper name of the owner(s) or entity(s) and provide their address and phone number.

4. Identify and set out each and every warning protocol and/or procedure followed by you and your employees, agents, contractors, and/or representatives, which served the purpose of warning persons, including Shawn Jarmail Brown, about the dangers of chemical exposure or providing a safe working environment at the Subject Property. In your response, please state the name, address, and phone number of each person who gave the warning.

5. Identify the name, address and telephone numbers of any individual(s) who served as your supervisor charged, empowered and/or entrusted with making decisions regarding the tanker trailer and/or any chemical(s), substance(s), and/or residues therein. Please specifically identify each job responsibility as it correlates to each individual person responsive to this request.

6. Please identify all safety measures taken by you to monitor work, employee activity, handling of chemicals/hazardous waste, and confined space work related to the Subject Incident.

7. Please identify all safety measures taken by you to monitor work, employee activity, handling of chemicals/hazardous waste, and confined space work after the date of the Subject Incident.

8. Prior to the Subject Incident, did you provide any warning to employees of the Subject Property that there were any dangerous conditions on the premises associated with cleaning tanker trucks, including the Subject Tank? If your answer is "yes", then provide the exact

warning(s) given, the name(s) of the individual(s) that gave the warnings, and the method by which such warning(s) was given (i.e., posted signage, verbal, written memo). If your answer is "no" please state why no such warning(s) was given. In your answer, please set forth and describe fully the wording of any prior warnings you provided employees of the Subject Property about any potential hazards you knew about prior to the Subject Incident and the manner or method you used to communicate that warning.

9. Identify each person who gave notice, who complained, or who made a claim against you and/or your associated entities with respect to chemical exposure at the Subject Property, other properties, or other tanker trailers related to the transport, removal, or storage of chemicals within the five (5) year period immediately preceding the Subject Incident to the date of trial in this matter.

10. Describe in detail any changes that have been made by any named Defendant to the Subject Property since the date of the Subject Incident including, but not limited to, standard operating procedures, hiring of new personnel, implementation of new safety procedures, alterations to the bay areas, signage addition(s) to the Subject Property, safety addition(s) to the Subject Property, and communications with any party or third party with respect to changing their activity.

11. If, following the Subject Incident, an investigation was made by you or on your behalf concerning the circumstances of the Subject Incident, please state the name and address of each person who made such an investigation, whether a written report of the investigation was furnished to the you or any other party, and the substance of any written report(s) of the investigation. This request excludes any and all communications by and between you and your attorney(s).

12. Please identify the person(s) or entity that was responsible for completing and/or inspecting the MSDS for the Subject Tank/Truck, including their last known address, phone number, and whether or not they are currently employed by you.

13. Please explain what the person(s) or entity that was responsible for completing and/or inspecting the MSDS for the Subject Tank/Truck was required or supposed to do in doing this task.

14. Please explain in detail The Dow Chemical Company's involvement, job, role, responsibility, and/or duty as it relates to the ownership of the chemical(s), storage of chemical(s), sale of chemical(s), transport of chemical(s), and/or cleaning of the tanker trailer and how this company's involvement relates to the Subject Incident.

15. Please explain in detail Union Carbide Corporation's involvement, job, role, responsibility, and/or duty as it relates to the ownership of the chemical(s), storage of chemical(s), sale of chemical(s), transport of chemical(s), and/or cleaning of the tanker trailer and how this company's involvement relates to the Subject Incident.

16. Please explain in detail Performance Materials' involvement, job, role, responsibility, and/or duty as it relates to the ownership of the chemical(s), storage of chemical(s), sale of chemical(s), transport of chemical(s), and/or cleaning of the tanker trailer and how this company's involvement relates to the Subject Incident.

17. Please explain in detail Sprint Transport's involvement, job, role, responsibility, and/or duty as it relates to the ownership of the chemical(s), storage of chemical(s), sale of chemical(s), transport of chemical(s), and/or cleaning of the tanker trailer and how this company's involvement relates to the Subject Incident.

18. Please explain in detail ATS/Quala Rail & Specialty's involvement, job, role, responsibility, and/or duty as it relates to the ownership of the chemical(s), storage of chemical(s), sale of chemical(s), transport of chemical(s), and/or cleaning of the tanker trailer and how this company's involvement relates to the Subject Incident.

19. Identify and describe in detail the process/method you, one of your affiliates or subsidiaries, workers, or any employee/worker of any other Defendant or third party used to remove the chemical(s) and/or substance(s) from the tanker trailer prior to the attempted cleaning of the tanker trailer.

## IV. PLAINTIFF'S REQUESTS FOR ADMISSIONS TO DEFENDANTS DOW, UNION CARBIDE, AND PERFORMANCE MATERIALS

1. Admit that you have been sued in your proper name.

2. Admit that you have been sued in your proper capacity.

3. Admit that Plaintiff has satisfied all conditions precedent to bring this suit against you.

4. Admit that Plaintiff's claims are not barred by the statute of limitations.

5. Admit that you had knowledge of the risk of chemical exposure to workers working in confined spaces.

6. Admit that you had knowledge of the risk of harm of chemical exposure to workers working in confined spaces.

7. Admit that you owned the chemical(s) formerly located inside the tanker trailer prior to the Subject Incident.

8. Admit that you transported the chemical(s) formerly located inside the tanker trailer prior to the Subject Incident.

9. Admit that you possessed the chemical(s) formerly located inside the tanker trailer prior to the Subject Incident.

10. Admit that you owned the chemical(s) formerly located inside the tanker trailer prior to the Subject Incident.

11. Admit that you removed the chemical(s) formerly located inside the tanker trailer prior to the Subject Incident.

12. Admit that you completed the MSDS for the Subject Tank/Truck.

13. Admit that you inspected the MSDS for the Subject Tank/Truck.

14. Admit that the MSDS did not identify all of the chemicals and/or residue contained in the Subject Tank/Truck.

15. Admit that Shawn Jarmail Brown was not responsible for the Subject Incident.

16. Admit that Sidarieub Lozano was not responsible for the Subject Incident.

17. Admit that, as a result of the Subject Incident, Shawn Jarmail Brown died.

18. Admit that the Subject Incident was proximately caused by your negligent acts or omissions.

# Attachment 1-B

CAUSE NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN | § | IN THE DISTRICT COURT OF |
| Plaintiffs | § | |
| SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED | § | |
| Intervening Plaintiffs, | § | |
| KYLE WILLIAMS | § | |
| Intervening Plaintiff, | § | |
| AND | § | HARRIS COUNTY, T E X A S |
| FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NET FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, CYNTHIA RICHARDSON AND ROY ROBINSON | § | |
| Plaintiffs, | § | |



| | | |
|---|---|---|
| VS. | § | |
| ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, QW HOLDING CORPORATION, STEVEN DODDS, UNION CARBIDE CORPORATION, THE DOW CHEMICAL COMPANY, SPRINT TRANSPORT, LLC, PERFORMANCE MATERIALS NA, INC., AND MOBILE MINI TANK AND PUMP SOLUTIONS, INC. | § | |
| Defendants | § | 113TH JUDICIAL DISTRICT |

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
ELENA LABRADOR
MAY 10, 2022

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF ELENA LABRADOR, produced as a witness at the instance of the Intervening Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on Tuesday, May 10, 2022, from 2:48 p.m. to 7:16 p.m., before Joanna Sagastisado, CSR in and for the State of Texas, reported by computerized stenotype machine in Houston, Texas 77069, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record herein and the current emergency order regarding the COVID-19 state disaster.



A P P E A R A N C E S

FOR ROY ROBINSON:
Mr. Brandon C. Francis
HERD LAW FIRM, PLLC
19500 Tomball Parkway
Suite 250
Houston, Texas 77070
brandon.francis@herdlawfirm.com

FOR THE PLAINTIFFS:
Mr. Matthew A. Elwell
Mr. Zane Aubert
Mr. Caleb McVicker
THE AMARO LAW FIRM
2500 E. TC Jester Boulevard
Suite 525
Houston, Texas 77008
Phone: (713) 352-7975
Fax: (713) 864-1942

FOR QUALAWASH HOLDINGS, LLC:
Mr. David Brenner
BURNS ANDERSON JURY & BRENNER, L.L.P.
P.O. Box 26300
Austin, Texas 78755
Phone: (512) 338-5322
Fax: (512) 338-5363
dbrenner@bajb.com

FOR MOBILE MINI TANK:
Ms. Karen Bennet
Ms. Jennifer Wright Schick
GERMER PLLC
550 Fannin
Suite 400
Beaumont, Texas 77701
Phone: (409) 654-6700
Fax: (409) 835-2115



APPEARANCES

FOR UNION CARBIDE CORPORATION:
Ms. Laura Friedl Jones
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place - South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Phone: (713) 221-2529
Fax: (713) 221-2525
ljones@sdablaw.com

FOR PERFORMANCE MATERIALS NA, INC.:
Mr. Callan Edquist
JORDAN, LYNCH CANCIENNE PLLC
1980 Post Oak Boulevard
Suite 2300
Houston, Texas 77056
Phone: (713) 955-4792
cedquist@jlcfirm.com

FOR PLAINTIFFS:
Mr. Byron C. Alfred
Ms. Kai Henderson
THE ALFRED FIRM
2211 Norfolk Street
Suite 803
Houston, Texas 77098
Phone: (713) 470-9714

FOR STEVEN DODDS:
Mr. Kevin D. Collins
BRACEWELL LLP
711 Louisiana Street
Suite 2300
Houston, Texas 77002

Mr. James M. Kimbell
CLARK HILL STRASBURGER
909 Fannin
Suite 2300
Houston, Texas 77010



§

## A P P E A R A N C E S

ALSO PRESENT:
Mike Jolly

THE VIDEOGRAPHER:
Kayla Brown



## I N D E X

PAGE

Stipulations ................................ 1/2
Appearances ................................. 3-5

Testimony of ELENA LABRADOR

Examination by Mr. Aubert..................... 8
Examination by Mr. Elwell..................... 106
Further Examination by Mr. Aubert............ 142

Changes and Signature..................... 156/157

Reporter's Certificate.................... 158/159

## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail from Elena Labrador - 4/11/2019 - WPN 123741 Approval at SRO | 31 |
| Exhibit 2 | Waste Authorization Signatures | 37 |
| Exhibit 3 | Waste Characterization Form | 46 |
| Exhibit 4 | Waste Characterization Form - 4/11/2022 | 47 |
| Exhibit 5 | Waste Verification Sampling Waiver | 49 |
| Exhibit 6 | Waste Acceptance Screening Form | 52 |
| Exhibit 7 | Site Environmental Services Laboratory "Fingerprint Sample Record - 98094 Sample Worksheet | 61 |
| Exhibit 8 | Difficult to Analyze Form | 65 |
| Exhibit 9 | E-mail from Elena Labrador - 9/18/2019 - WPN-123741 Shipping Temperature | 72 |
| Exhibit 10 | E-mail from Elena Labrador - 11/5/2019 - WPN-123741 Shipping Temperature | 87 |




## EXHIBITS CONTINUED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Waste Authorization Signatures | 97 |
| Exhibit 12 | Site Environmental Services Liquid Trailer/Dumpster Unloading Communication Form | 99 |
| Exhibit 13 | Safety Data Sheet | 108 |
| Exhibit 14 | Waste Characterization | 108 |
| Exhibit 15 | Waste Characterization | 108 |
| Exhibit 16 | Process Design | 108 |




## P R O C E E D I N G S

THE VIDEOGRAPHER: The time is 2:48 p.m.; we're on the record.

THE COURT REPORTER: Okay. I'll do my introduction.

My name is Joanna Sagastisado, Texas CSR 9153. I am reporting the deposition remotely by stenographic means from Houston, Texas. And The witness is also located in Houston, Texas.

ELENA LABRADOR,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. AUBERT:

**Q. Can you please state your full name for the record?**

A. First name's Elena, middle name is Quilatan, Q-U-I-L-A-T-A-N, last name is Labrador.

**Q. Ms. Labrador, my name is Zane Aubert. I represent the intervening Brown plaintiffs. They're the sons and daughters of one of the deceased in the incident we're here to talk about. You kind of understand who I represent?**

A. Yes. Could you speak up a little bit though, please?

**Q. Yeah, no problem. And going forward, if you**

**could get out of a pump at a gas station or is it different?**

A. If I remember correctly, there are different types or grades of diesel. And this particular case, I'd have to check with our operations group if it's the same diesel that you can get straight out of the gas station.

**Q. Would you have a -- some sort of chemical breakdown for the diesel you use at the Performance Materials plant?**

A. Not a separate one. We have a generic, you know, diesel -- like, hydrocarbons and gasoline being part of that, diesel being part of that. There's general -- it's not really one chemical; gasoline it's a mix, diesel is a mix. So we -- well, we would go with the generic description of diesel in this case. And the description would be a certain ranges of molecules -- carbon -- hydrocarbon molecules. But it would generic; it's not specific to Performance Materials.

**Q. And what is the allowable temperature range?**

A. If the generator writes --

MR. EDQUIST: Objection; form.

THE WITNESS: Sorry? Oh, form. Okay.

MR. EDQUIST: Go ahead.

A. Yeah, if the generator writes that their waste stream can only be processed at a certain temperature,



then we would write that on the cover sheet. In this particular case on the WCF, waste characterization form, that was -- that's being referred to at this date, it says it's not listed on the WCF. So I just write down "not listed on the WCF."

**Q. (BY MR. AUBERT) So, essentially, you don't -- you don't know the allowable temperature range?**

A. The allowable temperature range is a range given to us by the generator.

**Q. Is that common for it to not be listed?**

A. Yes. It's a -- a generator would have a specific temperature range if they have some -- you know, some chemical constituents that require processing at a certain temperature range. It's more usual that we don't have ones listed from the generator because, you know, it's waste, so if it's -- the generator says it can be -- let me go back.

It's more common that there's no allowable temperature range because if there's a specific temperature range, then the generator would have to know and would have to tell us what's going on, and that would be a -- a specific requirement based on a particular waste stream.

**Q. So you rely on the generator to tell you what the allowable temperature range is?**



A. Yes.

**Q. What's the "Flash point"?**

A. The flash point is also from the generator. That's a -- it's a RCRA term, pretty much. It's a classification of whether a waste stream is ignitable or not.

**Q. And what does this section say "BTU/lb"?**

A. That's the heating value of the waste stream measured in terms of BTU, British thermal units, per pound of the waste stream.

**Q. And does that say that you estimated "6,154 BTU/lb"?**

A. Correct. That's a calculation estimate, yeah.

**Q. And going back to flash point, what about a waste stream being at a certain temperature makes it ignitable versus, I guess, not ignitable at a lower temperature?**

A. Yeah. In this particular case for the RCRA designation, you have waste streams -- well, yes, specifically for RCRA -- there would be waste stream with organic constituents that would be -- if they were in the vapor phase, and if you introduced an ignition source and if there's enough of an organic constituent in the vapor phase and you introduce an ignition source, then that would ignite at that temperature. And that's a RCRA designation.



**Q. So at the flash point, the particular waste would give off vapors that are potentially ignitable?**

A. Yes, if you introduced an ignition source.

**Q. Yeah. And I'm assuming you're the one that circled "incineration"?**

A. Yes.

**Q. And wrote in "tank farm?"**

A. Correct.

**Q. And then, do you recognize any of these signatures --**

A. Yes.

**Q. -- in Section "IV" and "V"?**

A. Yes.

**Q. What is the one by "Analysis of Record"?**

A. That is Sue Reeves.

**Q. And "Authorized by WAO"?**

A. That is Sam Smith.

**Q. Okay. So there were -- there were two waste approval officers at that time?**

A. At that time, there were -- I'm going to have to count because we were transitioning. There's -- there's -- if Jas- -- let's see one -- that would be me, Sam, obviously here. I'm not sure if Jason was still around. I'd have to look at organization charts, but there were at least two of us. Because, like, I signed

"123741." And this is just the cover sheet for that waste approval packet. So we would want to look at the entire packet, however many pages are in that packet. And then we would look for the signed waste characterization form in that approval packet.
**Q. And are those -- how are those approval packets stored?**
A. They are stored in a waste approval folder in the common drive.
**Q. Did you say "in the common drive"?**
A. Correct.
MR. AUBERT: And just for clarity, I can't remember if I marked the second waste characterization as Exhibit 4, but that's Exhibit 4.
Now, I'm pulling up what I've marked as Exhibit 5. This PM 2010.
(Exhibit No. 5 marked.)
**Q. (BY MR. AUBERT) What is this form?**
A. This is one of the forms of the packet. It's a form that we would sign off on to say whether we can waive sampling of the waste stream.
**Q. (BY MR. AUBERT) And is that just the initial authorized to burn sampling or is that all samples?**
A. I'm sorry?
**Q. So is this waiver to see whether you can waive**



**sampling for the "authorized to burn" analysis, or is it for all sampling going forward for this waste stream?**
A. This is for the -- when I'm doing approval to store, this is part of the documents there, and I would say, "Okay, can we sample this waste, or can we waive sampling?" So this is for getting the first sample.
**Q. And here you found that you couldn't waive sampling, correct?**
A. In this -- in this one in April, yeah, April 16th it looks like, if I'm reading my handwriting correctly -- yeah. At that time, the waste verification sampling waiver was not necessary because it says "no" on all -- on that -- the column "no" is checked off on all the rows.
**Q. And is this your signature?**
A. Yes.
**Q. Your initial?**
A. Yes.
**Q. And do you know why WPN-123741 is crossed out?**
A. Because in this case the -- that statement is -- says it meets the waste analysis plan for waiving. And in this case, it does not because it just says "no" on -- I've checked off "no" on the column.
**Q. What is the "waste analysis plan"?**
A. The waste analysis plan is the document that tells us what needs to get analyzed and what can be



exempt. For example, in the waste analysis plan and it's -- it's for RCRA even, if you have debris-like waste, you don't have to analyze that because you cannot get a representative sample therefore you cannot get a representative analysis.
**Q. And does Performance Materials have its own waste analysis plan?**
A. Performance Materials, you mean our incinerator in Orange when we were with Performance Materials?
**Q. Yes.**
A. That we -- when we were -- we had a waste analysis plan under DuPont, and when DuPont and Dow merged to form Performance Materials, then the waste analysis plan of DuPont carried over to Performance Materials.
**Q. And a waste analysis plan is kind of all-encompassing, it's not for specific waste streams?**
A. Correct. It's a general description of what analysis is done on waste streams, not a specific waste stream.
**Q. All right. So there'd only be one path --**
**(Speaking simultaneously.)**
A. One --
**Q. (BY MR. AUBERT) -- that Performance Materials --**
A. -- one plan -- one waste analysis plan, yes.
**Q. I'm pulling up what I've marked as Exhibit 6 to**



**your deposition. This your name at the top?**
**(Exhibit No. 6 marked.)**
A. Yes.
**Q. (BY MR. AUBERT) And what is this "Waste Acceptance Screening Form"?**
A. It's kind of like the opposite of the waste sampling waiver form. This one just says, Okay, is the waste -- have we seen this kind of waste before. And where it says "chemically similar to other approved wastes," so is it kind of like a -- for example, if the waste is described as acid, is this waste chemically similar to other acid wastes? You know, generic terms like that.
Is the container similar -- you know, so it's -- "is this container similar," in this case, it's a trailer, yes, similar. "Unloading and handling facilities adequate at the incinerator," yes. "Sampling procedures," yes. "Materials and construction," yes. "PPE," yes. And then the "procedures adequate for inhibitor addition," N/A, not applicable. "Criteria for mixing this waste with other waste" is understood because it's organic waste. You can mix it with organic. If it's an acid, you cannot mix it with bases, yes. "Have all concerns about taking this waste been resolved," yes. And, again, this is part of the waste analy- -- I'm sorry, the waste approval

**January 2020?**
A. Yes.
**Q. What's the "committee of knowledgeable participants"?**
A. A process hazards analysis has -- and, again, this is a DuPont requirement or DuPont definition of process hazard analysis. A process hazard analysis would have knowledgeable people of the process. So you would have a -- an engineer, a chemist, an operator as minimum. Because you would need a technical person and an operations person so you can at least discuss from both the technical side/theoretical side and the operation side/practical side of things. You would go back and forth at least between these two people to figure out, Hey, what do we do if we have a waste, for example, that we've never seen before?
**Q. I'm pulling up what I've marked as Exhibit 7 to your depo. It's PM 2012 to 2013. Is this another one of the forms included in the waste approval packet?**
A. Yes.
(Exhibit No. 7 marked.)
**Q. (BY MR. AUBERT) Okay. And can you kind of briefly explain what this form is?**
A. It's a form that says, you know, what kind of tests need to be run on a sample.



**Q. And are those the tests for the, you know, the one-time analysis for authorizing the burn?**
A. Correct, yes.
**Q. All right. Not the analysis you would have to do every single time for the --**
A. Correct.
**Q. Okay. And then what does "N" mean here in the "Type" column?**
A. I'm trying to remember, let's see -- that's numerical versus, you see under "color," "T"? That's the text form versus a numerical form.
**Q. What does "B" mean?**
A. That's a good one. Chronic B, acute B -- I am not sure what that is. That is an old form. I'm not sure what the "B" would refer to.
**Q. And so --**
A. It's almost like it -- sorry, go ahead.
**Q. Oh, no, you go ahead.**
A. Well, if you were -- as you were scrolling down, I see MSDS waste characterization form; it's almost like -- if I were looking at, is it present or not? But "B" is not the alphabet I would use for that. So I don't know.
**Q. Okay. But this refers to a type of test you would do?**



A. Correct.
**Q. For each type of component?**
A. Yes.
**Q. And then you just kind of have those broken down by analysis ID?**
A. Correct.
**Q. So I think earlier you said you would get the flash point from the generator?**
A. The flash point is given to us by the generator because if it's a -- what a RCRA D001 -- D001 code, that would mean that the flash point is less than 140 degrees Fahrenheit. So the flash point would be given to us by the generator. We can also -- we can also measure it, but, in general, that is given to us by the generator. Partially because -- especially, in fact, if a waste is classified as D001 RCRA code, then it could have a flash point specified. And that would be -- it would be less than 140 degrees Fahrenheit.
**Q. So -- but, again, here it says "type," and you said that refers to the type of test done? So you're saying --**
**(Speaking simultaneously.)**
A. That's the type of data, numerical versus text. Like, say, if you go down on that same page, it says for example -- on that same page. Say, "odor," like



two-thirds down the page, and there's a "T" written on it. That would be a text -- essentially a text file versus a numerical file.
**Q. (BY MR. AUBERT) Understood. So for each one of these components, you're not -- that doesn't mean you're actually running a test for each one necessarily?**
A. Correct. It's more of a what kind of data file it would be whether it's text or numerical.
**Q. And you would make sure to get the data file for all these components whether you test for it yourself or get it from the generator?**
A. That's a fingerprint file. That would be in -- see, not all of the wastes would require all of these parameters on it. I'm trying to -- so with this one, for example, if you go up some more. See, there's some of this -- say, for example, the "bromine," it says "Plume-coloring." So if a waste profile tells us that there is a -- say, potassium bromide as a constituent, so then we know there's bromine. How much would that be? Then we could analyze for it or ask the generator for their knowledge of how much there would be in that waste stream. But say, for example, a generator says on their constituents there's nothing that lists bromine as a constituent, then we don't have to analyze for it because it's not there.

sampling-exempt, we go by as what in the form says, we can go by process knowledge, generator knowledge, literature data, and that's what we're going by. We're going by the process knowledge of the generator and what the generator puts in the profile.
**Q. Ma'am, did you need me to repeat my question?**
A. I mean, if you ask me the question, I'm trying my best to answer it.
**Q. Okay. So the answer to my question was no, you make no independent verification of what's inside the UCC tank trailers that are coming to you?**
MR. EDQUIST: Objection; form. You can go ahead, Elena; you can give your same answer.
A. Can --
MR. ELWELL: You want her to give the same answer; is that what you said?
A. No. Because the sampling-exempt makes it where after November we did not make a sample, but we've always relied on the generator's profile.
**Q. (BY MR. ELWELL) So the answer to my question was no, you do not make any independent verification of what the generator is telling you?**
MR. EDQUIST: Objection; asked and answered.
MR. ELWELL: No, it hasn't been answered.
MR. EDQUIST: It has. She's told you that



she independently verifies using their forms.
(Speaking simultaneously.)
MR. ELWELL: I'm going to wait till we --
MR. EDQUIST: I'm sorry you don't like the answer but that -- she's giving you the answer.
MR. ELWELL: So we're going to be here until we do get an answer.
MR. EDQUIST: The question, "Does she independently verify," she's telling you, "Yes, I verify by looking at the form."
MR. ELWELL: Are you done with your speaking objection?
MR. EDQUIST: It's an explanation to a question that you keep asking. I'm not trying to be a jerk, but she's answered it.
MR. ELWELL: Are you done?
MR. EDQUIST: Yeah, sure.
**Q. (BY MR. ELWELL) All right. Ms. Labrador, you've said repeatedly that, and correct me if I'm wrong, that you rely on the generator to, on paperwork, tell you what is list -- what is inside the tank trailers; is that true?**
A. Yes.
**Q. You've repeatedly said that's what you rely on in order for you to know what's inside the tank trailer, right?**



A. That's one of things we rely on, yes.
**Q. Okay.**
A. It's the main -- yeah, yeah.
**Q. And what else do you rely on to know what's inside the tank trailer?**
A. Aside from the profile if a waste stream is not sampling-exempt, we sample the waste stream, and then do an analysis and that's -- that's one. There's the generator profile --
(Speaking simultaneously.)
**Q. (BY MR. ELWELL) And let -- and we'll try to break this down real quick because that's --**
MR. EDQUIST: Well, can you let her finish her answer? She --
MR. KIMBELL: Yeah, please, don't interrupt the witness's answer.
**Q. (BY MR. ELWELL) Okay. Anyways. What you just talked about has nothing to do with UCC because y'all don't test with UCC. So that example you just gave is not applicable, correct?**
MR. KIMBELL: Objection; form.
MR. EDQUIST: Objection; form.
**Q. (BY MR. ELWELL) True?**
A. If you're asking about this particular waste, this particular waste at one point was not



sampling-exempt, so there was a sample there. There was also -- like, you also included the MSDS there. You know, there's the MSDS, there's the generator profile. So, but once it became sampling-exempt, after November, and we couldn't take a sample, then we did not have data after November 5th.
**Q. And by saying "after November 5th" that "we did not have data," what you are saying is that you did not independently verify, through your own methods of testing what are inside UCC tank trailers?**
MR. EDQUIST: Objection; form. Go ahead, Elena.
A. The verification, again, is looking at the profile.
**Q. (BY MR. ELWELL) Okay.**
A. And that is because we are a captive incinerator. We can rely on process knowledge, generator knowledge. In fact, that's an RCRA regulation, you are allowed to rely on generator knowledge.
MR. ELWELL: Object to form.
**Q. (BY MR. ELWELL) Do you know what "independent" means?**
A. Yes.
**Q. And what's it mean?**
A. Independent mean not dependant on anything else.

**Q. Okay. And so we can put aside captive, you know, incinerator, captive whatever. I'm asking whether independently from the paperwork, so everything you've just listed, the MSDS, the SDS, the hazardous waste manifest, the profile, that's all paperwork; is it not?**
A. Yes. And that's also -- generator knowledge that the RCRA allows is also paperwork.
**Q. Okay.**
A. Literature data that RCRA allows is also paperwork.
**Q. Sure.**
A. So --
**Q. Yeah.**
A. -- there --
**Q. I hear you. Yes. I don't disagree with you that -- that maybe RCRA is saying that y'all can do that, okay? That's not what the question was, and it's not what Zane was asking you earlier. All that we've been asking, repeatedly, which we have not received an answer for is whether or not Performance Materials, after November 5th, made any independent verification outside of paperwork, meaning sampling or looking inside the tank trailer, of what's inside UCC tank trailers, yes or no?**
A. If, as you said, independent, aside from paperwork -- that's the way you phrased it -- then the



answer to that is yes, we've not done it. When you say "independent aside from paperwork." If you -- if you say "independent as a whole" and RCRA allows us to use paperwork as a matter of verification, then the answer to your question is no. You know, it depends on how you phrase your question.
**Q. Okay. And just so we're on the same page. You said -- you said yes, because -- you said "yes" and you meant "no," meaning that you were -- because y'all -- y'all don't do anything outside of the paperwork?**
A. No. You said, if you -- you call "independent" including all of the paperwork. If you mean only lab data and lab analysis that we do here, then we did not do it after November 5th.
**Q. Okay.**
A. But you were the one who said "independent even with all paperwork," and what I'm saying is RCRA actually allows us to use paperwork as verification.
**Q. Yes. Aside from RCRA allowing you to use paperwork for verification, the answer is no, y'all did not do an independent verification by looking inside the tank -- UCC tank trailers or doing a sampling, after November 5th?**
MR. KIMBELL: Objection; form.
A. Correct. It's all -- with all those



qualifications you put in there, yes.
**Q. (BY MR. ELWELL) Yes, okay. Thank you, ma'am. Ethylene glycol diacetate, what's that?**
A. I think that was one of the listed constituents in the profile.
**Q. Yeah, do you know generally what that is?**
A. What was the name of the chemical again?
**Q. Ethylene glycol diacetate.**
A. Okay. Yes.
**Q. Yeah, what is that -- what is that?**
A. So essentially you have a hydrocarbon chain with two glycol functional groups, that's why it's called ethylene diglycol [sic]. And then the two functional groups are reacted with an acetyl functional group, that's why it becomes a ethanol diglycol diacetate [sic].
**Q. Do you know what furan is? F-U-R-A-N?**
A. Spell that again.
**Q. F-U-R-A-N.**
A. Furan, yes. It's a family of --
**Q. What is that?**
A. Oh, sorry. Go ahead.
**Q. I'm sorry.**
A. It's a cyclic compound.
**Q. A what?**
A. It's a hydrocarbon, but it's also a cyclic



compound.
**Q. Is that found in the vinyl acetate residue?**
A. No. It's not listed there.
**Q. It's not listed in that paperwork, right?**
A. It's not listed in the paperwork.
**Q. Okay. Ma'am, have you been asked to do any experiments or perform any tests in order to come up with any expert opinions in this case?**
A. You asked if I've been asked if -- to perform a test to come up with an expert opinion? Is that what your question was?
**Q. Yes.**
A. The que- -- then the answer is no.
**Q. Okay. Do you feel that you are capable of performing tests on different substances to determine reactivity and those things that you discussed earlier?**
A. The tests that we do here are -- in terms of reactivity are compatibilities, like I described earlier.
**Q. What would -- you're using the term "compatibility," would there be, like, different -- a different name for that for a different experiment?**
A. No. The compatibility test we do that, kind of like as I mentioned earlier, is if we were to combine the contents -- move -- well, transfer the contents of one trailer into a tank and so -- and to make sure that

SIGNATURE PAGE

I, ELENA LABRADOR, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

___________________________
ELENA LABRADOR

THE STATE OF TEXAS )
COUNTY OF ____________ )

Before me ___________________ on this day personally appeared ___________________ known to me [or proved to me on the oath of _________________ or through ____________________ (description of identity card or other document)] to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of ______________, 2022.

_________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF T E X A S

My Commission Expires:
______________________



CAUSE NO. 2020-13324

CHAUMEIKA BUSSEY, § IN THE DISTRICT COURT OF
INDIVIDUALLY, AS §
REPRESENTATIVE OF THE §
ESTATE OF SHAWN JARMAIL §
BROWN, DECEASED, AND AS §
NEXT FRIEND OF J.B., §
A.B., AND R.O., MINOR §
CHILDREN §
§
Plaintiffs §
§
§
SHAWN JARMAIL BROWN, JR. §
DA'SHAWN JAMAL BROWN, §
JOHN JARMAIL BROWN, §
DAVION JARMAIL BROWN, AND §
ERICKA BENS A/N/F OF A.B. §
AND J.B., MINORS, §
INDIVIDUALLY AS WRONGFUL §
DEATH BENEFICIARIES OF §
SHAWN JARMAIL BROWN, SR., §
DECEASED §
§
Intervening §
Plaintiffs, §
§
§
KYLE WILLIAMS §
§
Intervening §
Plaintiff, §
§
§
AND § HARRIS COUNTY, T E X A S
§
§
FELICIA SHEPPARD, AS §
REPRESENTATIVE OF THE §
ESTATE OF SIDARIEUS §
LOZANO, DECEASED, LEXUS §
PAUL, AS NET FRIEND OF §
N.L., L.L., AND S.L., §
MINOR CHILDREN, CYNTHIA §
RICHARDSON AND ROY §
ROBINSON §
§
Plaintiffs, §



VS. §
§
§
§
ALPHA TECHNICAL SERVICES §
CORPORATION, LC D/B/A §
QUALA RAIL & SPECIALTY, §
QUALAWASH HOLDINGS, LLC, §
QW HOLDING CORPORATION, §
STEVEN DODDS, UNION §
CARBIDE CORPORATION, THE §
DOW CHEMICAL COMPANY, §
SPRINT TRANSPORT, LLC, §
PERFORMANCE MATERIALS NA, §
INC., AND MOBILE MINI §
TANK AND PUMP SOLUTIONS, §
INC. §
§
Defendants § 113TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF
ELENA LABRADOR
TAKEN MAY 10, 2022

I, Joanna Sagastisado, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, ELENA LABRADOR, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ______________ to the witness or to the attorney for the witness for examination, signature and return to Discovery Resource Litigation Support Services within 20 days of receipt thereof;

That the amount of time used by each party at the deposition is as follows:

Mr. Brandon C. Francis - no time
Mr. Zane Aubert - 3 hours, 13 minutes
Mr. Matthew A. Elwell - 50 minutes
Mr. David Brenner - no time
Ms. Karen Bennet - no time
Ms. Laura Friedl Jones - no time
Mr. Callan Edquist - no time
Mr. Byron C. Alfred - no time
Mr. Kevin D. Collins - no time



That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Brandon C. Francis - ATTORNEY FOR ROY ROBINSON
Mr. Zane Aubert - ATTORNEY FOR PLAINTIFFS
Mr. Matthew A. Elwell - ATTORNEY FOR PLAINTIFFS
Mr. David Brenner - ATTORNEY FOR QUALAWASH HOLDINGS, LLC
Ms. Karen Bennet - ATTORNEY FOR MOBILE MINI TANK
Ms. Laura Friedl Jones - ATTORNEY FOR UNION CARBIDE CORPORATION
Mr. Callan Edquist - ATTORNEY FOR PERFORMANCE MATERIALS NA, INC.
Mr. Byron C. Alfred - ATTORNEY FOR PLAINTIFF
Mr. Kevin D. Collins - ATTORNEY FOR STEVEN DODDS
Mr. James M. Kimbell

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this ___6th____ day of _____June_____________, 2022.

____________________________________
Joanna Sagastisado, CSR
Texas CSR NO. 9153
Expiration Date: 03/31/2023
Discovery Resource
Firm Registration No. 231
1511 West 34th Street
Houston, Texas 77018
713-223-3311

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __________________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Zane Aubert, Custodial Attorney;

That $ ______________ is the deposition officer's charges to Intervening Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _______ day of __________________, 2022.

_____________________________________

Joanna Sagastisado, CSR
Texas CSR NO. 9153
Expiration Date: 03/31/2023

Discovery Resource
Firm Registration No. 231
1511 West 34th Street
Houston, Texas 77018
713-223-3311

# Attachment 1-C

**CAYIAS • CONSULTING**

314 WOODCREST DR. • RICHARDSON, TEXAS 75080-1946

PHONE: (972) 839-7891 • FAX: (972) 690-0009

September 12, 2023

Mr. Matthew A. Elwell
The Amaro Law Firm
2500 E. T. C. Jester Blvd., Ste. 525
Houston, TX 77008

Re: Shawn Jarmail Brown, Jr., et al. v. Alpha Technical Services Corp., LC D/B/A Quala Rail & Specialty, Qualawash Holdings, LLC, et al., Cause No. 2020-13324, in the 113th Judicial District Court, Harris County, Texas.

Dear Mr. Elwell:

At your request, I have issued this first report of findings regarding the death of two individuals, (the "Incident"), Mr. Shawn Jarmail Brown ("Mr. Brown") and Mr. Sidarieub Lozano ("Mr. Lozano"), both employees of Alpha Technical Services Corp., LC D/B/A Quala Rail & Specialty, Qualawash Holdings, LLC. ("Quala"). The Incident occurred on December 28, 2019 at the Quala facility located at 5100 Underwood Road, Pasadena, Texas 77507. Based on my review of information and documents I have received to date, pertaining to the Incident, and my visit to the Dow Chemical Complex, located in Orange, Texas on November 11, 2021 to inspect the Sabine River Ops., Performance Materials NA., Inc. ("Performance Materials") facility located inside of the Dow complex, this report discloses my factual observations, opinions and conclusions pertaining to my ongoing investigation into this matter. It is possible that additional discoveries may continue after the issuance of this report that may offer additional facts, findings and information. I intend to review these additional facts and findings along with any additional sources of information and, if warranted, supplement, revise, amend, augment, or delete the opinions and findings detailed in this report with one or more additional written reports and/or during deposition testimony.

## Overview

Leading up to the Incident, Union Carbide Corp. ("Union Carbide"), a wholly owned subsidiary of Dow Chemical Company ("Dow"), manufactures Vinyl Acetate at its Texas City plant. On November 18, 2019 Union Carbide contracted with Sprint Transport, LLC. ("Sprint") to

transport 44,870 lbs of waste material from their Texas City plant to the Performance Materials facility in Orange, Texas (UCC000010) for disposal. Sprint provided a DOT 407 stainless steel bulk tank wagon, number T-1629 (UCC000008), to transport the hazardous material from the Union Carbide plant to Performance Materials facility. Sprint picked up the tank wagon on December 2, 2019 and delivered it to Performance Materials facility on December 10, 2019. The weight ticket for the load at the Performance Materials facility (PM000016) shows a weight of 44,320 lbs. for the same load, a difference of some 550 lbs.

The Performance Materials facility is located inside of the Dow complex in Orange, Texas. The facility uses a retort to incinerate waste materials that are unloaded at its facilities. The facility is set up to handle tank wagons such as the DOT 407 tank wagon used by Sprint. The unloading procedure can involve the use of nitrogen gas to unload the liquid from the tank wagon into piping that is then fed to the retort for incineration. In the case of this Incident, 44,220 lbs of hazardous waste were recorded for disposal. The remaining amount of hazardous waste, sometimes referred to as the "heal," was some 100 to 650 lbs of hazardous waste left in the tank wagon. A nitrogen pressure was then placed on the tank wagon and it was then scheduled for cleaning.

The nitrogen used by Performance Materials is supplied by Praxair through their nitrogen gas plant in Orange, Texas. This nitrogen gas is supplied to the entire Dow complex at Orange, Texas. This is the same nitrogen supply that was used to place a nitrogen blanket on the tank wagon involved in the Incident. Praxair certified the purity of the nitrogen gas supplied to the Dow facility on the day of the Incident to be 99.99% pure with a dew point of -80°F (UCC006612).

Quala is a tank cleaning operation in Pasadena, Texas that cleans commercial tank wagons such as the DOT 407 tank wagon involved in the Incident. The specific tank wagon involved in the Incident was transported to Quala on December 13th, 2019. The weight of the hazardous waste left in the tank wagon was somewhere between 100 and 650 lbs when the tank wagon arrived at the Quala facility. The tank wagon had a nitrogen gas blanket placed on its contents and was under pressure when it arrived at the Quala facility. Quala had scheduled the tank wagon for cleaning on December 28th, 2019. The time involved from the loading of the waste at the Union Carbide plant to the scheduled cleaning of the tank wagon at Quala was over a month.

The Quala facility has surveillance video cameras, including ones that captured the actual tank cleaning operations at their facility at the time of the Incident. The facility has both a top view and a back view video as well as outside of the facility (Quala Videos). On the day of the incident, the videos documented the sequence of events. At 12:29 AM Mr. Lozano opened the top hatch of the tank wagon (top video). At approximately 12:32 AM the rear valve of the tank wagon is opened and operator activates the valve pump (back video). Mr. Brown takes a reading of the atmosphere inside of the tank wagon at 12:42 AM. The measurement showed 15.2% oxygen, 2,000 ppm carbon monoxide, 79 ppm hydrogen sulfide, and 155 ppm VOC's (Volatile

Organic Compounds). The hose to supply air into the tank wagon was placed in the top hatch at 12:56 AM. This was after men had already entered the tank wagon.

The video evidence showed Mr. Lozano entered the tank wagon at 12:44 AM with full face respirator and with chemical cartridges and personal protective clothing. Mr. Lozano lost consciousness within minutes of entering the tank wagon. Mr. Roy Robinson ("Mr. Robinson") entered at 12:47 AM and also lost consciousness within minutes. Mr. Brown went in next at 12:54 AM. Mr. Robinson was able to be retrieved but Mr. Lozano and Mr. Brown were not able to be quickly retrieved.

The autopsy of Mr. Brown and Mr. Lozano showed the cause of death was by carbon monoxide. The Occupational Safety and Health Administration ("OSHA") investigation included the analysis of the cartridges used by the men who entered the tank wagon. That analysis (OSHA0264-5) showed more chemicals present from the cartridges than Dow listed on their waste manifest (UCC000010) or their Safety Data Sheet ("SDS") (UCC2557) for the hazardous waste.

The Union Carbide plant did not collect and save a retain sample of the hazardous waste it shipped, including the waste that was involved with the Incident. For this reason, a complete chemical analysis of the remaining waste in the tank wagon and the various chemical reactions cannot be determined. The facts must be deduced from the evidence collected after the Incident. This includes the OSHA analysis of the respirator cartridges, and the vapor sampling conducted by Quala prior to the entry of its employees into the tank wagon.

There was correspondence between Performance Materials and Dow regarding the high temperatures of the hazardous waste material from the Union Carbide plant that Performance Materials was receiving (PM001956-8). The Performance Materials concern was that the waste materials were being delivered at temperatures greater than 200°F. This suggests that thermal reactivity of the waste material should be expected and the decomposition of the hazardous waste is likely to occur more rapidly due to the elevated temperatures of the hazardous waste. Chemical reactivity is a function of both temperature and time with most chemical reactions occurring more rapidly as the temperature is increased.

Union Carbide's procedure, in loading the tank wagon, utilizes a nitrogen purge of the tank wagon (Fellows, p120/3 - p121/17) prior to loading it with the hazardous waste. This establishes an oxygen deficient atmosphere inside of the tank wagon on filling it with the hazardous waste. Jason Rodriguez, a Union Carbide employee, described the preparation for loading the hazardous waste including the inspection of the tank wagon for any residue (Rodriguez, p93/1 – p94/14). There is no actual measurement of the atmosphere inside of the tank wagon performed by Union Carbide prior to loading the hazardous waste.

The high temperatures of the hazardous waste being sent to Performance Materials would explain the formation of carbon monoxide since the hazardous waste was in an oxygen reduced

environment given the nitrogen pressure placed on the tank wagon after being loaded at the Union Carbide facility and unloaded at Performance Materials facility. It is most probable that the chemical decomposition of the Union Carbide generated hazardous waste was actually occurring in the storage tank, but because of the plant vapor recovery system, the presence of carbon monoxide and other hazardous waste decomposition products were not detected. The decomposition of the hazardous waste would continue throughout the life of the hazardous waste, including all of the time it was loaded into the tank wagon.

The carbon monoxide and hydrogen sulfide identified by the air sampling of the tank wagon from Quala, as well as other chemicals identified by the OSHA analyses of the respirator cartridges, likely evolved from the decomposition of the hazardous waste generated at the Union Carbide facility. The respirator cartridges showed among other things, the presence of acetaldehyde, furan, acetone, acetic acid, acetamide, formamide, ethylene glycol diacetate, limonene, 2-butoxyethanol, 1,2 dichlorobenzene, m-xylene, vinylcyclohexene, beta-diisobutylene, diisobutylene, and alpha-pinene, as well as other compounds from the OSHA analyses (OSHA 0264-5). Dow listed 13 chemicals in its SDS. Those were Acetic acid, heavy acetates (unsaturated and/or cyclic), ethylene diacetate, 1,1-diacetoxyethane, acetoxy acetic acid, glycolic acid, 2-hydroxyethyl acetate, polyvinyl acetate, hydroquinone, nonylphenol, benzoquinone, potassium acetate, and acetaldehyde (UCC2559). Given the discrepancy between the OSHA analysis, the air sampling by Quala and the Dow SDS list, Dow failed to identify all of the hazardous waste composition.

A comparison of the Dow waste profile list with the OSHA cartridge analysis findings show only three compounds, acetaldehyde, acetic acid, and ethylene glycol diacetate (OSHA 0304) coinciding. Dow's estimate that the bulk of the hazardous waste they generated, such as acetic acid, acetaldehyde, and ethylene glycol diacetate, all list carbon monoxide as a hazardous decomposition product (Thermo Fisher SDS for acetaldehyde, acetic acid, and ethylene glycol diacetate). Dow was or should have been consciously aware of the decomposition of chemicals they identified in their waste profile list of their hazardous waste and the hazardous waste's ability to produce carbon monoxide.

Dow ignored and failed to evaluate and assess the hazardous waste they generated. The Union Carbide plant sampled the load line several times a day (Rodriguez, p52/5 – p53/11) for shipments to Freeport (Ruelas, p31/13-15), but did not retain any samples. The SDS for many of the chemicals listed in the Dow waste profile and the OSHA cartridge analysis show how carbon monoxide is a possible byproduct from the decomposition of some of the products claimed to be in the hazardous waste profile and from the chemicals found on the cartridges analyzed by OSHA.

Given the conditions and the time that the Union Carbide plant generated hazardous waste was present in the tank wagon, additional chemical reactions, including decomposition of chemicals within the hazardous waste are probable. The SDS for many of the chemicals identified in the hazardous waste warns of the decomposition to produce carbon monoxide.

All of the hazardous waste was listed by Dow as hydrocarbon based. Given the presence of hydrogen sulfide in the vapor phase of the tank wagon, Dow failed to provide a complete list of all of the chemicals or the composition of the hazardous waste as required by federal law (40 CFR parts 260-273).

The Environmental Protection Agency ("EPA") under the Resources Conservation and Recovery Act ("RCRA") is given the authority to control hazardous waste from the cradle to the grave (40 CFR parts 260-273). This includes the generation, transportation, treatment, storage, and disposal of hazardous waste. For this reason, in this Incident, Dow, who was the generator of the waste, was responsible for insuring the safe handling and had the ultimate responsibility for the handling of the hazardous waste and its safe disposal.

Given the description of the hazardous waste by Dow, the facts from the Incident show that Dow failed to identify all of the issues involving the hazardous waste it generated and failed to insure how the hazardous waste should be safely handled. Dow's failure to warn people of the possible dangers associated with the handling of the hazardous waste was the root cause of the Incident. Since both carbon monoxide and hydrogen sulfide were found present by Quala, it is most likely that those products were generated by the continuing reactivity of the hazardous waste that was left in the tank wagon at elevated temperatures for over 30 days.

## Exhibits for Supporting Opinions:

Exhibits for supporting my opinions include all of the documents and exhibits I have reviewed which are attached and will include any additional documents and evaluations I review that have not been received or disclosed and some additional exhibits that are in preparation or under consideration for preparation to be included at a later time.

## Summary of Opinions

My opinions are based on my investigation as described in this report, the review of the materials I have received in the case as outlined above and elsewhere, and my education, training, and experience in this type of operation as outlined in my CV which is attached. Based on scientific methodology, a reasonable degree of probability and upon all of the items listed above, I offer the following opinions:

1. Quala had a duty and failed to properly train their employees in the proper use of safety equipment and safe practices in dealing with hazardous conditions and operations.

2. Mr. Brown and Mr. Lozano died of acute carbon monoxide poisoning according to their autopsies.

3. The source of the carbon monoxide gas that killed Mr. Brown and Mr. Lozano and injured Mr. Robinson was from the ongoing decomposition of the Dow/Union Carbide generated hazardous waste from the time it was loaded at the Union Carbide facility to the delivery of the tank wagon to Quala.

4. Dow/Union Carbide errored in arranging for the transport of hazardous waste at high temperatures in excess of 200°F from its Union Carbide plant to Performance Materials which enhanced the decomposition of the hazardous waste.

5. Dow/Union Carbide had a duty and failed to follow EPA requirements under RCRA for the proper characterization of the hazardous waste it created. Dow/Union Carbide failed to identify all of the decomposition products in its hazardous waste, in particular, the 79 ppm of hydrogen sulfide that was generated from their hazardous waste along with the carbon monoxide that it shipped to Performance Materials and, subsequently, to Quala.

6. Dow/Union Carbide had a duty and failed to accurately published SDS information regarding the decomposition of the hazardous waste it generated and failed to warn about all of the dangers of that hazardous waste generated at its Union Carbide plant. Specifically they failed to identify the hazardous decomposition products identified in the Incident investigation.

7. Dow/Union Carbide had a duty and failed to list carbon monoxide on its SDS as a decomposition byproduct for the hazardous waste since they were or should have been consciously aware of the possibility of this reaction that was listed in the SDS for chemicals they identified in their waste manifest. Dow/Union Carbide had conscious awareness and proceeded indifferently to the known dangers of the hazardous waste generated at the Union Carbide plant.

8. The OSHA investigation indicated the presence of 2,000 ppm of carbon monoxide. Since carbon monoxide is lighter than oxygen or nitrogen, it is likely that the carbon monoxide level in the tank was higher than measured by Quala.

9. Dow/Union Carbide's failure to properly characterize the hazardous waste associated with this Incident was the root cause of the deaths of Mr. Brown and Mr. Lozano and the injuries to Mr. Robinson.

## Qualifications of the Witness

A copy of the current curriculum vitae of Dr. John Cayias is attached.

Respectfully submitted,
Cayias Consulting

John Cayias, Ph.D.
Consultant

JLC:jc

Enclosures

## Materials Reviewed in Forming Opinions:

### Pleadings:

P-BROWN, S. 000717 – 000737: Plaintiff's First Amended Petition
P-BROWN, S. 000974 – 000977: Quala/ATS Answer
P-BROWN, S. 000978 – 000980: Union Carbide, Dow Chemical Answer
P-BROWN, S. 000981 – 000984: (Sprint Answer).Produced 2020.0321
P-BROWN, S. 000985 – 000988: Sprint's Answer to P's 1st AM Petition
P-BROWN, S. 000989 – 000992: Dodd's Answer to P's 1st AM Petition
P-BROWN, S. 000993 – 000996: Performance Materials Answer to P's 1st AM Petition
P-BROWN, S. 001112 – 001136: Plaintiff's Third Amended Petition
P-BROWN, S. 001137 – 001145: KWilliams 2nd Amended Pet in Intervention
P-BROWN, S. 001146 – 001160: SBrownJR 2nd Amended Pet in Intervention

### Plaintiff Discovery:

P-BROWN, S. 000001–000059 (OSHA Docs in Resp to FOIA Qualawash #1392045)_Redacted
P-BROWN, S. 000060–000268 (OSHA Docs in Resp to FOIA QualaWash Holdings #1404259)
P-BROWN, S. 000269–000280 (Def Alpha Tech Quala 1st AROGS 06.02.20)
P-BROWN, S. 000303–000321 (OSHA citation and Fine)
P-BROWN, S. 000322–000324 (OSHA citation Subject Incident Press Release)
P-BROWN, S. 000325–000328 (News Story – Texas Co Cited After Employee Fatalities, Fined
P-BROWN, S. 000333–000496 WARNING GRAPHIC PHOTOS Brown-Harris Co Inst Forensic
P-BROWN, S. 000497–000632 (MAE inspection Photos)
P-BROWN, S. 000633 Video-KHOU 2 workers killed at Pasadena chemical plant HCSO
P-BROWN, S. 000643–000649 Osha Records.Produced 2020.0321
P-BROWN, S. 000650 workers dead after incident.Produced 2020.0321
P-BROWN, S. 000679 HCSOAudio Report.Produced 2020.0321
P-BROWN, S. 000680–000698 Osha Fine citation for ATS.Produced 2020.0321
P-BROWN, S. 000702–000708 Event Report.Produced 2020.0321
P-BROWN, S. 000709–000716 HCSO-Incident Report_Redacted.Produced 2020.0321
P-BROWN, S. 000738–000743 Intervenor Williams Resp to Sprints RFD
P-BROWN, S. 000744–000770 P's RRFDs to All Defs.Produced 2020.0321
P-BROWN, S. 000771–000917 Poblano Lawsuit.Produced 2020.0321
P-BROWN, S. 000918–000936 Steve Dodds Discovery Resp.Produced 2020.0321
P-BROWN, S. 000937–000943 Def Sprint Transport's RRFD.Produced 2020.0321
P-BROWN, S. 000944 Memorial Tshirt.Produced 2020.0321
P-BROWN, S. 000964–000973 (LaPorte EMS-Amb AFF)_Redacted.Produced 2020.0321

P-BROWN, S. 001002–001092 (Harris County Sheriff Accident)_Redacted .Produced 2020.0321
P-BROWN, S. 001093–001111 (Harris County Sheriff Accident)_Redacted.Produced 2020.0321
P-BROWN, S. 001161–001170 Lozano Autopsy Report.Produced 2020.0321
P-BROWN, S. 001173–001194 OSHA NOK Findings Ltr.Produced 2020.0321
P-BROWN, S. 001694–001696 2022.1116 Brown, Shawn.OSHA FOIA
R000001-R000458 Brown, S.DWQ to US Dept of Transportation (Any & All)

**Defendant Discovery:**

**Dow Discovery**

2020.0924 Brown, Shawn.Def Dow Chemical Company's RRFD
2021.0513 Brown, Shawn.Def Dow Chemical's RRFP & ARGOS
2021.0922 Brown, Shawn.Def Dow chemical's 2nd Disco Resp
2022.0128 Brown, Shawn.Def Dow Chemical's Unsworn Delaration to 01.17.22 ROG Resp
2022.0404 Brown, Shawn.Def Dow's 2nd RRFP to Plaintiff
2022.0826 Brown, Shawn.Def Dow's Obj&Resp to Plt 3rd RFP
1. DOW-RFP-000001-000053 Hold Harmless-Responsibility Ins Contract DOW & Sprint
1. DOW-RFP-000054-000057 Letter from DOW to Evergreen with Agreement & Amendment
1. DOW-RFP-000269-000393 Amended and Restated Services Agreement between DOW and
3. DOW-2RFP-000506-000508 Compound Name and match for Thermal Treatment FTIR Sc
4. DOW-3RFP-000509-000511 Emails from DOW to Oard re Shipping Temperature and Incin
4. DOW-3RFP-000512-000520 Waste Auth Signatures-Dupon Waste Services forms
4. DOW-3RFP-000521-000544 UCC Safety Data Sheet 06.08.2018 and printed 04.11.19
4. DOW-3RFP-000545 Benzene Waste Operations Neshap
4. DOW-3RFP-000567-000569 Email from DOW to Oard re WPN-123741 shipping temperature
4. DOW-3RFP-000570-000574 Waste Authorization Signatures Vinyl Acetate Polymer Resi
4. DOW-3RFP-000575-000578 DuPont Waste Characterization Form
4. DOW-3RFP-000579-000601 Union Carbide Safety Data Sheet – Vinyl Acetate Polymere Resi
4. DOW-3RFP-000602 Restricted Waste – Certificate of Acceptability – Vinyl Acetate Polymer
4. DOW-3RFP-000603 Notification Benzene Wates Operations Neshap 4.15.19
4. DOW-3RFP-000604-000615 The Dow Chemical Company LDR Certification Worksheet
4. DOW-3RFP-000616 DOW Process Description
4. DOW-3RFP-000617 DOW Process Design
4. DOW-3RFP-000618 DOW Waste Verification Sampling Waiver
4. DOW-3RFP-000619 DOW Waste Acceptance Screening Form
4. DOW-3RFP-000620-000621 Site Environmental Services Laboratory Fingerprint Sample
4. DOW-3RFP-000622 Difficult to Analyze Form
4. DOW-3RFP-000623-000625 Emails DOW re WPN-123741 shipping temperature
4. DOW-3RFP-000626 Waste Authorization Signatures WPN-123741
4. DOW-3RFP-000627-000630 DOW Emails re WPN 123741 Approval at SRO

4. DOW-3RFP-000631-000634 DuPont Waste Characterization Form
4. DOW-3RFP-000635-000657 Union Carbide Safety Data Sheet
4. DOW-3RFP-000658 Restricted Waste – Certificate of Acceptability
4. DOW-3RFP-000659 Benzene Waste Operations Neshap
4. DOW-3RFP-000660-000671 Dow Chemical Company LDR Certification Worksheet
4. DOW-3RFP-000672 DOW Chemical Company Process Description
4. DOW-3RFP-000673 DOW Chemical Company Process Design
4. DOW-3RFP-000674 Waste Verification Sampling Waiver
4. DOW-3RFP-000675 Waste Acceptance Screening Form
4. DOW-3RFP-000676-000677 Site Environmental Services Laboratory Fingerprint Sample R
4. DOW-3RFP-000678 Difficult to Analyze Form

**Mobile Mini Discovery:**

2022.0719 Brown, Shawn.Def MMTs RRFD to All Parties
2022.0728 Brown, Shawn. Def MMTs 1st Supp RRFD
2022.0819 Brown, Shawn.Def MMTs 2nd Supp Req to all parties RFD-FSC
2022.0901 Brown, Shawn.Def MMT & PS's 1st RRFP to def Union Carbide-FSC
2022.0916 Brown, Shawn.Def MMTs 1st RRFP RROGS-FSC
2022.1012 Brown, Shawn.Def MMTs Privilege Log-FSC
ConfidentialMMTP00001-00003 DOW Letter to Evergreen-Amendment 2
ConfidentialMMTP00004-00007 Amendment to the DOW-Evergreen Agreement
ConfidentialMMTP00008 Quala Cleaning Certificate to Clean Harbors
ConfidentialMMTP00009-00013 Mobile Mini Invoices to DOW
ConfidentialMMTP00014 Quala Quote to Mobile Mini 12.16.2019
ConfidentialMMTP00015 Mobile Mini Purchase Order Alpha Technical
ConfidentialMMTP00016-00017 Mobile Mini Invoices to DOW
ConfidentialMMTP00018 Quala Cleaning Certificate (Billing Copy) to Mobile Mini
ConfidentialMMTP00019 Mobile Mini Invoice to DOW
ConfidentialMMTP00020-00021 Mobile Mini letter to DOW (not signed)
ConfidentialMMTP00022 Letter from DOW to Evergreen re Storage Tank Rental Services
ConfidentialMMTP00023-00057 Agreement for Services DOW and Evergreen
ConfidentialMMTP00058-00065 Hold Harmless-Responsibility-Insurance Contract DOW an
ConfidentialMMTP00066-00067 Letter from DOW to Evergreen Notice Assgn of Agmt 3.31
ConfidentialMMTP00068-00069 Ltr from DOW to Evergreen notice of Assgn of Agmt - signe
ConfidentialMMTP00070-00105 Agreement for Services DOW and Evergreen
ConfidentialMMTP00106 Notification from DOW to Evergreen of payment change
ConfidentialMMTP00107-00117 DOW letter to Evergreen with Standardized Pre-Qual Form
ConfidentialMMTP00118-00120 Email chain regarding KPI reporting
ConfidentialMMTP00121 Email re DOW Implementation Update
ConfidentialMMTP00122-00127 Email chain re KPIs
ConfidentialMMTP00128-00129 Email re Complimentary Quality Incident at Dow Chemical

ConfidentialMMTP00130 Letter from Dow to Evergreen re Portable Storage Tank Rental Ser
ConfidentialMMTP00131-00165 Agreement for Services Dow and Evergreen
ConfidentialMMTP00166-00173 Letter from Dow to Evergreen with Hold Harmless-Responsi
ConfidentialMMTP00174-00181 Letter from Evergreen to Dow with signed Hold Harmless
ConfidentialMMTP00182 Mobile Mini Purchase Order to Alpha Technical
ConfidentialMMTP00183 Quala Invoice to Evergreen 11.7.18
ConfidentialMMTP00184 Quala Wash Out Ticket to Evergreen 11.6.18
ConfidentialMMTP00185 Quala Sustainable Container Solutions 10.6.18
ConfidentialMMTP00186 Veiolia Customer Certificate of Container Washout 11.6.18
ConfidentialMMTP00187 Uniform Hazardous Waste Manifest 10.18.18
ConfidentialMMTP00188 Quala Wash Out Ticket 11.6.18
ConfidentialMMTP00189 Quala Container Services Invoice to Mobile Mini 2.13.20
ConfidentialMMTP00190 Quala Cleaning Certificate to Mobile Mini 2.7.20
ConfidentialMMTP00191 Quala Cleaning Certificate to Clean Harbors 6.26.19
ConfidentialMMTP00192 Tank Diagram
ConfidentialMMTP00193 Dow letter to supplier re payment policy
MM000001 Tanker Diagram
MMTP0001 Quala Receiving Ticket to Mobile Mini
MMTP0002 Quala Sustainable Container Solutions to Sprint
MMTP0003 Uniform Hazardous Waste Manifest-Texas City Plant UCC and Sprint
MMTP0004-0005 Mobile Mini Insurance Dec Page
MMTP0006-0008 Waste Characterization
MMTP0009-0036 Polar Service Centers Inspection 7.23.2019
MMTP0037-0042 Emails Mobile Mini re Quala tanker profile information from Dow

**Performance Materials Discovery:**

2020.1214 Brown, Shawn. Def PM RRFD
2021.0513 Brown, Shawn.Def PM RRFP & AROGS
2021.0908 Brown, Shawn.Def PM Disco Resp
2021.0909 Brown, Shawn. Def PM Disco Resp
2021.1105 Brown, Shawn.Def PM 1st Amd RRFD
2022.0728 Brown, Shawn.Def PM Amended RRFD to Plt
2022.0829 Brown, Shawn.Def PM 2nd RRFP
PM00001-PM00005 Trailer Unloading Procedures
PM00006-PM00007 Manifest for 12.10.2019
PM00008-PM00009 Site Environmental Services Unloading Comm Form 12.2.2019
PM00010-PM00011 Shift Office Log dated 12.10.12
PM00012-PM00013 Shift Office Log dated 12.2.19
PM00014-PM00015 Straight Bill of Lading – Short Form dated 12.13.2019
PM00016 UCC Load ticket dated 11.18.2019
PM00020 Uniform Hazardous Waste Manifest – Sprint Transport dated 12.2.2019

PM00021-PM00023 Watse Characterization form dated 9.12.2019
PM00024-PM00025 Site Environmental Services Liquid Trailer Inspection datd 12.2.2019
PM00026-PM00107 Photos of Tanker
PM00108-PM00111 Certificate of Registration
PM00112-PM00117 TSMT Maintenance inspection Report
PM00118 SETX Tire & Mechanical Road Services Ticket
PM00119 Service Tank Prep List for Pressure & Vacuum Test
PM00120 Vehicle Inspection Connection TXDPS Report
PM00121-PM00123 Quala Wash Out Ticket dated 1.12.2017
PM00124-PM00125 Vehicle Inspection Connection DPS Report dated 1.13.2017
PM00126-PM00135 Photographs of Tank and equipment
PM00136 SES Incinerator shift Log dated 12.10.2019
PM00137-PM00347 Insurance Policy and Excess
PM000348-PM000395 Nitrogen Test Answer Key
PM000396-PM000399 Nitrogen Test Answer Key
PM000400-PM000413 Sabine River Works Site Safety Manual – Nitrogen Pipin Systems
PM000414-PM000442 Uniform Hazardous Waste Manifest
PM000443-PM000815 DWQ Roy Robinson Dr. Brylowski MR
PM000816-PM000833 DWQ Roy Robinson Dr. Brylowski BR
PM000834-PM000888 DWQ Roy Robinson Beaumont Emergency Center MR
PM000889-PM000902 DWQ Roy Robinson Beaumont Emergency Center BR
PM000903-PM001088 DWQ Roy Robinson HCA Houston Healthcare Mr
PM001089-PM001098 DWQ Roy Robinson Houston Medical Imaging MR
PM001099-PM001108 DWQ Roy Robinson Houston Medical Imaging BR
PM001109-PM001130 DWQ Roy Robinson LaPorte Fire EMS MR
PM001131-PM001140 DWQ Roy Robinson LaPorte Fire EMS BR
PM001141-PM001145 DWQ Roy Robinson Dr. Nilima Rai MR (ANR)
PM001146-PM001150 DWQ Roy Robinson Dr. Nilima Rai BR (ANR)
PM001151-PM001156 DWQ Roy Robinson Bay Area Heart MR (ANR)
PM001157-PM001162 DWQ Ry Robinson Bay Area Heart BR (ANR)
PM001163-PM001277 DWQ Roy Robinson Nova Medical Centers MR
PM001278-PM001299 DWQ Roy Robinson Nova Medical Centers BR
PM001300-PM001346 DWQ Roy Robinson Dr. Meltzer MR
PM001347-PM001382 DWQ Roy Robinson Dr. Meltzer BR
PM001383-PM001392 DWQ Roy Robinson Dr. Croft BR
PM001393-PM001445 DWQ Roy Robinson Dr. Croft MR
PM001446-PM001465 DWQ Roy Robinson Dr. Nathan BR
PM001466-PM001810 DWQ Roy Robinson UT Physicians MR
PM001811-PM001953 DWQ Lozano Harris County Forensic Institute -autopsy
PM001954 Difficult to Analyze Form
PM001955 Waste Authorization Signatures dated 11.8.19
PM001956-PM001961 Correspnodence DOW regarding WPN-123741 shipping temperature
PM001962 Waste Authorization Signatures dated 4.15.19

PM001963-PM001966 Correspondence DOW re WPN 123741 Approval at SRO
PM001967-PM001970 Waste Characterization Form
PM001971-PM001993 Safety Data Sheet UCC dated 6.8.18
PM001994 Restricted Waste-Certificate of Acceptability dated 4.15.19
PM001995 Notification of Benzene Waste Operations Neshap dated 4.15.19
PM001996-PM002007 DOW Chemical LDR Certification Worksheet
PM002008 Process Design WPN-123741
PM002010 Waste Verification Sampling Waiver WPN-123741
PM002011 Waste Acceptance Screening Form dated 4.16.19
PM002012-PM002013 Site Environmental Services Sample Worksheet
PM002014 Difficult to Analyze form dated 4.16.19
PM002015-PM002020 SES Incinerator Shift Log dated
PM002021-PM002052 Waste Analysis Plan Sabine River Works Incinerator
PM002053 Site Environmental Services Unloading Communication Form 9.4.19
PM002054 Site Environmental Services Unloading Communication Form 10.7.19
PM002055 Site Environmental Services Unloading Communication Form 11.1.19
PM002056-PM002062 Email chain DOW Update from week of 9.9.19-9.13.19
PM002063-PM002064 SES Incinerator Shift Log 9.18.19
PM002065 Waste Authorization Signatures 4.18.19
PM002066-PM002069 DOW Email chain regarding WPN 123741 Approval at SRO
PM002070-PM002073 Waste Characterization Form dated 4.9.19
PM002074-PM002096 Safety Data Sheet – Vinyl Aetate Polymer Residues
PM002097 Restricted Waste-Certificate of Acceptability 4.15.19
PM002098 Benzene Waste Operations Neshap 4.15.19
PM002099-PM002110 DOW LDR Certification Worksheet
PM002111 Process Description Vinyl Acetate Polymer Residues 4.15.19
PM002112 process Design Vinyl Acetate Polymer Residues
PM002113 Waste Verification Sampling Waiver 4.16.19
PM002114 Waste Acceptance Screening Form 4.16.19
PM002115-PM002116 Site Environmental Services Fingerprint Sample Record Worksheet
PM002117 Difficult to Analyze Form 4.16.19
PM002118-PM002124 DOW Email Chain regarding Shipping temperature
PM003276 Site Environmental Services unloading Communication Form 9.4.19
PM003277 Site Environmental Services Unloading Communication Form 10.7.19
PM003278 Site Environmental Services Unloading Communication Form 11.1.19
PM003279-PM003285 DOW Email Chain regarding Inc update from the wk of 9.19.19-9.13.19
PM003286-PM003287 SES Incinerator Shift Log 9.18.19
PM003288 Waste Authorization Signatures 4.15.19
PM003289-PM003292 DOW Email chain regarding WPN 123741 Approval at SRO
PM003293-PM003296 Waste Characterization Form 4.9.19
PM003297-PM003319 Safety Data Sheet UCC
PM003320-Restricted Waste-Certificate of Acceptability 4.15.19
PM003321 Notification of Benzene Waste Operating Neshap 4.15.19

PM003322-PM003333 DOW LDR Certification Worksheet
PM003334 Process Description 4.15.19
PM003335 Process Design Vinyl Acetate Polymer Residues
PM003336 Waste Verification Sampling Waivere 4.16.19
PM003337 Waste Acceptance Screening Form 4.16.19
PM003338-PM003339 Site Environmental Services Fingerprint Sample Record
PM003340 Difficult to Analyze Form 4.16.19
PM003341-PM003347 DOW Email Chain regarding WPN-123741 shipping temperature
PM003348 Uniform Hazardous Waste Management 9.6.19
PM003349 DOW LDR Certification Worksheet-page 1
PM003350-PM003352 DOW Spreadsheet pages 3 5 and 9 (not complete)
PM003353 DOW Restricted Waste List
PM003354 Sprint Transportation trailer unloaded sheet 9.6.19
PM003355 UCC VA Polymer ticket 9.3.19
PM003356 Site Environmental Services Liquid Trailer Inspection and Checklist 9.6.19
PM003357 Site Environmental Services Unloading communication Form 9.12.19
PM003358 Uniform Hazardous Waste Manifest 10.3.19
PM003359 UCC VA Polymer Ticket 10.16.19
PM003360 DOW LDR Certification Worksheet
PM003361 DOW Restricted page 3 of 9
PM003362 DOW Restricted Waste list
PM003363 Site Environmental Services Liquid Trailer Inspection and Checklist 10.31.19
PM003364 Site Environmental Services Unloading Communication Form 10.3.19
PM003365 Uniform Hazardous Waste Manifest 10.2.19
PM003366 UCC VA Polymer Ticket 9.22.19
PM003367 DOW LDR Certification Worksheet
PM003368-PM003370 DOW Restricted sheet page 3 5 and 9
PM003371 DOW Restricted Waste list
PM003372 Site Environmental Services Liquid Trailer Inspection and Checklist
PM003373 Site Environmental Services Unloading Communication Form 10.2.19
PM003374 Uniform Hazardous Waste manifest 11.27.19
PM003375 UCC VA Polymer Ticket 11.12.19
PM003376 DOW LDR Certification Worksheet
PM003377-PM003379 DOW Restricted Spreadsheet pages 3 5 and 9
PM003380 DOW Restricted Waste List
PM003381 Site Environmental Services Unloading Communication Form 11.27.19
PM003382 SES Incinerator Shift Log 12.10.19
PM003383 Site Environmental Services Liquid Trailer Inspection and Checklist 11.27.19
PM003384 Site Environmental Services Unloading Communication Form 11.27.19
PM003385 Uniform Hazardous Waste Manifest 10.30.19
PM003386 UCC VA Polymer Ticket 10.15.19
PM003387 DOW LDR Certification Worksheet
PM003388-PM003390 DOW Restricted sheet pages 3 5 and 9

PM003391 DOW Restricted Waste List
PM003392 Sprint Transport LLC Manifest 10.30.19
PM003393 Site Environmental Services Liquid Trailer Inspection and Checklist 10.30.19
PM003394 Site Environmental Services Unloading Communication Form 10.30.19
PM003395 Uniform Hazardous Waste Manifest 12.3.19
PM003396 UCC VA Polymer Ticket 11.19.19
PM003397 DOW LDR Certification Worksheet
PM003398-PM003400 DOW Restricted Spreadsheet pages 3 5 and 9
PM003401 DOW Restricted Waste List
PM003402 Site Environmental Services Liquid Trailer Inspection and Checklist 12.3.19
PM003403 Site Environmental Services Unloading Communication Form 12.3.19
PM003404 Uniform Hazardous Waste Manifest 9.4.19
PM003405 UCC VA Polymer ticket 8.29.19
PM003406 DOW LDR Certification Worksheet
PM003407-PM003409 DOW Restricted spreadsheet pages 3 5 and 7
PM003410 DOW Restricted Waste List
PM003411 Site Environmental Services Liquid Trailer Inspection and Checklist 9.4.19
PM003412 Non-Hazmat Environmental Tank Truck Carriers Personnel Questionnaire
PM003413 Site Environmental Services unloading Communication Form 9.4.19
PM003414 Uniform hazardous Waste Manifest 10.7.19
PM003415 UCC VA Polymer Ticket 9.24.19
PM003416 DOW LDR Certification Worksheet
PM003417-PM003419 DOW Restricted spreadsheet page 3 5 and 7
PM003420 DOW Restricted Waste List
PM003421 Site Environmental Services Liquid Trailer Inspection and Checklist 10.7.19
PM003422 Site Environmental Services Unloading Communication Form 10.7.19
PM003423 Uniform Hazardous Waste Manifest 11.1.19
PM003424 UCC VA Polymer Ticket 10.18.19
PM003425 DOW LDR Certification Worksheet
PM003426-PM003428 DOW Restricted Spreadsheet pages 3 5 and 7
PM003429 DOW Restricted Waste List
PM003430 Site Environmental Services Liquid Trailer Inspection and Checklist 11.1.19
PM003432 Uniform Hazardous Waste Manifest 12.2.19
PM003433 UCC Tare Receipt 12.2.19
PM003434 UCC VA Polymer ticket 11.18.19
PM003435-PM003442 DOW LDR Certification Worksheet 9 pages
PM003444 Site Environmental Services Liquid Trailer Inspection and Checklist 12.2.19
PM003445 Straight Bill of Lading – Short Form 12.13.19
PM003446 Site Environmental Services Unloading Communication Form 12.2.19
PM003447-PM003448 SES Incinerator Shift Log 9.4.19
PM003449-PM003450 SES Incinerator Shift Log 9.15.19
PM003451-PM003452 SES Incinerator Shift Log 9.11.19
PM003453-PM003454 SE Incinerator Shift Log 10.30.19

PM003455 SES Incinerator Shift Log 10.31.19 missing page 2
PM003456 SES Incinerator Shift Log 10.2.19 missing page 2
PM003457 SES Incinerator Shift Log 10.3.19 missing page 2
PM003458 SES Incinerator Shift Log 10.7.19 missing page 2
PM003459 SES Incinerator Shift Log 10.14.19 missing page 2
PM003460 SES Incinerator Shift Log 11.1.19 missing page 2
PM003461 SES Incinerator Shift Log 12.3.19 missing page 2
PM003462 SES Incinerator Shift Log 12.10.19 missing page 2
PM003463 uniform Hazardous Waste Manifest 9.6.19
PM003464 DOW LDR Certification Worksheet
PM00346-PM003467 DOW Restricted Spreadsheet pages 3 5 and 7
PM003468 DOW Restricted Waste List
PM003469 Sprint Transport Manifest 9.6.19
PM003470 UCC VA Polymer Ticket 9.3.19
PM003471 Site Environmental Services Liquid Trailer Inspection and Checklist 9.6.19
PM003472 Site Environmental Services Unloading Communication Form 9.6.19
PM003473 Uniform Hazardous Waste Manifest 10.31.19
PM003474 UCC VA Polymer ticket 10.16.19
PM003475 DOW LDR Certification Worksheet
PM003476 DOW Restricted Spreadsheet page 3 of 9
PM003477 DOW Restricted Waste List
PM003478 Site Environmental Services Liquid Trailer Inspection and Checklist 10.31.19
PM003479 Site Environmental Services Unloading Communication Form 10.31.19
PM003480 Uniform Hazardous Waste Manifest 10.2.19
PM003481 UCC VA Polymer ticket 9.22.19
PM003482 DOW LDR Certification Worksheet
PM003483-PM003485 DOW Restricted Worksheet pages 3 5 and 7
PM003486 DOW Restricted Waste List
PM003487 Site Environmental Services Liquid Trailer Inspection and Checklist 10.2.19
PM003488 Site Environmental Services Unloading Communication Form 10.2.19
PM003489 Uniform Hazardous Waste Manifest 11.27.19
PM003490 UCC VA Polymer Ticket 11.12.19
PM003491 DOW LDR Certification Worksheet
PM003492-PM003494 DOW Restricted Worksheet pages 3 5 and 7
PM003495 DOW Restricted Waste List
PM003496 Site Environmental Services Unloading Communication Form 11.27.19
PM003497 SES Incinerator Shift Log 12.10.19
PM003498 Site Environmental Services Liquid Trailer Inspection and Checklist 11.27.19
PM003499 Site Environmental Services Unloading Communication Form 11.27.19
PM003500 Uniform Hazardous Waste Manifest 10.30.19
PM003501 UCC VA Polymer 10.15.19
PM003502 DOW LDR Certification Worksheet
PM003503-PM003505 DOW Restricted Spreadsheet pages 3 5 and 7

PM003506 DOW Restricted Waste List
PM003507 Sprint Transport Manifest 10.30.19
PM003508 Site Environmental Services Liquid Trailer Inspection and Checklist 10.30.19
PM003509 Site Environmental Services Unloading Communication Form 10.30.19
PM003510 Uniform Hazardous Waste Manifest 12.3.19
PM003511 UCC VA Polymer ticket 11.19.19
PM003512 DOW LDR Certification Worksheet
PM003513-PM003515 DOW Restricted Spreadsheet pages 3 5 and 7
PM003516 DOW Restricted Waste List
PM003517 Site Environmental Services Liquid Trailer Inspection and Checklist 12.3.19
PM003518 Site Environmental Services Unloading Communication Form 12.3.19
PM003519 Uniform Hazardous Waste Manifest 9.4.19
PM003520 UCC VA Polymer ticket 8.29.19
PM003521 DOW LDR Certification Worksheet
PM003522-PM003524 DOW Restricted Spreadsheet pages 3 5 and 7
PM003525 DOW Restricted Waste List
PM003526 Site Environmental Services Liquid Trailer Inspection and Checklist 9.4.19
PM003527 Non-Hazmat Environmental Tank Truck Carriers Personnel Questionnaire
PM003528 Site Environmental Services Unloading Communication Form 9.4.19
PM003529 Uniform Hazardous Waste Manifest 10.7.19
PM003530 UCC VA Polymer Ticket 9.24.19
PM003531 DOW LDR Certification Worksheet
PM003532-PM003534 DOW Restricted Spreadsheet pages 3 5 and 7
PM003535 DOW Restricted Waste List
PM003536 Site Environmental Services Liquid Trailer Inspection and Checklist 10.7.19
PM003537 Site Environmental Services Unloading Communication Form 10.7.19
PM003538 Uniform Hazardous Waste Manifest 11.1.19
PM003539 UCC VA Polymer Ticket 10.18.19
PM003540 DOW LDR Certification Worksheet
PM003541-PM003543 DOW Restricted Worksheet pages 3 5 and 7
PM003544 DOW Restricted Waste List
PM003545 Site Environmental Services Liquid Trailer Inspection and Checklist 11.1.19
PM003546 Site Environmental Services Unloading Communication Form 11.1.19
PM003547 Uniform Hazardous Waste Manifest 12.2.19
PM003548 UCC Manifest Receipt 12.2.19
PM003549 UCC VA Polymer Ticket 11.18.19
PM003550-PM003558 DOW LDDR Certification Worksheet 12.2.19 (all 9 pages)
PM003559 Site Environmental Services LIquid Trailer Inspection and Checklist 12.2.19
PM003560 Straight Bill of Lading-Short form 12.13.19
PM003561 Site Environmental Serivces Unloading Communication Form 12.2.19
PM003562 SES Incinerator Shift Log 9.4.19
PM003563 SES Incinerator Shift Log 9.6.19
PM003564 SES Incinerator Shift Log 9.15.19

PM003565 SES Incinerator Shift Log 9.17.19
PM003566-PM003567 SES Incinerator Shift Log 9.11.19
PM003568-PM003569 SES Incinerator Shift Log 10.30.19
PM003570 SES Incinerator Shift Log 10.31.19
PM003571 SES Incinerator Shift Log 10.2.19
PM003572 SES Incinerator Shift Log 10.3.19
PM003573 SES Incinerator Shift Log 10.7.19
PM003574 SES Incinerator Shift Log 10.14.19
PM003575 SES Incinerator Shift Log 11.1.19
PM003576 SES Incinerator Shift Log 12.3.19
PM003577 SES Incinerator Shift Log 12.10.19
PM_002053-PM_002062 DWQ Roy Robinson Charles Covert BR
PM_002063-PM_0020102 DWQ Roy Robinson Charles Covert MR
PM_002103-PM_002121 DWQ Roy Robinson Genesis Medical Managment Solutions BR
PM_002122-PM_002715 DWQ Roy Robinson Genesis Medical Managment Solutions MR
PM_002716-PM_002734 DWQ Roy Robinson HCA Houston Healthcare Clear Lake BR
PM_002735-PM_002745 DWQ Roy Robinson Prestige Healthcare BR
PM_002746-PM_002973 DWQ Roy Robinson Prestige Healthcare MR
PM_002974-PM_002989 DWQ Roy Robinson Stuart Nathan PhD and Associates MR
PM_002990-PM_003003 DWQ Roy Robinson UT Physicians BR
PM_003004-PM_003111 DWQ Roy Robinson Jiffy Lube Employment
PM_003112-PM_003269 DWQ Roy Robinson Kirby Inland Marine Employment
PM_003270-PM_003275 DWQ Roy Robinson No Records Flexsteel Pipe Employment
PM_003578-PM_004127 OSHA Investigation File 9.15.22
PM_004128-PM_004374 Texas Commission on Environmental Quality File

**Sprint Discovery:**

2020.0604 Brown, Shawn.Def Sprint Transport's RRFD
2020.0609 Brown, Shawn.Def Sprint Transport's RRFA
2020.0609 Brown, Shawn.Def Sprint Transport's RRFP and AROGS
2021.0922 Brown, Shawn.Def Sprint Transport's 2nd AROGS
2021.0922 Brown, Shawn.Def Sprint Transport's 2nd RRFA
2021.0922 Brown, Shawn.Def Sprint Transport's 2nd RRFP
SPRINT-000001-000064 Sprint Safety & Health Mgmt 2019
SPRINT-000065-000070 Emails re Load
SPRINT-000071-000076 Work Order Sheets re Load
SPRINT-000077-000081 Settlement Sheets
SPRINT-000082-000383 Driver, E. Martinez File
SPRINT-000384-000608 Driver, R. Sevilla File
SPRINT-000609-000881 Driver Lease Agmt & Logs
SPRINT-000882-000987 Driver Lease Agmt & Logs

SPRINT-001068 -001074 Pasadena Police Department (No Records)
SPRINT-001075-001232 Harris County Institute of Forensic Sciences Records _ B_W Photos (Shawn Brown)
SPRINT-001233-001353 Color Photos from Harris County Inst Forensic Sciences DWQ
SPRINT-001354-001359 OSHA (No Records)
SPRINT-001360-001372 Pollution Control Services Records
SPRINT-001373-001377 LaPorte Police Department (No Records)
SPRINT-001378-001473 Care Now Urgent Care - Medical (Kyle Williams)
SPRINT-001474-001488 Care Now Urgent Care - Billing (Kyle Williams)
SPRINT-001489-001496 Care Now Urgent Care - Radiology Affidavit (Kyle Williams)
SPRINT-001497-001712 HCA Houston Healthcare Clear Lake - Medical (Kyle Williams)
SPRINT-001713-001719 HCA Houston Healthcare Clear Lake - Billing (Kyle Williams)
SPRINT-001720-001723 Houston Methodist - Billing (Kyle Williams)
SPRINT-001724-001746 Texas Interventional Cardiology - Medical (Kyle Williams)
SPRINT-001747-001750 Texas Interventional Cardiology - Radiology (Kyle Williams) (No Records)
SPRINT-001751-001765 LaPorte Fire Department Records
SPRINT-001766-001771 Pasadena Fire Marshall (No Records)
SPRINT-001772-001776 Houston Area Safety Council (No Records)
SPRINT-001890-002188 OSHA - 2014-2019 Complaints & Inspections

**Union Carbide Discovery:**

2020.0429 Brown, Shawn. Def Union Carbide Privilege Log
2020.0924 Brown, Shawn.Def Union Carbide Corp's RRFD
2021.0513. UCC Responses to Plaintiffs' 1st RFPs ROGs RFAs
2021.0922 Brown, Shawn. Def Union Carbide Corp's 2nd Disco Resp
2022.0106 Brown, Shawn.Union Carbide Corp's 1st Supp RRFD
2022.0315 Brown, Shawn.Def Union Carbide Corp's 1st Supp AROGS
2022.0404 Brown, Shawn.UCC Resp to Plaintiffs' 2nd RFP
2022.0810 Brown, Shawn.Def Union Carbide Corp's 2nd Supp RRFD
UCC000008-UCC000009 Tank Truck Loading-Unloading Checklist 11.18.19
UCC000010-UCC000013 Uniform Hazardous Waste Manifest 12.12.19
UCC000014 Email from TCO to Employees re OSHA investigation
UCC000015-UCC000016 DuPont Manifest Weight Ticket 12.2.19
UCC000017-UCC000018 Site Environmental Services Liquid Trailer Unloading Comm Form 12.10.19
UCC000019-UCC000020 Shift Office Log WPN-123741
UCC000021-UCC000022 Shift Office Log WPN-123741 12.2.19
UCC000023-UCC000024 Straight Bill of Lading-short Form 12.13.19
UCC000025-UCC000026 Site Environ Svcs Liquid Trailer Inspection and Checklist 12.2.19
UCC000027-UCC000036 Dow Chemical Company LDR Certification Worksheet 12.2.19

UCC000037-UCC000040 Uniform Hazardous Waste Manifest Waste Certification 12.2.19
UCC000041-UCC000044 UCC VA Polymer Weight Ticket 11.18.19
UCC000045-UCC000047 Email btwn DOW and OSHA re Dow - Sabine River loading unloading
UCC000048-UCC000049 Email bwtn Dow and OSHA re Dow - Sabine River
UCC000050-UCC000131 Emails bwtn Dow and OSHA re Last Contained Shipping Manifest
UCC000132-UCC000146 Email btwn Dow and OSHA re Last 3 Cargoes and Cleaning Records
UCC000147-UCC000152 Email btwn Dow and OSHA re Last Contained Shipping Manifest
UCC000153 Logbook Note for tanker 11.18.19
UCC000154-UCC000158 Emails btwn Dow and OSHA re Last 3 Cargoes and Cleaning Records
UCC000159-UCC000184 Alfred Firm LOR to UCC attorneys
UCC000185-UCC000196 Email btwn Dow and OSHA re Last 3 Cargoes and Cleaning Records
UCC000197-UCC000198 Email btwn Dow and OSHA re Last Contained Shipping Manifest
UCC000199-UCC000277 Jason Rodriguez Training and Certs
UCC000278-UCC000281 UCC Purchase Order 4700776257 12.20.18
UCC000282-UCC000285 UCC Purchase Order 4700902548 12.16.19
UCC000286-UCC000335 Teresa Ruelas Training and Certs
UCC000547-UCC000550 Jason Rodriguez Annual Performance Reviews
UCC000551-UCC000560 Mobile Mini Invoice Summary Template 11.1.19-11.30.19
UCC000561-UCC000571 Mobile Mini Invoice Summary Template 12.1.19-12.31.19
UCC000572-UCC000578 General Template Service Entry Sheet
UCC000579 Hazardous Waste Ticket 11.18.19
UCC000580-UCC000582 Cert Recert Critical Task Checksheet Jason Rodriguez
UCC000583-UCC000595 LEO for Loading Trailers with Vinyl Acetate Polymer Residues
UCC000596-UCC000598 Tank Truck Loading Unloading Checklist
UCC000599-UCC000685 Amended and Restated Agreement btwn Dow and Kelly Svcs
UCC000686-UCC000687 Amendment Twelve to Amended Agmt btwn Dow and Kelly Svcs
UCC000688-UCC000689 Amendment 23 to Amended Agreement btwn Dow and Kelly Svcs
UCC000690-UCC000706 Amd and Restated Services Agmt btwn Dow and UCC
UCC000707 1st Amd to Amd and Restated Agmt btwn Dow and UCC
UCC000708-UCC000721 2nd Amd and Restated Employee Seconding Agmt Dow and UCC
UCC000722-UCC000723 6th Amendment to 2nd Am Employee Agmt Dow and UCC
UCC000724-UCC000761 Uniform Hazardous Waste Manifests for Dec 2019
UCC000762-UCC000765 Purchase Order 12.17.19
UCC000766-UCC000771 LEO for Sampling Vinyl Acetate Polymer Residue
UCC000772-UCC000786 Attachment V.IV.D Waste Analysis Plan UCC
UCC000787-UCC000796 Waste Management Procedure
UCC000797-UCC000801 Photos of Danger tags posted on tanks
UCC000802-UCC000809 Container Labeling Procedure
UCC000810-UCC002498 Eurofins Environment Testing Analytical Report 6.28.19 UCC002499 Restated Service Addendum btwn Dow and UCC
UCC002500-UCC002541 Uniform Hazardous Waste Manifests November 2019
UCC002542 UCC Polymer Storage Tank diagram

UCC002543 VA Polymer Spreadsheet
UCC002544 Email btwn Dow and OSHA re Last contained Shipping Manifest
UCC002550 Uniform Hazardous Waste Manifest 10.30.19
UCC002551 Uniform Hazardous Waste Manifest 10.31.19
UCC002552 Uniform Hazardous Waste Manifest 10.31.19
UCC002553 Agreement Btwn Dow and Contractor 1.9.02
UCC002554 Employee Acknowledgement Dow and Kelly Services 1.10.02
UCC002555 Employment Agreement for Emp Kelly Services
UCC002556 Dow Non-Employee App for Computer User ID Teresa Ruelas
UCC002557-UCC002579 Safety Data Sheet Vinyl Acetate Polymer Residues
UCC002580-UCC002750 TestAmerica Analytical Report 5.11.15
UCC002751-UCC002905 TestAmerica Analytical Report 5.19.16
UCC002906-UCC004283 TestAmerica Analytical Report 3.13.17
UCC004284-UCC005996 TestAmerica Analytical Report 9.10.18
UCC005997-UCC006107 Eurofins Analytical Report 4.30.20
UCC006108-UCC006115 EH&S Off-site Sample Shipment Guide
UCC006116-UCC006136 Guidance for Shipping Waste to Texas Operations
UCC006137 Spreadsheet
UCC006138 Reaction System Polymer Removal Diagram
UCC006139-UCC006142 Process Containment Equipment Registration Form
UCC006143-UCC006277 EH&S Global Requirements Inspection & Testing
UCC006278-UCC006281 Global Mechanical Inspection Types for Installation Inspection
UCC006282-UCC006283 Global Mechanical Inspection Types for Owner Visual Inspections
UCC006284-UCC006290 Global Mechanical Inspection Types for External Inspections
UCC006291-UCC006296 Global Mechanical Inspection Types for Internal Inspections
UCC006297-UCC006303 Global Mechanical Inspection Types for Corrosion Under Insulation
UCC006304-UCC006305 Global Mechanical Inspection Types for Nondestructive Exam
UCC006306 Global Mechanical Insp Types for Insp Based on Corrosion Study
UCC006307-UCC006309 Dow Checklist for External Visual Exam of Pressure Vessels
UCC006310-UCC006313 Dow Polymer Storage Tank Inspection
UCC006314-UCC006315 Texas City Operation GMISS Inspection Forms
UCC006316-UCC006319 Dow Equipment Corrosion Report
UCC006320-UCC006321 Waste Coordinator Duties
UCC006322-UCC006323 Overview Job Description Maintenance Leader
UCC006324-UCC006325 Overview Job Description Production Director
UCC006326-UCC006327 Overview Job Description Production Leader
UCC006328-UCC006342 Dow Safety Data Sheet Vinyl Acetate
UCC006343 Emily Fellows Production Leader chart
UCC006344-UCC006347 Chart of Maintenance Employees with job title
UCC006348-UCC006351 Chart of Maintenance Employees with job title
UCC006352-UCC006393 Dow Waste Characterization Summary ID 75685
UCC006394-UCC006401 Dow Waste Characterization Summary ID 83874
UCC006402-UCC006409 Dow Waste Characterization Summary ID 83874

UCC006410-UCC006419 Dow Waste Characterizations Summary ID 0000101180
UCC006420-UCC006429 Email with Waste Characterization Summary ID 0000102314
UCC006430-UCC006434 UCC Gross Tickets Weight
UCC006435-UCC006436 Tank Truck Loading Unloading Checklist 8.22.19
UCC006437-UCC006438 Tank Truck Loading Unloading Checklist 8.29.19
UCC006439-UCC006440 Tank Truck Loading Unloading Checklist 9.14.19 UCC006441-UCC006442 Tank Truck Loading Unloading Checklist 9.24.19
UCC006443-UCC006444 Tank Truck Loading Unloading Checklist 10.18.19
UCC006445-UCC006454 Order Header Replace corroded line
UCC006455-UCC006456 Dow HAO Inspection Scope 2.21.16
UCC006457-UCC006458 Dow HAO Inspection Scope 2.6.16
UCC006459-UCC006466 Order Header Insulate Steam tracing piping tubing
UCC006467-UCC006474 Order Header Repair Polymer Tk dike drain valve
UCC006475-UCC006482 Order Header Replace Poly Storage Tank Inlet Valve
UCC006483-UCC006490 Order Header Need to ground polymer pump
UCC006491-UCC006496 Order Header Polymer Storage Tank Owner Visual
UCC006497-UCC006504 Order Header Close-cui set to 60 months with ext
UCC006505-UCC006506 Dow TCO Inspection Scope
UCC006507-UCC006514 Order Header Replace Poly Storage tank pump valves
UCC006515 Photo of wrapped pipes
UCC006516 Photo of valves
UCC006517 Photo of Pipes - disch valve-purge-disch to truck
UCC006518-UCC006525 Order Header Vent regulator
UCC006526-UCC006531 Order Header TECO Replace Valve Handle FE Tag
UCC006532-UCC006539 Order Header Replace valve at loading rack
UCC006540 Photo pipe and valve
UCC006541-UCC006548 Order Header Replace check valve on pump
UCC006549 Photo of valve
UCC006550 Photo of pump piping
UCC006551-UCC006558 Order Header Route a new vent line on Polymer
UCC006559-UCC006568 Order Header Polymer Storage tank cleaning
UCC006569-UCC006573 TCO Turnaround Group Photo Diagrams
UCC006574-UCC006581Order Header Poly Storage Tank Ext-UT-CUI Insp
UCC006582-UCC006583 Dow TCO Inspection Scope
UCC006584-UCC006589 Order Header Polymer Storage Tank Owner Visual
UCC006590-UCC006597 Order Header Steam Trace Tubing at Poly Str. Tk
UCC006598-UCC006605 Order Header Steam Tracing Proj for Poly Stor Tank
UCC006606 Photo of Tank
UCC006607 Logbook Note Loading Record 8.22.19
UCC006608 Logbook Note Loading Record 8.29.19
UCC006609 Logbook Note Loading Record 9.24.19
UCC006610 Logbook Note Loading Record 10.18.19
UCC006611 Logbook Note Loading Record 9.14.19

UCC006612 Praxair Letter to UCC 12.10.19
UCC006613 UCC Vinyl Acetate Reactor System Diagram
UCC006614 UCC Polymer Removal System Diagram
UCC006615 UCC Vinyl Acetate Unit Diagram
UCC006616 UCC Vinyl Acetate Piping Diagram
UCC006617 UCC Reaction System Polymer Removal Piping and Inst Diagram
UCC006618 Polymer Still diagram
UCC006619 CO Removal System diagram

**Quala Discovery:**

2020.0602 Brown, Shawn.Def Alpha Tec AROGS
2020.0602 Brown, Shawn.Def Alpha Tec RRFA
2020.0602 Brown, Shawn.Def Alpha Tec RRFD
2020.0605 Brown, Shawn.Def Alpha Tc RRFP
Brown, Shawn.Work Video
2020.0911 Brown, ShawnDef Alpha Tec 1st Supp RRFD
2021.0607 Brown, Shawn.Def Alpha Tec's 2nd RRFP & 2nd AROGS
2021.0609 Brown, Shawn.Def Alpha Tec's Amd to 2nd RRFP
2022.0729 Brown, Shawn. Def Alpha Tec RRFD
Quala Production 000263-000266 Bracewell Correspondence re site inspection
Quala Production 000267-000268 Bracewell Correspondence re preservation
Quala Production 000269-000270 Amaro Correspondence regarding preservation of PPE
Quala Production 000271-000272 Bracewell Correspondence xfer of cartridges to OSHA
Qu Quala Production 000293-000294 Confined Space Entry Permit completed
Quala Production 000295-000331 Confined Space Entry
Quala Production 000332-000335 Completing the Confined Space Entry Permit
Quala Production 000336-000339 Isolating a Confined Space
Quala Production 000340-000345 Atmospheric Testing of a Confined Space
Quala Production 000346-000349 Clean Tank Inspection
Quala Production 000350-000351 Confined Space Assessment Form
Quala Production 000352 Confined Space Assessment Summary
Quala Production 000353 Confined Space Peronnel Form
Quala Production 000354-000355 Confined Space Entry Permit blank form
Quala Production 000356 CSE Drill Instructions
Quala Production 000357 CSE Mock Rescue Drill
Quala Production 000358 Form letter regarding Confined Space Entry
Quala Production 000359 Confined Space Entry Training Acknowledgement
Quala Production 000360-000387 CSE Exams,Training Forms for Shawn Brown
Quala Production 000388-000395 CSE Training & Safety Meeting Shawn Brown
Quala Production 000396-000400 Job Description
Quala Production 000401-000412 Prehospital Care Report Roy Robinson

Quala Production 000413-000482 Pictures of Incident Area
Quala Production 000483-000485 Log of Work Related Injuries 2019
Quala Production 000486-000490 Emails re Ernesto and OSHA interview
Quala Production 000491-000517 Confined Space Entry Program Intro and Scope
Quala Production 000518-000524 First Report of Incident 5.24.19
Quala Production 000525-000532 Safety Data Sheet (Aniline)
Quala Production 000533-000536 Permeation Guide Tychem Fab
Quala Production 000537-000552 CSE Permit for La Porte Job
Quala Production 000553-000555 Ernesto Poblano Training History
Quala Production 000556 Quala Rail & Specialty Confined Space Entry Program
Quala Production 000557-000560 Arthur Davis Training Info
Quala Production 000561-000568 Pictures
Quala Production 000569-000578 Accident Incident Reporting and Investigation
Quala Production 000579-000592 Respiratory Protection Info
Quala Production 000593-000627 SOP for CSE
Quala Production 000628-000631 Canadian CSE Regulation
Quala Production 000632-000635 SOP for Completing the Confined Space Entry Permit
Quala Production 000636-000656 SOP for Isolating a Confined Space
Quala Production 000657-000746 Chemical Classification Guide
Quala Production 000747 Hazard Communication Poster
Quala Production 000748-000759 PPE Policy and Procedure
Quala Production 000760 PPE Matrix
Quala Production 000761-000762 PPE Disposal Procedure
Quala Production 000763-000772 Lockout Tagout and Try Procedure
Quala Production 000773-000783 Bloodborne Pathogen Program
Quala Production 000784 Bloodborne Pathogens TAsks and PPE Matrix
Quala Production 000785 Bloodborne Pathogens Spill Clean-Up Procedure
Quala Production 000786 Bloodborne Pathogen Housekeeping and Maint Sch
Quala Production 000787-000812 Bloodborne Pathogens OSHA Standard
Quala Production 000822-000831 Forklift Powered Industrial Trucks Program
Quala Production 000823-000830 Fire Prevention Plan
Quala Production 000831-000842 Fall Protection Policy and Procedureala Production 000273-000292 Email with Brown Paystubs from Bracewell to Amaro
Quala Production 000843-000845 Asbestos Evaluation Procedure
Quala Production 000846-000847 Quarantine of Crater Causing Products (PPG)
Quala Production 000848 PPG Sample Submission For Crater Testing
Quala Production 000849-000851 Aerosol Can Disposal
Quala Production 000852-000855 Cleaning Containers That Last Held Benzene
Quala Production 000856 IH Testing Report - Benzene October 2012
Quala Production 000857-000901 CSE Survey
Quala Production 000902-000909 SOP Safety Program
Quala Production 000910-000945 Tanker Report
Quala Production 000946-000966 SOP Regulations

Quala Production 000967-000998 OSHA Hexavalent Chromium
Quala Production 000999-001006 SOP SAF 023-024-A
Quala Production 001007-001050 Methylene Tanker Report
Quala Production 001051-001096 SOP SAF 025 & Photos
Quala Production 001097-001098 More Photos
Quala Production 001099-001101 OSHA Informal Conf
Quala Production 001102-001106 PPE Program
Quala Production 001107 Training Cert for Ernest Poblano
Quala Production 001108-001109 OSHCON
Quala Production 001110-001121 Quala Citation from OSHA
Quala Production 001122-001133 USDOL Invoice Debt Collection Notice
Quala Production 001134-001170 Confined Space Entry
Quala Production 001171 CSE Drill Instructions
Quala Production 001172 CSE Mock Rescue Drill
Quala Production 001173-001174 Report of Regulatory Agency Visit
Quala Production 001175 Photo of Simple Green Inds Cleaner
Quala Production 001176 Notice of OSHA Investigation
Quala Production 001177-001179 Photos of hole in PPE
Quala Production 001180-001196 ATA Ernest Poblano Cert List
Quala Production 001197-001200 Personal Action Form
Quala Production 001201 Thaddeus Williams CSE Training
Quala Production 001202-001203 QRS Weekly Eval
Quala Production 001204 QRS New Hire Checklist
Quala Production 001205-001211 Screening SB
Quala Production 001212-001213 Personnel Change
Quala Production 001214-001223 Emploment App SB
Quala Production 001224-001230 SB W-4
Quala Production 001231-001240 Atmospheric Test
Quala Production 001241-001243 Hazard Character
Quala Production 001244-001255 Carbon Mono Ex
Quala Production 001248-001255 Type of Dectector
Quala Production 001256 Detector used by ATS
Quala Production 001257 Detector used by ATS#2
Quala Production 001258 Detector used by ATS#3
Quala Production 001259-001262 Detector #4
Quala Production 001263-001264 Cal v Bump
Quala Production 001265 Min Response Time
Quala Production 001266-001267 Detector Selc
Quala Production 001268 Detector Sequence
Quala Production 001269 Lives of Staff
Quala Production 001270 Meter Pickup
Quala Production 001271-001272 Meter Setup
Quala Production 001273-001274 Meter Use

Quala Production 001275-001280 Atmosphere Exam
Quala Production 001281-001315 Worksafe
Quala Production 001316-001319 Hydro Sulf
Quala Production 001320-001327 Air SAR Use
Quala Production 001328-001332 Resp Hazard
Quala Production 001333-001361 Resp Protect
Quala Production 001362-001365 Teamwork
Quala Production 001366-001395 Valves
Quala Production 001396-001422 Drums
Quala Production 001423-001444 Totes
Quala Production 001445-001473 Main Hoses
Quala Production 001474-001499 Cam Locks
Quala Production 001500-001506 Hazard CS
Quala Production 001507-001509 Atmosph w CM
Quala Production 001510-001522 Atmosh Alarm
Quala Production 001523-001531 Duties of Entrant
Quala Production 001532 Duties to Commun
Quala Production 001533-001536 Safety Precau
Quala Production 001537-001572 Tech Train Guide
Quala Production 001573-001574 3 Mo Train Adden
Quala Production 001575-001576 Cleaning Terms
Quala Production 001577-001579 pH Explained
Quala Production 001580-001587 HSE Journey
Quala Production 001588-001596 Vapor Mitigation
Quala Production 001597-001620 RCRA
Quala Production 001621-001657 Work Order
Quala Production 001658-001736 Training Module
Quala Production 001737-001790 Trainee Guide
Quala Production 001791 HSEE Hazard Assessment
Quala Production 001792-001795 Waste Manifest
Quala Production 001796 Container Solutions
Quala Production 001797 Receiving Ticket
Quala Production 001798 Mobile Mini Baytown
Quala Production 001799-001803 Cleaning Estimate
Quala Production 001804-001805 Job Analysis
Quala Production 001806 Products Used On Tank
Quala Production 001807-001808 Ticket For Flush
Quala Production 001809-001813 CSE Permit
Quala Production 001814-001816 Container Log
Quala Production 001817-001822 Cleaning Proced
Quala Production 001823 Pollution Control Serv
Quala Production 001842-001844 Fire Safe Exam
Quala Production 001845-001847 Truck Exercise

Quala Production 001848-001858 HASC
Quala Production 001859-001924 Trainee Log
Quala Production 001925-001930 Rescue Drill
Quala Production 001931 CSE Training SB
Quala Production 001932-001937 CSE Train Employ
Quala Production 001938 Safety Meeting
Quala Production 001939-001940 CSE Completion
Quala Production 001941-001945 CR Exam
Quala Production 001946-001956 FDR Safety
Quala Production 001957-001972 JE Employ File
Quala Production 001973-002035 Safety Meeting
Quala Production 002036-002148 KW Safe Train
Quala Production 002149-002205 ML Safe Train
Quala Production 002206-002275 RR Safe Train
Quala Production 002276-002354 SB Safe Train
Quala Production 002355-002424 LS Safe Train
Quala Production 002425-002539 TW Safe Train
Quala Production 002540-002571 TW Respirator Tst
Quala Production 002572-002608 WB Safe Train
Quala Production 002609-002618 SAF 003-10
Quala Production 002619-002686 WB Employ Info
Quala Production 002687-002725 WB Employ Info
Quala Production 002726-002729 WB Employ Info
Quala Production 002730-002738 WB Employ
Quala Production 002739-002743 WB Health Test
Quala Production 002744-002786 SAF 220-08A
Quala Production 002787-002791 Envir Eval
Quala Production 002792-002795 List Of Employ
Quala Production 002796 OSHA Inspec
Quala Production 002797 Brand Pyramid
Quala Production 002798 Mission Statemen
Quala Production 002799-002863 JE Employ File
Quala Production 002864-003011 WB Fired Info
Quala Production 003012-003034 ML Employ Info
Quala Production 003035003047 SL Employ
Quala Production 003048-003051 SL Felony
Quala Production 003052-003063 SL Mom Info
Quala Production 003064-003106 RR Pers File
Quala Production 003107-003132 CR Pers File
Quala Production 003133-003172 CR Crim Rec
Quala Production 003173-003462 Employ Info
Quala Production 003293 Photo of Uniforms (dup #3293)
Quala Production 003463-003476 BTE Eval

Quala Production 003477-003634 TW Info
Quala Production 003635-003652 TW Crim Rec
Quala Production 003653-003664 Lead Tech
Quala Production 003665-003671 Occup DL
Quala Production 003672-003715 Employ Compl
Quala Production 003716-003804 Safe Analysis
Quala Production 003805-003863 KW Pers File
Quala Production 003904-003922 OSHA Citation & Fines to Alpha Technical
Quala Production 003923 Pic of Uniforms
Quala Production 003924-003927 Analysis of Med Examiner Findings
Quala Production 003928-003932 US DOL_OSHA Air Quality Sampling
Quala Production 003933-003934 MSA Sheet - Carbon Monoxide Sensor Sensitivity
Quala Production 003935 The Breather Box Fact Sheet
Quala Production 003936 Fall Tech Harness Spec Sheet
Quala Production 003937 Seattle Glove Inc Spec Sheet
Quala Production 003938-003939 Microflex Glove Spec Sheet
Quala Production 003940 Req for Verification of Employement of Stephen Dodds
Quala Production 003941-003950 Restrictive Covenants Agreement Between QW Holdings & Dodds
Quala Production 003951 Quala Termination Form for Dodds
Quala Production 003952-003963 Amended and Restated Employement Agreement Between Alpha Tech & Dodds
Quala Production 003964 Personnel Change Notice for Dodds
Quala Production 003965 Employee Handbook Acknowledgment for Robert Wilson
Quala Production 003966-003970 Separation Agreement & Release Between Qualawash & Robert Wilson
Quala Production 003971 Termination Form for Robert Wilson
Quala Production 003972 W4 Form for Robert Wilson
Quala Production 003973-003975 Initial Incident Report
Quala Production 003976-003977 Excerpts from Houston Chronicle Post Re Incident
Quala Production 003978-003979 Pay Summaries for Shawn Brown
Quala Production 003980 Texas Factual Claim Report Dated 12.30.2019
Quala Production 003981-003982 Health Ins Claim Form for Roy Robinson_EMS
Quala Production 003983-003994 Roy Robinson EMS MR
Quala Production 003995-004003 Shawn Brown Autopsy Report
Quala Production 004004-004007 Amaro LOR to Quala Dated 1.3.2020
Quala Production 004008-004017 Email Chain Between Kelley Stoll & Theresa Borzik WC Re Kids
Quala Production 004018-004046 WC Paperwork Between TX & Henderson
Quala Production 004047-004064 Def Mobile Mini's 91a MTD DAted 3.30.2020
Quala Production 004065-004072 Def Mobile Mini's Answer to Plt's OPet Dated 3.30.2020
Quala Production 004073-004076 Def Dodds Answer Dated 3.30.2.20
Quala Production 004077-004080 Def Alpha Tech's Answer

Quala Production 004081-004090 Kyle Williams' 1st Amen Petition
Quala Production 004091-004103 Shawn Brown Jr & Bens, et al Orig Petition
Quala Production 004104-004140 Plt Bussey's Orig Petition
Quala Production 004141-004177 Plt Bussey's Orig Petition
Quala Production 004178-004239 WC Application, Emails & Responses
Quala Production 004240-004276 Plt Bussey's Orig Petition
Quala Production 004277 Termination Form for Shawn Brown Deceased
Quala Production 004278-004280 Training Log for Shawn Brown
Quala Production 004281 Quala Confined Safety Training Check In Sheet
Quala Production 004282-004283 QRS Weekly Evaluation Sheets for Shawn Brown
Quala Production 004284 Quala New Hire Checklist for Shawn Brown
Quala Production 004285-004291 Liberty Screening Svc Client Report for Shawn Brown
Quala Production 004292 Personnel Change Notice for Shawn Brown
Quala Production 004293 Emergency Contact Form for Shawn Brown
Quala Production 004294-004297 Shawn Brown's Employment Application w Quala
Quala Production 004298 Shawn Brown New Hire Acknowledgment Form
Quala Production 004299-004302 Shawn Brown Quala Payroll Forms
Quala Production 004303-004304 Shawn Brown W4
Quala Production 004305-004306 Shawn Brown Employment Agreement
Quala Production 004307-004308 Quala WC Notice to New Employee Shawn Brown
Quala Production 004309-004310 Quala Affirmative Action Ntc to New Employee Brown
Quala Production 004311-004312 Dax Garza LOR to Quala
Quala Production 004313-004333 Shawn Brown Training Records
Quala Production 004334 Shawn Brown Ack for Forklift Handbook
Quala Production 004335 Powered Industrial Truck Pretest Exercise for Shawn Brown
Quala Production 004336-004337 Forklift Safety Quiz for Shawn Brown
Quala Production 004338-004339 Shawn Brown Training Records
Quala Production 004340-004341 Fire Safety Comprehension Exam for Shawn Brown
Quala Production 004342-004343 Hazard Communications and Comprehension Exam for Shawn Brown
Quala Production 004344 Confined Space Entry Training Ack for Shawn Brown
Quala Production 004345-004346 PPE Training
Quala Production 004347 Rail Safety Comprehension Exam for Shawn Brown
Quala Production 004348 GEMM Traning Doc for Shawn Brown
Quala Production 004349-004350 Employee_Contractor Orientation Comprehension Exam for Shawn
Quala Production 004351 Security Orientation Comprehension Exam for Shawn
Quala Production 004352 Initial Cycle Training for Shawn Brown
Quala Production 004353 Heat and Cold Stress Program for Shawn Brown
Quala Production 004354-004358 Orientation Test Package for Shawn
Quala Production 004359-004360 Houston Area Safety Counsel Badge for Shawn
Quala Production 004361-004367 Preapproved & PPE Training for Shawn
Quala Production 004368 Mailing envelope to ESIS

Quala Production 004369-004446 3 Mo Training Module Test Package for Shawn
Quala Production 004447 Uniform Requisition Form for Shawn
Quala Production 004448 Employee Payroll Deduction Acknowledgment
Quala Production 004449 QRS Weekly Eval for Shawn 10.26.2019
Quala Production 004450-004452 Safety Training Sign In Sheet for Duratech
Quala Production 004453-004464 Safety Train
Quala Production 004465 QRS Weekly Eval for Shawn 10.07.2019
Quala Production 004466 CSE Mock Rescue Drill Completion
Quala Production 004467 Confined Space Entry Permit Completion
Quala Production 004468 Confined Space Entry Permit Completion
Quala Production 004469 Confined Space Entry Safety Training Completion
Quala Production 004470 Respirator Care Instructions Signed by Shawn
Quala Production 004471 Mailing Envelope to ESIS
Quala Production 004472 Personnel Action Form for Shawn
Quala Production 004473-004475 Training Logs for Shawn
Quala Production 004476 Confined Space Entry Safety Training Sign IN
Quala Production 004477 QRS Weekly Eval 9.20.2019
Quala Production 004478 QRS Weekly Eval 9.29.2019
Quala Production 004479 Quala New Hire Checklist for Shawn
Quala Production 004480-004486 Liberty Screening Services Client Report for Shawn
Quala Production 004487 Personnel Change Notice for Shawn
Quala Production 004488 Emergency Contact form for Shawn
Quala Production 004489-004491 Shawn Brown Employment Application
Quala Production 004492-004505 Shawn Brown New Hire Docs
Quala Production 004506-004507 Dax Garza LOR to Alpha
Quala Production 004508-004521 Shawn Brown OJT Training Forms
Quala Production 004522-004523 Shawn Brown Certification Sheets
Quala Production 004524-004527 Shawn Brown Hazmat Training Record
Quala Production 004528-004538 Shawn Brown Certifications & Exam Results
Quala Production 004539-00562 Shawn Brown Adtl Training & Certifications
Quala Production 004563 Envelope to ESIS
Quala Production 004564-004581 2019 Pay Summaries for Shawn
Quala Production 00582-004585 Uniform Hazardous Waste Manifest
Quala Production 004586-004622 Citation & Petition for Bussy
Quala Production 004625-004629 ESIS with Hazardous Waste Manifest
Quala Production 004630-004666 Citation & Petition for Bussey
Quala Production 004667-004703 Citation & Petition for Bussy
Quala Production 004704-004740 Citation & Petition for Bussey
Quala Production 004741-004758 Def Mobile Mini's MTD Plt's Petition 3.31.2020
Quala Production 004759-004766 Def Mobile Mini's Answer 3.30.2020
Quala Production 004767-004770 Def S Dodd Original Answer to C Bussey POP
Quala Production 004771-004774 Defs Atla Techinical & Qualawash Answer to C Bussey POP
Quala Production 004775-004784 1st Amended Intervention of Kyle Wms

Quala Production 004785-004797 Interevention by Shawn Jarmail Brown etc in C Bussey POP
Quala Production 004798-004834 Citation & Petition for Bussey
Quala Production 004835-004836 TX Dept Ins - W Comp Burial benefits Ltr
Quala Production 004837-004866 Attys for Ace American Exchange with TX W Comp
Quala Production 004867-004867 S Lozano 2019 W2
Quala Production 004868 R Robinson 2019 W2
Quala Production 004869 Defs Atlas Answer Cover Sheets Re S Lozano Case
Quala Production 004870 POP Re S Lozano Case
Quala Production 004871-005004 Pltf Roy Robinson W Comp File
Quala Production 005005-005006 Citations to Quala from Plt Felicia Sheppard
Quala Production 005007 Email form ESIS to Chubb Re Employee W2s
Quala Production 005008 2019 W2 for Sidarieub Lozano
Quala Production 005009 2019 W2 for Roy Robinson
Quala Production 005010-005020 Ops Training Status for Clint Scott
Quala Production 005021-005029 Emissions Report 12.13.2019-12.28.2019
Quala Production 005030-005031 Qualawash Container Log 12.13.2019
Quala Production 005032-005033 Quala Rail & Specialty (Overnight-Weekends Log) 12.14.2019-12.16.2019
Quala Production 005034 Qualawash Container Log 12.17.2019
Quala Production 005035 Quala Rail & Specialty (Overnight-Weekends Log 12.17.2019
Quala Production 005036 Qualawash Container Log 12.18.2019
Quala Production 005037 Quala Rail & Specialty (Overnight-Weekends Log) 12.19.2019
Quala Production 005038-005039 Qualawash Container Log 12.19.2019
Quala Production 005040-005041 Qualawash Container Log 12.20.2019
Quala Production 005042 Qualawaash Container Log 12.23.2019
Quala Production 005043 Quala Rail & Specialty (Overnight-Weekends Log) 12.20.2019-12.23.2019
Quala Production 005044 Qualawash Container Log 12.26.2019
Quala Production 005045 Quala Rail & Specialty (Overnight-Weekends Log) 12.24.2019-12.26.2019
Quala Production 005046 Quala Rail & Specialty (Overnight-Weekends Log) 12.26.2019
Quala Production 005047 Qualawash Container Log 12.27.2019
Quala Production 005048 Quala Rail & Specialty (Overnight-Weekends Log) 12.26.2019-12.27.2019
Quala Production 005049 Qualawash Container Log 12.30.2019
Quala Production 005050 Qualawash Container Log 12.31.2019
Quala Production 005051 Qualawash Container Log (not dated)
Quala Production 005052 Quala Rail & Specialty (Overnight-Weekends Log) 12.31.2019
Quala Production 005053 Qualawash Container Log 01.02.2020
Quala Production 005054 Qualawash Container Log 01.03.2020
Quala Production 005055 Quala Rail & Specialty (Overnight-Weekends Log) 01.03.2020-01.04.2020
Quala Production 005056 Qualawash Container Log 01.06.2020

Quala Production 005057 Qualawash Container Log 01.07.2020
Quala Production 005058 Quala Rail & Specialty (Overnight-Weekends Log) 01.07.2020
Quala Production 005059 Qualawash Container Log 01.08.2020
Quala Production 005060-005061 Qualawash Container Log 01.09.2020
Quala Production 005062 Qualawash Container Log 01.10.2020
Quala Production 005063 Qualawash Container Log 01.06.2020
Quala Production 005064 Qualawash Container Log 01.13.2020
Quala Production 005065-005066 Qualawash Container Log 01.14.2020
Quala Production 005067 Qualawash Container Log 01.16.2020
Quala Production 005068-005069 Qualawash Container Log 01.17.2020
Quala Production 005070 Quala Rail & Specialty (Overnight-Weekends Log) 1.18.2020-1.19.2020
Quala Production 005071 Qualawash Container Log 01.20.2020
Quala Production 005072 Quala Rail & Specialty (Overnight-Weekends Log) 01.19.2020-01.20.2020
Quala Production 005073 Quala Rail & Specialty (Overnight-Weekends Log) 01.20.2020-01.21.2020
Quala Production 005074-005075 Qualawash Container Log 01.21.2020
Quala Production 005076-005077 Qualawash Container Log 01.22.2020
Quala Production 005078 Quala Rail & Speicalty (Overnight-Weekends Log) 01.21.2020-01.22.2020
Quala Production 005079 Qualawash Container Log 01.23.2020
Quala Production 005080-005081 Qualawash Container Log 01.24.2020
Quala Production 005082 Quala Rail & Specialty (Overnight-Weekends Log) 01.25.2020-01.27.2020
Quala Production 005083 Qualawash Container Log 01.27.2020
Quala Production 005084 Qualawash Container Log 01.29.2020
Quala Production 005085 Qualawash Container Log 01.30.2020
Quala Production 005086 Quala Rail & Specialty (Overnight-Weekends Log) 01.28.2020-01.30.2020
Quala Production 005087 Qualawash Container Log 01.31.2020
Quala Production 005088 Quala Rail & Specialty (Overnight-Weekends Log) 02.01.2020-02.02.2020
Quala Production 005089 Quala Rail & Speicalty (Overnight-Weekends Log) 02.02.2020
Quala Production 005090 Qualawash Container Log 02.03.2020
Quala Production 005091 Qualawash Container Log 02.04.2020
Quala Production 005092-005093 Qualawash Container Log 02.06.2020
Quala Production 005094-005095 Qualawash Container Log 02.07.2020
Quala Production 005096 Quala Rail & Specialty (Overnight-Weekends Log) 02.05.2020-02.09.2020
Quala Production 005097 Qualawash Container Log 02.11.2020
Quala Production 005098 Qualawash Container Log 02.12.2020
Quala Production 005099 Qualawash Container Log 02.14.2020

Quala Production 005100 Quala Rail & Specialty (Overnight-Weekends Log) 02.15.2020
Quala Production 005101 Qualawash Container Log 02.17.2020
Quala Production 005102 Quala Rail & Specialty (Overnight-Weekends Log) 02.15.2020-02.18.2020
Quala Production 005103 Qualawash Container Log 02.18.2020
Quala Production 005104 Quala Rail & Specialty (Overnight-Weekends Log) 02.17.2020-02.19.2020
Quala Production 005105-005106 Qualawash Container Log 02.19.2020
Quala Production 005107 Quala Rail & Specialty (Overnight-Weekends Log) 02.19.2020-02.20.2020
Quala Production 005108 Qualawash Container Log 02.21.2020
Quala Production 005109 Quala Rail & Specialty (Overnight-Weekends Log) 02.21.2020-02.23.2020
Quala Production 005110 Qualawash Container Log 02.24.2020
Quala Production 005111 Qualawash Container Log 02.25.2020
Quala Production 005112 Quala Rail & Specialty (Overnight-Weekends Log) 02.24.2020-02.25.2020
Quala Production 005113 Qualawash Container Log 02.26.2020
Quala Production 005114 Qualawash Container Log 02.28.2020
Quala Production 005115 Quala Rail & Specialty (Overnight-Weekends Log) 02.28.2020
Quala Production 005116 Quala Rail & Specialty (Overnight-Weekends Log) 02.28.2020-02.29.2020
Quala Production 005117 Quala Rail & Specialty (Overnight-Weekends Log) 02.29.2020
Quala Production 005118-005122 Quala Rail & Specialty Cleaning Certificate Ticket No. 083954
Quala Production 005123-005142 Pressure Wash Module 20
Quala Production 005143-005150 Open and Close Manways Module 27
Quala Production 005151-005160 9 Month Training Module No. 9
Quala Production 005161-005171 61 Nitrogen Purge Procedure
Quala Production 005172 QC Container Take Pictures
Quala Production 005173-005179 SR Tech 3 Complete and Sign JSA
Quala Production 005180-005220 Confined Space Entry Training Module
Quala Production 005221-005235 233 Confined Space Rescue
Quala Production 005236-005259 The Hazards of Nitrogen Asphyxiation
Quala Production 005260 Dow Prep Procedure ATS
Quala Production 005261 9 Month Utility Operator Duties and Training Requirements form
Quala Production 005262-005272 383 Confined Space Entry Supervisor
Quala Production 005273-005284 397 Calibrate & Bump Check BW Meters
Quala Production 005285-005292 Kik Custom Products Safety Data Sheet
Quala Production 005293-005302 A-One Safety Data Sheet Captoban Plus
Quala Production 005303-005314 A-One Safety Data Sheet Dyna-Brite Concentrate
Quala Production 005315-005325 A-One Safety Data Sheet Dyna-Solv 101 Concentrate
Quala Production 005326-005333 Covestro Safety Data Sheet

Quala Production 005334-005343 A-One Safety Data Sheet OD-62 Cherry
Quala Production 005344-005351 KMI Cleaning Solutions Safety Data Sheet
Quala Production 005352 Shift Report 12.27.2019-12.28.2019 Thaddeus Williams
Quala Production 005353-005355 Quala Rail & Specialty Clean Ticket No. 082033
Quala Production 005353-005373 Operation Tickets and Logs
Quala Production 005356-005358 Quala Rail & Specialty Clean Ticket No. 084027
Quala Production 005359-005361 Quala Rail & Specialty Clean Ticket No. 088198
Quala Production 005362 Quala Rail & Specialty Work Order Summary No. 088198
Quala Production 005363-005364 Quala Rail & Specialty Clean Ticket No. 083969
Quala Production 005365-005367 Quala Rail & Specialty Ticket No. 083956
Quala Production 005375-005380 Settlement Agreement
Quala Production 005381-005437 Emails with OSHA

**Depositions:**

Arthur Davis Deposition with exhibits
Beckman Kirk Deposition with exhibits
Cameron Withers Deposition with exhibits
Dee Champine Deposition with exhibits
Elena Labrador Deposition with exhibits
Joe Doucette Deposition with exhibits
Kyle Williams Deposition with exhibits
Nelson Quiros Deposition with exhibits
Roy Robinson Deposition with exhibits
Steven Dodds Deposition with exhibits
Teresa Ruelas Deposition with exhibits
Thaddeus Williams Deposition with exhibits
Wayne Butler Deposition with exhibits
Michael Bass Deposition with exhibits
Jason Rodriguez Deposition with exhibits
Emily Fellows Deposition with exhibits
Ryan Stricklind Deposition with exhibits
Dustin Hedges Deposition with exhibits
Jason McDonald Deposition with exhibits
Jeremy Kupper Deposition with exhibits
Brooke Hrach Deposition with exhibits
Clint Scott Deposition with exhibits
Julianne Butler Deposition with exhibits
Susanne Hamilton Deposition with exhibits

**MSDS Information**

SDS Acetaldehyde
SDS Acetamide
SDS Acetic Acid
SDS Acetone
SDS 2-ButoxyEthanol
SDS 1,2 DiChloroBenzene
SDS Beta Di-Isobutylene
SDS Di-Isobutylene
SDS Ethylene Glycol Di-Acetate
SDS Furan
SDS Alpha-Pinene
SDS Ethylene Glycol Di-Acetate
SDS Vinyl Acetate Polymer Residue
SDS Vinyl Acetate 5-7 ppm
SDS Vinyl Acetate Monomer
SDS Vinyl Acetate

**Federal Government**

40 CFR parts 260-273

# JOHN L. CAYIAS, Ph. D.
# CURRICULUM VITAE

## EMPLOYMENT HISTORY

| | |
|---|---|
| 1998 - Present | Cayias Consulting Company, Richardson, TX |
| 1989 - 1998 | Oryx Energy Company, Dallas, TX |
| 1981 - 1989 | Sun Company, Dallas, TX |
| 1976 - 1981 | Witco Corporation, Petrolia, PA |

## EDUCATION/HONORS:

Hazwoper Incident Commander, current
Hydrogen sulfide instructor, Current
Industrial Firefighting, Texas A&M University, College Station, TX, November 1997
Department of Transportation Compliance Officer, Oryx Energy Company, 1994 to 1998.
Radiation Safety Officer, Oryx Energy Company/Sun Company, 1989 to 1998
Ph. D. in Chemistry, University of Texas, Austin, TX, September 1975
National Science Foundation Fellow, University of Texas, Austin, TX, 1973 to 1975
Welch Fellow, University of Texas, Austin, TX, 1971 and 1972
B. S. in Chemistry, University of Texas, Austin, TX, May 1970
B. A., University of Texas Austin, TX, May 1970

## PROFESSIONAL SOCIETIES AND ORGANIZATIONS:

The American Chemical Society
The American Institute of Chemical Engineers
The American Institute of Mechanical Engineers
The American Oil Chemists Society
The American Society of Testing Materials
The International Association of Colloid and Interface Scientists
The National Association of Corrosion Engineers
The National Fire Protection Association
The Society of Automotive Engineers
The Society of Mining Engineers
The Society of Petroleum Engineers

## PUBLICATIONS, PAPERS AND PATENTS:

"Risk Assessment," Environmental Engineering for Exploration and Production Activities, SPE Monograph Series No. 18, (2000) 72-83.

"Brief: Hydrate Formation/Inhibition During Deepwater Subsea Completion Operations," J. Pet. Tech. 47 (1995) 330-331.

"System for Increasing Efficiency of Chemical Treatment," U. S. Patent No. 5,353,237, Issued October 4, 1994.

"Hydrate Formation/Inhibition During Deepwater Subsea Completion Operations," SPE 69th Annual Technical Conference and Exhibition, New Orleans, LA 1994.

"Bounding Risk Associated with NORM in Oil and Gas Operations," University of Tulsa Environmental Issues and Solutions in Exploration, Production and Refining Conference, March 2-4, 1994, Houston, TX.

"The Role of the Chemist in the Quest for Natural Resources," Chemist's Club, New York, October 12, 1994.

"Using Risk Assessment for Environmental Planning," Petro-Safe '93, Houston, TX, Book 1, p. 523-533, (1993).

"NORM Waste in Oil and Gas Operations: Management, Regulations and Disposal," Petro-Safe '93, Houston, TX, Book 3, p. 417-432, (1993).

"An Approach to Resolve Uncertainty in Quantitative Risk Assessment," SPE/EPA Exploration and Production Conference, San Antonio, TX, March 7-10, p. 257-268, 1993.

"Environmental Planning Through Risk Assessment," SPE 67th Annual Technical Conference and Exhibition, Washington, D.C., October 4-7, p.43-51, 1992.

"In-Situ Measurement of Chemical Reducing Capacity of Porous Media," U. S. Patent applied 1990.

"Redox Gel Process for More Uniform Fluid Flow in Formations," U. S. Patent No. 5,035,287, Issued July 30, 1991.

"Design, Operation, and Evaluation of a Surfactant/Polymer Field Pilot Test," SPE Res. Eng. J., (1991).

"Oil Recovery Agent," U. S. Patent No. 4,743,385, Issued May 10,1988.

"The Application of Low Tension Scaling Rules to Binary Hydrocarbon Mixtures," J. Col. Interface Sci. 58 (1977).

"The Utilization of Petroleum Sulfonates for Producing Low Interfacial Tensions Between Hydrocarbons and Water," J. Col. Interface Sci., 58 (1977).

"Modeling Crude Oils for Low Interfacial Tensions," Soc. Pet. Eng. J. 16 (1976) 351.

"Surfactant Aging: A Possible Detriment to Tertiary Oil Recovery," J. Pet. Tech., 28 (1976) 985.

"Spontaneous Emulsification - A Possible Mechanism for Enhanced Oil Recovery," 50th Annual Fall SPE Meeting, Dallas, Texas, September 28 - October 1, 1975.

"Low Interfacial Tension Variables," Proc. American Oil Chemists Society Short Course, Hershey, Pa. (1975) 1-9.

"The Measurement of Low Interfacial Tensions via the Spinning Drop Technique," Adsorption at Interfaces, ACS Symposium Series No. 8 (1975) 234-247.

"Adsorption on Flat Surfaces," J. Col. Interface Sci. 37 (1971) 678-685.

Attachment 1-D

**ATTORNEY CLIENT AND WP PRIVILEGE**

**CASE # 2020-13324**

**IN THE DISTRICT COURT OF**

**HARRIS COUNTY, TEXAS**

**113TH JUDICIAL DISTRICT**

**Plaintiff,**

**CHAUMEIKA BUSSEY, ET AL.,**

**VS.**

**ALPHA TECHNICAL SERVICES, ET AL.**

# Expert Report
**September 21, 2023**

**Prepared by:**

**Robert A. Richard**
**President, Hazmat Safety Consulting, LLC**
**6200 Interstate Highway 35E**
**Waxahachie, Texas 75165**

**Prepared for:**

**Matt Elwell**
**Amaro Law Firm**

EXHIBIT
1



EXHIBIT A P-BROWN, S. 002014

# REPORT AND OPINION
## (Subject to additional discovery and information as may arise in the future)

**TABLE OF CONTENTS**


Page

**I. SCOPE OF ENGAGEMENT** ..... 1

**II. RIGHT TO ALTER ADDITIONAL OPINIONS AND RESPOND TO ADDRESS OTHER OPINIONS** ..... 1

**III. COMPENSATION** ..... 2

**IV. PRIOR EXPERT TESTIMONY** ..... 2

**VI. PROFESSIONAL BACKGROUND AND QUALIFICATIONS** ..... 3

**VII. BASIS FOR OPINION** ..... 4

**VIII. OVERVIEW OF OPINION** ..... 4

**IX. EXPERIENCE AND METHODOLOGY** ..... 18

**X. CONCLUSIONS** ..... 20

**APPENDIX A - COPY OF ROBERT RICHARD CURRICULUM VITAE**

**APPENDIX B - LIST OF FACTS, DOCUMENTS OR DATA CONSIDERED**

## I. SCOPE OF ENGAGEMENT

I have been retained by Amaro Law Firm, to provide expert opinion in a case involving the death of Shawn Jarmail Brown and Sidarieus Lozano, and serious injuries to Roy Robinson all employees of Alpha Technical Services Corp., LC D/B/A Quala Rail & Specialty, Qualawash Holdings, LLC. ("Quala"). Quala is a tank cleaning operation. The incident occurred on December 28, 2019, at the Quala facility located at 5100 Underwood Road, Pasadena, Texas 77507. Quala was contracted to clean a DOT 407 stainless cargo tank truck, number T-1629[1] to transport the hazardous waste from Texas City to the Performance Materials NA, Inc. (PMNA) Sabine River facility, Orange Texas. DOW/UCC is the waste generator. PMNA is classified as a Treatment, Storage and Disposal Facility (TSDF) by the Environmental Protection Agency. Sprint picked up the tank truck on December 2, 2019, and delivered it to the Performance Materials facility on December 10, 2019. Shawn Brown and Sidarieus Lozano died after entering the tank truck and being exposed to toxic gas inside. Employees responsible for emergency confined space evacuation were not able to use the safety equipment to rescue the decedents. The autopsy revealed the cause of death for both men to be acute Carbon Monoxide (CO) Poisoning. Roy Robinson was also exposed to the hazardous material present in the tank truck. It is obvious that the tank truck contained a hazardous atmosphere that the employees entering the tank were not aware of and that resulted in their deaths.

Based on my review of information and documents I received from Amaro Law Firm and other documents I gathered and reviewed, pertaining to the incident, I have formed the opinions indicated in this report. My services include:

Reviewing documents related to the Case as set forth in **Appendix B** annexed hereto;

Providing expert opinions on compliance and responsibilities under the Hazardous Materials Regulations, 49 CFR Parts 100-180 (collectively, the "HMR") and OSHA's Hazard Communication Standard, 29 CFR §1910.1200 (HCS) and Title 40 of the Code of Federal Regulations (CFR), parts 239 through 282, Resource Conservation and Recovery Act (RCRA).

## II. RIGHT TO ALTER ADDITIONAL OPINIONS AND RESPOND TO ADDRESS OTHER OPINIONS

I am prepared to be deposed and to testify at trial to offer opinions consistent with those included in this report. It is possible that additional discoveries may continue after the issuance of this report that may offer additional facts, findings, and information. I intend to review these additional facts and findings along with any additional sources of information. I expressly reserve the right to alter any opinions and conclusions presented in this report based on additional information that may be received subsequent or following the submission of this report. I specifically reserve the right to address any opinions and rebut opinions offered by any other party or persons opining on their behalf in response to this report. I also reserve the right to submit additional reports as appropriate based on new or additional information.

[1] UCC000008



EXHIBIT A P-BROWN, S. 002016

## III. COMPENSATION

The agreed compensation for my services is $375 per hour for documentation review and report preparation and $475 per hour for participation in depositions, hearings, and trials.

## IV. PRIOR EXPERT TESTIMONY

Within the past five years, I have testified as an expert witness by deposition and/or at trial in the following cases:

- I served as an expert witness in a civil case where a chemical manufacturer allegedly did not appropriately classify their hazardous material for transportation by sea. I was deposed and the case was dismissed following the deposition. *M/V MSC Flaminia 1:12-cv-08892*.

- I served as an expert witness in a case involving a fatal incident that killed three crew members of a cargo ship and resulted in damage to the ship and the cargo. I was deposed but was not required to participate in the trial. *M/V MSC Flaminia 1:12-cv-08892.*

- I served as an expert witness and was deposed in a case involving issues of liability and damages arising from the catastrophic derailment of a train carrying a cargo of crude oil from North Dakota in the town of Lac-Mégantic, Quebec, on July 6, 2013, in the *United States Bankruptcy Court for the District of Maine, Bk. No. 1:13-10670 Adv. Proc. No. 14-1001.*

- I served as an expert witness and testified in a case involving a trucking company that failed to immediately communicate that there was formic acid on their vehicle. Five emergency responders were subsequently injured, *Circuit Court of St. Francis County, Arkansas Civil Division, Case No. 62CV-20-141-1.*

- I testified in a case involving issues of liability and damages arising from the catastrophic derailment of a train carrying a cargo of crude oil from North Dakota in the town of Lac-Mégantic, Quebec, on July 6, 2013, in *Superior Court Province of Quebec, District of Mégantic, NO: 480-06-000001-132.*

- I am serving as an expert witness and was deposed in a case involving issues of liability and damages involving an employee that was severely injured and hospitalized after being exposed to a spent catalyst waste that contained high levels of phenol. The case is based in Indiana, *Vanderburgh County Superior Court No. 5, Case No. 82D05-1508-CT-004187.*

- I am serving as an expert witness and was deposed in a case involving a contract dispute between two refrigerant gas companies. The case is based in *United States District Court, Southern District of New York, Case No. 1:21-CV-00297 (JPO).*


EXHIBIT A P-BROWN, S. 002017

## VI. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

I am presently the president of Hazmat Safety Consulting, LLC ("HSC"). HSC is a hazardous materials consulting company that assists clients worldwide in hazardous materials compliance matters. I supervise a team of hazmat safety professionals and provide hazardous materials regulatory assistance to clients that package, ship, store and transport a broad range of hazardous materials worldwide (*e.g.*, chemicals, pharmaceuticals, compressed gases, consumer goods, electronics, hazardous wastes, *etc.*). I have been involved in the development and implementation of hazardous materials safety regulations for more than 35 years and have been responsible for a broad range of domestic and international hazardous materials safety initiatives including the development, publishing, interpretation, and enforcement of the U.S. Hazardous Materials Regulations (HMR).

I also serve as the Executive Director of the Medical Device Transport Council (MDTC). The MDTC was formed to promote the safe transport of medical devices. As the Executive Director, I lead efforts to work with and educate regulators on how to identify risk reduction opportunities while also mitigating the impacts of overly burdensome regulations that have an adverse effect on a patient's ability to gain access to life-saving products.

Prior to starting HSC, I worked for 7 years as the Vice President of Regulatory Affairs at LabelMaster Services, Inc., a Chicago based hazardous materials consulting company where I also assisted clients with enhancing safety and hazardous materials compliance and improving their safety and compliance programs. During this time, the OSHA was implementing the GHS requirements into 29 CFR 1910.1200, and I was actively involved in assisting customers and clients to understand the new requirements. I provided several training courses in the GHS requirements and spoke at a major industry conference where I provided a GHS workshop. I provided technical support and helped draft GHS guidance materials and training aids.

Prior to working at LabelMaster, I served as the Deputy Associate Administrator for Hazardous Materials Safety within the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), United States Department of Transportation ("DOT"). I was responsible for directing approximately 150 hazardous materials transportation specialists and the day-to-day operation of the agency's safety program. My responsibilities included overseeing the regulatory development, technology, special permits and approvals, training and outreach, strategic planning, data analysis and enforcement offices. During my tenure at PHMSA, I gained experience applying, interpreting, and enforcing the HMR. I also worked closely with other government agencies with authority for regulating hazardous materials including the U.S. Environmental Protection Agency (EPA) and Department of Labor's Occupational Safety and Health Administration (OSHA). I represented the U.S. DOT on interagency committees that were responsible for hazardous materials and wastes regulations and policies.

The mission of PHMSA's Office of Hazardous Materials Safety is to improve the safety of hazardous materials shipments in domestic and international commerce. I advocated for the adoption of safety provisions and requirements within domestic regulations and international standards and regulations consistent with the standards specified in the HMR. My objective was to establish and maintain a global regulatory system for hazardous materials transportation that enhanced the safe and efficient movement of hazardous materials.

From 2017 through July 2022, I have served as a court appointed independent compliance monitor for a company that was charged with a criminal violation of the HMR and EPA Regulations. In this role, I am responsible for auditing compliance and submitting biannual reports to the DOJ prosecutor related to the company's compliance program.

I received a Bachelor of Science in Industrial Engineering ("BSIE") and a Master of Science in Engineering Management ("MSEM"), both from the New Jersey Institute of Technology (NJIT), and completed doctoral courses related to risk analysis, transportation accident investigation and safety engineering from Kennedy Western University. I completed several professional development and technical courses related to my area of expertise, including a course entitled Strategic Management of Regulatory and Enforcement Agencies from Harvard University's John F. Kennedy School of Government. I hold a Certified Dangerous Goods Professional ("CDGP") credential accredited through the Institute of Hazardous Materials Management ("IHMM"), the American National Standards Institute and the Council of Engineering and Scientific Specialty Boards.

A copy of my curriculum vitae, which includes a more complete description of my professional qualifications in the field of labeling and packaging hazardous material, is attached as **Appendix A.**

## VII. BASIS FOR OPINION

The opinions presented below are based upon:

- My education, research, and over 35 years of experience;
- My understanding and application of the relevant laws and regulations, including:
    - Title 49 Code of Federal Regulations, U.S. Department of Transportation Hazardous Materials Regulations, Part 100-185;
    - Title 29 Code of Federal Regulations, Occupational Safety and Health Administration, Hazard Communication Standard (HCS) § 1910.1200; and
    - Title 40 Code of Federal Regulations Part 82, Subpart E, Environmental Protection Agency Regulations, pertaining to RCRA waste requirements; and
- Consideration of the information and materials listed in **Appendix B**, and any additional information or material mentioned in the text of this expert report.

## VIII. OVERVIEW OF OPINIONS

I have been asked to consider the events leading up to the incident that occurred on December 28, 2019, involving the death of Shawn Jarmail Brown and Sidarieus Lozano, and the serious injuries to Roy Robinson all employees of Alpha Technical Services Corp., LC D/B/A Quala Rail &


EXHIBIT A P-BROWN, S. 002019

Specialty, Qualawash Holdings, LLC. ("Quala"). If called to testify in this action, I am prepared to testify that:

- There were discrepancies in the weight tickets for the shipment of Vinyl Polymer Waste that was loaded into Tanker T-1629 which was loaded with from the vinyl acetate production process on November 18, 2019, at Union Carbide Corporation (UCC), a subsidiary of DOW Chemical. When the tanker left the DOW/UCC facility, the weight ticket indicated it to be loaded with 44,870 lbs. of Vinyl Polymer Residue[2]. Jason Rodriguez indicated in his deposition that he weighed the tank truck and reported it to be 44,870 lbs. The tanker was then weighed with a reported weight of 44,320 lbs. of chemical waste[3]. The tanker was picked up from DOW/UCC on December 2, 2019, by Sprint Transport and taken to Performance Materials Inc. (PMNA) for emptying of the waste and disposal on December 10, 2019. At the disposal facility it was noted that the chemical waste disposed of consisted of 44,220[4] lbs. of waste to be disposed of, leaving 100 - 650 lbs. of chemical waste unaccounted for between the differing waste weight readings.

- Email correspondence between PMNA and DOW/UCC indicated that the Vinyl Acetate Polymer Residue waste was transported at elevated temperatures[5]. According to 49 CFR §172.203(n) elevated temperature materials must be identified on shipping papers (Bill of Lading, BOL) by placing the word "HOT" immediately proceeding the proper shipping name of the hazardous material. The BOL did not indicate "HOT" which may have alerted persons involved that the material was shipped at elevated temperature which could result in decomposition and the formation of toxic gas, carbon monoxide.

---

[2] Tank Truck Loading/Unloading Checklist UCC 000008-9
[3] UCC /Dow document VA Polymer weight ticket PM000016
[4] UCC 000015
[5] DOW 3RFP 000509-516


EXHIBIT A P-BROWN, S. 002020

**From:** Buss, Andy (AJ) <AJBuss@dow.com>
**Sent:** 18 September, 2019 15:53
**To:** Labrador, Elena (EQ) <Elena.Labrador@Dow.com>
**Cc:** Ruelas, Teresa (T) <TRuelas@dow.com>; Mitchell, Mark (MD) <Mark.Mitchell@Dow.com>
**Subject:** RE: WPN-123741 shipping temperature

Hello, Elena.

This material is generated by the production facility at between 150 and 180 degC (300 – 350 degF). We currently store it in an insulated tank prior to loading it into trailers, and as a result, the material holds its heat for a very long time. To my knowledge, the material has always been loaded very hot. The temperature at which it is shipped is dependent on the urgency of the shipment and the preferences of the recipient disposal facility. My understanding was that the Freeport Kiln preferred the material at a high temperature, as it allowed them to process it through their system with

1

DOW-3RFP-000509

less difficulty than at lower temperatures (I would assume due to viscosity and settling reasons). I also believe that we would just allow the trailers to sit on our site until they cooled to send them to 3rd-party disposal facilities if they preferred a lower temperature, in a similar fashion to how your facility was letting them sit. The only restriction there is that this is a RCRA waste, so we only have 90 days to get rid of the material. As far as loading temperature goes, there is not a whole lot the production facility can do due to the rate at which we generate it. We had discussed removing the thermal insulation for personnel-protection insulation, which would allow more heat to dissipate, but we would need to make sure this was in the best interest of all of the facilities who process this waste.

Please let me know if you have any more questions regarding this material; I'd be happy to help!

**Andy Buss**
Production Engineer / Quality Coordinator - VA5

The Dow Chemical Company | Texas City Operations
3301 5th Ave. South, Texas City, Texas 77590

49 CFR §172.203(n) states:
Elevated temperature materials. If a liquid material in a package meets the definition of an elevated temperature material in § 171.8 of this subchapter, and the fact that it is an elevated temperature material is not disclosed in the proper shipping name (for example, when the words "Molten" or "Elevated temperature" are part of the proper shipping name), the word "HOT" must immediately precede the proper shipping name of the material on the shipping paper.

- The DOT 407 Stainless Steel tank truck indicated a design temperature of -20 to 250 $^{0}$F.




If the waste was loaded at a temperature greater than 250 $^{0}$F it could have resulted in damage to the tank truck and increased the likelihood of chemical decomposition or reaction with the stainless steel.

- DOW/UCC should have marked the tank truck if the waste was transported at an elevated temperature according to 49 CFR §172.325 Elevated temperature materials:

  (a) Except as provided in paragraph (b) of this section, a bulk packaging containing an elevated temperature material must be marked on two opposing sides with the word “HOT” in black or white Gothic lettering on a contrasting background. The marking must be displayed on the packaging itself or in black lettering on a plain white square-on-point configuration having the same outside dimensions as a placard.

  There is no evidence that the tank truck was marked “HOT” which may have alerted persons involved that the material was shipped at elevated temperature which could result in decomposition and the formation of toxic gas, Carbon Monoxide.

- DOW/UCC could have placed a warning on a label, tag, or sign displayed at each location (e.g., manhole, loading head) where exposure to carbon monoxide vapors may be present such as “**Danger, Possible Carbon Monoxide Inhalation Hazard**” to communicate the possible risk of exposure to harmful concentrations of carbon monoxide gas. If this had been done the incident likely could have been avoided.

- Carbon monoxide has a molecular weight which is slightly lighter than air; but the difference in density between air and carbon monoxide is minimal and because of this difference, it causes the gas not to rise and therefore it easily mixes with air. This makes it more dangerous in an atmosphere such as the case of a tank truck. It is an odorless gas, which is not detectable without an alarm or proper air monitoring equipment. Because DOW/UCC failed to notify

Quala and because Quala did not properly assess the presence of the gas the Quala employees were exposed to it leading to the deaths and injuries that occurred.

- Under RCRA, hazardous waste generators are the first link in the hazardous waste management system. DOW/UCC was responsible under RCRA to determine if their waste was hazardous and required to ensure it was properly characterized and disposed of (e.g., sent to a landfill or incinerated). DOW/UCC was required to ensure and fully document that the hazardous waste that they produced was properly identified, managed, and treated prior to recycling or disposal. The degree of regulation that applies to each generator depends on the amount of waste that a generator produces. DOW/UCC was the hazardous waste generator. DOW/UCC had an obligation to communicate the hazard and potential hazards associated with their Vinyl Acetate Polymer Residue to employees and contractors who could be potentially exposed. DOW/UCC was the generator of the waste, therefore under RCRA regulation they were responsible for ensuring the safe handling and had the ultimate responsibility for the hazardous waste and its safe disposal from cradle to grave.

- The EPA regulations establish robust waste analysis requirements. PMNA is located at and is classified as a Treatment, Storage and Disposal Facility (TSDF) by the Environmental Protection Agency. At all times, the owner/operator of a waste disposal facility such as PMNA is responsible for obtaining sufficient information required for compliance, regardless of the completeness or quality of any information received from the generator or other parties. 40 CFR § 265.13(a) required PMNA to obtain a detailed chemical and physical analysis of a representative sample of the wastes:

  40 CFR § 265.13(a)(1) Before an owner or operator treats, stores, or disposes of any hazardous wastes, or nonhazardous wastes if applicable under § 265.113(d), he must obtain a detailed chemical and physical analysis of a representative sample of the wastes. At a minimum, the analysis must contain all the information which must be known to treat, store, or dispose of the waste in accordance with this part and part 268 of this chapter.

  (2) The analysis may include data developed under part 261 of this chapter, and existing published or documented data on the hazardous waste or on waste generated from similar processes.

  (3) The analysis must be repeated as necessary to ensure that it is accurate and up to date. At a minimum, the analysis must be repeated:

  (i) When the owner or operator is notified, or has reason to believe, that the process or operation generating the hazardous wastes or non- hazardous wastes, if applicable, under § 265.113(d) has changed; and

  (ii) For off-site facilities, when the results of the inspection required in paragraph (a)(4) of this section indicate that the hazardous waste received at the facility does not match the waste designated on the accompanying manifest or shipping paper.


EXHIBIT A P-BROWN, S. 002023

(4) The owner or operator of an off-site facility must inspect and, if necessary, analyze each hazardous waste movement received at the facility to determine whether it matches the identity of the waste specified on the accompanying manifest or shipping paper.

(b) The owner or operator must develop and follow a written waste analysis plan which describes the procedures which he will carry out to comply with paragraph (a) of this section. He must keep this plan at the facility. At a minimum, the plan must specify:

(1) The parameters for which each hazardous waste, or non-hazardous waste if applicable under § 265.113(d), will be analyzed and the rationale for the selection of these parameters (i.e., how analysis for these parameters will provide sufficient information on the waste's properties to comply with paragraph (a) of this section);

(2) The test methods which will be used to test for these parameters;

(3) The sampling method which will be used to obtain a representative sample of the waste to be analyzed. A representative sample may be obtained using either:

(i) One of the sampling methods described in appendix I of part 261 of this chapter; or

(ii) An equivalent sampling method.

(4) The frequency with which the initial analysis of the waste will be reviewed or repeated to ensure that the analysis is accurate and up to date;

(5) For off-site facilities, the waste analyses that hazardous waste generators have agreed to supply; and

(6) Where applicable, the methods that will be used to meet the additional waste analysis requirements for specific waste management methods as specified in §§ 265.200, 265.225, 265.252, 265.273, 265.314, 265.341, 265.375, 265.402, 265.1034(d), 265.1063(d), 265.1084, and 268.7 of this chapter.

Upon discovery, or if the facility cannot confirm that the waste profile is correct, they must attempt to reconcile any manifest discrepancy with the waste generator. If the discrepancy is not resolved within 15 days after receiving the hazardous waste, the facility owner or operator must immediately submit a copy of the manifest or shipping paper, as well as a letter describing the discrepancy and any attempts to reconcile it, to its implementing agency. PMNA had a regulatory duty to challenge the waste profile provided by DOW/UCC.

PMNA waived the sampling requirement and did not fulfill their regulatory obligation.

PMNA has a history of regulatory non-compliance and has previously been penalized by the EPA[6] In 2021, The EPA alleged RCRA violations at the PMNA facility which included failure

[6] https://www.12newsnow.com/article/news/local/orange-county-plants-penalized-following-environmental-lawsuit/502-20687375-bca6-4ac5-98fd-3d1720ace8ee

to make hazardous waste determinations, the treatment, storage or disposal of hazardous waste without a RCRA permit, and failure to meet land disposal restrictions.

- Carriers or transporters such as Sprint may move the waste to a facility that can recycle, treat, store or dispose of the waste. Since such transporters are moving regulated wastes on public roads, highways, rails and waterways, the United States Department of Transportation Hazardous Materials Regulations, as well as EPA's Hazardous Waste Regulations, apply.

  The Hazardous Materials Regulations (HMR; 49 CFR parts 171–180) are promulgated under the mandate in 49 U.S.C. 5103(b) that the Secretary of Transportation ''prescribe regulations for the safe transportation of hazardous material in intrastate, interstate, and foreign commerce.'' Section 5103(b)(1)(B) provides that the HMR ''shall govern safety aspects of the transportation of hazardous material the Secretary considers appropriate.'' Requirements in the HMR apply to transportation of a hazardous material in commerce and to each person who transports a hazardous material in commerce. Transportation in commerce,'' for purposes of applicability of the HMR, begins when a carrier takes possession of a hazardous material and continues until the carrier delivers the package containing the hazardous material to its destination as indicated on shipping papers. Under the HMR, DOW/UCC and PMNA were offerors and Sprint was a carrier. Each had specific responsibilities for performing pre-transportation functions to ensure the safe transport and loading and unloading of the waste that was involved in the incident. These responsibilities were developed and have been clarified by the agency responsible for the HMR, which is the Pipeline and Hazardous Materials Safety Administration (PHMSA) in which I served in various roles. The responsibilities were determined on the basis of assigning and holding accountable the persons with control over specific aspects involved in the safe transport of hazardous materials.

- There are certain terms defined in the HMR that are critical to understanding responsibilities of persons that offer or transport hazardous materials. It is important to note the following definitions that are defined in the HMR because they relate to the responsibilities that apply to any hazardous materials shipment. The terms "carrier", "person", "offeror" and "pre-transportation function" are defined in 49 CFR §171.8:

  **Carrier** means a person who transports passengers or property in commerce by rail car, aircraft, motor vehicle, or vessel.

  **Person** means an individual, corporation, company, association, firm, partnership, society, joint stock company; or a government, Indian Tribe, or authority of a government or Tribe, that offers a hazardous material for transportation in commerce, transports a hazardous material to support a commercial enterprise, or designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce. This term does not include the United States Postal Service or, for purposes of 49 U.S.C. 5123 and 5124, a department, agency, or instrumentality of the government.

  **Offeror or Person who offers** means:
  (1) Any person who does either or both of the following:


EXHIBIT A P-BROWN, S. 002025

(i) Performs, or is responsible for performing, any pre-transportation function required under this subchapter for transportation of the hazardous material in commerce.
(ii) Tenders or makes the hazardous material available to a carrier for transportation in commerce.
(2) A carrier is not an offeror when it performs a function required by this subchapter as a condition of acceptance of a hazardous material for transportation in commerce (e.g., reviewing shipping papers, examining packages to ensure that they are in conformance with this subchapter, or preparing shipping documentation for its own use) or when it transfers a hazardous material to another carrier for continued transportation in commerce without performing a pre-transportation function.

When an offeror provides a shipment to the carrier and the carrier accepts it the carrier assumes the legal responsibility for transportation of the hazardous material until it is delivered to the consignee, and it is signed for and released from their possession. As a prior regulator working for the agency responsible for the content of the HMR, it is clear to me that transportation in commerce for purposes of the applicability of the HMR, begins when a carrier takes possession of a hazardous material and continues until the carrier delivers the package containing the hazardous material to its destination as indicated on shipping papers.

The BOL that PMNA provided to Sprint indicated the weight of the waste in the tank truck as "0". Sprint accepted the load even though the BOL indicated the content weight as zero. Both PMNA and Sprint should have corrected the weight because they should have known that there was residual waste in the tank truck. PMNA was the shipper and had responsibility for ensuring the BOL was correct and compliant with the HMR. Sprint was the carrier and was responsible for not accepting a non-compliant BOL from the shipper. The liquid content of a tank truck is difficult to remove entirely through the unloading valve. There is typically remaining residue referred to as the heel. On December 13, 2019, Sprint transported the tanker to Quala for cleaning. Video taken at Quala, the night of the incident (and recording the time as an hour ahead of the actual time), showed that the rear valve to the tanker was opened at 12:32 a.m.[7]. A significant quantity of liquid is seen to drain from the tanker when the rear valve was opened. This is evidence that the tank truck was not empty, and the BOL was not correct. 49 CFR §172.202(a)(5) requires that the total quantity of hazardous materials must be indicated:

(5) Except for transportation by aircraft, the total quantity of hazardous materials covered by the description must be indicated (by mass or volume, or by activity for Class 7 materials) and must include an indication of the applicable unit of measurement, for example, "200 kg" (440 pounds) or "50 L" (13 gallons).

The BOL was not in compliance with the HMR. Both PMNA and Sprint were in violation of the HMR and because they did not accurately communicate the quantity of material in the tank truck placed persons at risk. According to DOT "An improperly prepared shipment increases the risk to everyone in the supply chain. Lives, safety, property, and the environment all rely on the safe transportation of dangerous goods. Experts believe that the most frequent explanation for misdeclared shipments is a shipper's lack of knowledge--an unawareness or

[7] P - BROWN, S. 001795 Synced Rear View.mp4

misunderstanding of the requirements for properly declaring and transporting hazardous materials."[8] The carrier is required to reject the load if the shipping paper contains errors.

- In 49 CFR §177.817(a) and (b) shipping paper requirements applicable to the carrier are specified:

  §177.817 Shipping papers. (a) General requirements. A person may not accept a hazardous material for transportation or transport a hazardous material by highway unless that person has received a shipping paper prepared in accordance with Part 172. Sprint was responsible for compliance with §177.817.

- In the deposition of Emily Fellows, she indicated that Sprint weighed the load. If this was the case, they should have known the weight of the content of the tank truck was not zero.

- Sprint had responsibilities defined in 49 CFR §171.1 and are responsible for the pre-transportation functions that they perform:

  **§171.1(c) Transportation functions**. Requirements in the HMR apply to transportation of a hazardous material in commerce and to each person who transports a hazardous material in commerce, including each person under contract with any department, agency, or instrumentality of the executive, legislative, or judicial branch of the Federal government who transports a hazardous material in commerce. Transportation of a hazardous material in commerce begins when a carrier takes physical possession of the hazardous material for the purpose of transporting it and continues until the package containing the hazardous material is delivered to the destination indicated on a shipping document, package marking, or other medium, or, in the case of a rail car, until the car is delivered to a private track or siding. For a private motor carrier, transportation of a hazardous material in commerce begins when a motor vehicle driver takes possession of a hazardous material for the purpose of transporting it and continues until the driver relinquishes possession of the package containing the hazardous material at its destination and is no longer responsible for performing functions subject to the HMR with respect to that particular package. Transportation of a hazardous material in commerce includes the following:

  (1) Movement. Movement of a hazardous material by rail car, aircraft, motor vehicle, or vessel (except as delegated by Department of Homeland Security).

  (2) Loading incidental to movement of a hazardous material. Loading of packaged or containerized hazardous material onto a transport vehicle, aircraft, or vessel for the purpose of transporting it, including blocking and bracing a hazardous materials package in a freight container or transport vehicle, and segregating a hazardous materials package in a freight container or transport vehicle from incompatible cargo, when performed by carrier personnel or in the presence of carrier personnel. For a bulk packaging, loading incidental to movement is filling the packaging with a hazardous material for the purpose of transporting it when

[8] Undeclared Dangerous Goods, https://www.faa.gov/hazmat/what_is_hazmat/undeclared_hazmat.


EXHIBIT A P-BROWN, S. 002027

performed by carrier personnel or in the presence of carrier personnel (except as delegated by Department of Homeland Security Delegation No. 0170 at 2(103)), including transloading.

(3) Unloading incidental to movement of a hazardous material. Removing a package or containerized hazardous material from a transport vehicle, aircraft, or vessel; or for a bulk packaging, emptying a hazardous material from the bulk packaging after the hazardous material has been delivered to the consignee when performed by carrier personnel or in the presence of carrier personnel or, in the case of a private motor carrier, while the driver of the motor vehicle from which the hazardous material is being unloaded immediately after movement is completed is present during the unloading operation. (Emptying a hazardous material from a bulk packaging while the packaging is on board a vessel is subject to separate regulations as delegated by Department of Homeland Security Delegation No. 0170 at 2(103).) Unloading incidental to movement includes transloading.

(4) Storage incidental to movement of a hazardous material. Storage of a transport vehicle, freight container, or package containing a hazardous material by any person between the time that a carrier takes physical possession of the hazardous material for the purpose of transporting it until the package containing the hazardous material has been delivered to the destination indicated on a shipping document, package marking, or other medium, or, in the case of a private motor carrier, between the time that a motor vehicle driver takes physical possession of the hazardous material for the purpose of transporting it until the driver relinquishes possession of the package at its destination and is no longer responsible for performing functions subject to the HMR with respect to that particular package.

- I participated in the publication of the HM-223 Offeror Final Rule[9] further clarifies that when a carrier knows information accompanying a hazardous materials shipment is incorrect, it may not accept the shipment for transportation as indicated in the following statement from the preamble discussion in the HM-223 Final rule:

> "Note that a carrier that knows that information accompanying a hazardous materials shipment is incorrect may not accept the shipment for transportation unless and until the information has been corrected and any discrepancies involving this shipment have been resolved. Indeed, a carrier that knows that a hazardous materials shipment does not comply with the HMR in any respect (e.g., packaging, markings, labels, shipping paper) may not accept the shipment for transportation unless and until the problems are corrected and any discrepancies resolved."

The rule also concludes that a carrier that accepts a hazardous material shipment when it has knowledge or information that indicates the shipment may not be compliant is in violation of Hazardous Materials Law:

The rule also addresses the issue of joint and several responsibilities (emphasis added) and explains that both the offeror and the carrier can be held accountable and in violation of the HMR and Hazmat Law. This, in my opinion, was to address the situation where the offeror

---

[9] Applicability of the Hazardous Materials Regulations to a ''Person Who Offers'' a Hazardous Material for Transportation in Commerce, Final Rule, 05-14912.pdf (govinfo.gov)



EXHIBIT A P-BROWN, S. 002028

does not exercise reasonable care and apply due diligence in classifying a material and the carrier accepts the shipment without questioning the classification when there is reason to believe the classification may be incorrect. In my opinion, Sprint had constructive knowledge that was enough for it to reject the shipment of waste from PMNA.

PHMSA's commentary in the HM-223 Final rule clearly clarifies the concept of "joint and several liability":

"We note with respect to this comment that the concept of ''joint and several liability'' does not strictly apply to violations of the HMR when there are multiple persons; rather, each person is liable for its own violations that may involve noncompliance in: (1) Preparing a shipment of hazardous material for transportation (i.e., improperly performing or failing to perform a pre-transportation function); (2) accepting for transportation a shipment of hazardous material that does not conform to the requirements in the HMR; or (3) failing to handle or transport a shipment of hazardous material in the manner required by the HMR. Thus, each person who knowingly violates an ''offeror'' requirement in the HMR may be assessed a civil penalty, and payment of a penalty by one violator does not satisfy a penalty assessed against another violator (unlike ''joint and several liability,'' where payment by one party satisfies the obligations of all liable parties). Further, we explicitly reject any notion, advanced by some commenters, that Federal agencies that enforce the HMR attempt to hold one party liable for another party's violation of the HMR. In other words, when a carrier accepts and transports a shipment of hazardous material that is not properly prepared for transportation in commerce, with actual or constructive knowledge of the noncompliance, the carrier's liability is based on its own improper acceptance and transportation of that shipment—not the violation of the person who improperly prepared the shipment. The application of ''constructive knowledge''—when ''a reasonable person acting in the circumstances and exercising reasonable care would have * * * actual knowledge of the facts giving rise to the violation'' of the law or the HMR—is set forth in RSPA's prior interpretation published in the Federal Register, 63 FR 30411, 30412 (June 4, 1998), where we stated that:

A carrier knowingly violates the HMR when the carrier accepts or transports a hazardous material with actual or constructive knowledge that a package contains a hazardous material which has not been packaged, marked, labeled, or described on a shipping paper as required by the HMR. This means that a carrier may not ignore readily apparent facts that indicate that either:

(1) a shipment declared to contain a hazardous material is not properly packaged, marked, labeled, placarded, or described on a shipping paper, or
(2) a shipment contains a hazardous material governed by the HMR even though it is not marked, labeled, placarded, or described on a shipping paper as containing a hazardous material."

- The OSHA investigation[10] into the incident which included review of the contents of the tank truck indicated a discrepancy between the waste manifest provided by DOW/UCC/UCC to the original waste manifest. This could have been related to the fact that the waste was transported

[10] OSHA0001-0304 Alpha Technical Service File

at elevated temperature (e.g., thermal decomposition) or several reasons including reaction with other chemicals transported previously, or a change in the process over time. Nevertheless, the coroner autopsy reports of Shawn Brown and Sidarieub Lozano showed the cause of death was by carbon monoxide.

A document in Quala Production entitled "Tanker Atmosphere, Analysis of Cartridges and Medical Examiner Findings",[11] where it was noted that "the MSA Altair 5 gas meter, used by Shawn Brown at the incident scene indicated 2000 parts per million (ppm) of carbon monoxide in the tanker."

- A review of the SDS from DOW/UCC[12] does not specifically identify that a decomposition product of the waste is carbon monoxide:

**10. STABILITY AND REACTIVITY**

**Reactivity:** No data available

**Chemical stability:** Stable under recommended storage conditions. See Storage, Section 7.

**Possibility of hazardous reactions:** Polymerization will not occur.

**Conditions to avoid:** Exposure to elevated temperatures can cause product to decompose.

**Inhibitor:** Hydroquinone, p-Benzoquinone,

**Incompatible materials:** Avoid contact with strong bases. Avoid contact with: Acids. Amines. Bases. Oxidizers. Contamination with water can cause corrosion of common metals and can generate flammable hydrogen gas. Avoid contact with metals such as: Galvanized metals. Zinc. Iron. Magnesium.

**Hazardous decomposition products:** Decomposition products depend upon temperature, air supply and the presence of other materials.

DOW/UCC should have indicated that carbon monoxide could have been present on its SDS for the Vinyl Acetate Polymer Residue waste, especially if they knew the product was being shipped at elevated temperature. Additionally, there were at least 30 days where the waste remained in the tank prior to being cleaned subjecting the content to further potential decomposition. The SDS is vague and only indicates that there could be decomposition products. On the contrary an SDS for products in the waste (e.g., Acetic Acid, ethylene glycol diacetate and Acetaldehyde) from ThermoFisher Scientific[13] clearly indicates carbon monoxide as a decomposition product.

[11] Quala Production 00003928-3931 4-9
[12] DOW/UCC SDS UCC002579
[13] ThermoFisher Scientific SDS Acetic Acid, https://www.fishersci.com/msds?productName=BP2401212&productDescription=ACETIC+ACID+GLACIAL+ACS+PLUS&catNo=BP2401-212&vendorId=VN00033897&storeId=10652
ThermoFisher Scientific SDS Acetaldehyde, msds (fishersci.com)
ThermoFisher Scientific SDS Ethylene glycol diacetate https://www.fishersci.com/store/msds?partNumber=AC176220100&productDescription=ETHYLENE+GLYCOL+DIACETAT+10LT&vendorId=VN00032119&countryCode=US&language=en

Acetic Acid SDS:

| 10. Stability and reactivity | |
|---|---|
| Reactive Hazard | Yes |
| Stability | Stable under recommended storage conditions. Polymerization can occur. May form explosive peroxides. |
| Conditions to Avoid | Excess heat. Exposure to air. Keep away from open flames, hot surfaces and sources of ignition. |
| Incompatible Materials | Strong oxidizing agents, Acids, Bases, Metals, Strong reducing agents, Alcohols, Amines, Halogens |
| Hazardous Decomposition Products | Carbon monoxide (CO), Carbon dioxide ($CO_2$) |
| Hazardous Polymerization | Hazardous polymerization may occur. |
| Hazardous Reactions | Reacts with air to form peroxides. |

Ethylene glycol diacetate SDS:

| 10. Stability and reactivity | |
|---|---|
| Reactive Hazard | None known, based on information available |
| Stability | Stable under normal conditions. |
| Conditions to Avoid | Incompatible products. Excess heat. Keep away from open flames, hot surfaces and sources of ignition. |
| Incompatible Materials | Strong oxidizing agents, Strong acids, Strong bases, Strong reducing agents |
| Hazardous Decomposition Products | Carbon monoxide (CO), Carbon dioxide ($CO_2$) |
| Hazardous Polymerization | Hazardous polymerization does not occur. |
| Hazardous Reactions | None under normal processing. |

Acetaldehyde SDS:

| 10. Stability and reactivity | |
|---|---|
| Reactive Hazard | Yes |
| Stability | Stable under recommended storage conditions. Polymerization can occur. May form explosive peroxides. |
| Conditions to Avoid | Excess heat. Exposure to air. Keep away from open flames, hot surfaces and sources of ignition. |
| Incompatible Materials | Strong oxidizing agents, Acids, Bases, Metals, Strong reducing agents, Alcohols, Amines, Halogens |
| Hazardous Decomposition Products | Carbon monoxide (CO), Carbon dioxide ($CO_2$) |
| Hazardous Polymerization | Hazardous polymerization may occur. |
| Hazardous Reactions | Reacts with air to form peroxides. |

DOW failed to warn persons exposed to the contents of the tank truck of the possible dangers associated with the handling of their hazardous waste which generated carbon monoxide. This was a significant contributing factor to the deaths and injuries that occurred. DOW/UCC failed to accurately publish SDS information regarding the decomposition of the hazardous waste it



EXHIBIT A P-BROWN, S. 002031

generated. The OSHA investigation indicated the presence of 2,000 ppm of carbon monoxide[14]. They failed to identify the hazardous decomposition products identified in the OSHA investigation and verified in the autopsy reports.

- DOW/UCC could have allowed the waste to cool in their storage tanks as opposed to transporting it at elevated temperature from its Union Carbide plant to Performance Materials which could have avoided the decomposition reaction that formed carbon monoxide. In the email exchange previously referenced, Andy Buss admitted that: "To my knowledge, the material has always been loaded very hot. The temperature at which it is shipped is dependent on the urgency of the shipment and the preferences of the recipient disposal facility. My understanding was that the Freeport Kiln preferred the material at a high temperature, as it allowed them to process it through their system with less difficulty than at lower temperatures (I would assume due to viscosity and settling reasons). I also believe that we would just allow the trailers to sit on our site until they cooled to send them to 3rd-party disposal facilities if they preferred a lower temperature, in a similar fashion to how your facility was letting them sit." So, there was precedent to allow the waste to cool in the DOW storage tank (which has a permanent flare to remove the toxic gas) which would have reduced the likelihood of decomposition forming toxic gas and the deaths and injuries that resulted. Once the elevated temperature material was loaded into the tank truck there was no way to prevent the decomposition due to elevated temperature of the waste. DOW/UCC either was or should have been aware of the likelihood of decomposition.

- On the day of the incident, the videos documented the sequence of events. At 12:29 AM Sidarieub Lozano opened the top hatch of the tank truck. At approximately 12:32 AM the rear valve of the tank truck was opened. Shawn Brown took a reading of the atmosphere inside of the tank truck at 12:42 AM. The measurement showed 15.2% oxygen, 2,000 ppm carbon monoxide, 79 ppm hydrogen sulfide, and 155 ppm VOC's (Volatile Organic Compounds). The video evidence showed Sidarieub Lozano entered the tank truck at 12:44 AM with full face respirator and with chemical cartridges and personal protective clothing. Sidarieub Lozano lost consciousness within minutes of entering the tank truck. After attempting multiple times to use the winch to retrieve Sidarieub Lozano, Shawn Brown entered the tank truck at 12:54 AM. Once inside Shawn Brown passed out and was unresponsive. Multiple employees tried to operate the retrieval winch without engaging it resulting in unsuccessful attempts to recover Sidarieub Losano from inside the tanker. Roy Robinson entered and lost consciousness within minutes. The hose to supply air into the tank truck was not placed in the top opening until 12:56 AM after the men had already entered the tank truck. Roy Robinson was able to be retrieved but Sidarieub Lozano and Shawn Brown were not able to be rescued. In my opinion Quala's employee training, operating procedures and equipment were substandard leading to the deaths and injuries. Quala did not adequately prepare the employees to fulfill the requirements of their jobs and did not safely complete a non-entry or entry confined space rescue. Quala had a duty and failed to properly train their employees in the proper use of safety equipment and safe practices in dealing with hazardous conditions and operations.

[14] OSHA0001-0304 Alpha Technical Service File


EXHIBIT A P-BROWN, S. 002032

- Further evidence that Quala failed to properly train their employees and instruct them on the procedures is provided in Roy Robinson's deposition. Roy Robinson was asked if he had ever seen the Quala General Container Cleaning Procedure[15].

  Q. All right. Let me show you another document.
  12Let me go back one step.
  13 The first document I showed you, this --
  14 this general cleaning procedure I'm going to mark as
  15 Exhibit 1.
  16 (Exhibit 1 marked)
  17 Q. (BY MR. BREM) And you told me that you've
  18 never seen this document before; is that correct?
  19 A. **Yes, sir. (Emphasis added)**

  The fact that Roy Robinson stated he never saw the General Container Cleaning Procedure is evidence that Quala employees were not properly trained or prepared in the case of a confined space rescue procedure. The Quala Confined Space Procedure[16] requires training, completion of checklists, use of safety equipment (e.g., emergency retrieval system) and testing and monitoring prior to and during entry. As a result of the OSHA investigation conducted after the incident issued citations for violations related to improper determination of the hazards, inadequate training related to hazard recognition, confined space entry procedures and rescue techniques. Several of the citations were Willful or Repeat violations indicating OSHA's belief that Alpha Technologies were aware of the hazards and the consequences of not adhering to proper confined space procedures. In my experience as a federal regulator and in my role overseeing the Office of Hazardous Materials Safety's enforcement office repeat violators are the most egregious and are typically dealt with more severely because it is a sign that they are not committed to safety.

- While there were records indicating that some employees received training based on the performance and actions taken by employees on the day of the incident, in my opinion the training was inadequate. Training should be competency based where supervisors evaluate the competency of their employees upon completion of training to ensure the training was effective and employees received the knowledge needed to perform their job functions safely and consistent with policies and procedures. The inability of employees to operate the rescue equipment is very convincing evidence of a lack of commitment to employee safety and was a contributing factor to the two fatalities that resulted.

## IX. <u>EXPERIENCE AND METHODOLOGY</u>

PHMSA is the agency that is responsible for developing and enforcing the regulations for the safe transportation of hazardous materials consistent with the HMR. OSHA is the agency responsible for developing and enforcing the HCS. In preparing this report, I based my statements on my knowledge and experience working within the primary regulatory agency responsible for publishing, maintaining, and enforcing the HMR, as well as experience gained through developing

---

[15] Quala production 001816-001819
[16] Quala Production 000293-000359


EXHIBIT A P-BROWN, S. 002033

compliance programs, auditing, training, and consulting companies that ship, transport, and manufacture hazardous materials including the packaging used to transport them. I have reviewed the documents identified in this report, and based on my experience in various professional roles, including my previous employment, my experience assisting companies to comply with the HMR, my formal and secondary education, my experience working with OSHA and EPA in developing the Globally Harmonized System for Classification and Labelling (GHS) within PHMSA's Office of Hazardous Materials Safety, and my experience and understanding of how PHMSA applies, interprets, and enforces the HMR. My opinions reflect my experience in how PHMSA and OSHA apply, interpret, and enforce the HMR and the Hazard Communication Standard (HCS).

My experience relevant to the foregoing includes the following:

- Servings as the head of U.S. delegations to the UN Sub-Committee of Experts on the Transport of Dangerous Goods (UN TDG SCOE), the International Maritime Organization Sub-Committee on Carriage of Cargoes and Containers (CCC) and as the Panel Member to the International Civil Aviation Organization, Dangerous Goods Panel (ICAO DGP). I also severed as the chairman of the UN TDG SCOE and vice chairman of the ICAO DGP. I further served as a member of the delegation the UN Sub-Committee on the Globally Harmonized System of Hazard Classification and Labelling (UN GHS SCOE) for several years along with representatives from OSHA and EPA.

- When the GHS requirements were developed, an interagency committee under the auspices of the Department of State coordinated U.S. involvement in the development of the GHS. OSHA, DOT, CPSC, and EPA, other agencies were involved that had interests related to trade or other aspects of the GHS process. I was the DOT representative on the interagency committee. I worked with counterparts from OSHA and EPA to develop the GHS requirements including the GHS labeling examples in Annex 7 of the GHS. These examples help industry to comply with the applicable regulations. I spoke at public meetings hosted by the agencies to answer questions regarding the GHS requirements.

- I participated on the rulemaking team that published the HM-223 Final Rule on July 28, 2005. In the rule, PHMSA which is the agency responsible for developing and issuing the Hazardous Materials Regulations clarified the responsibilities of both offerors and carriers. I was personally involved in the development of the rulemaking while serving as the Deputy Associate Administrator for Hazardous Materials and am intimately familiar with the rule and the fact that it clearly concluded that a carrier cannot strictly rely on the offeror's classification if the carrier knows, should have known based on the information available, or a reasonable person acting in the circumstances and exercising reasonable care would have knowledge that the information provided by the offeror or prior carrier is incorrect, and that the carrier cannot accept the shipment for transportation.

- Participating as a team member and supervising regulations development teams that resulted in the publication of new and amended regulations pertaining to the transport of hazardous materials, including the packaging in which they are transported, stored and used.


EXHIBIT A P-BROWN, S. 002034

- Drafting, approving, and issuing letters of interpretation and regulatory clarifications, including Federal Register Notices and Safety Advisories, to clarify the meaning of various regulatory requirements.

- Overseeing PHMSA's enforcement program, including developing policies related to enforcement actions, providing guidance related to the types of activities to enforce, providing input to the training program for the enforcement staff, and approving the overall hazardous materials investigator training program.

- Overseeing agencies outreach and training programs. Leading the development of a hazardous materials training guide to facilitate the training of employees that are responsible for the safe transport of hazardous materials.

- In coordination with the emergency response community, the states, and the affected parties, working to establish goals and programs for assisting with training and planning for hazardous materials emergencies. Overseeing the development of training curricula and guidance for the emergency response community. Directing the periodic review of training programs to ensure their continuing relevance to contemporary hazardous materials transportation practices.

- As Deputy Associate Administrator, I participated in the development of and approved numerous regulatory actions including Notices of Proposed Rulemakings and Final Rules;

- Managing and supervising a staff of more than 150 hazardous materials specialists and professionals.

- Participating in PHMSA public meetings, enforcement conferences, safety conferences (*e.g.*, The Commercial Vehicle Safety Alliance Cooperative Hazardous Materials Enforcement Development (COHMED) Program Annual Conference) and National Transportation Safety Board and Congressional hearings.

## X. <u>CONCLUSIONS</u>

The purpose of the DOT, OSHA and EPA regulations are to minimize threats to life, property, or the environment due to hazardous materials related incidents. Compliance with the regulations ensures the safe and secure movement of hazardous materials to industry and consumers by all modes of transportation. Hazardous waste that is improperly managed and transported poses a serious threat to human health and the environment.

In reviewing all the documents including depositions and based on my years working as a regulator and hazardous materials safety professional striving to protect people, property and the environment, it saddens me to know that multiple defendants in the lawsuit did not take their responsibilities seriously or devote appropriate resources to protect the Quala employees. Their actions and lack of actions resulted in offering a hazardous material improperly and without warning people including employees of the inherent hazards of the waste and the presence of carbon monoxide in the tank truck.



EXHIBIT A

P-BROWN, S. 002035

DOW/UCC failed to properly characterize and declare their waste for transport. They also failed to advise the plaintiffs of the true hazards of the waste. The failure to appropriately characterize the waste and to offer it for transport as a regulated hazardous material with appropriate packaging, markings, placards, documentation, protective equipment, emergency response and first aid information directly contributed to the death of Shawn Jarmail Brown and Sidarieus Lozano and the injuries to Roy Robinson.

The actions of DOW/UCC, PMNA, Sprint and Quala indicate a lack of commitment and disregard for public safety. In my professional opinion with over 35 years of experience in the hazardous materials transport industry it is my opinion to a reasonable degree of regulatory certainty that DOW/UCC, PMNA, Sprint and Quala all contributed to the incident that resulted in injuries and fatalities on December 28, 2019, at the Quala facility located at 5100 Underwood Road, Pasadena, Texas 77507. These companies knew or ought to have known based on the circumstances that their conduct would naturally and probably result in injury or damage and yet they continued such conduct in reckless disregard of the consequences.

Respectfully submitted,



Robert A. Richard
President, Hazmat Safety Consulting, LLC



 

Attachment 1-E

CAUSE NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, Individually, as Representative of the Estate of SHAWN JARMAIL BROWN, DECEASED, and as Next Friend of JB AND AB, MINOR CHILDREN,<br><br>*Plaintiffs,* | § § § § § § § § | IN THE DISTRICT COURT OF |
| SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN,<br>AND ERICKA BENS a/n/b of A.B., a Minor, Individually as Wrongful Death Beneficiaries of SHAWN JARMAIL BROWN, SR., DECEASED | § § § § § § § § § | HARRIS COUNTY, TEXAS |
| AND<br><br>KYLE WILLIAMS<br><br>*Intervenors,*<br><br>VS.<br><br>ALPHA TECHNICAL SERVICES CORPORATION, LLC d/b/a QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, STEVEN DODDS, MOBILE MINI TANK AND PUMP SOLUTIONS, INC., UNION CARBIDE CORPORATION, and THE DOW CHEMICAL COMPANY,<br><br>*Defendants.* | § § § § § § § § § § § § § § § § § § § | 113TH JUDICIAL DISTRICT |

CONSOLIDATED WITH

CAUSE NO. 2020-41555

| | | |
|---|---|---|
| FELICIA SHEPPARD, as Representative of the Estate of SIDARIEUS LOZANO, Deceased; LEXUS PAUL as Next Friend of N.L., L.L. and S.L., Minors; and CYNTHIA RICHARDSON | § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § § | |
| VS. | § § | HARRIS COUNTY, TEXAS |
| THE DOW CHEMICAL COMPANY; PERFORMANCE MATERIALS NA, INC.; UNION CARBIDE CORPORATION; SPRINT TRANSPORT, LLC; ALPHA TECHNICAL SERVICES CORPORATION, LLC d/b/a QUALA RAIL & SPECIALTY; STEPVVEN DODDS; and QUALAWASH HOLDINGS LLC, | § § § § § § § § § | |
| *Defendants.* | § § | 113TH JUDICIAL DISTRICT |

**DEFENDANTS PERFORMANCE MATERIALS NA, INC., UNION CARBIDE CORPORATION, AND THE DOW CHEMICAL COMPANY'S**
**EXPERT DESIGNATIONS AND DISCLOSURES**

Pursuant to the Docket Control Order and Texas Rules of Civil Procedure 194.3 and 195.5(a), Defendants Performance Materials NA, Inc. ("PMNAI"), Union Carbide Corporation ("UCC"), and The Dow Chemical Company ("Dow") (collectively, "Defendants") serve their expert designations and disclosures. Defendants reserve the right to supplement these designations and disclosures.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: */s/ Kevin Jordan*
Kevin Jordan
State Bar No. 1014800
Brittainie Zinsmeyer
State Bar No. 24115981
Amir Halevy
State Bar No. 24065356
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: 713.955.4022
Facsimile: 713.955.9644
kjordan@jlcfirm.com
bzinsmeyer@jlcfirm.com
ahalevy@jlcfirm.com

**ATTORNEYS FOR DEFENDANT PERFORMANCE MATERIALS NA, INC.**

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By */s/ Michael L. Brem* (by permission)
Michael L. Brem
State Bar No. 02952020
mbrem@sdablaw.com
Laura Friedl Jones
State Bar No. 00787500
ljones@sdablaw.com
Pennzoil Place ~ South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 221-2525

**ATTORNEYS FOR DEFENDANT UNION CARBIDE CORPORATION**

THE MOORE LAW FIRM

By */s/ Randy E. Moore* (by permission)

Randy E. Moore
State Bar No. 14363450
rmoore@moore-law.us
P.O. Box 3087
Lake Jackson, Texas 77566
Telephone: (979) 285-2230
Facsimile: (979) 285-2235

**ATTORNEY FOR DEFENDANT**
**THE DOW CHEMICAL COMPANY**

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to all counsel of record by electronic means on November 13, 2023.

By: */s/ Brittainie Zinsmeyer*
Brittainie Zinsmeyer

## EXPERT DISCLOSURES

Rule 194.2(f): [F]or any testifying expert:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which the expert will testify;

(3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

(4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party;

(A) All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B) the expert's current resume and bibliography.

**Response:**

### I. RETAINED EXPERTS

Defendants identify the following individuals who have been retained as experts and may be called as a testifying expert as part of Defendants' case:

1) **David O. Anderson, PhD**
899 Casalvieri St.
Las Vegas, NV 89113
(702)333-1503
Aesi1@airmail.net

Dr. David Anderson has been involved in environmental, health, and safety for over forty years. He previously served as an OSHA compliance officer in industrial hygiene and as an Interim Area Director for OSHA. He is currently the President and CEO for Advanced Environmental Services, Inc. and Advanced Environmental Services, LLC in Texas and Nevada. Through these companies, Dr. Anderson provides consultation program development and implementation, including such activities as customized training and written health and safety programs, risk assessment, including exposure measurements and assessments, OSHA compliance packages, emergency response plans, confined space entry, and facility/program audits. This includes several contracts providing training to the United States Navy concerning health, safety, management, and confined space entry.

Dr. Anderson also currently works as an Adjunct Assistant Professor at Embry-Riddle Aeronautical University, where he taught in the Graduate level Safety Management and Human Factors departments. He also serves as a Contributing Faculty Member at Walden University, where he teaches undergraduate and graduate-level courses in Environmental Health, and serves as the Chair for approximately 20 Doctoral candidates. In the past, he taught the Respiratory Protection Program Management for the Navy and Marines for a decade, as well as the OSHA Training Institute Southwest Education Center and has been an expert witness in the use of respiratory protection issues. In addition to his teaching, he has published multiple peer-reviewed articles concerning management, safety, and health.

Dr. Anderson obtained his Doctor of Philosophy in Environmental and Occupational Health from the University of Oklahoma Health Sciences Center in 1976. He is a Certified Industrial Hygienist, a Certified Safety Professional, a Qualified Environmental Professional, and a Certified Professional Environmental Auditor. Dr. Anderson's CV is attached as Exhibit A.

Dr. Anderson is expected to testify as to the standards and procedures, including OSHA regulations, applicable to confined space entry and training employees for same. He will provide opinions as to the lack of training provided by Quala and the errors made by Plaintiffs and Intervenors on the night in question. He will further opine as to regulations applicable to waste disposal companies under RCRA and any duties PMNAI may have had pursuant to those regulations. Lastly, Dr. Anderson may provide information concerning the air supply and respiratory protection issues at Quala.

Dr. Anderson may also offer his analysis of opinions expressed by persons called as witnesses by other parties to this proceeding. Additional opinions of Dr. Anderson will be set forth in his deposition, should the parties choose to depose him.

Dr. Anderson reviewed the depositions of current and former Quala employees taken in this case, including Wayne Butler, Julianne Butler, Clint Scott, and Steve Dodds, Quala's corporate representative depositions, Plaintiff Roy Robinson's deposition, Intervenor Kyle Williams' deposition, and the depositions of the UCC, Dow, and PMNAI representatives. Dr. Anderson further reviewed video and photographic evidence of the night of the incident and subsequent investigation by OSHA produced in the case. Dr. Anderson further reviewed the pleadings in this case, expert report for Robert Richard, and the following production:

- Quala production: 293-357; 395-400; 413-485; 491-513; 568-1070; 1231-1362; 1365-1621; 1658-1823; 2787-2791; 3924-3939; 4582-4585; 5021-5029; 5123-5171; 5173-5374; and
- Performance Materials production: PM_348-413, 4128-4374; 1-136; 2015-2052.

Dr. Anderson's opinions are based on his review of the production and depositions noted above, as well as his experience, knowledge, education, and training as detailed in his C.V. He has also reviewed the RCRA and OSHA regulations.

2) **Jason Babcock, MS, PhD**
Director, Chemistry
Engineering Systems Inc.
15235 Alton Parkway, Ste. 120
Irvine, CA 92618
(949)336-9001

Dr. Babcock is Senior Managing Consultant at Engineering Systems, Inc. ("ESi") and is ESi's Director for Chemistry. He holds a Ph.D. in Inorganic Chemistry, an M.S. in Chemistry from the University of Chicago, and a B.A. in Chemistry from Illinois Wesleyan University. Other of his qualifications are included in his C.V., which is attached as Exhibit B. His C.V. also includes his publications. Dr. Babcock will respond to plaintiffs' allegations that the vinyl acetate polymer waste at issue in this lawsuit decomposed "from the time it was loaded at the UCC facility to delivery of the tank wagon to Quala." The general substance of his testimony is that the waste could not decompose at even the highest temperatures which were present in the tank trailer (< 250° F/121° C) and, in fact, would not decompose until temperatures above 400° F/200° C). He will also testify that the presence of carbon monoxide or hydrogen sulfide in the vinyl acetate process would poison the VA-5 catalyst, further demonstrating the absence of both in the process or waste.

The materials which have been provided to or reviewed by Dr. Babcock to date are:

- Bussey Plaintiffs' Eighth Amended Petition
- Brown Intervenors' Fifth Amended Petition in Intervention
- Robinson's Second Amended Petition
- Sheppard's Second Amended Petition
- Williams' Second Amended Petition in Intervention;
- Defendant The Dow Chemical Company's July 5, 2023 Objections and Responses to Plaintiffs' Fourth Requests for Production and Second Set of Interrogatories;
- Operating Manual for Altair 5X PID Multigas Detector (2015), Order No. 10165710/00
- Operating Manual for ALTAIR 5X – Multigas Detector, ALTAIR 5X IR – Multigas Detector (2015), Order No. 10114801/04;
- Depositions (with exhibits) of the following in this case: Nelson Quiros, Emily Fellows, Mark Mitchell, Elena Labrador, Joe Doucette, Jason Rodriguez, Wayne Butler, Michael Bass, Arthur Davis;
- The following documents produced in this case:

| Bates Start | Bates End |
|---|---|
| UCC000010 | UCC000013 |
| UCC000027 | UCC00036 |
| UCC00810 | UCC002498 |
| UCC002580 | UCC002750 |
| UCC002751 | UCC002905 |
| UCC002906 | UCC004283 |
| UCC004284 | UCC005996 |
| UCC005997 | UCC006107 |
| UCC006328 | UCC006342 |

| Bates Start | Bates End |
|---|---|
| UCC002558 | UCC002579 |
| UCC006618 | UCC006618 |
| UCC006619 | UCC006619 |
| Quala 001796 | Quala 001815 |
| Quala 000395 | Quala 000395 |
| UCC000008 | UCC000009 |
| UCC000153 | UCC000153 |
| UCC000583 | UCC000595 |
| UCC000772 | UCC000786 |
| UCC006138 | UCC006138 |
| UCC006613 | UCC006613 |
| UCC006614 | UCC006614 |
| UCC006615 | UCC006615 |
| UCC006616 | UCC006616 |
| UCC006617 | UCC006617 |
| UCC006352 | UCC006429 |
| UCC006430 | UCC006434 |
| UCC006435 | UCC006444 |
| UCC006139 | UCC006319 |
| UCC006607 | UCC006611 |
| UCC006612 | UCC006612 |
| UCC006445 | UCC006606 |
| PMNA003279 | PMNA003347 |
| Quala 005615 | Quala 005645 |
| PMNA003810 | PMNA003813 |
| PMNA003823 | PMNA003861 |
| PMNA003964 | PMNA003973 |
| Quala 001791 | Quala 001792 |
| Quala 003904 | Quala 003922 |
| Quala 003924 | Quala 003932 |
| Quala 003933 | Quala 003934 |
| Quala 005118 | Quala 005122 |
| Quala 005285 | Quala 005351 |
| UCC000054 | UCC000060 |
| UCC000132 | UCC000146 |
| UCC002543 | UCC002543 |
| PM_003279 | PM_003347 |
| PM_003810 | PM_003813 |
| PM_003823 | PM_003861 |
| PM_003834 | PM_003835 |
| PM_003841 | PM_003862 |
| PM_003964 | PM_003973 |
| PM_004090 | PM_004095 |
| Quala 005615 | Quala 005645 |

| Bates Start | Bates End |
|---|---|
| UCC000008 | UCC000009 |
| UCC000054 | UCC000060 |
| UCC000132 | UCC000146 |
| UCC000153 | UCC000153 |
| UCC000583 | UCC000595 |
| UCC000772 | UCC000786 |
| UCC002543 | UCC002543 |
| UCC006138 | UCC006138 |
| UCC006139 | UCC006142 |
| UCC006143 | UCC006277 |
| UCC006278 | UCC006281 |
| UCC006282 | UCC006283 |
| UCC006284 | UCC006290 |
| UCC006291 | UCC006296 |
| UCC006297 | UCC006303 |
| UCC006304 | UCC006305 |
| UCC006306 | UCC006306 |
| UCC006307 | UCC006309 |
| UCC006310 | UCC006313 |
| UCC006314 | UCC006315 |
| UCC006316 | UCC006319 |
| UCC006352 | UCC006393 |
| UCC006394 | UCC006401 |
| UCC006402 | UCC006409 |
| UCC006410 | UCC006419 |
| UCC006420 | UCC006429 |
| UCC006430 | UCC006434 |
| UCC006435 | UCC006436 |
| UCC006437 | UCC006438 |
| UCC006439 | UCC006440 |
| UCC006441 | UCC006442 |
| UCC006443 | UCC006444 |
| UCC006445 | UCC006454 |
| UCC006455 | UCC006456 |
| UCC006457 | UCC006458 |
| UCC006459 | UCC006466 |
| UCC006467 | UCC006474 |
| UCC006475 | UCC006482 |
| UCC006483 | UCC006490 |
| UCC006491 | UCC006496 |
| UCC006497 | UCC006504 |
| UCC006505 | UCC006506 |
| UCC006507 | UCC006514 |
| UCC006515 | UCC006517 |

| Bates Start | Bates End |
| --- | --- |
| UCC006518 | UCC006525 |
| UCC006526 | UCC006531 |
| UCC006532 | UCC006539 |
| UCC006540 | UCC006540 |
| UCC006541 | UCC006548 |
| UCC006549 | UCC006549 |
| UCC006550 | UCC006550 |
| UCC006551 | UCC006558 |
| UCC006559 | UCC006568 |
| UCC006569 | UCC006573 |
| UCC006574 | UCC006581 |
| UCC006582 | UCC006583 |
| UCC006584 | UCC006589 |
| UCC006590 | UCC006597 |
| UCC006598 | UCC006605 |
| UCC006606 | UCC006617 |
| DOW-2RFP-000394 | DOW-2RFP-000503 |
| DOW-2RFP-000506 | DOW-2RFP-000508 |
| DOW-4RFP-000679 | DOW-4RFP-000682 |
| UCC006620 | UCC006623 |
| UCC006624 | UCC006636 |
| P-BROWN, S. 000512 | P-BROWN, S. 000518 |
| P-BROWN, S. 000594 | P-BROWN, S. 000594 |
| P-BROWN, S. 000597 | P-BROWN, S. 000599 |
| P-BROWN, S. 001753 | P-BROWN, S. 001794 |
| P-BROWN, S. 001797 | P-BROWN, S. 002043 |

- Other Literature Reviewed and Relied Upon by Dr. Babcock includes:
  - CRC Handbook of Chemistry and Physics, D.R. Linde (ed.), CRC Press, Boca Raton, FL (1997);
  - B.J. Holland and J.N. Hay, "The thermal degradation of poly(vinyl acetate) measured by thermal analysis-Fourier transform infrared spectroscopy," Polymer, 43(8), 2002, 2207-2211;
  - B. Rimez, et. al, "The thermal degradation of poly(vinyl acetate) and poly(ethylene-co-vinyl acetate), Part I: Experimental study of the degradation mechanism," Polymer Degradation and Stability, 93(4), 2008, 800-810;
  - L. C. S. do Nascimento, et.al, "Thermal behavior of glycolic acid, sodium glycolate and its compounds with some bivalent transition metal ions in the solid state," J. Therm. Anal. Calorim., 130, 2017, 1463-1472;
  - Veryser, et. al, "Low-cost instant CO generation at room temperature using formic acid, mesyl chloride and triethylamine," React. Chem. Eng., 1, 2016, 142-146;
  - T. Ueda, et. al, "Trichlorophenyl Formate: Highly Reactive and Easily Accessible Crystalline CO Surrogate for Palladium-Catalyzed Carbonylation of Aryl/Alkenyl Halides and Triflates," Org. Lett., 14(20), 2012, 5370-5373;

- T. Ueda, et. al, "Palladium-Catalyzed Fluorocarbonylation Using N-Formylsaccharin as CO Source: General Access to Carboxylic Acid Derivatives," Org. Lett., 15(20), 2013, 5370-5373; and
- T. Morimoto, et. al, "CO-Transfer Carbonylation Reactions. A Catalytic Pauson−Khand-Type Reaction of Enynes with Aldehydes as a Source of Carbon Monoxide," J. Am. Chem. Soc., 124(15), 2002, 3806-3807.

**3) Joe Fedoruk, M.D., CIH, DABT, FACMT, FACOEM**

Principal Scientist, Health Sciences
Exponent Engineering & Scientific Consulting
Irvine, California
jfedoruk@exponent.com
(949)242-6018

Dr. Fedoruk is a Clinical Professor of Medicine at the University of California Irvine School of Medicine and a Principal Scientist at Exponent. He holds a medical degree with distinction from the University of Alberta. He performed postgraduate medical training at McGill University and his residency in Occupational Medicine at the University of California Irvine. He is board-certified in Occupational Medicine, Medical Toxicology, and Toxicology. He is also board-certified (CIH) by the American Board of Industrial Hygiene. Other of his qualifications are included in his C.V., which is attached as Exhibit C. His C.V. also includes his publications.

Dr. Fedoruk will respond to plaintiff Roy Robinson's allegations regarding his exposure to carbon monoxide and to Dr. Lindsay's opinions, including her opinions about future risks of cardiac, pulmonary, and neurological issues. As a medical doctor himself, he will also address Drs. Albustami, Nguyen, and Lotfi's diagnoses, including observing where each notes that further testing is required to reach a definitive diagnosis.

The materials which have been provided to or reviewed by Dr. Fedoruk to date are:

- Quala 000395;
- UCC000010-13;
- Medical and other records pertaining to Roy Robinson received to date, including:
  - 2023.07.12 and 2023.08.22 Omar Albustami, M.D. Records (internally bates labeled HLF_ROBINSON 001936-39, HLF_ROBINSON 001941-42);
  - 2023.08.31 Djamchid Lotfi, M.D. Records (internally bates labeled HLF_ROBINSON 001959-63);
  - 2023.09.05 Chau D. Nguyen, M.D. Records (internally bates labeled HLF_ROBINSON 001944-52);
  - 2023.11.06 Summary of Records (received to date) pertaining to Roy Robinson
  - 2022.06.17 La Port Fire EMS Records (internally bates labeled ROBINSONR-1LPEMS-00001-19);
  - 2022.07.26 HCA Houston Healthcare Clear Lake Records (internally bates labeled ROBINSONR-10HCACL-00001-183);
- P-BROWN, S. 001753-94 (2023.08.17 Report of Janci C. Lindsay, Ph.D.);
- 2023.09.21 Report by Aaron M. Wolfson, Ph.D.; and
- 2022.07.29 Deposition of Roy Robinson with Exhibits

4) **Dr. Zdenek Hejzlar, Ph.D., CSP**
Senior Managing Consultant
Engineering Systems, Inc.
12750 Commonwealth Drive
Ft. Meyers, Florida 33913
Telephone: (866) 596-3994

Dr. Hejzlar is a Senior Managing Consultant with Engineering Systems, Inc. He holds a Ph.D. in Occupational Safety and Health Engineering from Columbia Southern University, an M.S. in Business Administration from the University of South Florida, and a B.S. in Textile Chemistry from the Philadelphia College of Textiles and Science. He is also a Certified Safety Professional by the Board of Certified Safety Professionals. Other of his qualifications are included in his C.V., which is attached as Exhibit 4. His C.V. also includes his publications.

The substance of Dr. Hejzlar's testimony is that Union Carbide included the correct paperwork with the shipment of vinyl acetate polymer waste from its VA-5 unit. And that, because it was a waste, an SDS should not be included. Dr. Hejzlar will also testify that plaintiffs' experts are misinterpreting/misreading Section 10 of the SDSs to which they refer. The identification of carbon monoxide from the decomposition of the individual constituents of the vinyl acetate waste in those SDSs refers to the scenario when it is burned, as required by the OHSA Hazard Communication Standard for Safety Data Sheets.

The materials which have been provided to or reviewed by Dr. Hejzlar to date are:

- Bussey Plaintiffs' Eighth Amended Petition
- Brown Intervenors' Fifth Amended Petition in Intervention
- The following documents produced in this case:
  - Quala 000395, 3924-27;
  - UCC000010-13, 000027-36, 000041-44;
  - DOW-2RFP-000429-451;
  - DOW-3RFP-000521-543; and
  - P-BROWN, S. 001753-1794, 000299-302, 001867-2043.
- Other literature reviewed and relied upon by Dr. Hejzlar, including the regulations referred to therein:
  - 40 CFR Part 370 (as of October 4, 2023);
  - OSHA Fact Sheet – Procedures for Atmospheric Testing in Confined Spaces;
  - OSHA – Confined Spaces – Hazards and Solutions (from www.osha.gov);
  - US EPA – Criteria for the Definition of Solid Waste and Solid and Hazardous Waste Exclusions (from www.epa.gov - last updated January 26, 2023);
  - 40 CFR Part 262, Subpart B – Manifest Requirements Applicable to Small and Large Quantity Generators;
  - National Library of Medicine, National Center for Biotechnology Information, Toxicological Profile for Carbon Monoxide – Regulations, Advisories, and Guidelines, EPA designation for CO under Clean Air Act;
  - Emergency Planning and Community Right-to-Know Act definition;
  - Hazardous Waste Operations and Emergency Response (HAZWOPER) – Background (from www.osha.gov);

- Hazardous Waste Operations and Emergency Response (HAZWOPER) – General Business (from www.osha.gov);
- Hazardous Waste Operations and Emergency Response (HAZWOPER) – Preparedness (from www.osha.gov);
- EPA530-R-01-007, "Land Disposal Restrictions: Summary of Requirements" (revised August 2001), EPA Offices of Solid Waste and Emergency Response & Enforcement and Compliance Assurance;
- Learn the Basics of Hazardous Waste (from www.epa.gov);
- OSHA Brief: Hazard Communication Standard: Safety Data Sheets (OSHA3514 SDS www.osha.gov);
- SERC definition;
- US EPA - Steps in Complying with Regulations for Hazardous Waste – Hazardous Waste Generators (from www.epa.gov);
- Texas Administrative Code § 335.54; and
- Toxicological profile of Carbon Monoxide.

**5) Steven B. Kushnick, P.E.**
Steven B. Kushnick, P.E. Inc.
P.O. Box 670084
Marietta, Georgia 30066
(770)591-1720
sbk@sbkushnick.com

Mr. Kushnick has worked as the Principal Engineer for Steven B. Kushnick, P.E. Inc. since 1996. He is a trained Mechanical Engineer with experience in designing hardware for and assessing, amongst other things, compressors, combustion systems, and heat transfer equipment. He also has experience with writing inspection procedures, repair procedures, and process specifications. Mr. Kushnick obtained his Bachelor of Science in Mechanical Engineering from Boston university in 1980. He currently holds licensure as a Professional Engineer in eight different states, and is a member of various national engineering organizations, including the American Society of Mechanical Engineers and the National Society of Professional Engineers. Mr. Kushnick's full CV is attached as Exhibit 5.

Mr. Kushnick is expected to testify regarding the potential sources of carbon monoxide from various systems at the Qualawash facility where the incident occurred. He will further opine as to other occurrences involving carbon monoxide exposure and industrial expectations for avoiding such incidents.

Mr. Kushnick may also offer his analysis of opinions expressed by persons called as witnesses by other parties to this proceeding. Any additional opinions from Mr. Kushnick will be set forth in his deposition, should the parties choose to depose him.

Mr. Kushnick reviewed the depositions of current and former Quala employees taken in this case, including Wayne Butler, Julianne Butler, Clint Scott, and Steve Dodds, Quala's corporate representative depositions, Plaintiff Roy Robinson's deposition, Intervenor Kyle Williams' deposition, and the depositions of the UCC, Dow, and PMNAI representatives. Mr. Kushnick also reviewed video and photographic evidence of the night of the incident and

subsequent investigation by OSHA produced in the case. Mr. Kushnick further reviewed the pleadings in this case, and the following production:

- Quala production: 293-357; 395-400; 413-485; 491-513; 568-1070; 1231-1362; 1365-1621; 1658-1823; 2787-2791; 3924-3939; 4582-4585; 5021-5029; 5123-5171; 5173-5374; and
- Performance Materials production: PM_348-413, 4128-4374; 1-136; 2015-2052;
- Sullair User Manual for Industrial Air Compressor … 7500…, downloaded from the internet at https://best-aire.com/wp-content/uploads/2021/09/4500P.-5500-7500-4500PV-5500V-7500V-45-55-75KW-60-60-75hp.pdf on 18 August 2023; and
- Parts manual for above, downloaded from the internet at www.industrialairpower.com/assets/images/Manuals/Sullair%20VARIABLE%20SPEED%204500-5500-7500-PARTS.pdf on 18 August 2023; and
- Operating Instructions And Replacement Parts Manual for Air Systems Breather Box, downloaded from the internet at https://www.airsystems.com/manuals/BREBX013.pdf on 13 October 2023.

Mr. Kushnick's opinions are based on his review of the production and depositions noted above, as well as his experience, knowledge, education, and training as detailed in his C.V.

**6) Michael Nikolaou, PhD**
University of Houston
4226 MLK Blvd.
Houston, Texas 77204
nikolaou@uh.edu
713.743.4323

Dr. Michael Nikolaou is a Professor and Associate Chair of Chemical and Biomolecular Engineering in the Cullen College of Engineering at the University of Houston, where he has taught for over 25 years. At the University of Houston, Dr. Nikolaou teaches a variety of undergraduate and graduate courses. He also routinely advises both undergraduate and graduate (master and Ph.D.) students.

Dr. Nikolaou has a diploma in chemical engineering from the National Technical University in Athens, Greece, and obtained his Ph.D. in chemical engineering at the University of California, Los Angeles in 1989. He has extensive experience in process systems engineering and mathematical modeling. His research interests are in computer-aided systems engineering, i.e., development and use of computer-based methods for the design, optimization, monitoring, and automatic control of various kinds of systems, in a diverse array of industries, including the oil and gas industry and pharmaceuticals. He has over thirty years' experience in academia and has served as a consultant in several industries. His full C.V. is attached as Exhibit 6.

Dr. Nikolaou will testify as to the conditions necessary for chemical thermal decomposition of the components of the vinyl acetate polymer waste stream. He will also testify as to the pressure implications of thermal decomposition in a closed system and transfer of gases relating to the readings from the MSA gas sensor used in this case.

Dr. Nikolaou may also offer his analysis of opinions expressed by persons called as witnesses by other parties to this proceeding, including but not limited to Cayias. Dr. Nikolaou will testify that the scenario posed by Cayias is unlikely based on the evidence in this case. Any additional opinions from Dr. Nikolaou will be set forth in his deposition, should the parties choose to depose him.

Dr. Nikolaou reviewed the depositions of Nelson Quiros, Jeffrey Kupper, and Emily Fellows. Dr. Nikolaou further reviewed the expert reports of Janci Lindsay and John Cayias. Dr. Nikolaou also reviewed photographs of various chemicals located at Quala provided by the parties in this case, the manuals relating to the MSA Altair Gas Detector, and the following documents:

- UCC000010-13;
- UCC002557-2579;
- UCC006620-6636;
- PM001955-2014;
- PM003276-3347;
- PM003834-85;
- PM003841-3862;
- PM004090-4095;
- Quala000395;
- Quala003924-3932;
- Quala003933-34; and
- Quala005285-5351.

Dr. Nikolaou was also provided all of the documents identified as having been provided to John Cayias in his report and in Plaintiffs' and Intervenors' disclosures.

Dr. Nikolaou's opinions are based on his review of the production and depositions noted above, as well as his experience, knowledge, education, and training as detailed in his C.V.

7) **Sarah S. Shafer, M.D.**
Assistant Professor of Emergency Medicine & Medical Toxicology
Baylor College of Medicine
1 Baylor Plaza
Houston, Texas 77030
sshafer@bcm.edu

Dr. Sarah Shafer is an Assistant Professor of Emergency Medicine and Medical Toxicology at Baylor College of Medicine, as well as a Clinical Associate Professor at the M.D. Anderson Cancer Center. She received her B.S. in Biology from Denison University, her Doctor of Medicine from Virginia Commonwealth University. She completed an Emergency Medicine Residency at Christiana Care Health System in Delaware and then a Medical Toxicology Fellowship at the University of Texas Southwestern. She holds a Texas Medical License and is certified by the American Board of Emergency Medicine in Medical Toxicology. Her full C.V. is attached as Exhibit 7.

Dr. Shafer did a rotation in forensic pathology during medical school at the Richmond County Medical Examiner's office where she performed autopsies and determined cause of death. In addition, she completed a rotation as part of a historical pathology course during medical school and has previously worked with a clinical pathologist.

Dr. Shafer will testify as to her review and assessment of the autopsies performed on Shawn Brown and Sidarieus Lozano and their causes of death. She will also opine as to her review of Roy Robinson's and Kyle Williams's medical records, specifically as to the lack of causation between the alleged injuries and the incident. Dr. Shafer will testify that she believes some of Roy Robinson's injuries are due, at least in part, to preexisting conditions. Lastly, Dr. Shafer will offer her analysis of opinions expressed by persons called as witnesses by other parties to this proceeding, including but not limited to Dr. Janci Lindsay. Any additional opinions from Dr. Shafer will be set forth in his deposition, should the parties choose to depose her.

Dr. Shafer reviewed the depositions of Roy Robinson, Kyle Williams, Wayne Butler, Steve Dodds, and Marshall Land. Dr. Shafer further reviewed the expert reports of Janci Lindsay, including literature cited in Lindsay's report, and the report for John Cayais. Dr. Shafer also reviewed the OSHA documents (PM_003578–4127), medical records for Roy Robinson and Kyle Williams produced by the parties in the case, and the autopsies performed on Shawn Brown and Sidarieus Lozano. Dr. Shafer was also provided all documents identified as having been given to Dr. Lindsay in Plaintiffs' and Intervenors' disclosures.

Dr. Shafer's opinions are based on her review of the production and depositions noted above, as well as her experience, knowledge, education, and training as detailed in his C.V. She also reviewed and anticipates relying on academic research and publications, including medical toxicology textbooks, academic articles on carbon monoxide, government reports on carbon monoxide poisoning, and academic articles regarding forensic pathology and carbon monoxide.

## II. NON-RETAINED EXPERTS—MEDICAL PROVIDERS

Although they have not been retained as experts, these individuals or entities may be called to testify regarding the allegations in this case and as to Defendants' affirmative or other defenses:

1) **Dr. Robert Bellair**
Technical Leader
The Dow Chemical Company
c/o Mike Brem & Laura Friedl Jones
Schirrmesiter Diaz-Arrastia Brem LLP
Pennzoil Place ~ South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: 713.221.2500

Dr. Robert Bellair has been a Subject Matter Expert in hazardous chemistry for The Dow Chemical Company since 2010. He is currently the Technical Leader of the Dow Chemical Company's Reactive Chemicals group, and his title is Senior Research Scientist. He holds a Ph.D. in Materials Science and Engineering and a B.S. in Chemical Engineering from Wayne State University. In his role at Dow, he is familiar with the VA-5 production process, process chemistry, and the vinyl acetate polymer waste from that process. If asked, he would testify that the thermal decomposition of the waste is not credible at the highest temperatures which were present in the tank trailer (< 250° F/121° C) or at the highest temperatures physically possible in the tank trailer (< 304° F/151° C) and, in fact, the thermal decomposition would not achieve relevant rates above 400° F/200° C). He will be prepared to testify that even at the elevated temperatures at which the waste might undergo thermal decomposition readily, such decomposition would not generate either carbon monoxide or hydrogen sulfide.

**2) Okikiolu Olufokunbi**
Sr. Technology Manager
Rohm and Haas Texas, Inc.
c/o Mike Brem & Laura Friedl Jones
Schirrmesiter Diaz-Arrastia Brem LLP
Pennzoil Place ~ South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: 713.221.2500

Okikiolu Olufokunbi is a Senior Technology Manager at Rohm and Haas Texas, Inc., supporting Union Carbide's VA-5 unit. He holds a B.Sc. in Chemical Engineering from the University of Texas. In his role, he is knowledgeable about the VA-5 production process (including process temperatures), process chemistry, and the vinyl acetate polymer waste from that process. If asked, he would testify that, from testing that has been done, the waste could not decompose at even the highest temperatures which were present in the tank trailer (< 250° F/121° C) and, in fact, would not begin to decompose until temperatures above 400° F/200° C). And he can testify that any such decomposition would not generate hydrogen sulfide because there is no sulfur in the VA-5 process. He can testify to the accuracy of the waste characterization of the vinyl acetate waste from testing done by TDCC. He will also testify that the presence of carbon monoxide or hydrogen sulfide in the vinyl acetate process would poison the VA-5 catalyst and that this shows that neither is present in the process or waste because the catalyst in place during the relevant time period in 2019 performed as expected for its expected life.

**3) Emily Fellows**
Improvement Director – GE/OS
The Dow Chemical Company
c/o Mike Brem & Laura Friedl Jones
Schirrmesiter Diaz-Arrastia Brem LLP
Pennzoil Place ~ South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: 713.221.2500

Emily Fellows was the production leader for the VA-5 unit after Jeremy Kupper (she has recently changed jobs). She holds a degree in Chemical Engineering from the University of Dayton. In her role, she is knowledgeable about the VA-5 production process, process chemistry, and the vinyl acetate polymer waste from the production process. She has been deposed in this action. In addition, she can testify there is no sulfur in the VA-5 process. She can also testify that the presence of carbon monoxide or hydrogen sulfide in the vinyl acetate production process would poison the VA-5 catalyst and that this did not occur because the catalyst in place during the relevant time period in 2019 performed as expected for its expected life.

4) **Jeremy Kupper**
Maintenance Leader
Union Carbide Corporation
c/o Mike Brem & Laura Friedl Jones
Schirrmesiter Diaz-Arrastia Brem LLP
Pennzoil Place ~ South Tower
712 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: 713.221.2500

Jeremy Kupper was the production leader for the VA-5 unit at the time of the incident. He holds a degree in Chemical Engineering from Lamar University. From his previous role, he is knowledgeable about the VA-5 production process, process chemistry, and the vinyl acetate polymer waste from the production process. He has been deposed in this action. In addition, he can testify there is no sulfur in the VA-5 process. He can also testify that the presence of carbon monoxide or hydrogen sulfide in the vinyl acetate production process would poison the VA-5 catalyst and that this did not occur because the catalyst in place during the relevant time period in 2019 performed as expected for its expected life.

5) **Nelson Quiros**
Research Scientist
Rohm and Haas Chemicals LLC
c/o Mike Brem & Laura Friedl Jones
Schirrmesiter Diaz-Arrastia Brem LLP
Pennzoil Place ~ South Tower
713 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: 713.221.2500

Nelson Quiros is a Research Scientist with Rohm and Haas Chemicals LLC in process R&D in the performance monomers business that includes VA-5. He holds a Ph.D. in Organic Chemistry from the University of Utah and a B.Sc. in Chemistry from the University of Puerto Rico. He has been deposed in this action. In addition, He can testify there is no sulfur in the VA-5 production process. He can also testify that the presence of carbon monoxide or hydrogen sulfide in the vinyl acetate production process would poison the VA-5 catalyst.

6) **Mark Mitchell**
Heritage Environmental Services
c/o Kevin Jordan, Amir Halevy, & Brittainie Zinsmeyer
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4020

Mark Mitchell currently works for Heritage Environmental Services as the Director of Operations Management. He worked for Performance Materials for 38 years, in various roles, including as Area Superintendent. Mr. Mitchell can testify as to his knowledge of the working of the incinerator, permitting held by Performance Materials at the time of the incident, and that carbon monoxide is not used in the unloading process. Mark Mitchell has already been deposed in this case on behalf of PMNAI. Mr. Mitchell may also testify as to the mechanisms in place to ensure that the unloading could not have permitted intermingling or the introduction of outside gases or liquids to the tanker. He may be asked questions in opinion form during the course of his testimony.

7) **Dustin Hedges**
Responsible Care Leader
The Dow Chemical Company
c/o Kevin Jordan, Amir Halevy, & Brittainie Zinsmeyer
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4020

Dustin Hedges is currently the Responsible Care Leader for the Dow Chemical Company supporting the East Texas hub. He has a B.E. from Louisiana State University in Chemical Engineering. Dustin Hedges has already been deposed in this case. Mr. Hedges will testify as to the structure of the Sabine River Operations ("SRO") in relation to the incinerator that was operated by PMNAI at the time of the incident, the source of nitrogen used for offloading procedures, and how carbon monoxide was not used or near the incinerator's location at SRO. He may be asked questions in opinion form during the course of his testimony.

Defendants reserve the right to elicit opinion testimony from individuals who have been or may be designated as expert witnesses by other parties in this matter and to designate individuals needed for rebuttal or impeachment witness purposes in accordance with applicable rules and the Docket Control Order. Defendants further reserve the right to supplement these designations and disclosures, as necessary.

Attachment 1-F

CAUSE NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, ET AL., Plaintiffs, | ) | IN THE DISTRICT COURT OF |
| SHAWN JARMAIL BROWN, JR.; ET AL., Intervenors, | ) | HARRIS COUNTY, T E X A S |
| VS. | ) | |
| ALPHA TECHNICAL SERVICES, ET AL., Defendants. | ) | 113TH JUDICIAL DISTRICT |

******************************************

ORAL AND VIDEOTAPED DEPOSITION OF JOHN CAYIAS, Ph.D.

JANUARY 9, 2024

(REPORTED REMOTELY)

******************************************

ORAL AND VIDEOTAPED DEPOSITION of JOHN CAYIAS, Ph.D., produced as a witness at the instance of the Defendant Union Carbide Corporation, and duly sworn, was taken in the above-styled and numbered cause on the 9th of January, 2024, from 10:08 a.m. to 3:23 p.m., before Wendi Broberg, CSR in and for the State of Texas, reported by machine shorthand remotely via Zoom, pursuant to the Texas Rules of Civil Procedure.



A P P E A R A N C E S

FOR THE BUSSEY PLAINTIFFS:

MR. MATTHEW A. ELWELL - (VIA ZOOM)
MR. JAMES AMARO
MR. CHRIS GADOURY
THE AMARO LAW FIRM
2500 E. TC Jester Boulevard
Suite 525
Houston, Texas 77008
Ph. (713) 864-1941
Fax (713) 864-1492
E-mail: matt@amarolawfirm.com

FOR THE PLAINTIFF ROY ROBINSON:

MR. BRANDON FRANCIS - (VIA ZOOM)
HERD LAW FIRM, P.L.L.C.
19500 Tomball Parkway
Suite 250
Houston, Texas 77070
Ph. (713) 955-3699
E-mail: brandon.francis@herdlawfirm.com

FOR THE PLAINTIFF THE ESTATE OF SIDARIEUS LOZANO AND WRONGFUL DEATH BENEFICIARIES:

MR. BYRON ALFRED - (VIA ZOOM)
THE ALFRED FIRM
2211 Norfolk
Suite 803
Houston, Texas 77098
Ph. (713) 470-9714
Fax (877) 751-7453
E-mail: byron@alfredfirm.com



A P P E A R A N C E S (Continued)

FOR THE INTERVENORS SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED:

MR. SCOTT GREENLEE - (VIA ZOOM)
DAX F. GARZA, P.C.
One City Centre
1021 Main Street
Suite 1400
Houston, Texas 77002
Ph. (713) 522-3000
Fax (713) 522-3001
E-mail: dax@daxgarzalaw.com

FOR THE DEFENDANT SPRINT TRANSPORT, LLC:

MR. JAMES M. KIMBELL - (VIA ZOOM)
CLARK HILL, P.L.C.
909 Fannin
Suite 2300
Houston, Texas 77010-3033
Ph. (713) 951-5600
Fax (713) 951-5660
E-mail: jkimbell@clarkhill.com

FOR THE DEFENDANT STEVEN DODDS:

MR. KEVIN COLLINS - (VIA ZOOM)
BRACEWELL, L.L.P.
111 Congress Avenue
Suite 2300
Austin, Texas 78701-4061
Ph. (512) 494-3640
E-mail: kevin.collins@bracewell.com



A P P E A R A N C E S (Continued)

FOR THE DEFENDANT UNION CARBIDE CORPORATION:

MR. MICHAEL L. BREM - (VIA ZOOM)
MS. LAURA JONES - (VIA ZOOM)
SCHIRRMEISTER DIAZ-ARRASTIA BREM, L.L.P.
Pennzoil Place - South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Ph. (713) 221-2500
Fax (713) 221-2525
E-mail: mbrem@sdablaw.com

FOR THE DEFENDANT ALPHA TECHNICAL SERVICES CORPORATION, LC, D/B/A QUALA RAIL & SPECIALTY AND QUALAWASH HOLDINGS, LLC:

MR. DAVID BRENNER - (VIA ZOOM)
BURNS ANDERSON JURY & BRENNER, L.L.P.
4807 Spicewood Springs Road
Building 4, Suite 100
Austin, Texas 78759
Ph. (512) 338-5322
Fax (512) 338-5363
E-mail: jebrenner@bajb.com

FOR THE DEFENDANT DOW CHEMICAL COMPANY:

MR. RANDY E. MOORE - (VIA ZOOM)
THE MOORE LAW FIRM
#7 West Way Court, Suite C
Lake Jackson, Texas 77566
Ph. (979) 285-2230
Fax (979) 285-2235
E-mail: rmoore@moore-law.us

FOR THE DEFENDANT PERFORMANCE MATERIALS, NAI:

MR. AMIR HALEVY - (VIA ZOOM)
JORDAN, LYNCH & CANCIENNE, P.L.L.C.
1980 Post Oak Boulevard, Suite 2300
Houston, Texas 77056
Ph. (713) 955-4020
E-mail: kjordan@jlcfirm.com
E-mail: bzinsmeyer@jlcfirm.com

A P P E A R A N C E S (Continued)

FOR THE DEFENDANT MOBILE MINI:

MS. KAREN BENNETT - (VIA ZOOM)
GERMER, P.L.L.C.
550 Fannin, Suite 400
Beaumont, Texas 77701
Ph. (409) 654-6700
Fax (409) 835-3373
E-mail: krbennett@germer.com

and

MS. JENNIFER ANN WRIGHT - (VIA ZOOM)
ANSA ASSUNCAO, L.L.P.
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
Ph. (443) 539-7788
Fax (410) 480-7081
E-mail: jennifer.wright@ansalaw.com

ALSO PRESENT:

Mr. Bob Richard - (Via Zoom)
Ms. Kayla Brown - Videographer - (Via Zoom)
Ms. Myra Thetford - Videographer - (Via Zoom)

REPORTED BY:

WENDI BROBERG, CSR 7091 - (VIA ZOOM)
Contracted by:
Discovery Resource
1511 West 34th Street
Houston, Texas 77018
Ph. (713) 223-3300
Fax (713) 228-3311



INDEX

Appearances ....................................2
Index ..........................................6
Index of Exhibits ..............................6
JOHN CAYIAS, Ph.D.
Examination by Mr. Brem ...................8
Examination by Mr. Halevy ................88
Examination by Mr. Kimbell ..............107
Examination by Mr. Moore ................109
Further Examination by Mr. Brem .........124
Examination by Mr. Brenner ..............126
Examination by Mr. Elwell ...............128
Further Examination by Mr. Brem .........175
Further Examination by Mr. Halevy .......191
Further Examination by Mr. Elwell .......194
Signature of Witness .........................199
Reporter's Certification .....................200

INDEX OF EXHIBITS



| NUMBER | DESCRIPTION | MARKED/IDENTIFIED |
|---|---|---|
| 1 | Cayias Consulting first report of findings, 9/12/2023 (Bates Nos. P-BROWN, S. 001867 - 001903) | 9 |
| 2 | EPA Form 8700-22, Uniform Hazardous Waste Manifest with attached Waste Characterization, Texas City Union Carbide Plant (Bates Nos. UCC000010 - 000013) | 25 |





EXHIBITS (Continued)



| NUMBER | DESCRIPTION | MARKED/IDENTIFIED |
|---|---|---|
| 3 | OSHA Air Sampling Worksheet, 1/22/2020, Alpha Technical Services, LC (Bates Nos. PM_003841 - 003862) | 40 |
| 4 | Excerpts from Eurofins TestAmerica Analytical Report, Texas City HWC Sampling 2019 for DDT Specialty Electronic Materials US 8, Deer Park, Texas (Bates Nos. UCC000810, 000829 - 000842, 001638) | 74 |
| 5 | Document titled "RC/PHA - RC/LHA Questionnaire and Protocol" (Bates Nos. UCC006717 - 006756) | 124 |
| 6 | Cayias Consulting first report of findings, 9/12/2023 (Bates Nos. P-BROWN, S. 001867 - 001903) | 129 |
| 7 | Harris County Autopsy Report, Toxicology Report and Investigative Findings | 146 |
| 8 | Waste Characterization report (Bates Nos. UCC000011 - 000013) | 147 |
| 9 | OSHA Narrative with full findings (Bates Nos. OSHA0243 - 0259) | 147 |
| 10 | Quala spreadsheet CO3 Spike 1 (Bates No. Quala Production 000395) | 149 |
| 11 | Dow Tank Truck Loading/Unloading Checklist (Bates Nos. UCC000008 - 000009) | 155 |
| 12 | Du Pont inbound transportation ticket (Bates No. PM000006) | 156 |
| 13 | OSHA Air Sampling Report, Alpha Technical Services (Bates Nos. Quala Production 003928 - 003931) | 164 |





THE VIDEOGRAPHER: Today is Tuesday, January 9th, 2024. We're on the record at 10:08 a.m.
(Witness sworn)
THE WITNESS: I do.
JOHN CAYIAS, Ph.D.,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. BREM:
**Q Doctor, my name is Mike Brem, and I represent one of the defendants in this case, Union Carbide Corporation. I assume you've been deposed before?**
A Yes, sir.
**Q Do you have any idea how many times?**
A How many times I've heard of Dow --
**Q No.**
A -- or Union Carbide?
**Q Been deposed.**
A Oh, I'm -- I don't hear very well. Don't feel bad about screaming at me.
**Q All right.**
A Anyway, many times.
**Q More than a hundred?**
A Probably not over a hundred, but say somewhere between 20 and 50, something like that.
**Q Fair enough. Were those always as you were**

**can be a constituent in a cleaning material?**
A It can. Alpha-pinene is not that common for a cleaning material but it -- it -- it's a -- it can be generated and it can be present in them, yes.
**Q So it wouldn't surprise you to find that at Qualawash either, would you?**
A No.
**Q Okay. So the only two items we have left then are furan and acetone on Mr. Lozano's cartridges, correct?**
A Yes.
**Q All right. So let's add those two to the materials that we've identified either from the Eurofins report or -- well, and the waste characterization. If you add Euro -- furan and acetone to that mixture, is there a pathway to carbon monoxide?**
MR. ELWELL: Form.
A Fur -- furan is very reactive. I guess the simple answer is sure. Both -- both of them contain oxygen. Both of them contain carbon. Both of them could be used to produce carbon monoxide.
**Q (By Mr. Brem) Okay. Where -- in -- in what quantities would it be -- would it -- of furan would it take to react with what to generate at least 2000 ppm of carbon monoxide?**



MR. ELWELL: Form.
A I'm not even sure I could begin to give you -- well, it's too complex of a system to try and describe. The -- The reactivity of furan is very dependent upon everything from metal to, you know, different metals that it could come in contact with to other chemicals. Acetone that still has a very high vapor pressure and can be reactive with almost anything. It's -- it's very flammable. I just -- you know, there's just too many avenues.
**Q (By Mr. Brem) All right. So let's stay with the furan for a second.**
A Okay.
**Q Is it your position that furan reacted with any of the known constituents of the waste to generate carbon monoxide?**
A I have no way of answering that. I don't know.
**Q Is it your position that acetone reacted with any of the known constituents of the waste to generate carbon monoxide?**
MR. ELWELL: Form.
A I don't know.
**Q (By Mr. Brem) I'm sorry?**
A I don't know.
**Q And these are cartridges from Mr. Lozano's**



**respirator, the one person we know who went into the tanker, correct?**
MR. ELWELL: Form.
A I'm sorry. Are you saying that he entered the tank? Yes.
**Q (By Mr. Brem) Yes. This is -- is there any reaction from any of these items identified on these cartridges combined with the materials found in the Eurofins report or the materials found on the waste characterization that you can identify a potential reaction to generate at least 2000 ppm of carbon monoxide?**
MR. ELWELL: Form.
A Again, all of the materials that have carbon and oxygen are capable of producing carbon monoxide, and those produce it, yes. Under what conditions, it varies.
**Q (By Mr. Brem) Okay. Could they -- could they -- could they produce it in the conditions present here --**
MR. ELWELL: Form.
**Q (By Mr. Brem) -- a nitrogen blanket --**
A I'm sorry. Where?
**Q The conditions that were present in the tank wagon?**



MR. ELWELL: Form.
**Q (By Mr. Brem) We know -- we know something about that, don't we?**
A At what point in time?
MR. ELWELL: Form.
**Q (By Mr. Brem) Well, did the reaction occur in the tank wagon, or did it occur in the waste storage tank?**
A Based -- based on the analysis from the storage tank, there's no carbon monoxide present, but I'm not sure if they were looking for carbon monoxide. That's one of the problems about the way DuPont -- I'm sorry, the way --
**Q Union Carbide?**
A -- Union Carbide was doing their analysis based on their risk assessment. But, again, I'm assuming that their analysis would have included that, and the answer is they didn't find any. So it had to have occurred sometime between the loading, after the loading and before it was un -- unopened at Quala.
**Q Okay. So just to summarize and then we'll take a break, not in the storage tank but in the tank wagon is where this reaction occurred, correct?**
A Based on all of the evidence that we have to date, yes.

A John Cayias.
**Q Okay. Do you go by Dr. Cayias?**
A I've been called Dr. Cayias.
**Q Okay.**
A I have a Ph.D. in chemistry and -- from The University of Texas.
**Q Dr. Cayias, what was your role and what were you asked to do in this case?**
A I was asked to look into and investigate an incident that occurred at the Quala tank cleaning operation that caused the death of two people.
**Q Okay. And were you asked to -- to do that analysis from -- from your role or expertise as a chemist?**
A I was and my knowledge base.
**Q Okay. And I would like to mark this as Exhibit 6 to your deposition.**
**(Exhibit 6 marked)**
**Q (By Mr. Elwell) Do you recognize this?**
A Yes, sir. It's the report I wrote for my investigation of the incident.
**Q Okay. And, you know, this report has some of the factual -- or what does this report have in it as far as the basis for your opinions?**
A It lists all of the facts that I was able to



identify based on the documents and information I reviewed and a trip that I made to the incineration facilities at the Dow chemical complex down in Orange, Texas.
**Q Okay. And down here on page -- on Page 8 of Exhibit 6, as of the date of this report would this fairly -- fairly and accurately reflect the documents that you reviewed in forming your opinions.**
A Yes, sir, it was.
**Q Okay. And down -- further down in this document -- it's a lot of document so --**
A Yes, sir.
**Q Okay. On Page 36 of this Exhibit 6, what are -- what are we looking at here?**
A That's my curriculum vitae that I provided as part of my report. It describes my employment history, education, honors, professional societies and publications.
**Q Okay. And just briefly for the jury, if you don't mind, could you please describe what makes you the right person to testify about your expert opinions today?**
MR. KIMBELL: Objection. Form and leading.
A My -- my expertise involves basically chemistry



and chemical engineering as well as hazardous materials given my years of work with Sun Oil Company, before that Witco, and also my work in looking at incidents that involved either chemicals or explosives.
**Q (By Mr. Elwell) Could you briefly describe for the jury your educational background.**
A Yes. I have a Ph.D. in chemistry and a BS in chemistry and a BA in mathematics. I went to The University of Texas and studied under some really very intelligent people including Michael Dewar, who was probably one of the premier molecular orbital theory people; Norman Hackerman, who was at one time a president's adviser, science adviser; and my major professor is Bill Layden who bought Schecter (phonetic).
**Q Okay. Are you a member of any professional organizations or societies in your field of expertise?**
A Yes. It's listed on my resumé, and if you'll put that back up, I'll read them for you, if you don't mind.
**Q I mean, just -- could you tell the jury for a couple, two or three?**
A American Chemical Society, the American Society of Pure and Applied Chemistry, Society of Petroleum Engineers, Society of Mechanical Engineers. Without my list, I -- I can't remember all of them, but, anyway,



several.
**Q Have you written any papers or peer reviewed -- well, let's break that down. Have you authored any publications in your field of expertise?**
A Yes. The refer -- referenced and refereed papers are listed in my resumé. I think there's like 25 or 30 publications that were refereed. I've given probably over a hundred talks, lectures and informal presentations.
**Q Okay. And generally I'd like to go next into the opinions that you have in this case.**
**Do you -- well, first of all, do you hold some opinions into the cause of the carbon monoxide that led to the deaths of these individuals?**
A I do. I -- it's my opinion that the material that was placed in the tank wagon reacted generating carbon dioxide which led to the death of two individuals that entered the tank wagon.
**Q And for other -- that's the main, ultimate opinion, correct?**
A That is the main, ultimate opinion.
**Q Okay. You have some other lesser opinions, if you will, or other opinions as to certain matters that you've already addressed with opposing counsel, and it's also addressed in your report?**

A Yes, the -- the issue -- ba -- basically my opinion consists of the fact that ideally in transporting or dealing with hazardous waste one should always have a retained sample -- it's a cradle to the grave issue -- and in this case that was not followed by Union Carbide for whatever reasons and as a result there -- one can't really readily do a straightforward calculation with analysis to conclude how the reactivity of the material that was placed in the tank wagon was able to generate carbon monoxide, but the overwhelming evidence after the fact with the measurement of the levels of carbon monoxide in the tank wagon confirmed that there was obviously a chemical reaction and the chem -- chemistry of it is fairly simple. It's carbon and oxygen in various elevated states combining to form carbon monoxide. There were other ingredients found that were, to say the least, bothersome, including hydrogen sulfide, that was present in the tank.

**Q What methodology did you use in order to come to your opinions in this case?**

A I had to do a reverse analysis of -- kind of an accepted method for the National Fire Protection Association, NFPA, where you sit down and look at all of the known facts that you gather after the incident and then back calculate what most likely was or was not the



situation and in this case it was pretty obvious that with a sealed tank from the time it was loaded at Union Carbide to the time it was ultimately unloaded at the incinerating facility and then later transported to Quala the only material that was ever present in the tank other than a heel that may have been present in the initial loading of the tank came from the Union Carbide facility and since the trailer was dedicated to hauling the Union Carbide waste, at least for the last five or more incidents, only the Union Carbide material would have been in the tank wagon that caused the generation of the CO2 -- CO, CO, carbon monoxide, that caused the fatal injuries to several people.

**Q Can you tell the jury if you've seen any evidence from the defendants in discovery responses or that has been gathered in this case as to the amount or percentage of heel that was actually inside that tank trailer prior to it being loaded the last time by Union Carbide?**

A No, there was no indication. As a matter of fact, it was real unclear about how they even determined if there was any material in the tank wagon at the time of loading. The -- there was just no evidence or no information provided.

**Q Have you -- can you tell the jury whether you've seen any evidence from any of the defendants as to the heel composition percentage, meaning what was in the heel and what percentage of that chemical compound was in -- located in the heel at the time it was opened by the employees, the workers at Quala?**



A No, there was no evidence of actually examining it other than to open the rear valve and allow it to drain while they put the water hose in the tank on the upper -- upper side while a sample was taken.

**Q Right. And as -- well, you -- can you tell the jury whether or not you've seen a video that let's you know whether or not that tank trailer at the time it was opened at the Quala facility for the first time was actually -- actually had materials still left in it? Have you seen a video that would let you know one way or the other?**

A Yes, there -- there was a video -- there were two camera -- well, there was three cameras. There was one camera outside showing the holding position for the tank wagon and then the tank wagon was taken in and there was a back camera that showed the back valving arrangement on the tank wagon and there is an overhead camera that picked up the manhole cover at the top and the lower -- the back camera showed the opening of the valve to allow for the drainage of the heel and that was



just discharge and then the opening of the top tank manhole was where they inserted a air line and then later took an air sample with an air monitoring tool.

**Q Have you seen any evidence for any sampling or anything from the defendants as to what constituents -- what actually made up the material when it was loaded the last time in this loop of -- of loading at the Union Carbide back on this -- on November 18th when it was loaded by Jason Rodriguez, the Union Carbide employee?**

A No, there was no analysis taken, no chemical analysis made of the material that was loaded into the tank from the storage tank as they put it into the tank wagon from the storage tank.

**Q Have you seen any evidence or documents that show you even for the storage tank prior to it going to the tank trailer or the tank wagon what -- what the percentage constituents were or what the constituents were of the storage tank of the -- the waste at that time prior to loading it by Jason Rodriguez?**

A No, there was no analysis and, furthermore, testimony suggests or stated that they did not routinely do an analysis of the tank and it varied with regard to individual components wide -- widely, I think is the way they phrased it.

need a transcript or video at this time.

MS. BENNETT: Karen Bennett and Jennifer Wright. We do not need the transcript or the video. Thank you.

MR. MOORE: This is Randy Moore. I don't need the transcript or the video.

MR. HALEVY: Amir Halevy. At this time I don't need the transcript or the video.

MR. BREM: Wendi, you have our standing.

THE VIDEOGRAPHER: Okay. All right. The time is 3:23 p.m. We're off the record.

(Proceedings concluded at 3:23 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME: JOHN CAYIAS, Ph.D. DATE: JANUARY 9, 2024

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |



I, JOHN CAYIAS, Ph.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________
JOHN CAYIAS, Ph.D.

THE STATE OF ________________________________ )
COUNTY OF __________________________________ )

Before me, __________________________________, on this day personally appeared JOHN CAYIAS, Ph.D., known to me (or proved to me under oath or through ________________________)(description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ________ day of ___________________________, ___________________.

NOTARY PUBLIC IN AND FOR THE STATE OF _______________



CAUSE NO. 2020-13324

CHAUMEIKA BUSSEY, ET AL., ) IN THE DISTRICT COURT OF
Plaintiffs, )
)
SHAWN JARMAIL BROWN, JR.; ET )
AL., ) HARRIS COUNTY, T E X A S
Intervenors, )
)
VS. )
)
ALPHA TECHNICAL SERVICES, ET )
AL., )
Defendants. ) 113TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF JOHN CAYIAS, Ph.D.
JANUARY 9, 2024
(REPORTED REMOTELY)

I, Wendi Broberg, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOHN CAYIAS, Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ______________________, ______________ to the witness or to the attorney for the witness for examination, signature and return to me by __________________________, _________________;

That the amount of time used by each party at the deposition is as follows:

MR. BRANDON FRANCIS - 00 Hour(s) :00 Minute(s)
MR. BYRON ALFRED - 00 Hour(s) :00 Minute(s)
MR. SCOTT GREENLEE - 00 Hour(s) :00 Minute(s)
MR. MATTHEW A. ELWELL - 01 Hour(s) :14 Minute(s)
MR. JAMES AMARO - 00 Hour(s) :00 Minute(s)
MR. CHRIS GADOURY - 00 Hour(s) :00 Minute(s)
MR. JAMES M. KIMBELL - 00 Hour(s) :02 Minute(s)
MR. KEVIN COLLINS - 00 Hour(s) :00 Minute(s)
MS. LAURA JONES - 00 Hour(s) :00 Minute(s)
MR. MICHAEL L. BREM - 02 Hour(s) :19 Minute(s)
MR. DAVID BRENNER - 00 Hour(s) :04 Minute(s)
MR. RANDY E. MOORE - 00 Hour(s) :20 Minute(s)

MR. AMIR HALEVY - 00 Hour(s) :28 Minute(s)
MS. KAREN BENNETT - 00 Hour(s) :00 Minute(s)
MS. JENNIFER ANN WRIGHT - 00 Hour(s) :00 Minute(s)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Scott Greenlee, Mr. Zane P. Aubert, Attorneys for Intervenors Shawn Jarmail Brown, Jr., Da'Shawn Jamal Brown, John Jarmail Brown, Davion Jarmail Brown, and Ericka Bens a/n/f of A.B and J.B., Minors, Individually as Wrongful Death Beneficiaries of Shawn Jarmail Brown, Sr., Deceased

Mr. Mike Jolly, Attorney for Intervenor Kyle Williams

Mr. Byron Alfred, Mr. Johnny Alfred, Ms. Kai Henderson, Attorneys for Plaintiff The Estate of Sidarieus Lozano and Wrongful Death Beneficiaries

Mr. Matthew A. Elwell, Mr. James Amaro, Mr. Chris Gadoury, Attorney for the Bussey Plaintiffs

Mr. Brandon Francis, Attorney for Plaintiff Roy Robinson

Mr. James M. Kimbell, Attorney for Defendant Sprint Transport, LLC

Mr. Kevin Collins, Attorney for Defendant Steven Dodds

Mr. Michael L. Brem, Ms. Laura Jones, Attorneys for Defendant Union Carbide Corporation

Mr. Case Donovan, Ms. Linda R. Meltzer, Ms. Jheris Jordan, Mr. James Brenner, Mr. David Brenner, Attorneys for Defendant Alpha Technical Services Corporation, LC, d/b/a Quala Rail & Specialty and QualaWash Holdings, LLC

Mr. Randy E. Moore, Attorney for Defendant Dow Chemical Company

Mr. Callan Edquist, Ms. Brittainie Zinsmeyer, Mr. Amir Halevy, Mr. Kevin Jordan, Attorneys for Defendant Performance Materials, NAI



Ms. Karen Bennett, Ms. Valerie Lewis, Attorneys for Defendant Mobile Mini

Ms. Jennifer Ann Wright, Attorney for Defendant Mobile Mini

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 17th day of January, 2024.

______________________________
WENDI BROBERG, CSR 7091
Expiration Date:  1/31/24
Discovery Resource
1511 West 34th Street
Houston, Texas  77018
Ph. (713) 223-3300
Fax (713) 228-3311



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _________________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Michael Brem, Custodial Attorney;

That $_________________ is the deposition officer's charges to Mr. Michael Brem, Counsel for Defendant Union Carbide Corporation, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this _______ day of _____________, __________________.

______________________________
WENDI BROBERG, CSR 7091
Expiration Date:  1/31/24
Discovery Resource
1511 West 34th Street
Houston, Texas  77018
Ph. (713) 223-3300
Fax (713) 228-3311

Attachment 1-G

NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, ET AL., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| | § | |
| SHAWN JARMAIL BROWN, JR., | § | |
| ET AL., | § | |
| Intervenors, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ALPHA TECHNICAL SERVICES, | § | |
| ET AL., | § | |
| Defendants. | § | 113TH JUDICIAL DISTRICT |

-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT A. RICHARD
JANUARY 10, 2024

-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF ROBERT A. RICHARD, produced as a witness via Zoom videoconference at the instance of the Defendant Union Carbide Corporation and duly remotely sworn, was taken in the above-styled and numbered cause on January 10, 2024, from 10:04 a.m. to 5:33 p.m., before Jamie Prince Hess, Certified Shorthand Reporter in and for the State of Texas, reported stenographically by machine



shorthand, with the witness appearing remotely from Manassas, Virginia, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES VIA ZOOM

FOR THE BUSSEY PLAINTIFFS:
Mr. Matthew A. Elwell
AMARO LAW FIRM
2500 E. TC Jester Boulevard
Suite 525
Houston, Texas 77008
713.864.1941
matt@amarolawfirm.com

FOR THE INTERVENORS SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED:
Mr. Scott C. Greenlee
DAX F. GARZA, PC
1021 Main Street
Suite 1400
Houston, Texas 77002
713.522.3000
scott@daxgarzalaw.com

FOR THE PLAINTIFF ROY ROBINSON:
Mr. Brandon C. Francis
HERD LAW FIRM, PLLC
19500 Tomball Parkway
Suite 250
Houston, Texas 77070
713.955.3699
brandon.francis@herdlawfirm.com

FOR THE PLAINTIFFS FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO:
Mr. Byron C. Alfred
THE ALFRED FIRM
2211 Norfolk Street
Suite 803
Houston, Texas 77098
713.470.9714
byron@alfredfirm.com



FOR THE DEFENDANT UNION CARBIDE CORPORATION:
Mr. Michael L. Brem
Ms. Laura F. Jones
SCHIRRMEISTER DIAZ-ARRASTIA BREM, LLP
711 Louisiana Street
Suite 1750
Houston, Texas 77002
713.221.2500
mbrem@sdablaw.com
ljones@sdablaw.com

FOR THE DEFENDANT PERFORMANCE MATERIALS, NA, INC.:
Mr. Amir Halevy
Ms. Brittainie Zinsmeyer
JORDAN, LYNCH & CANCIENNE, PLLC
1980 Post Oak Boulevard
Suite 2300
Houston, Texas 77056
713.955.4020
ahalevy@jlcfirm.com
bzinsmeyer@jlcfirm.com

FOR THE DEFENDANTS ALPHA TECHNICAL SERVICES CORPORATION, LC, D/B/A QUALA RAIL & SPECIALTY AND QUALAWASH HOLDINGS, LLC:
Mr. David L. Brenner
Mr. James Brenner
BURNS ANDERSON JURY & BRENNER, LLP
4807 Spicewood Springs Road
Building 4, Suite 100
Austin, Texas 78759
512.338.5322
dbrenner@bajb.com
jebrenner@bajb.com

FOR THE DEFENDANT SPRINT TRANSPORT, LLC:
Mr. James M. Kimbell
Ms. Katherine T. Garber
CLARK HILL, PLC
909 Fannin
Suite 2300
Houston, Texas 77010
713.951.5600
jkimbell@clarkhill.com
kgarber@clarkhill.com

FOR THE DEFENDANT STEVEN DODDS:
Mr. Kevin D. Collins
BRACEWELL LLP
111 Congress Avenue
Suite 2300
Austin, Texas 78701
512.494.3640
kevin.collins@bracewell.com
FOR THE DEFENDANT DOW CHEMICAL COMPANY:
Mr. Randy E. Moore
THE MOORE LAW FIRM
7 West Way Court, Suite C
Lake Jackson, Texas 77566
979.285.2230
rmoore@moore-law.us

FOR THE DEFENDANT MOBILE MINI TANK AND PUMP SOLUTIONS, INC. D/B/A MOBILE MINI:
Ms. Karen R. Bennett
GERMER PLLC
550 Fannin, Suite 400
Beaumont, Texas 77701
409.654.6700
krbennett@germer.com

and

Ms. Jennifer Wright Schick
ANSA ASSUNCAO, LLP
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
443.539.7788
jennifer.schick@ansalaw.com
ALSO PRESENT:
Mr. Pete Jennings, the videographer



I N D E X

PAGE
Appearances . . . . . . . . . . . . . . . . . . . . 3
Index . . . . . . . . . . . . . . . . . . . . . . . 6
WITNESS - ROBERT A. RICHARD
Examination by Mr. Brem . . . . . . . . . . 8
Examination by Mr. Halevy . . . . . . . . . 103
Examination by Mr. Moore. . . . . . . . . . 153
Examination by Mr. Kimbell. . . . . . . . . 161
Examination by Mr. Collins. . . . . . . . . 217
Examination by Mr. Brenner. . . . . . . . . 261
Examination by Mr. Elwell . . . . . . . . . 264
Further Examination by Mr. Brem . . . . . . 292
Further Examination by Mr. Kimbell. . . . . 302
Witness Signature Page/Corrections. . . . . . . . . 307
Reporter's Certificate. . . . . . . . . . . . . . . 309

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Expert report dated 09/21/23 prepared by Robert A. Richard. . . . . . . . . . . | 9 |
| 2 | Temperature chart (UCC006660) . . . . . . | 33 |
| 3 | Email chain beginning 09/18/19 (DOW-3RFP-000509-511) . . . . . . . . . . | 33 |
| 4 | Gas meter readings (Quala 000395) . . . . | 61 |
| 5 | OSHA air sampling findings (PM_003841-3862). . . . . . . . . . . . . | 94 |
| 6 | Defendant Union Carbide Corporation's First Amended Notice of Intent to Take the Oral and Videotaped Deposition of Robert A. Richard with Subpoena Duces Tecum . . . . . . . . . . . . . . . | 171 |



EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Expert report dated 09/21/23 prepared by Robert A. Richard. . . . . . . . . . . | 171 |
| 8 | Uniform Hazardous Waste Manifest (Sprint 000071-76). . . . . . . . . . . . | 212 |
| 9 | RC/PHA - RC/LHA Questionnaire and Protocol (UCC006717-6756) . . . . . . . . | 285 |
| 10 | Excerpt from the deposition of Emily Fellows (pages 124-126) taken 02/02/23. . | 303 |

IT WAS STIPULATED AND AGREED by and between all counsel present that an objection by one party is good for all parties present.



P R O C E E D I N G S

THE VIDEOGRAPHER: Today is Wednesday, January 10th, 2024. The time is 10:04 a.m.

THE REPORTER: My name is Jamie Hess, certified Texas CSR Number 6761. I am reporting this deposition remotely by machine shorthand from Rowlett, Texas, and the witness is located in Manassas, Virginia.

ROBERT A. RICHARD,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BREM

**Q. Good morning, Mr. Richard. We met just a moment ago. My name is Mike Brem and I am a lawyer for one of the defendants, Union Carbide Corporation.**
**I assume that you have been deposed before.**
A. Yes.
**Q. On how many occasions, roughly?**
A. Maybe like between five and 10.
**Q. Well, then with that, let me go through a few simple ground rules.**
**Even when you know the answer to the question that I'm going to ask, please let me finish it so that -- before you start your answer so that Ms. Hess can get it down accurately.**
**Please avoid saying "uh-huh" or "huh-uh,"**

**Q. Okay. Are you saying that he wasn't going to do anything with that measurement once he took it?**

A. I can't say what his level of knowledge is. He's a worker at a cleaning facility. I mean, he should have had good training, but does he even understand what 2000 ppm or 79 ppm means? I don't know. I don't know of his understanding of that. If there was a tag there, then that would have been more obvious perhaps.

MR. BREM: Objection, nonresponsive.

**Q (By Mr. Brem) Certainly no one should go into a tanker when they have just received a reading of 2000 ppm. We can agree on that, correct?**

A. If they understand what that meaning is.

**Q. Well, if they don't understand that 2000 ppm of carbon monoxide is dangerous, a mere tag that says carbon monoxide is on there isn't going to change that.**

A. Right. It wasn't --

MR. ELWELL: Hold on.

A. -- a mere tag --

MR. ELWELL: Hold on. Y'all are going to have to break up or kind of pause, Mr. Richard.

I had an objection to form.

Sorry, Mike. You can repeat your question.

MR. BREM: Fair enough.

**Q (By Mr. Brem) You don't think that him simply**



**getting a reading of 2000 ppm of carbon monoxide should have alerted Mr. Brown and everyone else on that platform that there was danger?**

MR. ELWELL: Form.

A. If you ask the average person what 2000 ppm of CO means, I don't know if they would know that. It all goes to his training. I don't know how well he was trained and I can't just assume or read his mind and what he was thinking about the reading and what it meant to him.

My opinion, as I stated in my report, is that a tag would have been helpful in alerting those workers that there was a danger. And it wasn't just like, hey, there's CO2 in there. You know, I put a specific statement that I thought would have as an industry practice -- I know they do this in the oil fields, because there's a lot of H2S in sour crude and they'll put an indication on a cargo tank truck or railcar that that gas exists.

So, you know, it's not unheard of. It's -- it would be a good industry practice and people would be warned and would be an extra warning that could have prevented an incident.

MR. KIMBELL: Objection, nonresponsive.

**Q (By Mr. Brem) Let's go back to your report,**



**because we were just talking about this very thing. You talk about it's an odorless gas and that it's because Dow/UCC failed to notify Quala and because Quala did not properly assess. Let's go back.**

**Dow/UCC failed to notify Quala. Now, we've talked about that before. You're assuming that UCC is the source of the carbon monoxide, correct?**

A. Yes. That's -- yes.

**Q. Then you go on to say because Quala failed to properly assess the presence of the gas. Now, we just saw -- in fact, we see it on exhibit -- we saw it on the video and we see it on Exhibit 4 that Quala gave these men a device that was set to check for the presence carbon monoxide. So how did Quala fail to assess the presence of the gas?**

MR. ELWELL: Form.

A. Because, in my opinion, the workers maybe did not understand the readings of the meter, what that meant, that there was a dangerous atmosphere, because obviously they went into the tank. And then Mr. Brown followed into the tank to try to save Mr. Lozano, and if there was a tag there that UCC had clearly communicated to Quala, then perhaps that could have been avoided.

I mean, UCC, like I said, they have engineers, they have technical staff. They're familiar with their



reactions, what's going to be present. You just can't say I'm just going to ship my material to this cleaning facility and they're going to know.

Yeah, there was a meter taken and they should have known; but I'm saying that I believe, in my personal opinion, that use could have done more to warn those employees of the presence of that danger. And that's my opinion. I'm not going to change that.

MR. BREM: Objection, nonresponsive to everything other than, yes, they had a meter and could have assessed it, that sentence.

**Q (By Mr. Brem) All right. Let's go down to the next bullet.**

**Under RCRA -- RCRA is a -- is about solid waste, isn't it?**

A. RCRA is about waste. It's not only solid waste. It could be liquid waste as well.

**Q. Okay. RCRA -- let's work with your definition for a second.**

**RCRA applies to solid and liquid waste. Fair statement?**

A. It applies to waste.

**Q. It applies to solid and liquid waste, doesn't it?**

A. Yes.

**Q. I mean, that's not in dispute, right?**
MR. ELWELL: Form.
A. In this case RCRA applied. Union Carbide had a responsibility as well as PNMF -- PMNA to comply with RCRA requirements. That's what I'm saying in my report.
MR. BRENNER: Objection, form -- nonresponsive.
**Q (By Mr. Brem) RCRA does not apply to all waste. For example, it does not apply to gaseous waste, does it?**
A. It applies to hazardous waste as defined in 40 CFR.
MR. BREM: Objection, nonresponsive.
**Q (By Mr. Brem) The definition under which gives us the application of RCRA does not apply to gaseous materials, does it?**
A. Not that I'm aware of.
**Q. Carbon monoxide is a gaseous material, isn't it?**
A. You know, yes, that's true, but come on. We're talking about a waste that's regulated under RCRA and something that was generated as a result of transporting that waste. So RCRA applies.
MR. BREM: Objection, nonresponsive.
**Q (By Mr. Brem) What I'm trying to get to,**



**Mr. Richard, is whether RCRA regulations have any relevance to this incident.**
**This incident, according -- was brought about by gaseous materials, carbon monoxide, correct?**
MR. ELWELL: Form.
A. This incident was caused because of the transport of waste.
MR. BREM: Objection, nonresponsive.
**Q (By Mr. Brem) Do you remember my question?**
MR. ELWELL: Form.
A. Yeah, but your question is misleading. It would mislead the courts. I mean, there was gas that was generated -- we talked about it -- through decomposition, chemical reaction, multiple ways that it could have been generated. It was in the tank. But it's all a result of transporting a waste that's regulated under RCRA.
MR. BREM: Objection, nonresponsive.
**Q (By Mr. Brem) RCRA regulates -- does not regulate gaseous materials, does it?**
A. If I was shipping a pure gas that's very rarely going to have a waste gas, then your statement is true, it would not apply. But we weren't shipping a gas. There was a gas that was in the tank that was a result of being generated as a result of transporting a



regulated waste.
MR. BREM: Objection, nonresponsive.
**Q (By Mr. Brem) We've already talked about the fact that you can't point us to a scientific reference that would suggest that this waste is capable of decomposing and generating this -- generating carbon monoxide. We've talked about that, haven't we?**
MR. ELWELL: Form.
A. We talked about, yeah, the decomposition over and over again, sure.
**Q (By Mr. Brem) And you agree -- you've already agreed that you're not a chemist or a chemical engineer and whether or not it generated -- the waste generated carbon monoxide is not within your area of expertise. We agree on that, don't we?**
A. Yes.
**Q. I want to go down in your report. I'm going to skip several pages since they have to do with other defendants. And I'm all the way down -- I think it's page 15. Let me make this a little smaller so we can see the page number. It's page 17 of the PDF but page 15 of your report.**
THE WITNESS: I'm actually --
MR. BREM: Go ahead. I'm sorry.
THE WITNESS: I'm turning a light on



because it's really dark in my office right now. I hope that doesn't put a glare on the screen or anything.
**Q. You talk about in this bullet point in the middle of the page a review of the SDS from Dow and Union Carbide. You understand that there are, in fact, two different SDSs for the waste. One is for -- one by Dow and one by Union Carbide because they're separate companies?**
A. Yes.
**Q. All right. First and foremost, no SDS accompanied this waste, did it?**
MR. ELWELL: Form.
A. So I know you asked Dr. Cayias this yesterday. And maybe -- okay. So he said that it should have. Look, the way that the regulation is written, when you're reporting hazardous materials, you have to provide information relative to the hazards of the material and emergency response information and you have multiple ways to do that.
Some people will attach the safety data sheet with the BOL or provide that to people in the transport chain. Others can use "refer to the emergency response guide" or they can create their own emergency response information in the information that they provide.
So in some cases an SDS might travel with the

A. Was it the next day, I think?

**Q. -- "the tanker interior had no product visible inside and no residue."**

**Did I read that correctly?**

A. That's what it says.

**Q. So the next morning OSHA did not find any sludge or viscous material or any gunk or any other residue in the tank that morning, correct?**

A. Based on this, yes. Based on what we're seeing here, that seems to be the case.

**Q. "And, in fact, an attempt was made to sample the liquid in the back valve and it appeared to be water."**

**Did I read that correctly?**

A. Yes.

**Q. So assuming Mr. Dodds' representation to OSHA was correct, that nothing had been done to the tanker between the entry of the individuals and the rescue and OSHA's appearance the next day, can we agree that the tanker had no residue and no material at the time of the opening?**

MR. ELWELL: Form.

A. I wasn't there. So, you know, you've given me some relevant reasons why, but I can't say without a doubt that that was the case.



**Q (By Mr. Halevy) Do you have any reason to believe that the OSHA representative has a reason to misrepresent the facts?**

A. No.

MR. ELWELL: Form.

**Q (By Mr. Halevy) And you said I've given you this information, but this was information that was provided to you and you told me that you reviewed prior to writing your report, correct, sir?**

A. I said that I reviewed documents, some in more detail than others.

**Q. Okay. Let's move on. And let's go back to the -- we're going to stick on the concept of empty.**

**You're familiar with the RCRA standards, correct, on what's considered RCRA empty?**

A. Yes.

**Q. Okay. And to save time, is it fair to summarize that for a container that contains more than 119 gallons -- and we can agree this tanker was more than 119 gallons -- that for a container that could contain more than 119 gallons of product, RCRA empty is considered 0.3 percent of the total weight capacity of the container?**

A. Okay.

**Q. Do you agree that's the RCRA standard?**



A. Sure, yeah.

**Q. I just want to make sure we're on the same page. And I want you to turn to page 7 of your report. It's the picture of the tanker plate that you reviewed with Mr. Brem previously.**

**Can we agree that the tanker capacity is 7,000 gallons of liquid?**

A. Yes.

**Q. Can we agree that it says that the maximum lading density is 13 pounds per gallon?**

A. Yes.

**Q. Can we agree that that means the capacity of the trailer is at least 91,000 pounds of material? That's 7,000 times 13.**

A. Okay. I can agree with you.

**Q. Are we fair there?**

A. Sure, yeah.

**Q. And can we agree that 0.3 percent of 91,000 is 273 pounds?**

A. I'll trust you that you did the calculation properly.

**Q. Trust my calculator, not me, but yes.**

**And this is going to be a stupid question, Mr. Richard, but we can agree that 100 pounds is less than 273 pounds?**



A. Yes.

**Q. So by RCRA standards, this was considered a RCRA empty tanker when it was delivered to Quala, correct?**

MR. ELWELL: Form.

A. Based on what you're telling me, I could agree to that.

**Q (By Mr. Halevy) Okay. And can we also agree -- we've talked about the weight discrepancy. The only basis for the allegation or the assertion that there was 100 pounds of product that was residual in the tanker is the delta between the two scales, correct?**

MR. ELWELL: Form.

A. I don't think anybody's basically said there's 100 pounds in the tank. We -- you know, in my report I didn't say there's 100 pounds in the tank. I said there could be -- there was residue in the tank. And I believe there to be residue in the tank, but I didn't say what the quantity was, and that was based on seeing the fact that material came out of the back valve.

**Q (By Mr. Halevy) Okay. You believe there was residue in the tank. We just reviewed the OSHA CSHO report that said there was no residue and that the liquid in the back valve of the tank was determined to be water the next morning. Where was the residue?**

mischaracterizing the question and the document. It was a reference specifically to -- we're going to move on.

**Q (By Mr. Halevy) Mr. Richard, as part of your answer, or non-answer, to my prior question, you said that it couldn't generate levels of 2000 ppm of carbon monoxide, that it was unlikely. Do you remember saying that?**

A. Yeah, I said that.

**Q. What chemical reaction or -- of either polymerization, decomposition, mixed reaction generates carbon monoxide in a concentration of 2000 parts per million?**

A. That's not a question for me. I'm not qualified to answer that. I'm not a chemical engineer and I think you should ask that question of the other expert.

**Q. Perfectly fine. And is it fair -- because you did cite SDSs. Can we agree that the SDSs do not discuss any carbon monoxide concentrations that can result from decomposition? Is that fair?**

A. They don't give you a concentration. They say it can be generated, or it can -- yeah.

**Q. Let's move to pages 8 and 9 of your report, which is the PMNA material.**

MR. ELWELL: You said 8?



MR. HALEVY: 8 and 9, Matt.

**Q (By Mr. Halevy) I'm going to start you off with -- maybe we can go to the conclusion and save time, maybe we won't be able to.**

**On the bottom of page 9 you write, quote, "PMA waived -- PMNA waived the sampling requirement and did not fulfill the regulatory obligations."**

**Did I read that correctly?**

A. Yes.

**Q. Are you stating that PMNA had a regulatory requirement to sample each load of waste prior to incineration?**

A. They had the choice to do that. They're a TSDF. So they can question it. They have an obligation. I think I cited the appropriate cite in my report where that's indicated according to regulatory requirements.

MR. HALEVY: Objection, nonresponsive.

**Q (By Mr. Halevy) My question was, is there a legal obligation for PMNA to sample each load of waste prior to incineration?**

A. Under RCRA requirements they should do sufficient sampling to ensure that they know what the product is and what the hazards are to the environment and to workers who may be exposed to it.



**Q. And how do you define sufficient sampling, sir?**

A. That's left to the company to use their expertise to make that determination and --

**Q. Okay. So --**

A. -- also working with the generator that's supplying it to them.

**Q. Let's turn to page 8 of your report then, sir. In fact, we might -- I'll go ahead and figure out how to share the screen again.**

MR. BREM: Hey, Amir, I'm happy to Vanna White it for you if you'll just tell me where you want to go.

**Q (By Mr. Halevy) Let's go to page 8. We'll start off with the second bullet, EPA regulations. And you write there that PMNA is responsible for obtaining sufficient information required for compliance.**

**Is that what you were just referring to right now, our discussion?**

A. It says "At times the owner-operator of waste disposal facilities such as PMNA is responsible for obtaining sufficient information required for compliance regardless of the completeness or quality of any information received from the generator of the waste."

**Q. Correct. And let's go down to the next**



**paragraph where you're citing CFR -- 40 CFR 265.13(a)(1). Do you see the first sentence?**

A. Yes.

**Q. And PMNA is responsible for obtaining and doing a chemical and physical analysis of, quote, "a representative sample of the waste," correct?**

A. Yes. That's what it says.

**Q. It doesn't say every sample that goes to the incinerator. It is a representative sample. Fair?**

A. I totally agree with that.

**Q. Okay. And have you seen PMNA's testing of the waste and the analysis of a representative sample?**

A. I don't recollect if I've seen that or not, if that is in my documents.

**Q. Okay. And if it exists, that's a relevant document, correct? Because that means PMNA at least satisfied the initial requirement of doing the chemical and physical analysis of a representative sample. Fair?**

MR. ELWELL: Form.

A. Not necessarily, because if the product differed in respects like that there was carbon monoxide available, then obviously they didn't do a good job of characterizing it and they should have taken more samples.

MR. HALEVY: Nonresponsive.

**Q. We agree that -- I appreciate that. This is Zoom and we're doing the best we can.**

**You agree that there's not a requirement to test every load. So how many representative samples should be tested and at what frequency would that be sufficient for Mr. Richard?**

A. So the regulation is written in a way that they would not say that every sample has to be tested. We can agree on that. And the frequency of the sampling is left to the discretion based on the criteria that's provided in the RCRA regulations.

And, obviously, this material, there was -- well, there was presence of materials, gases in that tank, and based on that, then I would say perhaps they should have done more sampling. That's just my opinion.

**Q. Okay. Is there any -- you said that there is regulatory guidance on things like that. Did PMNA violate any regulatory guidance on sampling?**

A. I'm not an EPA inspector. I don't believe that EPA did an enforcement visit or did anything in that regard, so I can't say.

**Q. Okay. Coming down to the bottom of the page on page 9. PMNA -- you write, quote, "PMNA has a history of regulatory noncompliance and has been previously penalized by EPA in 2000," and you keep**



**going.**

**Did I read that correctly?**

A. Yes.

**Q. And for that you cite Footnote 6, correct?**

A. Yes.

**Q. And again going back to your Appendix B, which is the documents you reviewed -- I believe you actually said they were provided to you. Did --**

A. Not everything was provided. I actually looked up some things myself.

**Q. Okay. I was about to ask. Was the article titled "Orange County plants penalized following environmental lawsuit," was that provided to you or did you find that yourself?**

A. Found that myself.

**Q. Okay. Is that the extent of your research on the EPA violations, or the alleged EPA violations?**

A. I found that one. I thought that was critical in looking at a compliance record. And I didn't go and explore -- go to the EPA enforcement database and look at all of the enforcement actions that have been taken to various companies, but I -- I didn't do that.

**Q. So you didn't actually look at the EPA documents on this particular investigation. You relied on this article. Fair?**



A. I relied on the article to make that statement.

**Q. And do you know when the alleged violations occurred?**

A. Not off the top of my head as I sit here today. I'd have to look it up.

**Q. And are you aware of how long it usually takes from violation allegations to an agreement that you're referencing in this article? Do you have any knowledge of that?**

A. Can you repeat the question? I want to make sure I understand it.

**Q. It was a poorly worded question. Thank you, sir.**

**Do you have any knowledge regarding how long this EPA investigation took from the initiation of the investigation until the agreement that's referenced in this newspaper article?**

A. Well, that's going to vary depending on the circumstances of the allegations. I've had -- now that -- when I was enforcement, we would, you know, enforce regulations and we would issue notices of probable violation, but there's many -- there's a lot of recourse people can have to appeal it all the way up to an administrative law judge.



And now I work with my clients when they get accused of alleged violations to work through that. So that time could be very variable depending on factors of what the alleged violations are and who's involved.

**Q. Is it fair to say it usually takes a number of years between initiation of the investigation and the agreement?**

A. Yes. Well, it depends. And it could take a number of years. I wouldn't disagree with that.

**Q. And do you happen to have a copy of the article in front of you that you reference?**

A. No.

**Q. Let me see if I can figure out a way to pull it up. Hold on. Give me one --**

THE WITNESS: I think Brittainie's raising her hand. You just have to click on the link.

MR. HALEVY: Rock and roll, Brittainie. Go ahead and give us the cover page of the PDF, please.

**Q (By Mr. Halevy) This is the article you found, correct, sir?**

A. Yeah, I believe so.

**Q. The opening sentence is the former DuPont facility now owned and operated by Performance Materials is accused of doing various things, correct?**

A. Yes.

4:20 p.m.
(Recess taken.)
THE VIDEOGRAPHER: The time is 4:32 p.m. We're back on the record.

EXAMINATION

BY MR. BRENNER

**Q. Mr. Richard, are you ready to proceed? You're muted.**
**I'll repeat my question, Mr. Richard. Are you ready to proceed?**
A. Yes.
**Q. I hope I don't have very long. I have a few questions regarding your report.**
**Before I get to that, you testified in response to Mr. Collins' questions that you haven't reviewed Quala's training programs or written procedures. That being the fact, is it fair to say that you don't have any specific criticism over their policies or procedures as they were written?**
A. No, I don't have any criticism.
**Q. Okay. Now, you were asked some questions by Mr. Brem relating to the atmospheric testing. Do you recall that?**
A. Yes.
**Q. And he was asking you whether or not Mr. Brown**



**should have prevented Mr. Lozano from entering the tank when he took those readings. Do you recall those -- that testimony?**
A. Yes.
**Q. And you said you didn't know what Mr. Lozano or Mr. Brown's level of training was. Did I hear that correctly?**
A. That's correct.
**Q. Now, did you look at the confined entry sheet that they had?**
A. I don't recollect at this point.
**Q. Okay. Do you recall what the confined entry permit said about the level of oxygen that permitted entry?**
A. No.
**Q. Do you know what a safe entry level of oxygen would be considering the PPE they were wearing?**
A. No.
**Q. Did you look at the confined space entry form and what it disclosed about the safe level of part per million of carbon monoxide?**
A. Could you repeat that?
**Q. Yes. Did you review the confined entry permit to recall what it disclosed about the safe entry levels of carbon monoxide?**



A. No.
Just to be clear, you know, I've already testified that I'm not an expert on the confined space. So, you know...
**Q. Well, I understand that, but you did review it and you were asked about how they should interpret the reading. The document that they had with them would have told them how to interpret the reading, correct?**
A. I don't know.
**Q. You don't know. You didn't pay any attention to that?**
MR. ELWELL: Form.
A. No. It's not what I was engaged to do.
**Q (By Mr. Brenner) Okay. And there was also a disclosure on the confined entry permit on what the safe level of hydrogen sulfide would be prior to entry. Did you look at that?**
A. It's not my area of expertise or what I was required to do.
**Q. Okay. So whether or not the confined entry permit was sufficient to warn them about safe entry, that was outside of what you were engaged to do?**
A. I have no opinion on that.
MR. BRENNER: All right. Thank you. I think that's all the questions I have. I'll pass the



witness.
MR. BREM: That's all the defendants, Matt. Are you going?
MR. ELWELL: If that's all the defendants, then, sure.

EXAMINATION

BY MR. ELWELL

**Q. Okay. Could you state your name for the record, sir?**
A. Robert Andrew Richard. I go by Bob.
**Q. What were you asked to do in this case?**
A. So I was asked to review documents and form opinions in relation to my knowledge of regulations, including transport regulations relevant to OSHA regulations and to EPA regulations such as RCRA.
**Q. In doing so, were you able to come up with any opinions in this case with regard to what happened?**
A. Yes.
**Q. Generally what are those opinions as to -- we'll just break them down.**
**What are your opinions as to Union Carbide?**
A. So my opinions relative to Union Carbide is that they could have more effectively communicated the fact that CO2 and H2S were constituents that could be within the tank truck that the workers at the Quala

facility were exposed to and that they knew that the material was hot, was being -- was hot.

I believe they knew or should have known that the material could have a reaction, a decomposition, a reactive polymerization or a chemical reaction, whatever it might be. And I've stated that I'm not a chemical engineer that I could say exactly; but, you know, based on the evidence, there was carbon monoxide in the trailer, and that's undisputable.

And the fact that that was the case, a company like UCC with all the expertise they have should have known and I think they should have done a better job of communicating that to Quala.

**Q. Okay. And next, as to -- do you have any opinions as to Performance Materials in this case?**

A. Yeah. So with Performance Materials -- let me go back and refer to my report here, go to my conclusions.

MR. ELWELL: While you're looking at that, Mike, you had Number 1, right? You had --

MR. BREM: I made the report Number 1 if that's what you're asking.

MR. ELWELL: Yes. And we can go off the record for a second. All I need to know is it your -- we didn't go through the whole thing. Did your report



have his CV on it, your exhibit, so I don't have to do another one?

MR. BREM: I'm sure it did, but I don't want to lie to you.

**Q (By Mr. Elwell) Mr. Richard, I'll ask the question again. Were you able to --**

MR. ELWELL: I'm sorry, Mike?

MR. BREM: It does, the one that I marked as 1.

MR. ELWELL: Okay. Perfect. Thank you.

**Q (By Mr. Elwell) Mr. Richard, I'll ask the question again. Do you have any opinions as to Performance Materials' involvement in this case?**

A. Yeah. So their waste facility, they incinerate waste. They have certain requirements under RCRA. And today we discussed sampling and their responsibilities for understanding the waste that the generator is providing to them.

I felt that they didn't appropriately sample or question the waste characterization that was provided to them. I believe that they did not characterize the product that was leaving the facility being that there was residue in the tank truck. I think those -- those were my main issues.

**Q. Within your report or today have you expressed**



**any opinions as to Sprint Transport's involvement in this case?**

A. As I said, my main issue with them was -- even though we talked about that exception in the regulations, that they should have questioned the bill of lading or hazardous waste manifest.

I think the bill of lading said zero pounds, and it should have been obvious that there was still residue in there. We went back and forth on the definition of residue and such, but my opinion is still that they mischaracterized the weight or the content of the tank truck.

**Q. Earlier you were asked a lot of questions about residue and was this residue. Do you recall those questions generally and the back-and-forth?**

A. Oh, yeah. Absolutely.

**Q. Okay. As we sit here today, have you seen any document or anything, testing, sampling or anything that would tell us that what came out of that tank trailer on video was only residue?**

A. No. Nobody knows that because nobody tested the material. So we have no idea. There's no evidence one way or the other.

**Q. And just so we're clear, because I think that that was made unclear earlier, do you recall reviewing a**



**video of the back of that tank trailer and identifying whether or not material came out of the back of that tank trailer after it was opened?**

MR. HALEVY: Objection to form.

A. Yes. There was -- and I said "significant amount" in my report and I was challenged on what's a significant amount, but nobody knows really how much came out, but there was liquid that came out of it and did not appear to be water.

**Q (By Mr. Elwell) Okay. Since we still want to fight about this --**

MR. HALEVY: Objection, sidebar.

MR. ELWELL: That's a valid objection. Good, Kevin, we're learning.

MR. COLLINS: Objection, sidebar.

MR. ELWELL: There you go.

**Q (By Mr. Elwell) Do you see this video on your screen, sir?**

A. Yes, I do.

**Q. Okay. This is a top view. You see the time stamp on this, right?**

A. Yes.

**Q. Let's fast forward to a point in time. Okay. At 1:28:54 a.m. I'm going to play this video.**

**(Video played.)**

**video at the back of the trailer with Mr. Lozano.**
**Did it appear to you that there was an expectation by Mr. Lozano that there would be so little coming out of the back of that trailer that he didn't bother to put a hose on the -- on the end opening? He didn't even put a bucket under it and then he stood right in front of it. Is that what it appeared like to you?**
MR. ELWELL: Form.
A. I don't know what he was thinking.
**Q (By Mr. Kimbell) Well, you know he didn't put a hose on it, right?**
A. Didn't put a hose on it.
**Q. Didn't put a bucket under it?**
A. I didn't see a bucket.
MR. KIMBELL: Okay. Pass.
MR. ELWELL: I'm sorry, sir?
MR. KIMBELL: Pass.
MR. ELWELL: Any others or we're going off the record. Once, twice, sold.
MR. BREM: I'm 100 percent for going off the record.
THE VIDEOGRAPHER: Off the record at 5:33 p.m.
MR. ELWELL: Okay. Jamie, you got my



order?
THE REPORTER: Got it.
MR. ELWELL: Bob, you're done. Oh, do you want to read and sign?
THE WITNESS: Do I want to what?
MR. ELWELL: Do you want to take a look at your transcript and review it and sign for it?
THE WITNESS: I think that's usually the procedure, right?
MR. ELWELL: Yup. Jamie, you can forward it to my office and we'll transmit that.
THE REPORTER: Okay. Thank you.
(Proceedings concluded.)



CHANGES AND SIGNATURE
WITNESS NAME: ROBERT A. RICHARD
DATE: JANUARY 10, 2024

PAGE/LINE CHANGE REASON
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________



I, ROBERT A. RICHARD, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________
ROBERT A. RICHARD

THE STATE OF _______________)
COUNTY OF __________________)

Before me, ___________________, on this day personally appeared ROBERT A. RICHARD, known to me or proved to me on the oath of ________________ or through _______________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this ________ day of ___________________, _________.

________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF __________________
My Commission Expires ________

NO. 2020-13324

CHAUMEIKA BUSSEY, ET AL., § IN THE DISTRICT COURT OF
Plaintiffs, §
§
SHAWN JARMAIL BROWN, JR., §
ET AL., §
Intervenors, §
§
v. § HARRIS COUNTY, TEXAS
§
ALPHA TECHNICAL SERVICES, §
ET AL., §
Defendants. § 113TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT A. RICHARD
JANUARY 10, 2024

I, Jamie Prince Hess, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT A. RICHARD, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________________ to the witness or to the attorney for the witness for examination, signature, and return to me by _______________________________.

That the amount of time used by each party at the time of the deposition is as follows:

Mr. Matthew A. Elwell (00 hours 40 minutes)
Mr. Scott C. Greenlee (00 hours 00 minutes)



Mr. Brandon C. Francis (00 hours 00 minutes)
Mr. Byron C. Alfred (00 hours 00 minutes)
Mr. Michael L. Brem (02 hours 23 minutes)
Ms. Laura F. Jones (00 hours 00 minutes)
Mr. Amir Halevy (01 hours 01 minutes)
Ms. Brittainie Zinsmeyer (00 hours 00 minutes)
Mr. David L. Brenner (00 hours 03 minutes)
Mr. James Brenner (00 hours 00 minutes)
Mr. James M. Kimbell (01 hours 19 minutes)
Ms. Katherine T. Garber (00 hours 00 minutes)
Mr. Kevin D. Collins (00 hours 55 minutes)
Mr. Randy E. Moore (00 hours 10 minutes)
Ms. Karen R. Bennett (00 hours 00 minutes)
Ms. Jennifer W. Schick (00 hours 00 minutes)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE BUSSEY PLAINTIFFS:
Mr. Matthew A. Elwell
AMARO LAW FIRM
2500 E. TC Jester Boulevard
Suite 525
Houston, Texas 77008
713.864.1941
matt@amarolawfirm.com



FOR THE INTERVENORS SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED:
Mr. Scott C. Greenlee
DAX F. GARZA, PC
1021 Main Street
Suite 1400
Houston, Texas 77002
713.522.3000
scott@daxgarzalaw.com

FOR THE PLAINTIFF ROY ROBINSON:
Mr. Brandon C. Francis
HERD LAW FIRM, PLLC
19500 Tomball Parkway
Suite 250
Houston, Texas 77070
713.955.3699
brandon.francis@herdlawfirm.com

FOR THE PLAINTIFFS FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO:
Mr. Byron C. Alfred
THE ALFRED FIRM
2211 Norfolk Street
Suite 803
Houston, Texas 77098
713.470.9714
byron@alfredfirm.com

FOR THE DEFENDANT UNION CARBIDE CORPORATION:
Mr. Michael L. Brem
Ms. Laura F. Jones
SCHIRRMEISTER DIAZ-ARRASTIA BREM, LLP
711 Louisiana Street
Suite 1750
Houston, Texas 77002
713.221.2500
mbrem@sdablaw.com
ljones@sdablaw.com



FOR THE DEFENDANT PERFORMANCE MATERIALS, NA, INC.:
Mr. Amir Halevy
Ms. Brittainie Zinsmeyer
JORDAN, LYNCH & CANCIENNE, PLLC
1980 Post Oak Boulevard
Suite 2300
Houston, Texas 77056
713.955.4020
ahalevy@jlcfirm.com
bzinsmeyer@jlcfirm.com

FOR THE DEFENDANTS ALPHA TECHNICAL SERVICES CORPORATION, LC, D/B/A QUALA RAIL & SPECIALTY AND QUALAWASH HOLDINGS, LLC:
Mr. David L. Brenner
Mr. James Brenner
BURNS ANDERSON JURY & BRENNER, LLP
4807 Spicewood Springs Road
Building 4, Suite 100
Austin, Texas 78759
512.338.5322
dbrenner@bajb.com
jebrenner@bajb.com

FOR THE DEFENDANT SPRINT TRANSPORT, LLC:
Mr. James M. Kimbell
Ms. Katherine T. Garber
CLARK HILL, PLC
909 Fannin
Suite 2300
Houston, Texas 77010
713.951.5600
jkimbell@clarkhill.com
kgarber@clarkhill.com

FOR THE DEFENDANT STEVEN DODDS:
Mr. Kevin D. Collins
BRACEWELL LLP
111 Congress Avenue
Suite 2300
Austin, Texas 78701
512.494.3640
kevin.collins@bracewell.com

FOR THE DEFENDANT DOW CHEMICAL COMPANY:
Mr. Randy E. Moore
THE MOORE LAW FIRM
7 West Way Court, Suite C
Lake Jackson, Texas 77566
979.285.2230
rmoore@moore-law.us

FOR THE DEFENDANT MOBILE MINI TANK AND PUMP SOLUTIONS, INC. D/B/A MOBILE MINI:
Ms. Karen R. Bennett
GERMER PLLC
550 Fannin, Suite 400
Beaumont, Texas 77701
409.654.6700
krbennett@germer.com

and

Ms. Jennifer Wright Schick
ANSA ASSUNCAO, LLP
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
443.539.7788
jennifer.schick@ansalaw.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of the Texas Code of Civil Procedure will be complied with after they have occurred.



Certified to by me on this _______________ day of ___________________, ____________.

___________________________________
JAMIE PRINCE HESS, TEXAS CSR #6761
Expiration Date: 10/31/2025
Firm Registration No. 231
Discovery Resource
910 Louisiana Street
Suite 4500
Houston, Texas 77002
713.223.3300
713.228.3311 Fax

Not valid in any Texas court unless signed by a licensed Texas Certified Shorthand Reporter



FURTHER CERTIFICATION BY COURT REPORTING FIRM UNDER TRCP RULE 203

The original deposition ____ was ____ was not returned to the deposition officer;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor.

If returned, the original deposition was delivered to Mr. Michael L. Brem, Custodial Attorney.

$_________ is the deposition officer's charges to the ___Plaintiff(s) ___Defendant(s) for preparing the original deposition and any copies of exhibits;

The deposition was delivered in accordance with Rule 203.3, and a copy of this certificate, served on all parties shown herein, was filed with the Clerk.

Certified to by me on this ________ day of ___________________, __________.

__________________________
Firm Registration No. 231
Discovery Resource
910 Louisiana Street
Suite 4500
Houston, Texas 77002
713.223.3300
713.228.3311 Fax

# Attachment 1-H

2/26/2024 10:09 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 84884663
By: Mariyah Fritz
Filed: 2/26/2024 10:09 AM

CAUSE NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN, | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN,AND ERICKA BENS A/N/F OF A.B., MINOR, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED, | § | |
| Intervening Plaintiffs, | § | |
| KYLE WILLIAMS | § | HARRIS COUNTY, TEXAS |
| Intervening Plaintiff, | § | |
| AND | § | |
| FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, CYNTHIA RICHARDSON AND ROY ROBINSON | § | |
| Plaintiffs, | § | |
| V. | § | |
| ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, QW HOLDING | § | |

Unofficial Copy Office of Marilyn Burgess District Clerk

| | | |
|---|---|---|
| CORPORATION, STEVEN DODDS, | § | |
| UNION CARBIDE CORPORATION, | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| SPRINT TRANSPORT, LLC, | § | |
| PERFORMANCE MATERIALS NA, | § | |
| INC., AND MOBILE MINI TANK AND | § | |
| PUMP SOLUTIONS, INC., | § | |
| | § | |
| Defendants. | § | 113TH JUDICIAL DISTRICT |

**INTERVENORS' REPLY TO UNION CARBIDE CORPORATION'S RESPONSE**
**<u>TO INTERVENORS' MOTION TO COMPEL DISCOVERY RESPONSES</u>**

TO THE HONORABLE JUDGE RABEEA SULTAN COLLIER:

COME NOW, Intervenors, Shawn Jarmail Brown, Jr., Da'Shawn Jamal Brown, John Jarmail Brown, Davion Jarmail Brown, and Ericka Bens a/n/f of A.B., Minor and file this Reply brief in support of their Motion to Compel Discovery Responses from Union Carbide Corporation (hereafter UCC), and respectfully show as follows:

I.
<u>There is overwhelming evidence that the material UCC placed in the tank reacted generating carbon monoxide</u>.

1. UCC mischaracterizes the testimony of Intervenors' retained experts in its quest to escape liability. Intervenors' chemistry expert, John Cayais, Ph.D., unambiguously testified that "the material that was placed in the tank wagon reacted generating carbon monoxide which led to the death of two individuals that entered the tank wagon."[1] He stated that the chemistry of the reaction is fairly simple, but no one can do a straightforward calculation because UCC failed to retain a sample of the waste.[2] He opined that retaining a sample is "a cradle to the grave issue" that UCC failed to follow, but explained "the *overwhelming evidence* after the fact with the measurement of the

[1] **<u>Exhibit 1</u>** – 01.09.24 deposition of John Cayais, 132:12-18
[2] *Id*. at 132:22-133:18



Unofficial Copy Office of Marilyn Burgess District Clerk

levels of carbon monoxide in the tank wagon there was *obviously* a chemical reaction." [3] Based on video and other evidence, Dr. Cayais found this was a sealed tank from the time it was loaded at UCC and the *only* material that was ever present in the tank originated from UCC.[4]

II.
UCC's failure to retain a sample makes issues affecting the condition of the waste discoverable.

2. The testimony from Dr. Cayais makes clear that UCC's failure to retain a sample of the waste, in and of itself, is a breach of the standard of care. In fact, not even UCC's witnesses can determine the composition of the waste that was generated by UCC and is alleged to have killed two men.[5] Since there is no sample for anyone to do a straightforward calculation, discovery is necessary related to conditions in which the waste is capable of a chemical reaction. UCC witnesses affirmed that certain metals can catalyze decomposition chemistries in the waste.[6] UCC witnesses also testified that chemical reactivity and the speed of decomposition depend on the temperature and pressure of the waste.[7]

3. To date, no data has been produced by UCC showing measurements of metals in the waste, "other than what was found on the respirators of the people that were injured."[8] Dr. Cayais explained that substances found in the respirator cartridges, including furan, can produce carbon monoxide, particularly when mixed with metals or other chemicals: "[t]he reactivity of furan is very dependent upon everything from metal to, you know,

Unofficial Copy Office of Marilyn Burgess District Clerk

---

[3] *Id*. (emphasis added)
[4] **Exhibit 1** – 01.09.24 deposition of John Cayais, 133:19-134:13; 135:10-136:3; 152:22-154:1; 154:18-156:18
[5] See, Intervenors' Motion to Compel at Section I,C
[6] See, Intervenors' Motion to Compel at Section I,A
[7] See, Intervenors' Motion to Compel at Section I,B
[8] **Exhibit 1** – 01.09.24 deposition of John Cayais, 29:6-14

different metals that it come in contact with to other chemicals."[9] In short, UCC's statement in its Response that: "none of Plaintiffs' and Intervenors' expert witness [sic] make any claim that 'metal contaminants' played any part in the carbon monoxide found in the subject tank trailer," is demonstratively false.

4. The substances *(including metals)* and conditions known by UCC to create a chemical reaction in their hazardous waste is clearly discoverable. See, TEX. R. CIV. 192.3(a) ("In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action…").

III.
UCC must have a good faith factual and legal basis for its objections.

5. Intervenors would respectfully show the Court that concise requests attempting to discover the ultimate issue in this case, the composition of UCC's waste, have been met with literally pages of unfounded objections for each and every request. Many of the same boilerplate objections (overbroad, vague, ambiguous, irrelevant, unduly burdensome, and failure to describe with reasonable particularity) are peppered throughout virtually every UCC response.[10] The rules provide that an objection "obscured by numerous unfounded objections" is waived unless the court excuses the waiver for good cause. TEX. R. CIV. 193.2(e).

6. Unfortunately, meet-and-confer meetings revealed that UCC would never consider removing *any* of its objections to discovery requests attempting to determine the composition of its vinyl acetate polymer waste. Despite UCC's hardline position, it repeatedly states in its Response that "UCC could surmise what Intervenor means in this

Unofficial Copy Office of Marilyn Burgess District Clerk

[9] *Id*. at 45:8-46:10
[10] See Exhibits 8-10 to Intervenor's Motion to Compel

request," in reference to the very Requests for Production subject to the instant Motion. Intervenors would respectfully show that if UCC is able to surmise the documents Intervenors are requesting, then those materials have been described with reasonable particularity.

7. The Texas rules make clear that a party may object to written discovery *only* if a good faith factual and legal basis for the objection exists at the time the objection is made. TEX. R. CIV. 193.2(c). Under the rules, any party may at any reasonable time request a hearing on discovery objections, and *the party making the objections has the burden of presenting evidence in support of same*. See, TEX. R. CIV. 193.4(a). Despite not having the burden of putting forward evidence, Intervenors have pointed the Court, and UCC, to testimony from UCC's own witnesses that illustrates why Intervenor's requests are discoverable. Completely absence from UCC's response is any evidence to the contrary.

8. Intervenors move the Court to enter an order compelling Defendant to remove its boilerplate objections and compel full and complete responses to Intervenors' Requests for Production as set forth in their Motion to Compel, and for such additional relief to which they are justly entitled.

Unofficial Copy Office of Marilyn Burgess District Clerk

Respectfully submitted,

**DAX F. GARZA, P.C.**

Scott Greenlee

By: ______________________________

Dax F. Garza
Texas Bar No. 24030514
Scott C. Greenlee
Texas Bar No. 24007270
1021 Main Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 522-3000
Facsimile: (713) 522-3001
dax@daxgarzalaw.com
scott@daxgarzalaw.com

**ATTORNEYS FOR INTERVENORS SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B., MINOR, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED**

Unofficial Copy Office of Marilyn Burgess District Clerk

## CERTIFICATE OF SERVICE

On February 26, 2024, a true and correct copy of the foregoing instrument was served upon opposing counsel of record in accordance with Rule 21a of the Texas Rules of Civil Procedure.

| | |
|---|---|
| Mr. David Brenner<br>Ms. Belinda Arambula<br>Burns Anderson Jury & Brenner, L.L.P.<br>P.O. Box 26300<br>Austin, Texas 78755-0300 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. Michael Brem<br>Ms. Laura Jones<br>Schirrmeister Diaz-Arrastia Brem, LLP<br>Pennzoil Place ~ South Tower<br>711 Louisiana Street, Suite 1750<br>Houston, Texas 77002 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. Jay Aldis<br>Mr. Kevin Collins<br>Bracewell LLP<br>711 Louisiana Street, Suite 2300<br>Houston, Texas 77002 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. James M. Kimbell<br>Clark Hill Strasburger<br>909 Fannin, Suite 2300<br>Houston, Texas 77010 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. Randy E. Moore<br>The Moore Law Firm<br>#7 West Way Court, Suite C<br>Lake Jackson, Texas 77566 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. Kevin Jordan<br>Mr. Callan Edquist<br>Jordan, Lynch & Cancienne, PLLC<br>1980 Post Oak Blvd., Suite 300<br>Houston, Texas 77056 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. R. James Amaro<br>Matthew A. Elwell<br>The Amaro Law Firm<br>2500 E. T C Jester Blvd., Ste. 525<br>Houston, Texas 77008 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |

Unofficial Copy Office of Marilyn Burgess District Clerk

| | |
|---|---|
| Mr. Michael B. Jolly<br>Mr. Hamilton G. Rucker<br>405 Main St., Suite 200<br>Houston, Texas 77002 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. Byron C. Alfred<br>Mr. Johnny Alfred III<br>The Alfred Firm<br>2211 Norfolk Street, Suite 803<br>Houston, Texas 77098 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Mr. Charles Herd<br>Mr. Brandon C. Francis<br>Herd Law Firm PLLC<br>19500 Tomball Pkwy, Suite 250<br>Houston, Texas 77070 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |
| Ms. Karen Bennett<br>Germer PLLC<br>P.O. Box 4915<br>Beaumont, Texas 77704 | ☐ Messenger<br>☐ Telephonic Document Transfer<br>☐ Certified Mail – RRR<br>☐ First Class Mail<br>✓ Electronic Mail/E-Service |

Scott Greenlee

Scott Greenlee

Unofficial Copy Office of Marilyn Burgess District Clerk

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esbeidy Milan on behalf of Scott Greenlee
Bar No. 24007270
esbeidy@daxgarzalaw.com
Envelope ID: 84884663
Filing Code Description: Motion (No Fee)
Filing Description: Intervenor's Reply to UCC's Response to Intervenor's Mtn to Compel Discovery Responses
Status as of 2/26/2024 10:17 AM CST

Unofficial Copy Office of Marilyn Burgess District Clerk

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michael L.Brem | | mbrem@sdablaw.com | 2/26/2024 10:09:23 AM | SENT |
| R. JamesAmaro | | fax@amarolawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Randy E.Moore | | rmoore@moore-law.us | 2/26/2024 10:09:23 AM | SENT |
| Kaycie Moore | | kmoore@moore-law.us | 2/26/2024 10:09:23 AM | SENT |
| Debra Hexsel | | debra@jollylegal.com | 2/26/2024 10:09:23 AM | SENT |
| David L. Brenner | 2958020 | dbrenner@bajb.com | 2/26/2024 10:09:23 AM | SENT |
| Anthony Simmons | 24046847 | simmonslaw@me.com | 2/26/2024 10:09:23 AM | SENT |
| Dax Frank Garza | 24030514 | dax@daxgarzalaw.com | 2/26/2024 10:09:23 AM | SENT |
| Dax Frank Garza | 24030514 | dax@daxgarzalaw.com | 2/26/2024 10:09:23 AM | SENT |
| Hamilton Rucker | 24067850 | hgr@ruckerfirm.com | 2/26/2024 10:09:23 AM | SENT |
| R. JamesAmaro | | fax@amarolawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Michael Brem | | mbrem@sdablaw.com | 2/26/2024 10:09:23 AM | SENT |
| Karen Bennet | | krbennett@germer.com | 2/26/2024 10:09:23 AM | SENT |
| Donale Evans | | donale.evans.law@gmail.com | 2/26/2024 10:09:23 AM | SENT |
| Kristy Whipkey | | kristyr@germer.com | 2/26/2024 10:09:23 AM | SENT |
| Michael BJolly | | michaelbjolly@gmail.com | 2/26/2024 10:09:23 AM | SENT |
| Kevin Collins | | kevin.collins@bracewell.com | 2/26/2024 10:09:23 AM | SENT |
| Karen Bennett | | krbennett@germer.com | 2/26/2024 10:09:23 AM | SENT |
| Laura FriedlJones | | ljones@sdablaw.com | 2/26/2024 10:09:23 AM | SENT |
| Kevin Collins | | Kevin.collins@bracewell.com | 2/26/2024 10:09:23 AM | SENT |
| Michael Bruce Jolly | 10856910 | michaelbjolly@gmail.com | 2/26/2024 10:09:23 AM | SENT |
| James MKimbell | | jkimbell@clarkhill.com | 2/26/2024 10:09:23 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esbeidy Milan on behalf of Scott Greenlee
Bar No. 24007270
esbeidy@daxgarzalaw.com
Envelope ID: 84884663
Filing Code Description: Motion (No Fee)
Filing Description: Intervenor's Reply to UCC's Response to Intervenor's Mtn to Compel Discovery Responses
Status as of 2/26/2024 10:17 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| James MKimbell | | jkimbell@clarkhill.com | 2/26/2024 10:09:23 AM | SENT |
| Kathy Garber | | kgarber@clarkhill.com | 2/26/2024 10:09:23 AM | SENT |
| Georgia Seeley | | gseeley@clarkhill.com | 2/26/2024 10:09:23 AM | SENT |
| Amir Halevy | | ahalevy@jlcfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Kevin Jordan | | kjordan@jlcfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Byron CraigAlfred | | eservice@alfredfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Anna Hearn-Darst | | anna.hearn-darst@bracewell.com | 2/26/2024 10:09:23 AM | SENT |
| Scott Greenlee | | scott@daxgarzalaw.com | 2/26/2024 10:09:23 AM | SENT |
| Mary Parsons | | mary@amarolawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Drew Ortiz | | drew@amarolawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Gayle McKay | | gayle.mckay@bracewell.com | 2/26/2024 10:09:23 AM | SENT |
| Esbeidy Milan | | esbeidy@daxgarzalaw.com | 2/26/2024 10:09:23 AM | SENT |
| Nancy Medina | | nancy@jollylegal.com | 2/26/2024 10:09:23 AM | SENT |
| David Brenner | | dbrenner@bajb.com | 2/26/2024 10:09:23 AM | SENT |
| James E.Brenner | | jebrenner@bajb.com | 2/26/2024 10:09:23 AM | SENT |
| Ariana Ines | | aines@bajb.com | 2/26/2024 10:09:23 AM | SENT |
| Randy E.Moore | | rmoore@moore-law.us | 2/26/2024 10:09:23 AM | SENT |
| Jay Aldis | | jay.aldis@bracewell.com | 2/26/2024 10:09:23 AM | ERROR |
| Neil COlsen | | NOlsen@clarkhill.com | 2/26/2024 10:09:23 AM | SENT |
| Brittainie Zinsmeyer | | bzinsmeyer@jlcfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Callan Edquist | | cedquist@jlcfirm.com | 2/26/2024 10:09:23 AM | ERROR |
| Marissa Edwards | | legal@herdlawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Charles F.Herd | | charles.herd@herdlawfirm.com | 2/26/2024 10:09:23 AM | SENT |

Unofficial Copy Office of Marilyn Burgess District Clerk

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esbeidy Milan on behalf of Scott Greenlee
Bar No. 24007270
esbeidy@daxgarzalaw.com
Envelope ID: 84884663
Filing Code Description: Motion (No Fee)
Filing Description: Intervenor's Reply to UCC's Response to Intervenor's Mtn to Compel Discovery Responses
Status as of 2/26/2024 10:17 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Charles F.Herd | | charles.herd@herdlawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Brandon C.Francis | | brandon.francis@herdlawfirm.com | 2/26/2024 10:09:23 AM | SENT |
| Terry Hudgens | | paralegal@herdlawfirm.com | 2/26/2024 10:09:23 AM | SENT |

Unofficial Copy Office of Marilyn Burgess District Clerk

# Attachment 1-I

Advantage Reporting Service

Full Service Court Reporting Agency

Zdenek Hejzlar, Ph.D.

July 15, 2025

Cause No: 2020-13324

Chaumeika Bussey, et al Vs. Alpha Technical Services Corporation, LC D/B/A Quala Rail & Specialty, et al

Job # 108762

CAUSE NO. 2020-13324

| | |
|---|---|
| CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN, Plaintiffs, | IN THE DISTRICT COURT |
| SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED, Intervening Plaintiffs, | |
| KYLE WILLIAMS, Intervening Plaintiff, | |
| AND | HARRIS COUNTY, T E X A S |
| FELICIA SHEPPARD AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, CYNTHIA RICHARDSON AND ROY ROBINSON, Plaintiffs, | |
| VS. | |
| ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, QW HOLDING CORPORATION, STEVEN DODDS, UNION CARBIDE CORPORATION, THE DOW CHEMICAL COMPANY, SPRINT TRANSPORT, LLC, PERFORMANCE MATERIALS NA., INC., AND MOBILE MINI TANK AND PUMP SOLUTIONS, INC. Defendants. | 113TH JUDICIAL DISTRICT |



ORAL AND VIDEOTAPED DEPOSITION BY ZOOM OF

ZDENEK HEJZLAR, Ph.D.

July 15, 2025

Oral and Videotaped Deposition by Zoom of ZDENEK HEJZLAR, Ph.D. was taken on July 15, 2025, in Matlacha, Florida, from 9:39 a.m. to 3:39 p.m., before Dickie Zimmer, Certified Shorthand Reporter, pursuant to Notice and the Texas Rules of Civil Procedure and under the following agreement of counsel for the respective parties that:

The deposition may be signed by the witness before any Notary Public or officer authorized to administer oaths.



A P P E A R A N C E S

FOR THE PLAINTIFFS (Via Zoom):
Amaro Law Firm
2500 E. T C Jester Boulevard, Suite 525
Houston, Texas 77008
Phone: 713.864.1941
Fax: 713.864.1942
Email: fax@amarolawfirm.com
By: Matthew A. Elwell
Will McMillan

FOR THE INTERVENOR PLAINTIFF, KYLE WILLIAMS (Via Zoom):
Norman Jolly Law Firm
405 Main Street, Suite 100
Houston, Texas 77002
Phone: 713.237.8383
Email: hgr@ruckerfirm.com
By: Hamilton J. Rucker

FOR THE INTERVENOR PLAINTIFFS, SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERIKA BENS A/N/F OF A.B., MINOR, INDIVIDUALLY AND AS NEXT FRIEND BENEFICIARIES OF SHAWN JARMAIL BROWN (DECEASED) (Via Zoom):
Dax F. Garza, PC
1021 Main street, Suite 1400
Houston, Texas 77002
Phone: 713.522.3000
Email: scott@daxgarzalaw.com
By: Scott Greenlee

FOR THE CONSOLIDATED PLAINTIFFS, FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINOR CHILDREN; CYNTHIA RICHARDSON AND ROY ROBINSON (Via Zoom):
The Alfred Firm
211 Norfolk
Houston, Texas 77098
Phone: 713.489.1875
Fax: 877.751.7453
Email: byron@alfredlaw.com
By: Byron Alfred



A P P E A R A N C E S (Continued)

FOR THE CONSOLIDATED PLAINTIFF, ROY ROBINSON (Via Zoom):
Herd Law Firm, PLLC
19500 Tomball Parkway, Suite 250
Houston, Texas 77070
Phone: 713.955.3699
Email: charles.herd@herdlawfirm.com
By: Charles F. Herd, Jr.

FOR THE DEFENDANT, UNION CARBIDE CORPORATION (Via Zoom):
Schirrmeister Diaz-Arrastia Brem, LLP
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Phone: 713.221.2530
Email: mbrem@sdablaw.com
By: Michael L. Brem
Laura Friedl Jones

FOR THE DEFENDANT, DOW CHEMICAL COMPANY (Via Zoom):
The Moore Law Firm
#7 West Way Court, Suite C
Lake Jackson, Texas 77566
Phone: 979.285.2230
Email: rmoore@moore-law.us
By: Randy E. Moore

FOR THE DEFENDANT, PERFORMANCE MATERIALS NA, INC. (Via Zoom):
Jordan, Lynch & Cancienne, PLLC
1980 Post Oak Boulevard, Suite 300
Houston, Texas 77056
Phone: 713.955.4797
Email: skhuwaja@jlcfirm.com
By: Shahnoor Khuwaja
Kevin Jordan (when noted)

A P P E A R A N C E S (Continued)

FOR THE DEFENDANT, MOBILE MINI TANK AND PUMP STATIONS, INC. (Via Zoom):
Germer, PLLC
550 Fannin Street, Suite 400
Beaumont, Texas 77701
Phone: 409.654.6700
Email: krbennett@germer.com
By: Karen R. Bennett
Jennifer Wright

FOR THE DEFENDANT, SPRINT TRANSPORT, LLC (Via Zoom):
Clark Hill Strausburger
909 Fannin Street, Suite 2300
Houston, Texas 77010
Phone: 713.951.5665
Email: kgarber@clarkhill.com
By: Katherine T. Garber

ALSO PRESENT (Via Zoom):
Kristina Gates
Amanda Berry, Videographer

* * * * * * * * * * *



INDEX

TESTIMONY OF: ZDENEK HEJZLAR, Ph.D.


| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Elwell | 8 |
| Mr. Alfred | 109 |
| Mr. Elwell | 154 |
| Mr. Herd | 156 |
| Mr. Elwell | 196 |


EXHIBIT INDEX


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Curriculum Vitae (UCC-ZH-000028-35) | 11 |
| 2 | Testimony List (UCC-ZH-000023-27) | 30 |
| 3 | ESi Project No. 100683 Report Slides (UCC-ZH-007973-7025) | 73 |
| 4 | SDS for Vinyl Acetate Polymer Residues | 85 |
| 5 | Uniform Hazardous Waste Manifest | 87 |
| 6 | RC/PHA-RC/LHA Questionnaire and Protocol Version 5.0 1-Oct-2013 (UCC006717-56) | 100 |
| 7 | OSHA 91A Sampling (OSHA0260-282) | 103 |
| 8 | OSHA Findings (OSHA0246-249) | 106 |
| 9 | Fact Sheet OSA EPA, The Importance of Root Cause Analysis During Incident Investigation | 122 |
| 10 | Defendants Union Carbide Corporation, Performance Materials NA., Inc., and the Dow Chemical Company's First Supplemental Expert Designation of Dr. Zdenek Hejzlar and Supplemental Response to All Parties' Requests for Disclosure | 160 |




THE VIDEOGRAPHER: All right. Today's date is Tuesday, July 15th, 2025. The time is approximately 9:39 a.m., and we are now on the record.
THE COURT REPORTER: This is the Oral and Videotaped Deposition of Zdenek Hejzlar and it is being conducted remotely. My name is Dickie Zimmer, CSR No. 1954, with Advantage Reporting Service.
For the record, will counsel please state their appearance?
MR. ELWELL: Well, we just did that in the chat. So, if we want to forego doing that.
MR. BREM: I'm for that. There's so many people. Let's just get moving.
THE COURT REPORTER: That's fine.
MR. ELWELL: And --
THE COURT REPORTER: That's fine.
Would you raise --
MR. ELWELL: By the Rules -- I'm sorry. By the Rules, one objection for all is usually what we do, too.
MR. BREM: Agreed.
THE COURT REPORTER: Would you raise your right hand, please, sir?
Do you solemnly swear that the testimony you are about to offer will be the truth, the whole truth



and nothing but the truth, so help you God?
THE WITNESS: I do.
THE COURT REPORTER: Thank you.
ZDENEK HEJZLAR, Ph.D.,
having been duly sworn, testified as follows:
EXAMINATION
BY MR. ELWELL:
**Q.** State your name, sir.
A. My name is Zdenek Hejzlar.
**Q.** Have you gone by the nickname Zed before?
A. Yes, and most -- on most depositions.
**Q.** Okay.
A. Even in trial.
**Q.** Could you -- could you say your last name for me? I'll try to get it right today.
A. It's -- it's actually Hejzlar. It's -- the "J" is silent. It's like a hazy day. Hejzlar.
**Q.** Yeah. I'll phonetically spell that for myself there.
All right. Could -- give me a second here.
All right. Do you go by Dr. Hejzlar or Zed, what do you go by?
A. Zed is fine.
**Q.** Okay.
Okay. Zed, my name is Matt Elwell. I represent

**Q.** I'll show you what I've marked as Exhibit 4 to your deposition.

(Exhibit 4 marked)

**Q.** (By Mr. Elwell) Do you see this on your screen, sir?

A. Sure.

**Q.** And it says Union Carbide Safety Data Sheet at the top?

A. Uh-huh.

**Q.** And the date range is, basically, June 2018 to April 2019?

A. Correct.

**Q.** And the product name is vinyl acetate polymer residues.

Do you see that?

A. Yes.

**Q.** And another name for the vinyl acetate waste in this case is vinyl acetate polymer residues?

A. Correct.

**Q.** Okay. And so, this was a safety data sheet that was supposed to be on file with Quala, correct?

MR. BREM: Objection, form.

A. They -- as -- if they were going to -- their employees, if they were going to be exposed to this, they would either have to have this safety data sheet or



they would have to have the -- the manifest that, basically, gives you the profile. So, if Union Carbide was to sell the vinyl acetate residue as a product to somebody, they would have this.

Additionally, if they were asked by somebody, like Quala, to have -- to provide them with a safety data sheet, then, Union Carbide could provide them with that material safety data sheet, in addition to, you know, the waste stream manifest that they -- that they have, the characterization manifest.

**Q.** (By Mr. Elwell) Okay. So, it's your testimony that Exhibit 4, the safety data sheet for vinyl acetate residues or waste, would only be used if you're trying to sell it, or if they were -- or if they were exposed to it?

A. No, if --

MR. BREM: Objection, form.

A. -- if their specific -- if Quala requests from Union Carbide, "Hey, we want a material safety data sheet," they could provide them -- actually, generate one of those and have them, or if they were to sell that product to somebody else for recycling. Then, that becomes a product now. And so, for that you would be required to have a material safety data sheet.

**Q.** (By Mr. Elwell) Okay. If Quala wants to know --



Well, just a second ago you said the hazardous waste manifest lists the components of the waste?

Do you remember that?

A. It lists the profile. It -- there is a profile associated with the hazardous waste manifest. And that profile provides information that is similar to what's provided on material safety data sheet for products; but that, then -- and they -- Quala could -- would have the profile and, also, could ask for material safety data sheet.

**Q.** Okay. Exhibit 5 to your deposition is the hazardous waste manifest for this load that went in Tank 16129.

Have you seen this before?

A. Yes.

(Exhibit 5 marked)

**Q.** (By Mr. Elwell) And so, when you say the profile, you're just saying the name, right?

A. Correct, but there is a profile associated with that product that they can request; and that was, also, provided in the documents. That's the profile of the waste.

**Q.** Are you sure about that, that the profile was -- was sent along with the shipment, are you sure about that?



A. No, not sent with the shipment; but if requested, Quala can -- Quala can request that --

**Q.** Okay. I just want to be sure that I'm not misunderstanding you that you're not saying that every time a -- this hazardous waste manifest goes out, that the profile goes along with it?

A. Correct, I'm not saying that.

**Q.** Okay. And you know that that didn't happen in this case, that the profile didn't go with this, correct?

A. Correct. Yes, sir.

**Q.** Okay. In fact, they had to -- after this incident happened, Quala and actually other Defendants had to go back and find the profile, correct?

A. Correct.

MR. BREM: Objection.

**Q.** (By Mr. Elwell) Okay. Going back to Exhibit 3, which is your, you know, PowerPoint report.

A. Correct.

**Q.** This EPA's Cradle-to-Grave Hazardous Waste Management Program, that's applied to the generator of this waste, correct?

A. Correct. It's generator and all the people in the chain that handle it.

**Q.** And it says, "'cradle to grave' meaning from the

time it is created, while it is transported, treated, and stored, and until it is disposed"?
A. Correct.
**Q.** Okay. And you're saying that abide to Union Carbide?
A. Yeah, they were the RC -- RCRA of hazardous waste generators; and, also, they had responsibilities associated with what happens to that waste until it's disposed of.
**Q.** Have you met with any attorneys for -- for Dow?
A. No.
**Q.** Have you met with any attorneys for Performance Materials?
A. I don't think so. I don't recall.
**Q.** Just Union Carbide?
A. Correct.
**Q.** Do you know who owns Union Carbide?
A. No.
**Q.** Did you -- you weren't aware that Union Carbide is a wholly owned subsidiary of the Dow Chemical Corporation?
A. In -- just in general terms, but I -- you know, not from -- I'm not an expert on corporate ownership.
**Q.** Okay. That doesn't fall in that business administration thing that you were talking about?



A. Sure, I just know, generally; but I don't know the details of it, and it wasn't relevant to my investigation.
**Q.** Do you recall seeing e-mails regarding -- you know, between, you know, Performance Materials' employees and employees from the generator facility?
A. I -- I think so. There was a lot of materials that I looked at, but --
**Q.** Do you recall any e-mail coming from a Union Carbide, you know, address, like, "amarolawfirm.com"; but instead it said Union Carbide?
A. I'm sure I came across some, but I don't -- I don't recall specifics.
**Q.** Okay. Well, I haven't seen any ones that said Union Carbide. All the ones I've seen have been e-mails from people with a Dow domain.
A. As I -- as I said, that wasn't part of, you know, what I was asked to do; so, I don't know.
**Q.** Okay. Fair enough.
A. And you have everything that I have.
**Q.** Well, that's -- that's what we were getting at earlier, is the materials that you reviewed in order to prepare for this report were approximately four in your Union Carbide folder and five or six in your Quala folder, correct?



MR. BREM: Objection, form.
A. In those particular folders; but there were other information that was provided as part of exhibits and depositions and all of that.
**Q.** (By Mr. Elwell) Okay. So, to the extent that they were -- also, there was information attached as exhibits to a deposition, you may have reviewed those?
A. Yes.
**Q.** Okay. Going back to Exhibit 3 for you here, which is your PowerPoint report, right?
A. Right.
**Q.** Down here in Conclusion 8 -- and this is, again, like, out of whatever section this is, I guess the hazardous waste section?
A. Yeah.
**Q.** It says here that the "Contents of the tank trailer were not collected at the time drain was opened (small amount of dark liquid on the video)"?
A. Yes.
**Q.** So, meaning that there were still contents within this tank trailer when Quala employees were starting to do their thing?
A. I would -- I -- yes, that's a good assumption.
**Q.** I'm talking about in this case, from that video, that's what you were able to see?



A. Yes, I was able to see some dark material liquid that come -- that was coming out when he opened the drain.
**Q.** I'm going to Page 16 -- I think it's still in the hazardous -- it's still in the same section.
A. Uh-huh.
**Q.** Conclusion 10 right here. We're talking about, essentially, carbon monoxide, right? (Reading), A party could have used the subject tank trailer in the time it arrived at their facility and before they cleaned it. This could have released the protective nitrogen atmosphere and introduced carbon monoxide, H2S and volatile organics into the trailer.
Did I read that correct?
A. Correct.
**Q.** Have you --
A. That's a hypothesis.
**Q.** Right. That hypothesis, have you seen any written -- written documentation, testimony, that supported that?
A. No, the only testimony that supports that is the that they are a large quantity generator; and that they manage hazardous waste, and they do ship it for disposal. So, essentially, they treat it onsite. And then, they have shipments that are going to a TSDF or

what I'm trying to get at, sir.

A. No --

MR. BREM: Objection, form.

A. No, I don't -- I don't think so. I don't know, because it's difficult to predict what I would say to something that I don't know yet and I haven't been presented with; but I have an open mind. I mean, if -- I would certainly consider whatever hypothesis was being proposed for whatever reaction mechanism was being proposed. And depending on my qualification, I may be able to provide critique, or I may not. Because there's -- you know, I only know certain parts of the chemistry and the polymer chemistry. But I am not a metallurgist, and some of the these other mechanisms may involve things that are not in my area of expertise.

**Q.** (By Mr. Elwell) Okay. Thank you, sir.

MR. ELWELL: Reserve and pass.

MR. BREM: Going, going, gone.

THE VIDEOGRAPHER: All right. The time is 3:39 p.m., and we are now off of the record.

(Time: 3:39 p.m.)

* * * * * * * * * * * *



CHANGES AND SIGNATURE

WITNESS NAME: ZDENEK HEJZLAR, Ph.D.

DATE OF DEPOSITION: July 15, 2025

PAGE LINE CHANGE REASON

_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________



I, ZDENEK HEJZLAR, Ph.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________________
ZDENEK HEJZLAR, Ph.D.

THE STATE OF ___________ )

COUNTY OF ______________ )

Before me, ________________________, on this day personally appeared ZDENEK HEJZLAR, Ph.D., known to me or proved to me under oath of _______________________ or through __________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _________ day of __________________, _________.

______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ________________



CAUSE NO. 2020-13324

| | |
|---|---|
| CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN, Plaintiffs, | IN THE DISTRICT COURT |
| SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED, Intervening Plaintiffs, | |
| KYLE WILLIAMS, Intervening Plaintiff, | |
| AND | HARRIS COUNTY, T E X A S |
| FELICIA SHEPPARD AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, CYNTHIA RICHARDSON AND ROY ROBINSON, Plaintiffs, | |
| VS. | |
| ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, QW HOLDING CORPORATION, STEVEN DODDS, UNION CARBIDE CORPORATION, THE DOW CHEMICAL COMPANY, SPRINT TRANSPORT, LLC, PERFORMANCE MATERIALS NA., INC., AND MOBILE MINI TANK AND PUMP SOLUTIONS, INC. Defendants. | 113TH JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION VIA ZOOM OF
ZDENEK HEJZLAR, Ph.D.
July 15, 2025

I, Dickie Zimmer, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following;

That the witness, ZDENEK HEJZLAR, Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on July 21, 2025 to the witness or to the attorney for the witness for examination, signature and return to me within 20 days of the receipt thereof.

That the amount of time used by each party at the deposition is as follows:

Mr. Elwell -- 2 hours, 44 minutes
Mr. Alfred -- 1 hour, 7 minutes
Mr. Herd -- 1 hour, 1 minute

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:



FOR THE PLAINTIFFS:
Amaro Law Firm
2500 E. T C Jester Boulevard, Suite 525
Houston, Texas 77008
Phone: 713.864.1941
Fax: 713.864.1942
Email: fax@amarolawfirm.com
By: Matthew A. Elwell TB# 24036134

FOR THE INTERVENOR PLAINTIFF, KYLE WILLIAMS:
Norman Jolly Law Firm
405 Main Street, Suite 100
Houston, Texas 77002
Phone: 713.237.8383
Email: hgr@ruckerfirm.com
By: Hamilton J. Rucker

FOR THE INTERVENOR PLAINTIFFS, SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERIKA BENS A/N/F OF A.B., MINOR, INDIVIDUALLY AND AS NEXT FRIEND BENEFICIARIES OF SHAWN JARMAIL BROWN (DECEASED):
Dax F. Garza, PC
1021 Main street, Suite 1400
Houston, Texas 77002
Phone: 713.522.3000
Email: scott@daxgarzalaw.com
By: Scott Greenlee

FOR THE CONSOLIDATED PLAINTIFFS, FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINOR CHILDREN; CYNTHIA RICHARDSON AND ROY ROBINSON:
The Alfred Firm
211 Norfolk
Houston, Texas 77098
Phone: 713.489.1875
Fax: 877.751.7453
Email: byron@alfredlaw.com
By: Byron Alfred



FOR THE CONSOLIDATED PLAINTIFF, ROY ROBINSON:
Herd Law Firm, PLLC
19500 Tomball Parkway, Suite 250
Houston, Texas 77070
Phone: 713.955.3699
Email: charles.herd@herdlawfirm.com
By: Charles F. Herd, Jr.

FOR THE DEFENDANT, UNION CARBIDE CORPORATION:
Schirrmeister Diaz-Arrastia Brem, LLP
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Phone: 713.221.2530
Email: mbrem@sdablaw.com
By: Michael L. Brem

FOR THE DEFENDANT, DOW CHEMICAL COMPANY:
The Moore Law Firm
#7 West Way Court, Suite C
Lake Jackson, Texas 77566
Phone: 979.285.2230
Email: rmoore@moore-law.us
By: Randy E. Moore

FOR THE DEFENDANT, PERFORMANCE MATERIALS NA, INC.:
Jordan, Lynch & Cancienne, PLLC
1980 Post Oak Boulevard, Suite 300
Houston, Texas 77056
Phone: 713.955.4797
Email: skhuwaja@jlcfirm.com
By: Shahnoor Khuwaja

FOR THE DEFENDANT, MOBILE MINI TANK AND PUMP STATIONS, INC.:
Germer, PLLC
550 Fannin Street, Suite 400
Beaumont, Texas 77701
Phone: 409.654.6700
Email: krbennett@germer.com
By: Karen R. Bennett



FOR THE DEFENDANT, SPRINT TRANSPORT, LLC:
Clark Hill Strausburger
909 Fannin Street, Suite 2300
Houston, Texas 77010
Phone: 713.951.5665
Email: kgarber@clarkhill.com
By: Katherine T. Garber

FOR THE DEFENDANT, ALPHA TECHNICAL SERVICES CORPORATION:
Burns, Anderson, Jury & Brenner, LLP
4807 Spicewood Springs Road, Building 4, Suite 100
Austin, Texas 78759
Phone: 512.338.5322
Fax: 512.338.5363
Email: dbrenner@bajb.com
By: David Brenner

FOR THE DEFENDANT, STEVEN DODDS:
Bracewell, LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
Phone: 713.221.1381
Email: jaldis@bracewell.com
By: Jay Aldis

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 TRCP will be certified after they have occurred.

Certified to by me this 21st day of July, 2025.

Dickie Zimmer, Texas CSR 1954
Expiration Date: May 31, 2026
Firm Registration No. 378
Advantage Reporting Service
P.O. Box 169
Tomball, Texas 77377
Phone: 281.376.9303
Fax: 281.376.7117



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on ____________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Matthew A. Elwell, for the Plaintiffs, Custodial Attorney, TB# 24082962;

That $ __________ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this __________ day of ______________________, 2025.

Dickie Zimmer, Texas CSR 1954
Expiration Date: May 31, 2026
Firm Registration No. 378
Advantage Reporting Service
P.O. Box 169
Tomball, Texas 77377
Phone: 281.376.9303
Fax: 281.376.7117

Attachment 1-J

Advantage Reporting Service

Full Service Court Reporting Agency

Jason R. Babcock, Ph.D.

July 22, 2025

Cause No: 2020-13324

Chaumeika Bussey, et al Vs. Alpha Technical Services Corporation, LC D/B/A Quala Rail & Specialty, et al

Job # 108765

CAUSE NO. 2020-13324

CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN,

PLAINTIFFS

SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED,

INTERVENING PLAINTIFFS,

KYLE WILLIAMS,

INTERVENING PLAINTIFF,

AND

FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, CYNTHIA RICHARDSON AND ROY ROBINSON,

PLAINTIFFS

VS.

ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, QW HOLDING CORPORATION, STEVEN DODDS, UNION CARBIDE CORPORATION,

) IN THE DISTRICT COURT OF

) HARRIS COUNTY, T E X A S



THE DOW CHEMICAL COMPANY, SPRINT TRANSPORT, LLC, PERFORMANCE MATERIALS NA, INC., AND MOBILE MINI TANK AND PUMP SOLUTIONS, INC.,

DEFENDANTS ) 113TH JUDICIAL DISTRICT

ORAL AND VIDEOTAPED DEPOSITION OF

JASON R. BABCOCK, Ph.D.

JULY 22, 2025

(Reported remotely via Zoom)

ORAL DEPOSITION OF JASON R. BABCOCK, Ph.D., produced as a witness at the instance of Plaintiff Chaumeika Bussey, Individually, as Representative of the Estate of Shawn Jarmail Brown, Deceased, and as Next Friend of J.B., A.B., and R.O., Minor Children; duly sworn by an officer authorized to administer oaths by agreement of counsel, taken in the above-styled and numbered cause on July 22, 2025, from 9:45 a.m. to 3:31 p.m., before Mylinda Tubbs Faircloth, Certified Shorthand Reporter No. 2896 for the State of Texas, via machine shorthand, with the witness appearing via Zoom from Aurora, DuPage County, Illinois, pursuant to the Texas Rules of Civil Procedure and any provisions stated on the record.



APPEARANCES

FOR PLAINTIFF CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN,
Mr. Matthew A. Elwell
Amaro Law Firm
2500 East TC Jester Boulevard, Suite 525
Houston, Texas 77008
Telephone: 713.864.1941
Facsimile: 713.864.1942
E-mail: matt@amarolawfirm.com

FOR INTERVENING PLAINTIFFS SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED
Mr. Scott Greenlee
Dax F. Garza, P.C.
1021 Main Street, Suite 1400
Houston, Texas 77002
Telephone: 713.581.6976
Facsimile: 713.522.3001
E-mail: scott@daxgarzalaw.com

FOR INTERVENING PLAINTIFF KYLE WILLIAMS
Mr. Hamilton G. Rucker
Hamilton Rucker, P.C.
540 Heights Boulevard, Suite 112
Houston, Texas 77007
Telephone: 713.589.2960
Facsimile: 713.583.3980
E-mail: hgr@ruckerfirm.com

FOR CONSOLIDATED PLAINTIFF FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, AND CYNTHIA RICHARDSON
Mr. Byron C. Alfred
The Alfred Firm
2211 Norfolk Street, Suite 803
Houston, Texas 77098
Telephone: 713.470.9714
Facsimile: 877.751.7453
E-mail: byron@alfredfirm.com



FOR CONSOLIDATED PLAINTIFF ROY ROBINSON
Mr. Charles Herd
Herd Law Firm, PLLC
19500 Tomball Parkway, Suite 250
Houston, Texas 77070
Telephone: 713.955.3699
Facsimile: 713.955.4299
E-mail: charles.herd@herdlawfirm.com

FOR DEFENDANT UNION CARBIDE CORPORATION
Mr. Michael L. Brem
Ms. Laura Friedl Jones
Schirrmeister Diaz-Arrastia Brem, LLP
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: 713.221.2500
Facsimile: 713.221.2525
E-mail: mbrem@sdablaw.com
E-mail: ljones@sdablaw.com

FOR DEFENDANT THE DOW CHEMICAL COMPANY
Mr. Randy E. Moore
The Moore Law Firm
No. 7 West Way Court, Suite C
Lake Jackson, Texas 77566
Telephone: 979.285.2230
Facsimile: 979.285.2235
E-mail: rmoore@moore-law.us

FOR DEFENDANT SPRINT TRANSPORT, LLC
Mr. James M. Kimbell
Clark Hill Strasburger
1000 Louisiana, Suite 2800
Houston, Texas 77010
Telephone: 713.951.5600
Facsimile: 713.951.5660
E-mail: jkimbell@clarkhill.com

FOR DEFENDANT PERFORMANCE MATERIALS NA, INC.
Ms. Sydney Rupe (morning session)
Mr. Shahnoor Khuwaja (afternoon session)
Jordan, Lynch & Cancienne, PLLC
1980 Post Oak Boulevard, Suite 2300
Houston, Texas 77056
Telephone: 713.955.4793
Facsimile: 713.955.9644
E-mail: srupe@jlcfirm.com

FOR DEFENDANT MOBILE MINI TANK AND PUMP SOLUTIONS, INC.
Ms. Karen Bennett
Germer, PLLC
550 Fannin, Suite 400
Beaumont, Texas 77701
Telephone: 409.654.6700
Facsimile: 409.835.2115
E-mail: krbennett@germer.com

FOR DEFENDANT MOBILE MINI TANK AND PUMP SOLUTIONS, INC.
Ms. Jennifer Wright
Ansa Assuncao, LLP
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
Telephone: 443.539.7788
E-mail: jennifer.wright@ansalaw.com

VIDEOGRAPHER
Ms. Amanda Berry

ALSO PRESENT
Ms. Kristina Gates
Ms. Allison Yam



INDEX


| | PAGE |
|---|---|
| Appearances | 3 |
| Stipulations | 7 |
| JASON R. BABCOCK, Ph.D. | |
| Examination by Mr. Elwell | 8 |
| Examination by Mr. Alfred | 116 |
| Examination by Mr. Herd | 174 |
| Further Examination by Mr. Elwell | 205 |
| Correction and Signature Pages | 209 |
| Reporter's Certifications | 211 |


EXHIBITS


| NO. DESCRIPTION | IDENTIFIED |
|---|---|
| Exhibit 1 Curriculum Vitae | 9 |
| Exhibit 2 Expert Designation and Response to Requests for Disclosure | 23 |
| Exhibit 3 Summary of Opinions | 23 |
| Exhibit 4 Testimony list | 23 |
| Exhibit 5 RC/PHA - RC/LHA Questionnaire and Protocol | 49 |
| Exhibit 6 LinkedIn page regarding 2025 DRI event | 118 |
| Exhibit 7 Webinar brochure | 121 |
| Exhibit 8 LinkedIn page with Webinar information | 122 |
| Exhibit 9 Journal of Failure Analysis and Prevention article | 133 |
| Exhibit 10 Process flow chart | 140 |




P R O C E E D I N G S

JULY 22, 2025

THE VIDEOGRAPHER: All right. Today's date is Tuesday, July the 22nd, 2025. The time is approximately 9:45 a.m., and we are now on the record.

THE REPORTER: My name is Mylinda Faircloth, Texas Certified Shorthand Reporter No. 2896, and I will be taking the deposition by machine shorthand.

Counsel, please state your stipulations for the record.

MR. ELWELL: By the Rules. One objection for all.

MR. BREM: And we also stipulate that you can swear in the witness, even though he is not in Texas. Matt -- Matt and Byron, do y'all agree with that?

MR. ELWELL: Yes.

MR. ALFRED: Yeah.

THE REPORTER: Raise your right hand, please, sir.

(The witness was then duly sworn.)

THE REPORTER: Thank you.



JASON R. BABCOCK, Ph.D.,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ELWELL:

**Q.** Could you state your name for the record, sir?
A. Yes, it's Jason Babcock.
**Q.** Do you go by Dr. Babcock? What do you go by?
A. Either one is fine, Dr. or Mr. I'm not particular.
**Q.** Okay. All right. Mr. Babcock, I would like to get through this pretty quickly if I can today. You've been retained by certain defendants in this case as an expert witness, true?
A. By the counsel, yes, counsel for them.
**Q.** Sure. Do you know which defendants hired you or designated you as an expert in this case?
A. Union Carbide Corporation.
**Q.** Were you aware that The Dow Chemical Company also identified you as an expert for them in this case?
A. I believe so.
**Q.** Were you aware that Performance Materials, a defendant in this case, also identified you as an expert for them in this case?
A. Yes, I think so.
**Q.** Have you had any conversations with Dow

initially we were given some file material, and I started to try and understand just what -- what -- what I could about the -- the manufacturing process for the vinyl acetate monomer, and -- and what the waste contained, and how it was characterized. And so some of these things have been developed over that long of a period of time, yes.
**Q.** Okay. Would you consider yourself a hazardous waste disposal expert?
A. No, I certainly have to dispose of hazardous waste, and I've had to, but it's mostly just placing it in the proper containers until it's taken away by a hazardous waste disposal company.
**Q.** Okay. Have you or would you consider yourself an expert in DOT or RCRA standards, regulations, or requirements with regard to hazardous waste transport or disposal?
A. No.
**Q.** Have you seen any documents or seen any testimony or anything that we can substantively point to in this matter that confirms whether the tank trailer was opened at any time after it left the Union Carbide facility up until the time it was opened by Mr. Lozano on video the night of the incident?
A. I mean, the only thing that I've seen is the



-- the video of the removal of the -- the tag that was on the hatch on top of the tanker, and just observations that it was not cut away or anything like that. It was just basically taken off by hand.
And -- and then photos of the tags themselves that were, I think, part of the OSHA investigation that showed they were not torn or ripped. They were -- the holes, the loops where you would put the -- the zip tie or whatever type of tie that's used there, those -- those holes in those tags were still intact.
So the only thing that I've seen is just, you know, those observations, that -- that the -- the tags were easy -- easy to remove, and I don't know why that would be.
But obviously the -- the tanker was not under video surveillance or anything the entire time that it was -- after it left any of the -- either the -- the Union Carbide facility or Performance Materials' facility, so there's no -- nothing that I've seen that has shown that it's actually been opened, by some type of video surveillance.
MR. ELWELL: Object, nonresponsive.
**Q.** (By Mr. Elwell) Has there been any witness testimony, a document such as a cleaning invoice, or any



video that we can point to that proves that this tank trailer was opened at any time between the time it left Performance -- or it left Union Carbide's facility full of waste to the time it arrived at Quala and Mr. Lozano opened the top hatch?
MR. BREM: Objection, form.
A. No, there's no video that shows anything like that.
**Q.** (By Mr. Elwell) Or written document or testimony?
A. No, I don't think I've seen anything like that.
**Q.** Okay. Have you done any testing to analyze corrosion, pitting, or any of those factors for this particular tank trailer?
A. Testing, no.
**Q.** Okay. Have you seen any temperature readings for the waste material as it was loaded inside the tank trailer on December 2nd by the generator, Union Carbide?
MR. BREM: Objection, form. You've got the wrong date, Matt.
MR. ELWELL: December 2nd is not the date?
MR. BREM: It's November the 18th.
MR. ELWELL: Well, dadgummit.



MR. BREM: I just didn't want to --
MR. ELWELL: I have to redo this --
MR. BREM: -- cause any more confusion.
MR. ELWELL: -- entire -- entire thing now.
**Q.** (By Mr. Elwell) Okay, sir. For -- for the questions that we were talking about when it was loaded, it was November 18th, 2019. Does that sound about right, sir?
A. Yes.
**Q.** Okay. Anyways, for the time that the waste was loaded in this matter, I mean you understand that it was loaded and it was -- the tank trailer was sealed by a Union Carbide worker, correct?
A. Yes.
**Q.** Okay. For the actual waste material, have you seen any temperature readings for how -- for what that material's temperature was inside that tank trailer upon loading?
A. No.
**Q.** What about any temperature readings as it was in transport at any time after it left the Union Carbide facility?
A. No.
**Q.** Other than the -- well, were you aware that

CHANGES AND SIGNATURE TO THE
DEPOSITION OF JASON R. BABCOCK, Ph.D.
TAKEN ON JULY 22, 2025

PAGE/LINE CHANGE REASON

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________



I, JASON R. BABCOCK, Ph.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________________
JASON R. BABCOCK, Ph.D.

THE STATE OF TEXAS )
)
COUNTY OF ________)

Before me _________________ (name of officer) on this day personally appeared _________________, known to me or proved to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that the same was being executed for the purposes and consideration therein expressed.

(Seal) Given under my hand and seal of office this _____ day of ____________, ______.

________________________________________
Notary Public in and for the State of Texas



CAUSE NO. 2020-13324

CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF J.B., A.B., AND R.O., MINOR CHILDREN, ) IN THE DISTRICT COURT OF

PLAINTIFFS )

SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS A/N/F OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED, )

INTERVENING PLAINTIFFS, )

KYLE WILLIAMS, )

INTERVENING PLAINTIFF, )

AND )

FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO, DECEASED, LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L., AND S.L., MINOR CHILDREN, CYNTHIA RICHARDSON AND ROY ROBINSON, )

PLAINTIFFS )

VS. ) HARRIS COUNTY, T E X A S

ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, QW HOLDING CORPORATION, STEVEN DODDS, UNION CARBIDE CORPORATION, )



THE DOW CHEMICAL COMPANY, SPRINT TRANSPORT, LLC, PERFORMANCE MATERIALS NA, INC., AND MOBILE MINI TANK AND PUMP SOLUTIONS, INC., )

DEFENDANTS ) 113TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION TO THE
DEPOSITION OF JASON R. BABCOCK, Ph.D.
TAKEN ON JULY 22, 2025

(Reported remotely via Zoom)

I, MYLINDA TUBBS FAIRCLOTH, Certified Shorthand Reporter for the State of Texas, hereby certify to the following:

That the witness, JASON R. BABCOCK, Ph.D., was duly sworn by an officer authorized to administer oaths, and that the transcript of the oral deposition is a true record of the testimony given by the witness.

That the amount of time used by each party at the deposition is as follows:

Mr. Matthew A. Elwell - 2 hours, 33 minutes;
Mr. Scott Greenlee - (no time used);
Mr. Hamilton G. Rucker - (no time used);
Mr. Byron C. Alfred - 1 hour, 26 minutes;
Mr. Charles Herd - 45 minutes;
Mr. Michael L. Brem - (no time used);
Mr. Randy E. Moore - (no time used);
Mr. James M. Kimbell - (no time used);
Ms. Sydney Rupe - (no time used);
Ms. Karen Bennett - (no time used);
Ms. Jennifer Wright - (no time used).

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of

record:

Mr. Matthew A. Elwell, Attorney for Plaintiff Chaumeika Bussey, Individually, as Representative of the Estate of Shawn Jarmail Brown, Deceased, and as Next Friend of J.B., A.B., and R.O., Minor Children;

Mr. Scott Greenlee, Attorney for Intervening Plaintiffs Shawn Jarmail Brown, Jr., Da'Shawn Jamal Brown, John Jarmail Brown, Davion Jarmail Brown, and Ericka Bens a/n/f of A.B. and J.B., Minors, Individually as Wrongful Death Beneficiaries of Shawn Jarmail Brown, Sr., Deceased;

Mr. Hamilton Rucker, Attorney for Intervening Plaintiff Kyle Williams;

Mr. Byron Alfred, Attorney for Consolidated Plaintiffs Felicia Sheppard, as Representative of the Estate of Sidarieus Lozano, Deceased, Lexus Paul, as Next Friend of N.L., L.L., and S.L., Minor Children, and Cynthia Richardson;

Mr. Charles Herd, Attorney for Consolidated Plaintiff Roy Robinson;

Mr. Michael L. Brem or Ms. Laura Friedl Jones, Attorney for Defendant Union Carbide Corporation;

Mr. Randy E. Moore, Attorney for Defendant Dow Chemical Company;

Mr. James M. Kimbell, Attorney for Defendant Sprint Transport, LLC;

Ms. Sydney Rupe or Mr. Shahnoor Khuwaja, Attorney for Defendant Performance Materials, NA, Inc.,

Ms. Karen Bennett, Attorney for Defendant Mobile Mini Tank and Pump Solutions;

Ms. Jennifer Wright, Attorney for Defendant Mobile Mini Tank and Pump Solutions.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further



that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to TRCP Rule 203 will be certified to after they have occurred.

Sworn to by me this ____ day of ___________, 2025.

______________________________

MYLINDA TUBBS FAIRCLOTH, CSR
Certification No. 2896
Expiration Date: 1-31-27

ADVANTAGE REPORTING SERVICE
Registration No. 378
P.O. Box 169
Tomball, Texas 77377
281.376.9303
Fax 281.376.7117



REPORTING FIRM'S FURTHER CERTIFICATION

That the deposition transcript was made available on _______________ to the witness or to the attorney for the witness for examination, signature, and return to Advantage Reporting Service by _______________.

The original deposition transcript or Changes and Signature page ____ was or ____ was not returned to the deposition officer.

If returned, date received: __________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition transcript was delivered in accordance with Rule 203.3 to Mr. Matthew A. Elwell on _____________;

That $________ is the deposition officer's charge for preparing the original deposition transcript and any copies of exhibits, charged to Mr. Matthew A. Elwell.

That a copy of this certificate was served on all parties shown herein and filed with the court clerk.

Sworn to by me this ____ day of __________, ____.

______________________________

ADVANTAGE REPORTING SERVICE
Registration No. 378
P.O. Box 169
Tomball, Texas 77377
281.376.9303
Fax 281.376.7117

# Attachment 1-K

E-SERVICE
978346
7/29/2025 4:43:10 PM
File & Serve Texas™

CAUSE NO. 2020-13324

CHAUMEIKA BUSSEY, Individually, as Representative of the Estate of SHAWN JARMAIL BROWN, DECEASED, and as Next Friend of JB AND AB, MINOR CHILDREN,

*Plaintiffs,*

SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN,
AND ERICKA BENS a/n/b of A.B., a Minor, Individually as Wrongful Death Beneficiaries of SHAWN JARMAIL BROWN, SR., DECEASED

AND

KYLE WILLIAMS

*Intervenors,*

VS.

ALPHA TECHNICAL SERVICES CORPORATION, LLC d/b/a QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, STEVEN DODDS, MOBILE MINI TANK AND PUMP SOLUTIONS, INC., UNION CARBIDE CORPORATION, and THE DOW CHEMICAL COMPANY,

*Defendants.*

§ § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § §

IN THE DISTRICT COURT OF

HARRIS COUNTY, TEXAS

113TH JUDICIAL DISTRICT

**DEFENDANTS PERFORMANCE MATERIALS NA, INC., UNION CARBIDE CORPORATION, AND THE DOW CHEMICAL COMPANY'S FIRST SUPPLEMENTAL EXPERT DESIGNATIONS AND DISCLOSURES**

Pursuant to the Docket Control Order and Texas Rules of Civil Procedure 194.3 and 195.5(a), Defendants Performance Materials NA, Inc. ("PMNAI"), Union Carbide Corporation ("UCC"), and The Dow Chemical Company ("Dow") (collectively, "Defendants")

serve their First Supplemental Expert Designations and Disclosures. Defendants reserve the right to supplement these Disclosures.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: */s/ Kevin Jordan*

Kevin Jordan
State Bar No. 1014800
Amir Halevy
State Bar No. 24065356
Sydney C. Rupe
State Bar No. 24116999
srupe@jlcfirm.com
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: 713.955.4022
Facsimile: 713.955.9644
kjordan@jlcfirm.com
ahalevy@jlcfirm.com
srupe@jlcfirm.com

**ATTORNEYS FOR DEFENDANT PERFORMANCE MATERIALS NA, INC.**

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By */s/ Michael L. Brem* (by permission)

Michael L. Brem
State Bar No. 02952020
mbrem@sdablaw.com
Laura Friedl Jones
State Bar No. 00787500
ljones@sdablaw.com
Pennzoil Place ~ South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 221-2525

**ATTORNEYS FOR DEFENDANT UNION CARBIDE CORPORATION**

THE MOORE LAW FIRM

By */s/ Randy E. Moore* (by permission)

Randy E. Moore
State Bar No. 14363450
rmoore@moore-law.us
P.O. Box 3087
Lake Jackson, Texas 77566
Telephone: (979) 285-2230
Facsimile: (979) 285-2235

**ATTORNEY FOR DEFENDANT**
**THE DOW CHEMICAL COMPANY**

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to all counsel of record by electronic means on July 29, 2025.

By: */s/ Sydney Rupe*
Sydney Rupe

# I. RETAINED EXPERTS

Defendants identify the following individuals who have been retained as experts and may be called as a testifying expert as part of Defendants' case:

1) **David O. Anderson, PhD**
   899 Casalvieri St.
   Las Vegas, NV 89113
   (702)333-1503
   Aesi1@airmail.net

Dr. David Anderson has been involved in environmental, health, and safety for over forty years. He previously served as an OSHA compliance officer in industrial hygiene and as an Interim Area Director for OSHA. He is currently the President and CEO for Advanced Environmental Services, Inc. and Advanced Environmental Services, LLC in Texas and Nevada.

Through these companies, Dr. Anderson provides consultation program development and implementation, including such activities as customized training and written health and safety programs, risk assessment, including exposure measurements and assessments, OSHA compliance packages, emergency response plans, confined space entry, and facility/program audits. This includes several contracts providing training to the United States Navy concerning health, safety, management, and confined space entry.

Dr. Anderson also currently works as an Adjunct Assistant Professor at Embry-Riddle Aeronautical University, where he taught in the Graduate level Safety Management and Human Factors departments. He also serves as a Contributing Faculty Member at Walden University, where he teaches undergraduate and graduate-level courses in Environmental Health, and serves as the Chair for approximately 20 Doctoral candidates. In the past, he taught the Respiratory Protection Program Management for the Navy and Marines for a decade, as well as the OSHA Training Institute Southwest Education Center and has been an expert witness in the use of respiratory protection issues. In addition to his teaching, he has published multiple peer-reviewed articles concerning management, safety, and health.

Dr. Anderson obtained his Doctor of Philosophy in Environmental and Occupational Health from the University of Oklahoma Health Sciences Center in 1976. He is a Certified Industrial Hygienist, a Certified Safety Professional, a Qualified Environmental Professional, and a Certified Professional Environmental Auditor. Dr. Anderson's CV is attached as Exhibit A.

Dr. Anderson is expected to testify as to the standards and procedures, including OSHA regulations, applicable to confined space entry and training employees for same. He will provide opinions as to the lack of training provided by Quala and the errors made by Plaintiffs and Intervenors on the night in question. He will further opine as to regulations applicable to waste disposal companies under RCRA and any duties PMNAI may have had pursuant to those regulations. Lastly, Dr. Anderson may provide information concerning the air supply and respiratory protection issues at Quala.

Dr. Anderson may also offer his analysis of opinions expressed by persons called as witnesses by other parties to this proceeding. Additional opinions of Dr. Anderson will be set forth in his deposition, should the parties choose to depose him.

Dr. Anderson has reviewed and/or been provided the following documents and testimony as part of his analysis of this case:

- Deposition testimony of: Wayne Butler, Julianne Butler, Clint Scott, Steven Dodds, Quala (Corporate Representative), Roy Robinson, Kyle Williams, Union Carbide Corporation (Corporate Representative), The Dow Chemical Company (Corporate Representative), PMNAI (Corporate Representative), Michael Bass, Emily Fellows, Jason McDonald, Jason Rodrigues, Joe Doucette, Kirk Butler, Nelson Quiros, Ryan Strikland, Suzanne Hamilton, Teresa Ruelas, Arthur Davis, Cameron Withers, Dee Champine, Dustin Hedges, Elena Fellows, Jim Robbins, and Kenneth Busby;
- PMNA Production: PM000348-413, PM0004128-4374; PM000001-0136; PM0002015-2052;
- Quala Productions (all)
- OSHA files (all);
- Video and photographic evidence of the night of the incident (produced in discovery in this case);
- Expert Report of Robert Richard; and
- Pleadings.

Dr. Anderson's opinions are based on his review of the production and depositions noted above, as well as his experience, knowledge, education, and training as detailed in his CV. He has also reviewed the RCRA and OSHA regulations.

Attachment 1-L

8/4/2025 11:58 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 103965759
By: Davia Ford
Filed: 8/4/2025 11:58 PM

CAUSE NO. 2020-13324

| | | |
|---|---|---|
| CHAUMEIKA BUSSEY, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, AND AS NEXT FRIEND OF JB AND AB, MINOR CHILDREN, *et al.* | § | IN THE DISTRICT COURT OF |
| *Plaintiffs and Intervenors* | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| ALPHA TECHNICAL SERVICES CORPORATION, LC D/B/A QUALA RAIL & SPECIALTY, QUALAWASH HOLDINGS, LLC, STEVEN DODDS, MOBILE MINI TANK AND PUMP SOLUTIONS, INC., UNION CARBIDE CORPORATION, AND THE DOW CHEMICAL COMPANY, | § | |
| *Defendants*. | § | 113TH JUDICIAL DISTRICT |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ........ i

Introduction ........ 1

Summary Judgment Evidence ........ 2

Factual Background ........ 4

A. Dow/UCC Generates Hazardous Waste. ........ 4

B. Carbon Monoxide is produced by VAM and the chemical constituents of Vinyl Acetate Polymer residue waste. ........ 7

C. UCC pulled waste samples with every tanker as a safety issue. ........ 8

D. In April 2019, DOW/UCC begins transporting waste to Performance without pulling samples. ........ 8

E. Performance identifies serious concerns about Dow/UCC's hazardous waste, and Performance stops its own sampling and testing. ........ 9

F. Defendants load, transport, and process hazardous waste. ........ 10

G. The Tanker is loaded with hot, hazardous waste. ........ 12

H. Performance fails to unload all of the hazardous waste. ........ 13

I. A routine cleaning job turns deadly. ........ 14

J. The OSHA investigation reveals the undisclosed presence of carbon monoxide. ........ 15

K. Dow/UCC is the only source of the carbon monoxide that killed and injured these workers ........ 16

L. BB at PM0839 & PM003834-36. ........ 16

Argument and Authorities ........ 18

I. Standard of Review ........ 18

II. Plaintiffs have alleged and substantiated each element of their negligence and negligence per se claims against Defendants. ........ 19

A. All Defendants owed a duty to Plaintiffs to safely transport and handle the hazardous waste transportation and disposal. ........ 19

1. Dow/UCC ........ 19

2. Performance ........ 21

3. Mobile Mini ........ 21

4. Sprint ........ 25

B. Defendants' many breaches contributed to the deadly incident. ........ 26

C. Defendants' negligence can be established through res ipsa loquitur. ... 28

D. The summary-judgment record is replete with proof that Defendants' negligence was the proximate cause of the deaths and personal injuries at issue. ... 29

1. Plaintiffs need only prove that Defendants' negligence was a substantial factor in bringing about the carbon monoxide poisoning. ... 29

2. Expert testimony confirms the existence of fact issues as to causation. ... 31

3. A jury should decide whether Defendants' conduct caused Plaintiffs to be exposed to deadly carbon monoxide. ... 34

4. Dow's argument that it played no role in the incident is indefensible. ... 36

E. Negligence per se. ... 36

III. Defendants' affirmative defenses are inapplicable. ... 37

A. Chapter 82 does not apply ... 37

B. Graves Amendment preemption has no application here. ... 38

C. Sprint's preemption arguments have already been rejected by this Court. ... 40

IV. There is evidence of gross negligence. ... 40

Verification ... 45

Certificate of Service ... 45

TO THE HONORABLE DISTRICT COURT:

Plaintiffs CHAUMEIKA BUSSEY, INDIVIDUALLY, AND AS NEXT FRIEND OF JB AND AB, MINOR CHILDREN, W. TIMOTHY WEAVER, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS AS NEXT FRIEND OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED, FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO (DECEASED), LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINORS, AND CYNTHIA RICHARDSON, and ROY ROBINSON, AND PLAINTIFFS-INTERVENORS SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ANYIA BROWN, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED and KYLE WILLIAMS submit this Response to the various motions for summary judgment filed by Defendants[1], or alternatively motion for continuance under Rule 166a(g), to show the following:

## INTRODUCTION

Plaintiffs were exposed to lethal levels of carbon monoxide when they opened a sealed tank trailer ("Tanker") that should have been emptied of hazardous waste before transporting to Plaintiffs' employer for cleaning. Two of the Plaintiffs' decedents died in the Tanker, and others suffered significant injuries as they tried to save their co-workers. There is no question that the deceased and injured workers were exposed to deadly amounts of carbon monoxide, that carbon

[1] *See* Appendix A (collectively "Motions").

monoxide causes death and serious injuries at those levels, or that carbon monoxide caused these deaths and serious injuries. Carbon monoxide is a known by-product of the hazardous waste chemicals Dow/UCC loaded inside the Tanker before sealing it and sending it off for disposal. All of the Defendants played a role in this catastrophe, yet they each attempt to escape responsibility for their conduct by claiming that Plaintiffs cannot prove their case because Defendants failed to memorialize or record the chemicals in the toxic-soup waste they produced and transported. That has never been the law in Texas, and contrary to Defendants' "no evidence" catch phrase, there is substantial evidence of each and every element of Plaintiffs' negligence, negligence per se, and gross negligence claims. The Motions should be summarily denied.

**SUMMARY JUDGMENT EVIDENCE**[2]

| Exhibit | Document | Context |
|---|---|---|
| A | DEPOSITION OF NELSON QUIROS | Dow employee |
| B | DEPOSITION OF THERESA RUELAS | UCC employee |
| C | UCC'S WASTE CHARACTERIZATION PROFILE FOR VINYL ACETATE POLYMER RESIDUES | UCC008585 |
| D | DEPOSITION OF ZDENEK HEJZLAR, PH.D. | Defense expert |
| E | DEPOSITION OF MARK MITCHELL | Performance Corporate Representative |
| F | AFFIDAVIT OF JOHN CAYIAS, PH.D. (WITH 2023 REPORT AND 2025 SUPPLEMENT) | Plaintiffs' Expert on Chemistry Issues |
| G | DEPOSITION OF OKIKIOLU OLUFOKUNBI | Defense expert |
| H | DEPOSITION OF ROBERT BELLAIR | UCC Corporate Representative |

[2] The exhibits listed above are contained in the *Plaintiffs' Summary Judgment Evidence Notebook* that is being submitted contemporaneously with this response. On July 21, 2025, Plaintiffs filed two summary judgment motions: *Plaintiffs' No Evidence Motion for Partial Summary Judgment on the Dow Defendants' Third-Party Liability Defenses on Carbon Monoxide Source* and *Plaintiffs' No Evidence Motion for Partial Summary Judgment on the Dow Defendants' Defenses.* In appreciation of the Court's time and to avoid repetition, Plaintiffs incorporate the evidence and arguments raised in their motions by reference.

| | | |
|---|---|---|
| I | Deposition of Jason Rodriguez | Dow/UCC employee |
| J | Deposition of Cameron Withers | |
| K | Deposition of Monty Heins | UCC Corporate Representative |
| L | Safety Data Sheets for Acetaldehyde, Acetic Acid, Ethylene Glycol Diacetate, and VAM | UCC002557-2579 |
| M | Deposition of Ryan Strickland | Dow/UCC Technical Advisor (VA-5 Unit) |
| N | Deposition of Emily Fellows | Dow/UCC Production Leader (VAM plant—Texas City) |
| O | Deposition of Elena Labrador | Performance employee |
| P | Performance Materials' Unloading Communication Form | ConfidentialMMTP00008 |
| Q | Deposition of Kirk Beckman | Sprint Corporate Representative |
| R | Tanker placard | Brown 00594 |
| S | Deposition of Jeremy Kupper | Dow/UCC employee |
| T | Incoming Scale Ticket | UCC00010-15 |
| U | UCC's Hazardous Waste Manifest | Mitchell Depo. Ex. 3 |
| V | Deposition of Joe Doucette | Performance employee |
| W | Flash Tank Notice | Sprint-000068 |
| X | Deposition of Clint Scott | Quala supervisor |
| Y | Email from Scott to Ruelas | |
| Z | Deposition of Arthur Davis | Quala Corporate Representative |
| AA | Deposition of Lee Ann Grossberg, Ph.D. | Plaintiffs' Causation Expert |
| BB | OSHA Report | PM003824-3839 |
| CC | Deposition of John Cayias, Ph.D. | Plaintiffs' Chemistry Expert |
| DD | Affidavit of Kyle Williams | Plaintiff-Intervenor |
| EE | OSHA Citation and Notice of Penalty for Vasquez Incident | |
| FF | Defendant UCC's Second Supplemental Answers to Intervening Plaintiff Davion Jarmail Brown's Interrogatory | |

| | | |
|---|---|---|
| | NO. 7 AND REQUEST FOR PRODUCTION NO. 7 | |
| GG | DEPOSITION OF CARL PHILLPOTT | Mobile Mini Corporate Representative |
| HH | MMPT-DOW AGREEMENT | ConfidentialMMTP00071-105 |
| II | AFFIDAVIT AND REPORT OF JANCI CHUNN LINDSAY, PH.D. | Plaintiffs' Toxicology Expert |
| JJ | DEPOSITION OF ROBERT A. RICHARD | Plaintiffs' Safety and Regulatory expert |
| KK | AFFIDAVIT AND REPORT OF ROBERT A. RICHARD, PH.D. | Plaintiffs' Safety and Regulatory expert |

Pursuant to Texas Rules of Civil Procedure 166a(d) and 193.7, Plaintiffs give notice of their intent to use these materials for the purpose of this response. Although the discovery deadline in the April 16, 2025, *Agreed Amended Scheduling Order* ("Scheduling Order") has passed, the parties are continuing to conduct discovery, in particular as to expert witnesses, and the transcripts from many of the expert witness depositions are not yet available. If the Court is not convinced on the strength of the evidence already adduced and included as part of this response, Plaintiffs alternatively move for a continuance under Rule 166a(g) so that they can obtain the depositions transcripts to supplement this response. Appendix B details the deposition transcripts that are still outstanding and what they will show that is "essential to justify [Plaintiffs'] opposition" to the Motions. Tex. R. Civ. P. 166a(g).

## FACTUAL BACKGROUND

### A. Dow/UCC Generates Hazardous Waste.

Defendant Dow/UCC[3] manufactures various industrial chemicals, one of which is Vinyl Acetate Monomer ("VAM"). The manufacturing process of VAM is a corrosive process. Ex. A,

[3] Dow Chemical Company (Dow) and Union Carbide Corporation (UCC) have appeared in this case as separate defendants. UCC has been a wholly owned subsidiary of Dow since 2001. The evidence in this case indicates they operate as the same corporate entity. For purposes of this incident and simplicity in this response, Plaintiffs refer to the entities as Defendant Dow/UCC, unless specific facts warrant otherwise.

Quiros 37:13–38:9. VAM corrodes the pipes and tanks in the VAM plant (known as VA5). Quiros at 28:5:12, 37:13-42:16, 67:4-14. The pipes and tanks used at VA5 are stainless steel, and stainless steel (nickel metal) corrosion leads to waste that includes not only VAM and its by-products, but heavy metals such as chromium, iron, and nickel. Quiros at 67:4-14.

During the VAM manufacturing process, Dow/UCC generates significant hazardous waste. Dow/UCC must continually dispose of this waste. Ex. B, Ruelas at 42-44, 71. Dow/UCC identifies its waste as "Vinyl Acetate Polymer Residues." *See* Ex. C, UCC Waste Characterization Profile for Vinyl Acetate Polymer Residues. Hazardous waste has characteristics that indicate "the waste poses a sufficient threat to merit regulation as hazardous." U.S. Environmental Protection Agency ("EPA"), *Introduction to Hazardous Waste Identification: (40 CFR Parts 261)*, https://www.epa.gov/sites/default/files/2018-05/documents/introduction-to-hazardous-waste-identification.pdf, 5 (Sept. 2005).

To protect human health and the environment, Dow/UCC is required by law to identify and accurately disclose the characteristics of its waste. https://www.epa.gov/compliance/hazardous-waste-compliance-monitoring (last visited July 31, 2025). As the "Generator" of this hazardous waste, Dow/UCC had a duty to follow EPA requirements under the Resources Conservation and Recovery Act ("RCRA") for safe handling of the waste from "cradle to grave"—including properly characterizing the decomposition products in the waste. *See* 40 CFR parts 260-273 (EPA regulations); *see also* Ex. D, Hejzlar at 88; Ex. E Mitchell at 164:5-11 ("Every generator that we receive from has that responsibility to let us know what's in there."); *id.* at 165:11-22; Ex. F, Cayias 2023 Report at 6, ¶ 5.

Therefore, UCC must certify the accuracy of its Hazardous Waste Characterization Profile for Vinyl Acetate Polymer Residues or be subject to "significant penalties (including the

possibility of fine and imprisonment)" for knowingly causing the improper classification and/or disposal of wastes. *E.g.*, Ex. C at UCC008585.

There are a number of chemical byproducts resulting from VAM production. Ex. G, Olufokunbi at 42:8–43:14. And the composition of these constituents in UCC's waste stream as a percentage of this hazardous waste varies greatly. As a result, UCC does not know the exact composition of its waste material at any given time, whether it be concentrations of the expected individual chemicals of the waste or from any unexpected or unintended chemicals. Ex. H, Bellair at 82:18–83:21; 94:25–96:6. UCC describes the polymer residue as the "acetic acid" with "[a]ll the byproducts – all … just the junk, really, because that's what it is. It's acetic acid with junk in it that we can't use in our process, so we have to dispose of it." Ex. I, Rodriguez at 96:9-12. UCC identifies one of these byproducts in its Waste Characterization Form as "Vinyl Acetate Polymer Residue—a hazardous waste that is corrosive, flammable, and has a "High Chromium" content. Ex. C.

UCC sends this hazardous waste "junk"—full of excess heavy metals—into a storage tank and then hauls away the waste in stainless steel tankers. Ex. B, Ruelas at 42-44; Ex. A, Quiros at 33:24-34:18. UCC knows that some of these foreign substances can react with Vinyl Acetate Polymers. For example, chromium can react with Vinyl Acetate Polymers. Ex. A, Quiros at 28:5:12, 37:13-42:16, 67:4-14. Chromium is found in the waste stream as the result of degradation of the tanks. *Id.* at 41:19–42:16. The acid from the VA5 plant process will "sit in the tank and it will pull out some chromium." Ex. J, Withers at 31-32.

UCC uses Vinyl Acetate as the raw material used to link other molecules to form chemicals used in industrial application. When it comes in contact with certain other chemicals, vinyl acetate can react and polymerize. UCC's corporate representative, Monty Heins ("Heins") testified, "You

know, you're definitely avoiding making polymer. Whether it's, you know – like I said, there's different monomers behave differently in terms of their energetic desire to become a polymer." Ex. K, Heins 69:24-70:9. Uncontrolled or runaway polymerization can cause catastrophic accidents. Ex. F, Cayias Aff. To prevent uncontrolled polymerization, UCC adds an inhibitor inhibits the "energetic desire" of the monomer to react with other chemicals and become a polymer. Ex. A, Quiros at 109:7-16; Ex. F, Cayias Aff., ¶ 4. However, inhibitors have a limited shelf life. Ex. A. Quiros at 109:17–110:3; *see also* Ex. F, Cayias Aff. ¶ 4. In other words, the inhibitors lose their effectiveness over time. Therefore, the industry knows and cautions against holding VAM or its waste in vessels for extended periods of time. Ex. F, Cayias Aff. ¶ 4. Heins admitted that "chemistry is not, you know an exact science when it comes to everything falling into place and making everything perfectly like you want it. So even with the right amount of inhibitors, you can still make some vinyl acetate polymer." Ex. K, Heins at 72:24-73:9.

### B. Carbon Monoxide is produced by VAM and the chemical constituents of Vinyl Acetate Polymer residue waste.

Carbon monoxide is one of the byproducts of the VAM manufacturing process. Ex. H, Bellair at 34:2–35:7. As reflected in industry-standard safety data sheets ("SDS"), carbon monoxide is a primary decomposition product of VAM, as well as from the constituents of its Vinyl Acetate Polymer Residue waste, including vinyl acetate polymer, acetic acid, acetaldehyde, and ethylene glycol diacetate. Ex. L, SDS for Acetaldehyde, Acetic Acid, Ethylene Glycol Diacetate, and VAM. Most of the chemicals that represent the bulk of the waste by percentage, such as acetic acid, acetaldehyde and ethylene glycol diacetate, list carbon monoxide as a hazardous decomposition product. *Id.*

### C. UCC pulled waste samples with every tanker as a safety issue.

UCC routinely transports its hazardous waste characterized as Vinyl Acetate Polymer Residue from its Texas City plant to its company-owned plant in Freeport. Ex. B, Ruelas at 46-48, 52-53. A tank truck Loading/Unloading Checklist is done each time vinyl acetate waste goes into an empty tank for safe handling purposes. *Id.* at 56-61 & Ex. 1. UCC also generates a Uniform Hazardous Waste Manifest describing the contents that is sent with the tanker containing the waste to inform shippers, transporters, and receivers as to what is in the tanker for disposal. *Id.* at 58-59.

UCC sends samples of the waste as it was being loaded at Texas City for Freeport, which runs tests on the sample. *Id.* at 46-50. Ryan Stricklind ("Stricklind"), who works as a Technical Advisor for Fellows in UCC's VA-5 unit, also believes that "before 2019 all the way until current" UCC pulls a sample for every single tank trailer that came to get waste. Ex. M, Stricklind at 86:7-20. This was handled by Dow's waste scheduler, Theresa Ruelas ("Ruelas"). Ex. M, Stricklind at 86:7-22.

According to UCC's Emily Fellows ("Fellows"), the Production Leader in charge of the VA5 plant in Texas City today, sampling is what validates the waste characterization. Ex. N, Fellows at 79:18-80:3. She testified that "there is a sample that gets sent with every shipment." *Id.* at 79:18-80:3. She also testified that sampling should be performed "just in case something happened, people would have an idea of what it is and how dangerous it is and how to manage cleanup on it." *Id.* at 183:20-25.

### D. In April 2019, DOW/UCC begins transporting waste to Performance without pulling samples.

Just months before this incident, in April 2019, Dow/UCC began transporting its Vinyl Acetate Polymer Residue waste for incineration to its wholly owned subsidiary, Performance. Performance operates a kiln located at Dow/UCC's facility in Orange, Texas. Ex. E, Mitchell at

7:24. However, contrary to its established practice and recognized duty, Dow/UCC determined that it would ***not*** include samples of its waste sent to Performance in Orange. *E.g.*, Ex. O, Labrador at 72:7-14, 87:12-25, 97:1-101:6 Exs. 9, 10, 11.

When the waste arrived at Performance, however, Performance took its own sample and then tested the waste to avoid dangerous chemical reactions. *Id.* 125:15 -126:16. This testing requires a sample of the waste. *Id.* For the next few months, Performance accepted and incinerated the hazardous waste.

### E. Performance identifies serious concerns about Dow/UCC's hazardous waste, and Performance stops its own sampling and testing.

Some months later, in September of 2019, Performance identified and raised serious concerns with the loads of Vinyl Acetate Polymer Residue transported by Dow/UCC. Ex. O, Labrador at 72:7-14, 87:12-25, 97:1-101:6 Exs. 9, 10, 11. Performance reported receiving shipments of Vinyl Acetate Polymer Residue waste at extremely high temperatures, temperatures in excess of 200 degrees Fahrenheit. *Id.*

Decomposition, along with any potential chemical reaction, depends greatly on the chemical composition of the material, its temperature, and its pressure. Ex. H, Bellair at 82:18–83:21;94:25–96:3. Both Dow/UCC and Performance knew the waste had elevated temperatures that could cause the waste to decompose or react. *Id.* at 82:18–83:21;94:25–96:3; *see also* Ex. O, Labrador at 147.

> Q: So above that temperature, this waste stream gives off vapors, correct?
>
> A: It gives off what? I'm sorry. I didn't hear you.
>
> Q: Vapors.
>
> A: Yes, it gives off vapors that could ignite if an ignition source is introduced in this closed cup.
>
> [objection omitted]

Q: So because these loads are coming in over 200 degrees Fahrenheit, inside the trailer there would be vapors coming off of the load?

A: There would be vapors in the trailer, yes.

Ex. O, Labrador 82:25-83:12.

As a workaround to the temperature issue, Dow/UCC and Performance decided that Performance would stop sampling the hazardous waste. *Id.* at 87:12–88:22, 96; *see also id.* at 72:7-14, 87:12-25, 97:1-101, 6 Exs. 9, 10, 11. As a result, Dow/UCC and Performance stopped sampling waste and stopped running tests on Dow/UCC hazardous waste sent to Orange. *Id.* at 100:23–103:1. From that point forward, neither Dow/UCC nor Performance would be in a position to determine the concentrations of the expected individual chemicals of the waste or any unexpected or unintended chemicals or consequences. *Id.* at 125-26; Ex. H, Bellair at 82:18–83:21;94:25–96:6. And consequently, no one who came into contact with the waste could know what it was, or the dangers associated with it.

**F. Defendants load, transport, and process hazardous waste.**

Dow/UCC outsourced the most hazardous aspects of its hazardous waste disposal. Dow/UCC contracted with Mobile Mini and Sprint to transport its hazardous waste. Sprint is a transport company and dispatching service that provides hazardous bulk liquid transportation to the petrochemical industry.

Dow/UCC routinely reuses dirty tankers to ship its polymer residue waste. Ex. B, Ruelas at 71-72, 111. Dow/UCC had no established policies or procedures for cleaning or washing the tankers. *Id.* at 71-72. Dow/UCC employee Rodriguez testified he rarely loaded waste in clean tankers. Ex. I, Rodriguez 68:22-69:10.

One of these tankers was T-16129, the Tanker where the deadly accident occurred. The Tanker had previously been hauling another kind of waste, called Makrolon Solvent. Ex. LL at

MMTP00008. The Tanker was owned by Defendant Mobile Mini, who hired Quala to clean and inspect it on June 26, 2019. The inspection summary revealed that the Tanker pitting and stains. Ex. LL, at MMTP00008. Mobile Mini then leased the Tanker to Dow/UCC. Dow/UCC used the Tanker repeatedly to move Vinyl Acetate Waste Residue over the course of the next months.

Sprint moves tankers for Dow/UCC. Although Sprint owns around 500 of its own tractor-trailers, and Sprint uses its own vehicles to transport material for its customers 99 percent of the time—in this case, Sprint moved the Tanker owned by Mobile Mini and leased by Dow/UCC. Sprint's corporate representative testified it was highly unusual for Sprint to move a customer's tanker like this, it was that such instances constituted just one percent or less of their work. Ex. Q, Beckman at 24-25. Nonetheless, "[f]or this particular trailer which had a residue of a hazardous material on it, we would need what is legally defined as a hazmat shipping paper and the trailer would need to have placards on it and that's all that's required." *Id.* at 16:6-13; *see also* Ex. R, Tanker placard (Brown 00594). Before Sprint moved the Tanker with Dow/UCC waste, Sprint did not investigate or inspect its condition.

Similarly, Dow/UCC did not investigate the Tanker's history. Ruelas said she thought it had been loaded five or six times with VA polymer, but "from loads past that—I don't believe that we got a lot of information because it was so long." Ex. B, Ruelas 154:2-9. If Sprint or Dow/UCC had investigated and reviewed the inspection form, they would have known that the Tanker could have previous issues. And the June 2019 inspection form for the Tanker also indicated that: "***Over time, trace amounts of last contained may leach out of shell or rust remaining in the container***." Ex. P, MMTP00008 (emphasis added). But Sprint, Mobile Mini, and Dow/UCC went ahead and put the Tanker into service to haul Vinyl Acetate Polymer Waste residue for Dow/UCC.

For the next five months, Dow/UCC repeatedly loaded and unloaded the Tanker with heated Vinyl Acetate Polymer Waste residue. Dow/UCC delivered the hot waste either to Freeport or to Orange. The Tanker transported some five hot loads of corrosive vinyl acetate polymers, without maintenance or inspection. *E.g.*, Ex. B, Ruelas 106:5–113:7 & Ex 14.

Corrosion breaks down and destroys the stainless steel. *E.g.*, Quiros at 37:13-38:19, 41:19-42:16; 67:4-68:10, 79:21-80:17. The life of tanker is directly related to corrosion. Plaintiffs allege that the Tanker was used in a manner inconsistent with its intended purpose and manufacturer guidelines. The Tanker is a DOT 407 stainless steel tank trailer that is only rated for up to 250°F, Ex. R, Tanker placard (Brown 00594), Ex. F, Cayias 2023 Report at 2, Dow/UCC was loading waste that reached temperatures in excess of 250°F and with chemicals in excess of the reported and expected composition. Labrador at 75:16–76:10, 81-82 Labrador at 72:7-14 & Ex. 9. Defendants failed to verify the waste's exact composition, loading temperature, or the condition of the trailer, including whether it was already corroded. *See* SOF§G.

**G. The Tanker is loaded with hot, hazardous waste.**

On November 18, 2019, Dow/UCC loaded and sealed the Tanker with 44,870 lbs. of hazardous waste at its VAM facility. Ex. I, Rodriguez at 17:2 to 18:14. Dow/UCC "load[s its] waste hot" and does not do anything to specifically cool it down" before transporting it. Ex. N, Fellows at 171:18–182:13; Ex. S, Kupper at 111:18–112:2, 112:22–113:2. Dow/UCC does not take account of the temperature of the trailer after it is loaded and does not monitor it. Ex. S, Kupper at 115:12–116:4. Ex. T, Incoming Scale Ticket.

Sprint then transported the Tanker to Performance still under seal. Ex. U, Dow/UCC's Hazardous Waste Manifest (Mitchell Ex.3). Neither Dow/UCC nor Performance sampled or identified what exactly was placed in the tanker. Performance's Unloading Communication Form (PM 0008). Upon arrival, Performance did not sample or test the waste, even knowing that high

temperatures create vapors and potential dangerous chemical reactions. Performance also failed to record the temperature upon arrival at its facilities. Ex. LL.

**H. Performance fails to unload all of the hazardous waste.**

When Sprint picked up the hazardous waste on December 2, 2019, to deliver to Performance's waste disposal kiln in Orange, the scaled weight of the Tanker was 44,870 pounds. Ex. T at UCC00010. When Sprint delivered it to Performance on December 10, 2019, the weight ticket for the same load was 44,320 pounds—a difference of approximately 550 pounds.

Performance extricated most of the hazardous waste but failed to empty the Tanker. Ex. K, Heins at 30:23–c31:9. Only 44,220 pounds of hazardous waste were recorded as disposed. The remaining amount of hazardous waste, sometimes referred to as the "heel,"[4] was some 100 to 650 pounds of hazardous Vinyl Acetate Waste residue left in the Tanker. Defendants should have known that the Tanker had a sizeable, dangerous heel—contrary to Performance's practice that tankers are not released unless the residue was three pounds, or less. Ex. V, Doucette 92:7-10. The "concern for the amount of material in the heel is that organic material that's in the probably heel has a much higher absorption coefficient for [carbon monoxide] than in the air, so in terms of a source of CO being stored somewhere if it was being generated, that volume would become an important issue. Ex. CC, Cayias at 69:14-19.

Around this same time, Defendants received notification that Flash Tank—the company that had been performing the ultra-hazardous job of manually cleaning the confined space of its tankers—would not "wash waste corrosive liquid – acetic acid." Ex. W, Sprint-000068. As a result, Defendants diverted the Tanker to Quala.

---

[4] A heel is defined by law as "any material remaining in a tank following unloading, delivery, or discharge of the transported cargo. Heels may also be referred to as container residue, residual materials or residuals." 40 C.F.R. §442.2.

Dow/UCC then allowed the Tanker to sit for another 11 days at the Orange Facility before directing Sprint to pick it up on December 13, 2019, for further transportation to Quala for cleaning. Sprint's driver delivered the Tanker to Quala with the Hazardous Waste Manifest but did not inform Quala of the weight discrepancy or provide the weight ticket, or warn that there was a substantial, dangerous heel of chemical waste.

On December 16, 2019, Clint Scott ("Scott"), a Quala supervisor, attempted to inspect the Tanker and noted that the pressure in the supposedly empty tanker was 10 psi. Ex. X, Scott at 51:5-13, 161:21–62:15. Pressure is a sign of a chemical reaction, and Dow/UCC does not load a full tanker with more than nine pounds of pressure. Ex. I, Rodriguez at 101:22–102:7. Scott advised Dow/UCC's Ruelas of the pressure reading. Ex. V. Doucette 96:1-11 ("It is important to make sure all of the liquid is out of the trailer because the trailer can only have 180 lbs. in it.").

The next day, Mobile Mini confirmed the cleaning and wash order with Quala for the Tanker. But the Tanker sat in a trailer parking lot under seal for a few more weeks under these dangerous conditions. Ex. X, Scott at 51:5 to 51:13 and 161:21 to 162:15; Ex. Z, Davis at 246:5–248:2.

**I. A routine cleaning job turns deadly.**

On December 28, 2019, workers opened the Tanker. Ex. K, Heins at 26:22–27:8; Ex. K, Scott at 161:21–162:15. The entire events that transpired leading to the deaths of the two men and serious injury of many others played out on numerous video angles captured by security cameras.

Plaintiff-decedent Sidarieus Lozano ("Lozano") opened the Tanker for the first time since it had left Dow/UCC. Ex. K, Heins at 26:22 to 27:8; Ex. X, Scott at 161:21–162:15. Lozano became overcome by carbon monoxide and became unresponsive. Ex. AA, Grossberg at 35:17 to 35:21. Plaintiff-decedent Shawn Brown ("Brown"), along with Plaintiff Roy Robinson ("Robinson") and Intervenor Kyle Williams ("Williams") and other fellow Quala employees,

attempted to retrieve Lozano from the Tanker but were unsuccessful. Within minutes of Lozano entering the inside of the Tanker, he died from asphyxiation from carbon monoxide. Ex. AA, Grossberg at 14:11–14:15; 51:24–52:19; 56:21–57:21. Soon after, Robinson entered the tanker to rescue Lozano, he quickly passed out. Next, Brown entered and after helping to remove Robinson, he too became incapacitated inside the tank and eventually died. It is undisputed that both Lozano and Brown died from caron monoxide exposure. Ex. Z, Davis at 246:5—248:2; Ex. AA, Grossberg at 57:15–58:7.

**J. The OSHA investigation reveals the undisclosed presence of carbon monoxide.**

Following the incident, OSHA conducted an investigation. *E.g.*, Ex. B, Ruelas Ex. 3. The printout downloaded from the gas detection meter indicated 2,000 parts per million of carbon monoxide. Ex. BB at PM003835. OSHA's investigation also revealed that the Tanker contained significantly more chemicals than were recorded on the hazardous waste disclosures. *Id.* at PM003834-36. OSHA concluded that the "the presence of carbon monoxide or chemicals that can induce carbon monoxide toxicity was not reported in transportation documents required under the Resource Conservation and Recovery Act." *Id.* at PM003829.

OSHA tested the respiratory cartridges (the facemask used to breath in the atmosphere inside the Tanker) worn by Lozano and found the presence of acetaldehyde, acetic acid, and ethylene glycol diacetate (among numerous other substances)—these three make up a significant portion of vinyl acetate waste that Dow/UCC and Performance were attempting to transport and dispose in the Tanker. *Id.* at PM003834.

### K. Dow/UCC is the only source of the carbon monoxide that killed and injured these workers

The Tanker was opened by Lozano (on video) for the first time since Dow/UCC loaded the Tanker with misleadingly characterized hazardous waste. Ex. K, Heins at 26:11 to 27:8. The findings on Lozano's respirator is telling in that it shows that:

- the Tanker was ***not*** empty when he entered it;
- he was exposed to the Dow/UCC's hazardous waste that emitted carbon monoxide gas; and
- the inside of the tanker contained numerous other chemical compounds not listed on the transportation documents circulated by Dow/UCC, Sprint, and Mobile Mini to Quala and its employees that indicated a chemical reaction.

Ex. BB at PM003829, PM3834-36/

### L. BB at PM0839 & PM003834-36.

Dow/UCC's corporate representative and their expert, Zdenek Hejzlar ("Hejzlar"), both testified that they had no evidence that Quala or any of its employees had anything to do with carbon monoxide being inside the Tanker. Ex. D, Hejzlar at 93:25-94:17. Dow/UCC's corporate representative, Heins, admitted that the carbon monoxide did not come from Quala:

> Q: What about with regard to all that evidence that you've reviewed in preparation for this deposition, or you know, in your preparation as corporate representative in any of that evidence, ***have you seen any source of the carbon monoxide or H2S that was inside that tank trailer at the time that would have come from Quala?***
>
> A. ***I have not***, Matt. You know, I do not -- you know, where that carbon monoxide or hydrogen sulfide came from is really a head scratcher. It's pretty, pretty mysterious. But ***I do not have any source from Quala, that I'm aware of***.

Ex. K, Heins at 26:22 to 27:8 (emphasis added); *see also* Ex. CC, Cayias at 165:4–166:10; 159:16-160:24.

Defense expert Hejzlar agreed there is no evidence that this specific tank was opened prior to the moment it was opened on video. Ex. D, Hejzlar at 93:25-94:17. It is also undisputed that Brown and Lozano both died of acute carbon monoxide poisoning, Ex. AA, Dr. Grossberg at 57:15 to 58:7, and Robinson and Williams and the other men suffered serious toxic effects of carbon monoxide poisoning, *id.*; *see also* Ex. DD.

Despite the lack of any evidence that Quala was the source of the carbon monoxide, Defendants now blame Quala for the accident. Yet notably, they continued to use Quala for cleaning stainless steel tanks used to carry hazardous waste, until a similarly deadly accident occurred in 2023. Ex. EE, OSHA Citation and Notice of Penalty for Vasquez incident.[5] On December 23, 2023, another Quala worker, Carlos Vasquez, died from carbon monoxide poisoning inside a tanker. That accident involved the same type of tanker, same type of Dow/UCC waste, and temperatures as in this case. *Id.*

The month after this fatal incident, Dow/UCC decided to change the way it characterizes its VAM waste on its Uniform Hazardous Waste Manifest form to add the word "Hot" to Box 9b.1 of the form. *See* Ex. FF, Second Supplemental Answers to Intervening Plaintiff Davion Jarmail Brown's Interrogatory No. 7 and Request for Production No. 7 to Defendant Union Carbide Corporation.

The carbon monoxide can only be explained by the Dow/UCC hazardous waste that was placed in the sealed Tanker at Dow/UCC's facility, transported to Performance where it was not entirely emptied, and then transported to Quala where the Tanker was finally unsealed after weeks of sitting. The combined effect of the high temperatures of the toxic waste and length of time it

---

[5] The Court has previously granted Plaintiffs' motion to compel and, on December 26, 2024, ordered UCC to answer discovery about the 2023 incident that killed Mr. Vasquez.

was left in the Tanker is the only explanation for the existence of 2,000 ppm of carbon monoxide—the substance that killed Lozano and Brown and seriously injured Robinson and Williams when they tried to save their co-workers.

## ARGUMENT AND AUTHORITIES

### I. Standard of Review

A court addressing a no-evidence motion must view the evidence in the light most favorable to the nonmovant and must indulge every reasonable inference and resolve all doubts in favor of the nonmovant. *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 311 (Tex. 2002) (per curiam). A fact issue arises when a nonmovant's evidence provides a basis for conflicting inferences. *Randall v. Dall. Power & Light Co.*, 752 S.W.2d 4, 5 (Tex. 1988) (per curiam). When the evidence enables "'reasonable and fair-minded people to differ in their conclusions,'" summary judgment is improper. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

With no-evidence motions in particular, a nonmovant need not marshal its proof but need "only identify more than a scintilla of evidence raising a fact issue on the challenged element" to defeat a no-evidence motion for summary judgment. *Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 241 (Tex. App.—Houston [14th Dist.] 2002, no pet.). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Nardini v. Cont'l Airlines, Inc.*, 60 S.W.3d 197, 200 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). Here, Plaintiffs offer much more than the scintilla required to raise a genuine issue of material fact as to causation.

## II. Plaintiffs have alleged and substantiated each element of their negligence and negligence per se claims against Defendants.

The elements of negligence are a duty that is breached and is the proximate cause of damages. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 & n.24 (Tex. 2022) (citing *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998)).

### A. All Defendants owed a duty to Plaintiffs to safely transport and handle the hazardous waste transportation and disposal.

Vinyl Acetate Polymer Residues are flammable (and combustible products) and produce carbon monoxide. VAPR SDS, pg. 5, Section 5: Firefighting Measures. UCC's expert, Hejzlar, testified that Dow/UCC and all the Defendants in the chain had a continuing duty and responsibility to ensure safe handling of this hazardous waste:

> Q. This EPA's Cradle-to-Grave Hazardous Waste Management Program, that's applied to the generator of this waste, correct?
>
> A. Correct. It's ***[the] generator and all the people in the chain that handle it***.
>
> Q. And it says, "cradle to grave" meaning ***from the time it is created, while it is transported, treated, and stored, and until it is disposed***?
>
> A. ***Correct***.
>
> Q. Okay. And you're saying that abide to [sic] Union Carbide?
>
> A. Yeah, they were the RC -- RCRA of hazardous waste generators; and, also, they had responsibilities associated with what happens to that waste until it's disposed of.

Ex. D, Hejzlar at 88:20-89:9 (emphasis added); *see also* Ex. CC, Cayias at 132:22-133:18. Safe handling, includes, at a minimum, disclosing the chemical makeup of the hazardous waste to "all the people in the chain that handle it."

#### 1. Dow/UCC

Dow/UCC in particular had a duty to follow EPA requirements under the RCRA for the proper characterization of the hazardous waste it created. *See* 40 C.F.R. parts 260-273 (EPA

regulations for hazardous waste); *see also* Ex. F, Cayias 2023 Report at 5. As Generator of the hazardous solid wastes, Dow/UCC was required to "make an accurate determination as to whether that waste is a hazardous waste in order to ensure wastes are properly managed according to applicable [RCRA] regulations." 40 C.F.R. § 262.11. Dow/UCC's proper waste management is essential to society's public and environmental health. https://www.epa.gov/compliance/hazardous-waste-compliance-monitoring (last visited July 31, 2025) ("Proper waste management is an essential part of society's public and environmental health.") As part of this obligation, Dow/UCC had to provide shipping information for the hazardous waste that identified its constituents. 49 CFR §§ 172.202, 172.205(a)-(b). Dow/UCC was consciously aware of the possibility that carbon monoxide was a decomposition byproduct for the hazardous waste it produced from the VAM process. Ex. H, Bellair at 34:2—35:7, 24:15-28:1, 42:20-43:4 (UCC's corporate representative agreeing that the byproducts from the Vinyl Acetate process include carbon dioxide, carbon monoxide, acetaldehyde, and three different waste streams). As a result, Dow/UCC had a duty to list carbon monoxide as a decomposition byproduct on its SDS. Ex. F, Cayias 2023 Report at 6 ¶¶ 6-7.

Dow/UCC also had a duty to ensure that the trailers used to transport the hazardous waste were fit for that purpose. It was Dow/UCC's sole responsibility to maintain the mechanical integrity of the trailers provided once it was delivered to them. Ex GG, Phillpott at 63, 78.

Finally, although Dow/UCC claims that it delegated its duties to third parties, "[a] duty imposed by law on the basis of concerns for public safety is non-delegable." *Edwards v. Hammerly Oaks, Inc.*, 908 S.W.2d 270, 273 (Tex. App.—Houston [1st Dist.] 1995), *aff'd as modified*, 958 S.W.2d 387 (Tex. 1997) (citing *MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 153 (Tex. 1992)). That means "the party to bear the duty so imposed . . . cannot avoid its responsibility by

delegating it to another not so expressly identified" by the law. *In re Gamble*, 676 S.W.3d 760, 785 (Tex. App.—Fort Worth 2023, pet. denied). And even "[i]f he does assign to another the responsibility for performing such a duty, he remains liable for any negligence in" its performance. *Collins v. Vivanco*, 603 S.W.3d 843, 848 (Tex. App.—El Paso 2020, no pet.) (internal quotation omitted). Likewise, the federal duties to safely dispose of hazardous waste are nondelegable. *See, e.g.*, *Park v. Burlington N. Santa Fe Ry. Co.*, 133 Cal. Rptr. 2d 757, 768 (Cal. Ct. App. 2003) (manufacturer had nondelegable duty "to see that the waste [was] properly disposed of," and it could not avoid that duty by hiring the third party as a contractor to carry out the disposal work).[6]

**2. Performance**

As the facility that was supposed to have fully disposed of the hazardous waste from the Tanker, Performance had a duty to identify and sample what it was handling. In fact, that was Performance's practice before Dow/UCC convinced it to do otherwise. *See* SOF§E.

Performance expressed concerns to Dow/UCC about the "hot" vinyl waste shipments coming in at a temperature in excess of 200 degrees Fahrenheit underscoring that Performance understood its duties. Ex. O, Labrador at 72:7-14, 87:12-25, 97:1-101:6 Exs. 9, 10, 11. Yet, Performance failed to determine the Tanker's temperature and waived sampling. Ex. P, PM000008

**3. Mobile Mini**

Mobile Mini also had a duty to ensure that its Tanker used to transport the hazardous waste was fit for that purpose and that it complied with the EPA regulations governing transportation of

[6] In *Park*, the defendant escaped liability because a third party had packed the batteries in the drums that enabled the explosion to occur. *Park v. Burlington N. Santa Fe Ry. Co.*, 133 Cal. Rptr. 2d 757, 770 (Cal. Ct. App. 2003). In contrast, here, it is undisputed that Dow/UCC packaged the waste itself, and no one touched it until the day of the accident.

hazardous wastes, including but not limited to 49 C.F.R. § 173.33 et seq. and 49 C.F.R. § 180.407 et seq.

Mobile Mini also assumed specific duties and responsibilities under its contract with Dow/UCC, including but not limited to:

- § 6.5(a): representation that Mobile Mini had the requisite expertise to perform the hazardous waste transport services subject to their agreement.
- § 6.6(a): obligation of Mobile Mini "to inform Dow … of any significant unusual occurrences by Dow, Dow Affiliates, and/or others under the Agreement, including changes in waste amounts and unusual waste treatment."
- § 6.6(b): requiring Mobile Mini to make all required transportation arrangements
- §§ 10.1 and 20.1: Mobile Mini "shall…abide by all applicable laws, regulations, ordinances…;"
- Ex. A: Mobile Mini will ensure compliance with all appropriate regulations and Dow procedures;
- Ex. A, Section II-Responsibilities: Contractor is responsible for "[m]aintaining the mechanical integrity of all supplied equipment to manufacture's recommendations;"
- Ex. A, § 1.4: requiring that equipment supplied by Mobile Mini must be empty and "clean" prior to being delivered to a Dow location; "clean" meaning, "[u]nit must be free of water, free of any concernable visible particulate, and well-drained. In addition, all tanks, boxes, and tank trailers must be stain-free, vapor-free, and dry." *Id.* § 2.13;

Ex. A, § I.9: providing that Mobile Mini and Dow "will work together…by to managing residual product left in trailers;"

- Ex. D, § 6(1)(b): Mobile Mini "shall inform Dow…of any suspected non-conforming Waste…; and
- Ex. D, § 9(a): Mobile Mini may refuse to accept the shipment or revoke its prior acceptance, in the event that any shipment is discovered to be non-conforming.

Ex. HH, MMTP00070-105.

Further, because Mobile Mini was in a position to stop Dow/UCC from using its Tanker if it knew Dow was using it inconsistently with the manufacturer's recommendations, Agreement Ex. D, § 9(a), it had a duty to exercise that right. Ex. GG, Phillpott at 64.

Independently, Mobile Mini, as owner of the Tanker, was subject to regulations of the U.S. Department of Transportation ("DOT"). Prior to the tragic incident, in June of 2019, Mobile Mini was notified that the Tanker showed evidence of corrosion and pitting:

***Cleaning Certificate (Billing Copy)***

Generator: Covestro LLC

| **Inspection Summary** | Yes | No | Initials | Date |
|---|---|---|---|---|
| Exterior free from all cargo and contamination | ☑ | ☐ | CS | 6/26/19 |
| Entry made into tank by inspector | ☑ | ☐ | CS | 6/26/19 |
| Interior free from odor | ☑ | ☐ | CS | 6/26/19 |
| Interior free from all cargo and contamination | ☑ | ☐ | CS | 6/26/19 |
| Interior free from corrosion and pitting (attach explanation, if necessary) | ☐ | ☑ | CS | 6/26/19 |
| Interior dry | ☑ | ☐ | CS | 6/26/19 |
| Valves/Fittings free from all cargo and contamination | ☑ | ☐ | CS | 6/26/19 |
| Manlid seal/Dip-tube free from all cargo and contamination | ☑ | ☐ | CS | 6/26/19 |
| Stencils / placards correct | ☑ | ☐ | CS | 6/26/19 |
| Other equipment cleaned: #____ Type ____ | ☐ | ☑ | CS | 6/26/19 |
| Car has been made load ready | ☐ | ☑ | CS | 6/26/19 |

The above referenced container has been cleaned and/or triple-rinsed to a level suitable for change of service and meets the empty standards of both RCRA and the Department of Transportation.

Over time, trace amounts of last contained may leach out of shell or rust remaining in the container. These may not appear on meter testing performed after cleaning. Temperature changes may cause moisture accumulation and/or condensation after container has been sealed. For non-railcars, container manway and ball valve may be left open to facilitate drying/cooling, and transporter is responsible for properly securing the equipment prior to leaving the yard.

Comments TANK HAS PITTS AND STAINS

Certified By Clint Scott Clint Scott 6/26/19

Signature Print Name Date

Ex. P at MMTP0008 (highlighting added). Mobile Mini had a duty to pull this Tanker out of service and/or not put it into service with the corrosive, Vinyl Acetate Polymer Residues. 49 CFR §§ 180.407(a)(1)&(b)(1).

Mobile Mini allowed Dow/UCC's continued use of the Tanker, without question or inspection, for more than five months before the incident. Ex. Mobile Mini's Interrog. Ans. No. 5; *see also* Beckman at 31:3-11, 31:20-32:19. When Dow/UCC wanted the Tanker cleaned, Dow/UCC requested that Mobile Mini engage the cleaning company. Mobile Mini's Interrog. Ans. No 8. Teresa Ruelas testified that Mobile Mini had a say in the choice of Quala:

> Q: Okay. So does ETS or, in other words, Mobile Mini have kind of a say in who cleans their tanks?
>
> [objection omitted]
>
> A Yes.
>
> Q: Okay. And they wanted to use Flash Tank Services.
>
> [Objection omitted]
>
> A: Right.

Ex. B, Ruelas 139:17-25.

Quala sent the invoice for the cleaning to Mobile Mini and the invoice was paid by Mobile Mini. *See* Mobile Mini's Ans. to Interrog. 8. It is of no consequence that Mobile Mini argues (without evidence) that it then obtained some sort of reimbursement from Dow/UCC.

### 4. Sprint[7]

Sprint is in the business of transporting hazardous waste materials. Ex. Q, Beckman 54:18-21. As such, Sprint agrees it is required to follow the Hazardous Materials Transportation Act laws and regulations. Sprint's corporate representative agrees that a hazardous waste is a material that has been determined to pose an ***unreasonable risk*** to people or the environment. *Id.* at 82:14-83:1. Sprint had a duty to ensure that the Tanker it consigned to transport Dow's hazardous waste was fit for that purpose and that it complied with the EPA regulations governing transportation of hazardous wastes, including but not limited to 49 C.F.R. § 173.33 et seq. and 49 C.F.R. § 180.407 et seq. Sprint knew that it had a duty to the safety of the general public, including the men who cleaned the Tanker, from "cradle to grave." These duties applied to "***[the] generator and all the people in the chain that handle it***." Ex. D, Hejzlar at 88:20-89:9. As one essential link in the process of disposing of the waste, Sprint had a duty when transporting this hazardous waste.

Sprint's corporate representative agreed that he personally researches customer requests to transport materials and then lets "dispatch know what type of trailers this particular request could be hauled in." Ex. Q, Beckman 124:25-125:6, 49:2-51:15. Despite this duty, Sprint did not investigate the Tanker's history, its problems with corrosion and pitting, and the fact it was not safe for hauling this particular corrosive waste. Sprint turned a blind eye to these facts, simply because its position was that it did not outright own the Tanker and was just doing Dow/UCC's bidding. *Id.* 31:3-11, 31:20-32:19. But when transporting materials that create an unreasonable

---

[7] Sprint's first Traditional and No Evidence Summary Judgments have already been heard and denied by the Court, and Plaintiffs incorporate by reference here any additional evidence and arguments previously raised in their response.

risk, this abnormal set of circumstances should have heightened—not negated—Sprint's responsibilities.

Similarly, Sprint was alerted to issues with this job when, prior to this incident, Sprint notified Teresa Ruelas at Dow/CC that Flash Tank Services, Inc. were no longer accepting this hazardous waste because "they do not wash waste corrosive liquid-acetic acid." Ex. W at Sprint-000068. Sprint again ignored this fact.

**B. Defendants' many breaches contributed to the deadly incident.**

The breaches started with Dow/UCC arranging for the transport of its hazardous waste at high temperatures—in excess of 200 degrees Fahrenheit from its plant to its subsidiary Performance. SOF§G. The high temperatures enhanced the decomposition of the hazardous waste. Ex. F, Cayias 2023 Report at 6 ¶ 4. Here again, the exchange between Dow/UCC and Performance about this very issue is proof that these Defendants were not complying with their obligations. And to make matters worse, Dow/UCC's proffered solution was that neither should bother sampling. SOF§§E&F.

Dow/UCC's Uniform Hazardous Waste Manifest—the document that accompanied the Tanker and disclosed to Performance and every other handler in the chain of the Tanker's custody—failed to comply with its duty to adequately identify the toxic substances and dangers. It identified only:

> **UN2920, Waste Corrosive Liquids, Flammable, N.O.S. (Acetic Acid, 1,2-Ethanediol), 8(3), PGII, RQ (D001, D002)**

Dow/UCC Waste Manifest. Dow/UCC did not adequately identify the hazardous waste and did not indicate that the load was "Hot." *Id.* Dow/UCC also failed to identify all of the decomposition products in its hazardous waste, in particular, the 79 ppm of hydrogen sulfide that was generated from their hazardous waste that it shipped to Performance and, subsequently, to Quala. *Id.*

Performance accepted this load and did not sample any of the contents before disposing of most, but clearly not all, of the hazardous waste. SOF§G. Further, weight indications showed that there was likely (and in fact there was) a "heel" still left in the Tanker. SOF§H. Yet Performance Materials, Dow/UCC, and Sprint worked together to facilitate the Tanker's transport to Quala for cleaning, rather than arranging for the required inspections and testing. SOF§H. Once Mobile Mini was notified that its Tanker had signs of pitting and corrosion, the Tanker should have been taken out of service. Defendants breached their statutory and common law duties in taking the alternative course that led to tragic, but avoidable, circumstances.

Further:

- All of the Defendants were acutely aware that the hazardous waste they were creating, transporting, and disposing would produce carbon monoxide, and that process would be enhanced by time and temperature, yet they allowed hot waste to be loaded into a stainless steel Tanker.
- Defendants did not measure the temperature of the waste even after acknowledging they loaded it "hot:" "I don't have any data because Union Carbide did not measure the temperature, and they should have. I mean, it's a regulatory requirement. So, you know, they just can't fly by the wing and say, well, I know it's received at this temperature … we don't know. I don't know. They don't know. Ex. JJ, Richard at 48:8–49:1; *see also* Ex. KK, Richard report.
- Defendants reused the "dirty" Tanker and ignored warnings that the Tanker could have corrosion or pitting that would further lead to reactivity that could create toxic carbon monoxide.

- Mobile Mini had the right to refuse Dow/UCC the use of the Tanker under their contract, *see* part II.A.3, but Mobile Mini never attempted to do so.

### C. Defendants' negligence can be established through res ipsa loquitur.

The res ipsa loquitur doctrine applies when the way in which an accident occurs furnishes circumstantial evidence of the defendant's negligence. *Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 583 (Tex. 2023). The classic example of a case that "invites res ipsa loquitur treatment" is when a foreign object is left inside a patient after surgery. *Id.* at 583 (internal quotation omitted). Res ipsa loquitur may apply when it is impossible for the plaintiff to determine the sequence of events, or when the defendant has superior knowledge or means of information to determine the cause of the accident. *Id*.

The doctrine of res ipsa loquitur is not a rigid or arbitrary formula, but a rule that adjusts to circumstances and peculiar facts of each specific case. *See Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 251 (Tex. 1974).

Plaintiffs can—and do—rely on inferences based on the doctrine by establishing, by a preponderance of the evidence, two factors:

> 1. The character of the incident is such that it would not ordinarily occur in the absence of negligence; and
>
> 2. The instrumentality causing the injury is shown to have been under the management and control of the defendant.

*Schindler Elevator Co.*, 670 S.W.3d at 583. "The first factor is necessary to support the inference of negligence and the second factor is necessary to support the inference that the defendant was the negligent party." *Mobil Chem. Co.*, 517 S.W.2d at 251.

Both elements of res ipsa loquitur are met here. Undisclosed lethal levels of carbon monoxide would not have been present in the Tanker in the absence of negligence. *See* SOF§§K;

*see also* Ex. F, Cayias Aff. ¶ 6. And the instrumentality causing the injury was under the exclusive management and control of the Defendants, who were responsible for the safe handling, transportation, and disposal of this hazardous waste. In particular, by failing to collect and retain samples of the hazardous waste that was actually in the Tanker, Dow/UCC and Performance—in dereliction of their regulatory and common-law duties—prevented anyone from being able to determine the exact reaction that took place in the Tanker that produced the carbon monoxide at the levels that existed. Ex. F, Cayias Aff. ¶ 8.

**D. The summary-judgment record is replete with proof that Defendants' negligence was the proximate cause of the deaths and personal injuries at issue.**

**1. Plaintiffs need only prove that Defendants' negligence was a substantial factor in bringing about the carbon monoxide poisoning.**

The Court is presumably well familiar with the standard for proximate cause, which is the actual burden that Plaintiffs will bear at trial:

> "Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

PJC 2.4; *see also Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 158 (Tex. 2022). "The two elements of proximate cause are cause-in-fact and foreseeability." *Id*. (citing *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). "Cause-in-fact" itself has two components and is established if "(1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred." *Id*. (citing *Gunn*, 554 S.W.3d at 658). "Courts refer to these two components [of cause-in-fact] as 'substantial factor' causation and 'but for' causation." *Id*.

In situations where the deaths and personal injuries occurred as a result of exposure to a known toxin like carbon monoxide, extensive scientific, *Havner*-based analysis involving consideration of scientific studies is not necessary. *E.g.*, *Peterson v. Midstate Env't Servs., L.P.*, No. 10-16-00162-CV, 2019 WL 91587, at *4 (Tex. App.—Waco Jan. 2, 2019, pet. denied) (mem. op.) (allowing case to go forward, despite a lack of expert causation evidence, because immediate respiratory and skin reactions after exposure to spilled chemicals raised a material fact on causation). In a concurring opinion, Chief Justice Gray explained:

> Scientific studies are required when a plaintiff is trying to establish a connection between exposure to a specific chemical and a specific injury; normally a specific disease or defect like asbestosis, silicosis, mesothelioma, other types of cancer, or birth defects. Those cases normally involve exposure to various chemicals, over a long period of time, at varying levels, and for which the symptoms do not immediately manifest but rather take months, if not years, to cause even the first symptom. In response to the need to establish causation in that type of case, courts have laid out a framework of what scientific evidence is necessary to be considered reliable evidence of causation. But that is not the type of damages Peterson seeks. Rather, she seeks property damage and personal injury damages as a result of the immediate onset of breathing difficulty, skin irritation, and other injury directly related to the event. Midstate is certainly entitled to defend itself by arguing that Peterson's expression of respiratory distress and skin irritation is exaggerated or not credible and that used motor oil could not have caused those type symptoms, but that may only raise the question: "Well, then what were you hauling that damaged the painted surface of an automobile?"

*Id*. at *8; *see also Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007) ("[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence," such as when lay testimony "establish[es] a sequence of events which provides a strong, logically traceable connection between the event and the condition").

### 2. Expert testimony confirms the existence of fact issues as to causation.

Like *Peterson*, the immediate deaths and injuries in this case were indisputably caused by exposure to lethal amounts of carbon monoxide. SOF§§I-K. That should be enough to demonstrate a triable issue of fact. But Plaintiffs do not simply rely on lay experience. Their expert, John Cayias, Ph.D. ("Cayias"), testified that the chemicals inside the Tanker generated carbon monoxide:

> Q: … We set aside some things that you agree you don't know about. How did this -- how did the carbon monoxide get in what you call the tank wagon?
>
> A: My opinion is is that the carbon monoxide was generated inside the tank wagon because of the chemicals that were present in the tank wagon.

Ex. CC, Cayias at 33:19-25.

Dr. Cayias explained that in the atmosphere inside the Tanker when it was opened at Quala, there was a chemical reaction that produced carbon monoxide, and the chemicals that Dow/UCC and Performance introduced into the Tanker advanced the chemical reactions that produced the toxin:

> Q: … So if there's a nitrogen blanket on the waste material in the tank wagon and the waste material in the tank wagon is in a liquid state, how -- how does the chemical reaction occur, this oxygenation occur in the presence of that nitrogen blanket?
>
> A: Well, because it's a nitrogen blanket, you're in an oxygen reducing environment.
>
> Q: Right.
>
> A. And so the -- the most likely result if there is the combustion, which there evidently was based on the analysis when the wagon was opened, the reaction has to be a chemical reaction and a reducing environment which produces the [carbon monoxide] CO.
>
> Q Okay. Did -- did you discount the fact that any -- or ***did you eliminate the introduction of any other materials into the tank wagon at any time before the incident occurred***?

> A ***It's my understanding the tank wagon was sealed when it left the incinerator facility, and it stayed sealed until it was opened at Quala.*** From Union Carbide to the incinerator facility, it was sealed and unloaded there. ***The only time something could have been added was either at the incinerator facility or at Union Carbide***.

Ex. CC, Cayias at 117:20–118:19 (emphasis added).

Dr. Cayias also ruled out any other potential source of the chemicals inside the tank wagon:

> Q: How did you rule out the introduction of other materials into the tank wagon from the time it was loaded at Union Carbide's Texas City's site?
>
> A: It was under a nitrogen blanket when it left the Union Carbide site. It got to the incinerator facility. They unloaded it and again charged it with a nitrogen blanket, and it was then transported to Quala. I don't think there was any potential for interference or add any additional chemicals during this process.

Cayias at 35:3-12. This is consistent with the testimony of UCC's corporate representative and expert that they had no evidence that Quala or anyone else introduced the carbon monoxide. *See* SOF§K.

Dr. Cayias testified that Dow/UCC and Performance caused the introduction of chemicals into the Tanker that reacted and created carbon monoxide:

> Q: Are you aware of any evidence that any other party other than Union Carbide or Performance Materials introduced any chemicals that would react or create carbon monoxide prior to the time the manhole was even opened?
>
> [objections omitted]
>
> A: No, I -- there's no evidence that anyone else had anything to do with it.
>
> Q: The -- prior to that manhole being opened, would you agree that the only known defendants that put anything inside that tank trailer were Union Carbide and Performance Materials?
>
> [objections omitted]
>
> A: Those are the facts. ***Those the only two parties that put anything in the tank wagon***.

Ex. CC, Cayias at 165:20–166:10 (emphasis added).

Dr. Cayias also opined that Dow/UCC should have known there was a potential for the production of carbon monoxide.

> Q: Okay. And bottom line is that carbon monoxide should not have been in that tank; would that be fair?
>
> [objections omitted]
>
> A: It should not have been in that -- ***according to the manifest, it should not have been there***.
>
> Q: From the evidence that you've reviewed, do you hold the opinion that Union Carbide failed and in its omissions caused carbon monoxide to be located in the tank at the time of this incident?
>
> [objections omitted]
>
> A: I -- I -- ***it's my opinion that Union Carbide should have known that there was a potential for the production of carbon monoxide and should have so warned***.
>
> Q: Are you aware of any other -- any evidence whatsoever that any other party other than Union Carbide or potentially Performance Materials introduced carbon monoxide into the tank trailer before the men got inside it?
>
> [objections omitted]
>
> A: None whatsoever. There's no evidence. ***That's the only reasonable conclusion***.
>
> * * *
>
> Q: ***Do you hold the opinion that Union Carbide ultimately allowed its material or whatever it put inside this tank trailer to be placed inside the tank trailer and that -- and that that material ultimately produced carbon monoxide or a substance that creates carbon monoxide in the body which resulted in this incident***?
>
> [objections omitted]
>
> A: That -- ***that's my opinion***.
>
> Q: And ***why*** do you have that opinion?
>
> A: ***Based on all of the evidence that I reviewed, the fact that there was a carbon monoxide reading when the hatch was first opened on the tank wagon and the fact that it was basically a sealed system during its transport from Union Carbide to Performance Materials to Quala***.

Q: ***And do you believe that in doing that between Dow/Union Carbide and Performance Materials that was a breach of standard of care owed to Quala and its employees***?

[objections omitted]

A: ***Yes***.

Q (By Mr. Elwell) The opinions that you've expressed today, do you hold those to a reasonable degree of scientific probability in your field of expertise?

A: I do.

Ex. CC, Cayias at 164:15–171:18 (emphasis added).

Plaintiffs' expert, Lindsay, Ph.D., provided additional proof of this causal link and of the causal link between the exposure and injuries/deaths. Ex. II, Lindsay Aff. at ¶¶ 8-10.

**3. A jury should decide whether Defendants' conduct caused Plaintiffs to be exposed to deadly carbon monoxide.**

There is additional proof of both cause-in-fact and foreseeability that ***links*** Defendants' negligent acts and omissions ***with*** the carbon monoxide exposure that killed two Plaintiffs and injured several others:

- Following the incident, OSHA conducted an investigation that acknowledged gas meter readings taken prior to the two deaths indicated 2000 parts per million of carbon monoxide inside the tanker. OSHA report.
- OSHA's investigation also revealed that:
  - the Tanker contained significantly more chemicals than what was reflected on the Hazardous Waste Manifest;
  - "the presence of carbon monoxide or chemicals that can induce carbon monoxide toxicity was not reported in transportation documents required under [RCRA];"

    - testing of the respiratory cartridges worn by Lozano confirmed the presence of acetaldehyde, acetic acid, and ethylene glycol—all ingredients of vinyl acetate waste that the Defendants were attempting to transport and dispose of in the Tanker.

Ex. BB at PM003829, PM003834-36; *see also* SOF§J.

- Further, and although Defendants blame Quala for the accident in this case:
    - Dow/UCC's corporate representative and expert admitted that they had no evidence that Quala could have been the source of the deadly carbon monoxide; and
    - Defendants continued to use Quala even afterward, giving rise to a similarly terrible incident in 2023, SOF§K.
- Defendants' assertion that Lozano, Brown, Robinson, and Williams understood that the carbon monoxide was 2,000 ppm in the Tanker before unsealing it and proceeded anyway is specious. The best counter to that argument is the video showing them in safety gear and using respirators. There is simply no evidence that any of these four men had a "death wish," and lay experience confirms that they would have heeded a warning had it been given.
- Similarly, the suggestion that these men ignored a warning about nitrogen proves nothing—and certainly does not establish as a matter of law that they would have ignored a warning about deadly levels of carbon monoxide.
- Finally, it is noteworthy that Dow/UCC changed its forms shortly after this fatal accident to indicate that a load was "hot," and a jury could infer from the timing of this decision alone that it appreciated the need for such a warning.

#### 4. Dow's argument that it played no role in the incident is indefensible.

Dow alone argues that it could not have caused the incident because it claims it did not generate, load, ship, or transport the waste in the Tanker or prepare the Waste Manifest that accompanied the load. *See generally* Dow MSJ. This is untrue. For example, the Waste Characterization Form for Vinyl Acetate Polymer Residues, High Chromium, identifies the Generator Facility as "The Dow Chemical Company." Ex. C at PM001967-70. And Dow Chemical Company is identified as the entity responsible for identifying and describing the inherent hazards of Vinyl Acetate Polymer in its Safety Data Sheet. Ex. L, UCC002557-2579. Undeniably, these two documents are central to the liability issues in this case. And as testified to by employees such as Jason Rodriguez, the individual responsible for loading the trailer who said he was employed by Dow: "Well, Union Carbide, Dow Chemical, it's all the same." Ex. 1, Rodriguez 12:14-19. And Dow is also all over the documents that surround this incident. For example, the email exchange with Performance about the temperatures of the load are coming from "dow.com" addresses, as are the communications with OSHA regarding the incident, and the Dow emails are signed by Dow's Director of Regulatory Affairs. *See, e.g.*, Ex. O, Labrador at 72:7-14, 87:12-25, 97:1-101:6 Exs. 9, 10, 11; *see also* Ex. B, Ruelas Ex. 3. Likewise, the signatory to the agreement for Mobile Mini[8] to transport hazardous wastes is with Dow and executed by the Sourcing Manager of "THE DOW CHEMICAL COMPANY."

### E. Negligence per se.

UCC, Performance, and Mobile Mini argue that negligence per se is not an independent cause of action from negligence. UCC MSJ at 5; PM MSJ at 12-14; MMPT MSJ at 14-16. Both the Texas Supreme Court and the Texas Pattern Jury Charges recognize that negligence per se is

[8] At the time, Mobile Mini was known as "Evergreen."

a species of negligence that presumes a breach when a regulatory statute involving public safety is violated. *Perry v. S.N.*, 973 S.W.2d 301, 304-05 & n.4 (Tex. 1998) (The unexcused violation of a legislative enactment or administrative regulation adopted by the court as defining the standard of conduct of a reasonable person is negligence in itself if the statute or ordinance was designed to prevent injuries to a class of persons to which the injured party belongs (internal quotation omitted)); *see also* PJC General Negligence, Intentional Torts, and Workers' Compensation § 5.1 (2020) ("PJC 5.1 should be given if there are claims of both common-law negligence and negligence per se. It includes both an instruction, which should be placed immediately after the definition of "negligence," and a broad-form question jointly submitting negligence and proximate cause.").

All Defendants make the same generalized assertion that there is "no evidence" of any regulatory violations that would give rise to a claim. As explained above in part II, that is simply not the case. Each of the Defendants was subject to US DOT and OSHA regulations relating to the creation, transport, and disposal of hazardous substances, and there is no question that these regulations are for the safety of everyone involved in the chain of custody, as well as the public at large. There are at the very least fact issues as to whether these hazardous substances were handled properly and whether these failures caused Lozano, Brown, Robinson, and Williams to be exposed to deadly levels of carbon monoxide. *See* part II.D. And there can be no question that their exposure to carbon monoxide caused the deaths and serious, permanent, and disabling injuries they are claiming. Summary judgment should therefore be denied.

## III. Defendants' affirmative defenses are inapplicable.

### A. Chapter 82 does not apply.

In its no-evidence MSJ, Tanker owner Mobile Mini contends that Chapter 82 of the Civil Practice & Remedies Code, which covers products liability, bars the claims against it by "plac[ing]

strict limits on the liability of non-manufacturing sellers and lessors/renters like [Mobile Mini].” MMTP MSJ at 5-6. Mobile Mini says it delivered a clean and inspected tank to Dow in July 2019; that tank remained on lease to Dow until March 2020, well after the incident; and Plaintiffs have no evidence that Mobile Mini did anything to trigger any exceptions to its statutory immunity. MMTP MSJ at 3, 6-7.

Mobile Mini's Chapter 82 argument fails for two independent reasons:

1. Section 82.003 applies only to products-liability claims, and this is not a products-liability case. *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 109 (Tex. 2021) (“Chapter 82 . . . provides that non-manufacturing sellers are not liable for product defects unless one of the enumerated exceptions applies.”); *vRide, Inc. v. Ford Motor Co*., No. 05–15–01377–CV, 2017 WL 462348, at *6 (Tex. App.—Dallas Feb. 2, 2017, no pet.) (mem. op.) (A products-liability action “requires allegations of damages . . . caused by a ***defective product***.” (emphasis added)). Plaintiffs do not allege that the Tanker itself was defectively designed or manufactured. Thus, § 82.003 is irrelevant.

2. Mobile Mini's argument is also procedurally nonsensical. Because Plaintiffs did not raise a claim under § 82.003, Mobile Mini cannot seek summary judgment against them for providing “no evidence” to support a § 82.003 claim.

**B. Graves Amendment preemption has no application here.**

Mobile Mini next argues it is entitled to summary judgment because the federal Graves Amendment preempts state-law liability of a vehicle owner who leases a vehicle that ends up being involved in an accident, so long as the owner is not negligent or criminally liable. MMTP MSJ at 7-8.

Mobile Mini appears to seek no-evidence summary judgment on a preemption defense that it bears the burden to prove. *See Bekins Van Lines, Inc. v. Kahn*, — S.W.3d. —, No. 03-24-00088-CV, 2025 WL 1465786, at *10 (Tex. App.—Austin May 22, 2025, pet. filed) (“Federal preemption is an affirmative defense, and the party asserting an affirmative defense carries the burden of proving it.”). Consequently, it must surmount a higher hurdle to show that the defense has been conclusively established, which it cannot do.

Passed in 2005 as part of a federal highway bill, the Graves Amendment aimed to curb "state-law vicarious liability claims that seek to hold" a vehicle-rental company liable for an accident "solely on the theory that it owned the vehicle." *Rosas v. Langel*, No. EP-18-CV-00146-DCG, 2018 WL 11430926, at *2 (W.D. Tex. July 23, 2018) (cleaned up). The Amendment preempts state-law vicarious liability of "[a]n owner of a motor vehicle that rents or leases the vehicle . . . for harm to persons or property that results or arises out of the use, operation or possession of the vehicle during the period of the rental or lease," so long as the owner is:

(1) "engaged in the trade or business of renting or leasing motor vehicles," and

(2) "there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner)."

49 U.S.C. § 30106(a). Although Mobile Mini is in the business of renting tanker-trailers, owned the Tanker at issue, and the claims against it "arose out of the use, operation or possession of the vehicle"—the Tanker—Mobile Mini has failed to conclusively establish that it was not negligent. *See* part II. That alone defeats summary judgment in its favor.

Independently, Mobile Mini's Graves Amendment defense fails because Plaintiffs' claims against it are direct-negligence claims, not purely vicarious. The Graves Amendment only preempts claims made against a vehicle owner "by reason of being the owner of the vehicle." 49 U.S.C. § 30106(a). In other words, its preemption extends "only to claims of vicarious liability, not to claims of direct negligence." *Fuller v. Biggs*, 532 F. Supp. 3d 371, 380 (N.D. Tex. 2021*; see Said v. EAN Holdings, LLC*, No. 3:24-CV-728-BW, 2024 WL 4557349, at *5 (N.D. Tex. Oct. 22, 2024) (mem. op.); *Parker v. Auto-Owners Ins. Co*., No. 19-cv-374-jdp, 2020 WL 488366, at *3 (W.D. Wis. Jan. 30, 2020) (If plaintiff accuses defendant of direct negligence, "the Graves

Amendment's second condition has not been met, and the statute does not require dismissal of [plaintiff's] vicarious-liability claims.").

### C. Sprint's preemption arguments have already been rejected by this Court.

Sprint alone claims preemption under the Hazardous Materials Transportation Act ("HMTA") and the RCRA. Although the Court has already considered and denied Sprint's attempt to escape liability by claiming preemption under the HMTA, Sprint reurges those arguments. Plaintiffs incorporate by reference their prior response and ask that the Court once again deny Sprint's preemption argument.

Sprint's tag-along RCRA preemption claim fares no better, and it is noteworthy that the other Defendant are not asserting it.

## IV. There is evidence of gross negligence.

All Defendants claim that there is no evidence of gross negligence. At baseline, handling hazardous waste requires objective and subjective knowledge of an extreme risk of harm. The evidence above shows that Defendants made misrepresentations about the contents and characteristics (weight, pressure, etc.) of the hazardous waste that posed a threat to human life which they generated, loaded, transported, and disposed of, all of which contributed to a deadly accident that tragically killed two and seriously injured two others. Defendants and their vice principals and/or managers turned a blind eye to the deadly consequences of their actions leading to this incident. Further, Defendants UCC/Dow and Performance together failed to sample and test this hazardous waste, knowing it would prevent others from having "an idea of what it is and how dangerous it is." And then they tried to cover it up. These Defendants and their vice principals and/or managers minimized, misdirected, and failed to disclose material facts during the OSHA investigation which have now been discovered in this case. These facts show that there is at least a fact issue that supports submitting gross negligence to the jury as well.

## Conclusion and Prayer

For these reasons, Plaintiffs request that the Court deny Defendants' motions for summary judgment and grant Plaintiffs such other relief to which they are entitled.

Respectfully submitted,

**AMARO LAW FIRM**

R. James Amaro
SBN: 24036134
Matthew A. Elwell
SBN: 24082962
2500 E. T C Jester Blvd., Ste. 525
Houston, Texas 77008
713.864.1941 tel.
713.864.1942 fax
E-filing: fax@amarolawfirm.com
**ATTORNEYS FOR PLAINTIFFS CHAUMEIKA BUSSEY, INDIVIDUALLY, AND AS NEXT FRIEND OF JB AND AB, MINOR CHILDREN, W. TIMOTHY WEAVER, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, SHAWN JARMAIL BROWN, JR., DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ERICKA BENS AS NEXT FRIEND OF A.B. AND J.B., MINORS, INDIVIDUALLY AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED**
**THE ALFRED FIRM**

*/s/ Byron C. Alfred*
Byron C. Alfred
SBN: 24084507
2211 Norfolk Street, Ste. 803
Houston, Texas 77098
713.470.9714 tel.
877.751.7453 fax
Byron@alfredfirm.com
**ATTORNEYS FOR PLAINTIFF FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO (DECEASED), LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINORS, AND CYNTHIA RICHARDSON**

**HERD LAW FIRM, PLLC**
*/s/ Charles F. Herd, Jr.*
Charles F. Herd, Jr.
SBN: 09504480
Patrick O'Hara
SBN: 24060353
Tomball Parkway, Suite 250
Houston, Texas 77070
713.955.3699 tel.
281.462.5180 fax
Charles.Herd@HerdlawFirm.com
pjo@oharaattorney.com
**ATTORNEYS FOR PLAINTIFF ROY ROBINSON**

**DAX F. GARZA, P.C.**

By: Scott Greenlee
Dax F. Garza
Texas Bar No. 24030514
Scott C. Greenlee
Texas Bar No. 24007270
1021 Main Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 522-3000
Facsimile: (713) 522-3001
dax@daxgarzalaw.com
scott@daxgarzalaw.com
**ATTORNEYS FOR INTERVENORS SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ANYIA BROWN, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED**

*/s/ Hamilton G. Rucker*
Hamilton G. Rucker
Attorney at Law
Heights Mansion
540 Heights Blvd, Suite 112
Houston, Texas 77007
713.589.2960 tel.
713.583.3980 fax
hgr@ruckerfirm.com
**ATTORNEYS FOR INTERVENOR KYLE WILLIAMS**

**OF COUNSEL:**

**ALEXANDER DUBOSE & JEFFERSON LLP**

Marcy Hogan Greer
State Bar No. 08417650
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
512.482.9300 tel.
512.482.9303 fax
mgreer@adjtlaw.com

## VERIFICATION

I, Matt Elwell, as attorney of record for Plaintiffs and Plaintiffs/Intervenors certify that the contents of this Motion are true and correct and affirm that Appendix B accurately reflects the need for additional discovery pursuant to Rule 166a(g) in responding to Defendants' motions for summary judgment.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing instrument has been served on the following counsel of record pursuant to the Texas Rules of Civil Procedure on **August 4, 2025.**

***All Counsel listed by E-Service.***

*/s/Marcy Hogan Greer*
Marcy Hogan Greer

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stacey Jett on behalf of Marcy Greer
Bar No. 8417650
sjett@adjtlaw.com
Envelope ID: 103965759
Filing Code Description: Notice
Filing Description: Notice of Appearance
Status as of 8/5/2025 9:34 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Martha NMabry | | mmabry@bajb.com | 8/4/2025 11:58:46 PM | SENT |
| Michael L.Brem | | mbrem@sdablaw.com | 8/4/2025 11:58:46 PM | SENT |
| R. JamesAmaro | | fax@amarolawfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Randy E.Moore | | rmoore@moore-law.us | 8/4/2025 11:58:46 PM | SENT |
| Kaycie Moore | | kmoore@moore-law.us | 8/4/2025 11:58:46 PM | SENT |
| David Brenner | 2958020 | dbrenner@bajb.com | 8/4/2025 11:58:46 PM | SENT |
| Johnny Alfred | 24087092 | johnny@alfredfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Anthony Simmons | 24046847 | simmonslaw@me.com | 8/4/2025 11:58:46 PM | SENT |
| Dax Garza | 24030514 | dax@daxgarzalaw.com | 8/4/2025 11:58:46 PM | SENT |
| Dax Garza | 24030514 | dax@daxgarzalaw.com | 8/4/2025 11:58:46 PM | SENT |
| Hamilton Rucker | 24067850 | hgr@ruckerfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Donale Evans | | donale.evans.law@gmail.com | 8/4/2025 11:58:46 PM | SENT |
| Michael Jolly | 10856910 | michaelbjolly@gmail.com | 8/4/2025 11:58:46 PM | SENT |
| Kristy Whipkey | | kristyr@germer.com | 8/4/2025 11:58:46 PM | SENT |
| Michael BJolly | | michaelbjolly@gmail.com | 8/4/2025 11:58:46 PM | SENT |
| Debra Hexsel | | debra@jollylegal.com | 8/4/2025 11:58:46 PM | SENT |
| Byron CraigAlfred | | eservice@alfredfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Kevin Collins | | kevin.collins@bracewell.com | 8/4/2025 11:58:46 PM | SENT |
| Karen Bennett | | krbennett@germer.com | 8/4/2025 11:58:46 PM | SENT |
| R. JamesAmaro | | fax@amarolawfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Michael Brem | | mbrem@sdablaw.com | 8/4/2025 11:58:46 PM | SENT |
| James MKimbell | | jkimbell@clarkhill.com | 8/4/2025 11:58:46 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stacey Jett on behalf of Marcy Greer
Bar No. 8417650
sjett@adjtlaw.com
Envelope ID: 103965759
Filing Code Description: Notice
Filing Description: Notice of Appearance
Status as of 8/5/2025 9:34 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| James MKimbell | | jkimbell@clarkhill.com | 8/4/2025 11:58:46 PM | SENT |
| Kathy Garber | | kgarber@clarkhill.com | 8/4/2025 11:58:46 PM | SENT |
| Georgia Seeley | | gseeley@clarkhill.com | 8/4/2025 11:58:46 PM | SENT |
| Kevin Collins | | Kevin.collins@bracewell.com | 8/4/2025 11:58:46 PM | SENT |
| Karen Bennet | | krbennett@germer.com | 8/4/2025 11:58:46 PM | SENT |
| Kevin Jordan | | kjordan@jlcfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Jay Aldis | | jay.aldis@bracewell.com | 8/4/2025 11:58:46 PM | ERROR |
| Byron Alfred | 24084507 | byron@alfredfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Amir Halevy | | ahalevy@jlcfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Randy E.Moore | | rmoore@moore-law.us | 8/4/2025 11:58:46 PM | SENT |
| Veronica Silva | | vesilva@clarkhill.com | 8/4/2025 11:58:46 PM | SENT |
| Charles F.Herd | | charles.herd@herdlawfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Laura FriedlJones | | ljones@sdablaw.com | 8/4/2025 11:58:46 PM | SENT |
| Nancy Medina | | nancy@jollylegal.com | 8/4/2025 11:58:46 PM | SENT |
| David Brenner | | dbrenner@bajb.com | 8/4/2025 11:58:46 PM | SENT |
| Imani Shabazz | | iss@oharaattorney.com | 8/4/2025 11:58:46 PM | SENT |
| Gayle McKay | | gayle.mckay@bracewell.com | 8/4/2025 11:58:46 PM | SENT |
| Anna Hearn-Darst | | anna.hearn-darst@bracewell.com | 8/4/2025 11:58:46 PM | SENT |
| Mark Kressenberg | | mkressenberg@thompsoncoe.com | 8/4/2025 11:58:46 PM | SENT |
| EService ALF | | eservice@amarolawfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Cristi Cavazos | | ccavazos@jlcfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Sydney Rupe | | srupe@jlcfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Shahnoor Khuwaja | | skhuwaja@jlcfirm.com | 8/4/2025 11:58:46 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stacey Jett on behalf of Marcy Greer
Bar No. 8417650
sjett@adjtlaw.com
Envelope ID: 103965759
Filing Code Description: Notice
Filing Description: Notice of Appearance
Status as of 8/5/2025 9:34 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Shahnoor Khuwaja | | skhuwaja@jlcfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Veronica Silva | | Vesilva@clarkhill.com | 8/4/2025 11:58:46 PM | SENT |
| Travis Armstrong | | tarmstrong@thompsoncoe.com | 8/4/2025 11:58:46 PM | SENT |
| Marissa Edwards | | legal@herdlawfirm.com | 8/4/2025 11:58:46 PM | SENT |
| Esbeidy Milan | | esbeidy@daxgarzalaw.com | 8/4/2025 11:58:46 PM | SENT |
| James E.Brenner | | jebrenner@bajb.com | 8/4/2025 11:58:46 PM | SENT |
| Scott Greenlee | | scott@daxgarzalaw.com | 8/4/2025 11:58:46 PM | SENT |
| Mayra Perez | | mcp@oharaattorney.com | 8/4/2025 11:58:46 PM | SENT |
| Patrick O'Hara | | service@oharaattorney.com | 8/4/2025 11:58:46 PM | SENT |
| Stacey Jett | | sjett@adjtlaw.com | 8/4/2025 11:58:46 PM | SENT |
| Marcy Hogan Greer | | mgreer@adjtlaw.com | 8/4/2025 11:58:46 PM | SENT |

**Appendix A**

1. 07.18.2025 The Dow Chemical Co.'s No-Evidence Motion for Summary Judgment as to All Claims and Causes of Action of Plaintiffs and Intervenors and Motion to Sever

2. 07.18.2025 Union Carbide Corporation's No Evidence Motion for Summary Judgment on the Bussey Plaintiffs' Survival and Wrongful Death Claims

3. 07.18.2025 Union Carbide Corp.'s No Evidence Motion for Summary Judgment on Intervening Plaintiff Kyle Williams' Claims

4. 07.18.2025 Union Carbide Corp.'s No Evidence Motion for Summary Judgment on the Lozano Plaintiffs' Survival and Wrongful Death Claim

5. 07.18.2025 Union Carbide Corp.'s No Evidence Motion for Summary Judgment on Plaintiff Roy Robinson's Claims

6. 07.18.2025 Union Carbide Corp.'s No Evidence Motion for Summary Judgment on The Brown Intervenors' Wrongful Death Claims

7. 07.21.2025 Sprint Transport, LLC's Second Traditional and No-Evidence Motion for Summary Judgment

8. 07.21.2025 Performance Materials NA, Inc.'s No-Evidence Motion for Summary Judgment on Intervenors' Claims

9. 07.21.2025 Performance Materials NA, Inc.'s No Evidence Motion for Summary Judgment on Roy Robinson's Claims

10. 07.21.2025 Performance Materials NA, Inc.'s No Evidence Motion for Summary Judgment on Lozano Plaintiffs' Claims

11. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s No Evidence Motion for Summary Judgment on the Lozano Plaintiffs' Claims

12. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s No Evidence Motion for Summary Judgment on Plaintiff Roy Robinson's Claims

13. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s No Evidence Motion for Summary Judgment on The Bussey Plaintiffs' Claims

14. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s No Evidence Motion for Summary Judgment on The Brown Intervenors' Claims

15. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s Traditional Motion for Summary Judgment on Plaintiff Roy Robinson's Claims

16. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s Traditional Motion for Summary Judgment on the Bussey Plaintiffs' Claims

17. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s Traditional Motion for Summary Judgment on the Brown Intervenors' Claims

18. 07.21.2025 Mobile Mini Tank and Pump Solutions, Inc.'s Traditional Motion for Summary Judgment on the Lozano Plaintiffs' Claims

# Appendix B: Deposition Transcripts Not Yet Available

| Deponent | Date of Depo. | Context | Status | Testimony | Essentiality |
|---|---|---|---|---|---|
| John Holder | 7.10.25 | Defendants' expert | Rough draft transcript only | Mobile Mini relies extensively on Holder's report for its arguments that: (1) it "was not a motor carrier in this instance and did not transport the Subject Tank" and so, no "Federal Motor Carrier Safety Regulations" apply to it; (2) it owed no duties to Plaintiffs regarding any regulations; (3) the rental contracts in this case do not comply with federal regulations for the lease of a rental tanker. | The final transcript of Holder's deposition testimony is essential to undermine these and other opinions in his report. |
| David Anderson | 7.30.25 | Defendants' expert | Transcript received 8.4.2025 | Testified that the hatch/manhole on top of the tanker was too small for the Quala employees to enter while wearing Self-Contained Breathing Apparatus (SCBA) | Shows that the Tanker was unfit for the task of safely carrying this cargo of hazardous material |
| Sarah Shafer | 7.31.25 | Defendants' expert | Transcript not received | Stated that heart attacks (like the one Kyle Williams experienced) can be caused by exposure to carbon monoxide and that elevated troponin is often an indication of a heart attack. | Confirms a causal link between Williams' exposure to carbon monoxide and his heart attack as shown by his medical records. |
| Michael Nickolaou | 8.25.25 | Defendants' expert | Deposition not completed | Will be testifying about chemical | Need to ask the questions to know. |
| Steven Kuchnick | 8.06.25 | Defendants' expert | Deposition not completed | Inspected the Quala site | Need to ask the questions to know. |

# Exhibit 2

# Attorney Declarations

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| **v.** | § | |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| ***Defendants.*** | | |

**DECLARATION OF MATTHEW A. ELWELL**

Pursuant to 28 U.S.C. § 1746, I, Matthew A. Elwell, declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously.

2. I have been licensed to practice law in the State of Texas since 2012. I have been licensed to practice law in the State of New Mexico since early this year. I am a member in good standing of the Northern, Western, Southern, and Eastern Federal Districts of Texas and the U.S. Courts of Appeal for the Fifth Circuit. I am a partner at the Amaro Law Firm. The Amaro Law Firm has offices in The Woodlands, Sugar Land, Dallas, Houston, Austin, and Lakeway, Texas. I work at our principal office in Houston, Texas. I have worked at the Amaro Law Firm since June 2017.

3. I have represented clients in personal injury civil litigation throughout my time with the Amaro Law Firm. During my time with the Amaro Law Firm, my practice has been focused primarily on catastrophic injury and wrongful

**EXHIBIT 2-A**

death case. In that time, I have represented clients across Texas and in various states nationwide.

4. The Amaro Law Firm was retained by the following to represent them in the above captioned lawsuit in connection with the claims they have against various Defendants: Chaumeika Bussey, Individually, and as Next Friend of J.B. and A.B., Minor Children and W. Timothy Weaver, as Representative of the Estate of Shawn Jarmail Brown Sr., Deceased ("Plaintiffs").

5. My respective website bio contains my experience, honors, and other credentials and can be found at:

   https://amarolawfirm.com/attorneys/matt-elwell/

6. My Texas Bar number is 24082962, and my billing rate for this matter is $575.00 per hour. Based on several factors, including but not limited to the factors such as those listed in Rule 1.04 of the Texas Rules of Professional Conduct, a fee of $575.00 per hour for my attorney's fees is a reasonable hourly fee for the Amaro Law Firm to charge in this matter.

7. The above hourly rate is reasonable based on my skills, experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

8. Defendants filed their removal on or about August 26, 2025. At that time, I began legal research in order to determine the validity of Defendants' motion. In doing this work, I reviewed Defendants' removal motion, researched case law cited in Defendants' motion, pulled relevant case law, briefs, and orders being on this issue and transmitted the same to co-counsels representing Plaintiffs in this matter and who were similarly situated by way of Defendants' removal. I also drafted work product internal documents/emails analyzing the merits of Defendants' removal. Finally, I corresponded with Defendants regarding their removal and the implication of such on the deposition of John Cayias, Ph.D. which was to take place the following day. The work described above took place over 2 business days. The total time I spent undertaking the above referenced tasks was **6.5 hours**. These fees were necessary, reasonable, and were incurred in relation to my work for Plaintiffs in connection with

**EXHIBIT 2-A**

Defendants' removal and this Motion to Remand.

9. Prior to Defendants' removal of the case, Plaintiffs offered their expert witness (John Cayias, Ph.D.) for deposition to take place on August 27, 2025. I incurred time preparing for this deposition and visiting with the expert prior to his deposition. In total, I spent 4.5 hours preparing for his deposition and 1 hour visiting with the expert prior to his deposition. The night before the deposition, Defendants informed Plaintiffs/Intervenors' counsel that they had removed the case to federal court and would not be proceeding with the deposition. We offered to go forward with the deposition, but Defendants responded that they were not going forward with the deposition now that the case was in federal court. The total time I spent on this deposition was **5.5 hours**.

10. The fees charged in this case are customarily charged in this area for the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorneys due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; the "undesirability" of the case; and awards in similar cases.

11. The tasks performed and the costs incurred were all reasonably and necessarily incurred on Plaintiffs' behalf in the case. The fees incurred reflect tasks that were performed competently and efficiently.

12. Among other factors considered in determining the reasonableness of such fee, the following specific factors have been considered, including:

    a. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    b. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

    c. The fee customarily charged in the locality for similar legal services;

    d. The amount involved and the results obtained;

e. The time limitations imposed by the client or by the circumstances;

f. The nature and length of the professional relationship with the client;

g. The experience, reputation and ability of the lawyer or lawyers performing the services; and

h. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

13. My fees are reasonable and necessary in light of the non-exclusive factors identified by the Texas Supreme Court in ***Arthur Andersen & Co., v. Perry Equipment Construction***, 945 S.W.2d 812, 818 (Tex. 1997). Those factors include:

a. Performing unrelated and unnecessary tasks;

b. The time and labor required;

c. The novelty and difficulty of the questions involved;

d. The skill required to perform the legal service properly;

e. The fee customarily charged in the locality for similar legal services;

f. The amount involved;

g. The experience, reputation and ability of the lawyer or lawyers performing the services;

h. Whether the fee is fixed or contingent on results obtained;

i. The uncertainty of collection before the legal services have been rendered; and

j. The results obtained.

14. A statement of the legal services I provided in this case on this issue, identifying the date the service was provided, the activity type, a description of such services, the staff performing such services, the reasonable, usual and customary hourly fee charged for such person's work, the time spent and the reasonable and necessary charge for such service is included within this

affidavit and incorporated throughout by reference for all purposes.

15.Reasonableness of the Fee in this Case:

a. First, and most important to my analysis, are the fees customarily charged in Harris County, Texas for similar legal services. *See* Tex. Disc. R.Prof. Conduct 1.04(b)(3). In my experience, these market forces, more than any other factors, help set lawyer's hourly rates. In my expert opinion, the attorney's fees incurred in connection with the referenced tasks are consistent with the fees customarily charged in Harris County, Texas for similar legal services.

b. Second, the fees incurred in connection with the referenced tasks are reasonable given the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(1).

c. Third, the fees incurred in connection with the referenced tasks are reasonable given that my acceptance of the matter and undertaking the tasks as outline herein precluded me from accepting other employment or working on other matters. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(2).

d. Fourth, the fees incurred in connection with the referenced tasks are reasonable given my experience, reputation, and ability. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(7). I am qualified by training, experience, and reputation to deserve the hourly rates charged in connection with the referenced tasks.

e. Fifth, the fees incurred were reasonable given the amount involved and the results I expect to obtain. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(4). Other factors set out in the applicable professional rule also support the reasonableness of the fees charged in connection with the referenced tasks. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(5)-(6). In determining reasonable attorney's fees in this case, I considered the total hours of time actually incurred by myself/ the Amaro Law Firm.

16.I anticipate that an additional **6 hours** of my time at $575.00 per hour ($3,450.00) will be needed and incurred to complete the remand phase of this lawsuit – in reviewing the draft of our motion to remand, reviewing any

responses and replies thereto, and attending any hearing that may take place on the issue.

17. The total amount paid for the services so far is $0.00. However and accordingly, the total amount of hours the Amaro Law Firm has reasonably and necessarily expended (and will expend up to a hearing on this issue) on behalf of Plaintiffs in this matter from August 26, 2025, to the date of the hearing on this matter, is **18 hours**, and the attorney's fees being sought for the Amaro Law Firm's services is **$10,350.00**.

EXECUTED in Houston, Harris County, State of Texas, on the 12th day of September, 2025.

LESLIE CANCHOLA RANGEL
My Notary ID # 134110326
Expires December 19, 2026

M. Elwell

**Matthew A. Elwell**

Leslie C Rangel.

9/12/2025

**EXHIBIT 2-A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| ***Defendants.*** | | |

**DECLARATION OF SCOTT C. GREENLEE**

Pursuant to 28 U.S.C. § 1746, I, Scott C. Greenlee, declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously herewith.

2. I have been licensed to practice law in the State of Texas since 1998. I am a member in good standing of the Southern District of Texas and the U.S. Courts of Appeal for the Fifth Circuit. I have represented clients in personal injury civil litigation, including toxic tort litigation, throughout my career. I have represented clients across Texas and various states nationwide in chemical exposure cases similar to the case at bar. I have been with the Dax F. Garza, P.C. law firm since April 2023.

3. Dax F. Garza, P.C. was retained by Anyia Brown, Da'Shawn Brown, Davion Brown, John Brown, and Shawn Brown, Jr. to represent them in connection with the wrongful death of their father Shawn Brown, Sr. during an on the job toxic exposure. My billing rate for this matter is $575.00 per hour, based on several factors, including but not limited to the factors such as those listed in Rule 1.04 of the Texas Rules of Professional Conduct. A fee of $575.00 per hour for my attorney's fees is a reasonable hourly fee for Dax F. Garza, P.C. to charge in this matter for an attorney with my level of experience, skill, education, training and background, and is comparable to rates charged by attorneys of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

4. Defendants filed their removal on or about August 26, 2025. Prior to Defendants' removal of the case, Plaintiffs offered their expert witness (John Cayias, Ph.D.) for deposition to take place on August 27, 2025. I incurred time preparing for this deposition and visiting with the expert prior to his deposition. In total, I spent 6 hours preparing for his deposition and 1.5 hour visiting with the expert prior to his deposition.


**Exhibit 2-B**

5. The night before the deposition, Defendants informed Plaintiffs/Intervenors' counsel that they had removed the case to federal court and would not be proceeding with the deposition. We offered to go forward with the deposition, but Defendants responded that they were not going forward with the deposition now that the case was in federal court. The total time I spent preparing for this deposition was **7.5 hours**.

6. The fees charged in this case are customarily charged in this area for the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorneys due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; and awards in similar cases. The tasks performed and the costs incurred were all reasonably and necessarily incurred on Plaintiffs' behalf in the case. The fees incurred reflect tasks that were performed competently and efficiently.

7. Accordingly, the total amount of hours the I have reasonably and necessarily expended on behalf of Plaintiffs in this matter preparing for the deposition Defendants' unilaterally cancelled the evening before the deposition is 7.5 hours, and the attorney's fees being sought by Dax F. Garza, P.C.'s services is **$4,312.50**.

EXECUTED in Houston, Harris County, State of Texas, on the 15 day of September, 2025.

Scott C. Greenlee [signature]

**Scott C. Greenlee**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| *Defendants.* | | |

**DECLARATION OF MARCY HOGAN GREER**

Pursuant to 28 U.S.C. § 1746, I, Marcy Hogan Greer, declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously.

2. I have been licensed to practice law in the State of Texas since 1990. I am a member in good standing of the Northern, Western, Southern, and Eastern Districts of Texas, the United States Supreme Court, and the U.S. Courts of Appeals for the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Federal Circuits. I am the Managing Partner of Alexander Dubose & Jefferson LLP ("ADJ"). ADJ has offices in Austin, Houston, Dallas, and San Antonio and represents clients in civil litigation and appellate matters throughout Texas and nationwide.

3. ADJ was retained by the following Plaintiffs/Intervenors to represent them in the above captioned lawsuit in connection with pretrial and trial matters: CHAUMEIKA BUSSEY, INDIVIDUALLY, AND AS NEXT FRIEND OF JB AND AB, MINOR CHILDREN, and W. TIMOTHY WEAVER, AS REPRESENTATIVE OF THE ESTATE OF SHAWN JARMAIL BROWN, DECEASED, SHAWN JARMAIL BROWN, JR. DA'SHAWN JAMAL BROWN, JOHN JARMAIL BROWN, DAVION JARMAIL BROWN, AND ANYIA BROWN, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARIES OF SHAWN JARMAIL BROWN, SR., DECEASED, PLAINTIFF FELICIA SHEPPARD, AS REPRESENTATIVE OF THE ESTATE OF SIDARIEUS LOZANO (DECEASED), LEXUS PAUL, AS NEXT FRIEND OF N.L., L.L. AND S.L., MINORS, CYNTHIA RICHARDSON, KYLE WILLIAMS, and ROY ROBINSON ("Plaintiffs").

4. I performed the substantive work for ADJ on this matter that is summarized in this declaration. My website bio containing my experience, honors, and other credentials can



**Exhibit 2-C**

be found at: https://adjtlaw.com/attorney/marcy-hogan-greer/. My Texas Bar number is 08417650, and my billing rate for this matter is $900 per hour.

5. I reviewed Defendants' removal notice, researched case law cited in Defendants' notice, pulled relevant case law, briefs, and orders, drafted work product internal documents/emails analyzing the merits of Defendants' removal, and ultimately prepared, revised, finalized, and arranged for filing the motion to remand. The work described above took place over three weeks and involved multiple conferences with my co-counsel. The total time I spent undertaking the above-referenced tasks was 29.3 hours. These fees were necessary, reasonable, and were incurred in relation to my work for Plaintiffs in connection with Defendants' removal and this Motion to Remand.

6. Legal tasks were also undertaken by our paralegal, Stacey Jett, with a billing rate of $250 hour. Ms. Jett has had more than 25 years of experience as a litigation paralegal working closely with our team during most of that time. She has spent 8.1 hours on cite-checking the Motion to Remand and assisting with the exhibits and filing.

7. The above hourly rates are reasonable based on the attorneys' and paralegal's skills, experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys and staff of a comparable level who do comparable work in the Houston area and the Southern District of Texas. These fees were necessary, reasonable, and were incurred in relation to our work for Plaintiffs/Intervenors in connection with Defendants' removal and this Motion to Remand.

8. The fees charged in this case are customarily charged in this area for the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorneys due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; the "undesirability" of the case; and awards in similar cases.

9. The tasks performed and the costs incurred were all reasonably and necessarily incurred on Plaintiffs' behalf in the case. The fees incurred reflect tasks that were performed competently and efficiently.

10. I anticipate that an additional 10-15 hours of my time at $900 per hour ($9,000–$13,500) will be needed to complete the remand phase of this lawsuit, assuming the preparation of a reply and participation in a potential hearing.

11. Accordingly, the total amount of hours ADJ has reasonably and necessarily expended on behalf of Plaintiffs in this matter from August 26, 2025, to September 15, 2025, is 37.4 hours, and the attorneys' fees being sought for ADJ services provided to date is $28,395.

EXECUTED in Fayetteville, Colorado County, State of Texas, on the 15th day of September, 2025.

Marcy Hogan Greer

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| **v.** | § | |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| ***Defendants.*** | | |

**DECLARATION OF CHARLES F. HERD, JR.**

Pursuant to 28 U.S.C. § 1746, I, Charles F. Herd, Jr., declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously.

2. I have been licensed to practice law in the State of Texas since 1985. I also am or have been licensed to practice in Louisiana, Kentucky, and New York, and hold admissions to practice before the U.S. Fifth Circuit Court of Appeals, U.S. Ninth Circuit Court of Appeals, Southern and Western Districts of Texas, Eastern and Western Districts of Louisiana, Southern and Eastern Districts of New York, Western District of Kentucky, and the United States Supreme Court. I am the owner of Herd Law Firm, PLLC ("HLF"). HLF has an office in Houston and represents clients in civil litigation and appellate matters throughout Texas and nationwide.

3. HLF was retained by Roy Robinson ("Plaintiff") to represent him in the above-captioned lawsuit: Roy Robinson ("Plaintiff").



**Exhibit 2-D**

4. The following members of my firm performed work on this matter. Our respective website bios containing our experience, honors, and other credentials can be found at:

   https://herdlawfirm.com/

5. My Texas State Bar number is 09504480, my federal ID number is 2793, and my billing rate for this matter is **$650** per hour. I have represented clients for over forty years in personal injury lawsuits and wrongful death lawsuits. I own the Herd Law Firm. My hourly rate is a reasonable and customary rate for someone with my experience, background and accomplishments.

6. Legal tasks were also undertaken by our senior paralegal, Marissa Edwards, with a billing rate of **$145** per hour. Ms. Edwards has had five years of experience as a litigation paralegal, working closely with our team during most of that time.

7. The above hourly rates are reasonable based on the attorney's and paralegal's skills, experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys and staff of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

8. These fees are necessary, reasonable, and are incurred in relation to our work for Plaintiffs/Intervenors in connection with Defendants' removal, related cancelations of depositions, postponement of trial of this case in Texas state court, and this Motion to Remand.

9. This fee request covers the services performed from August 26, 2025 (date case was removed), to September 11, 2025, as well as anticipated fees for any reply and hearing preparation and presentation on the Motion to Remand.

10. The fees charged in this case are customarily charged in this area for the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorney and paralegal due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; the "undesirability" of the case; and awards in similar cases.

11. I spent **1 hour** preparing for the deposition of Plaintiff's expert that Defendants noticed for August 27, 2025. I spent **6.3 hours** reviewing Defendants' motion to remove, related correspondence, and documents relating to the removal. I anticipate that an additional **5 hours** of my time will be needed and incurred to complete the remand phase of this lawsuit – including reviewing the draft of our motion to remand, reviewing any responses thereto, and attending any hearings that may take place on the issue.

12. Among other factors considered in determining the reasonableness of such fee, the following specific factors have been considered, including:

    a. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    b. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

    c. The fee customarily charged in the locality for similar legal services;

    d. The amount involved and the results obtained;

    e. The time limitations imposed by the client or by the circumstances;

    f. The nature and length of the professional relationship with the client;

    g. The experience, reputation and ability of the lawyer or lawyers performing the services; and

    h. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

13. My fees are reasonable and necessary in light of the non-exclusive factors identified by the Texas Supreme Court in ***Arthur Andersen & Co., v. Perry Equipment Construction***, 945 S.W.2d 812, 818 (Tex. 1997). Those factors include:

    a. Performing unrelated and unnecessary tasks;

    b. The time and labor required;

    c. The novelty and difficulty of the questions involved;

    d. The skill required to perform the legal service properly;

e. The fee customarily charged in the locality for similar legal services;

f. The amount involved;

g. The experience, reputation and ability of the lawyer or lawyers performing the services;

h. Whether the fee is fixed or contingent on results obtained;

i. The uncertainty of collection before the legal services have been rendered; and

j. The results obtained.

14. A statement of the legal services I provided in this case on this issue, identifying the dates the service was provided, the activity type, a description of such services, the staff performing such services, the reasonable, usual and customary hourly fee charged for such person's work, the time spent and the reasonable and necessary charge for such service is included within this declaration, attached as **Exhibit A**, and incorporated throughout by reference for all purposes.

15. Reasonableness of the Fee in this Case:

a. First, and most important to my analysis, are the fees customarily charged in Harris County, Texas for similar legal services. *See* Tex. Disc. R.Prof. Conduct 1.04(b)(3). In my experience, these market forces, more than any other factors, help set lawyers' hourly rates. In my expert opinion, the attorney's fees incurred in connection with the referenced tasks are consistent with the fees customarily charged in Harris County, Texas for similar legal services.

b. Second, the fees incurred in connection with the referenced tasks are reasonable given the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(1).

c. Third, the fees incurred in connection with the referenced tasks are reasonable given that my acceptance of the matter and undertaking the tasks as outline herein precluded me from accepting other employment or working on other matters. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(2).

d. Fourth, the fees incurred in connection with the referenced tasks are reasonable given my experience, reputation, and ability. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(7). I am qualified by training, experience, and reputation to deserve the hourly rates charged in connection with the referenced tasks.

e. Fifth, the fees incurred were reasonable given the amount involved and the results I expect to obtain. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(4). Other factors set out in the applicable professional rule also support the reasonableness of the fees charged in connection with the referenced tasks. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(5)-(6). In determining reasonable attorney's fees in this case, I considered the total hours of time actually incurred by myself/ the Amaro Law Firm

16. The total amount of hours HLF has reasonably and necessarily expended on behalf of Plaintiff in this matter from August 26, 2025, to September 11, 2025, is **7.3 hours**, and the attorney's fees being sought for HLF's services is **$3,735**, as reflected in **Exhibit A**.

EXECUTED in **Houston, Harris** County, State of Texas, on the **12th** day of **September, 2025**.

______________________________
**Charles F. Herd, Jr.**

# EXHIBIT A

**Roy Robinson: HLF Fees**

| | Date | Description | Time | Hourly Rate | Amount Billed |
|---|---|---|---|---|---|
| Charles Herd | 8/25/2025 | review documents re: Dr. Cayias' assessment and opinions; review case notes; prepare notes for deposition; and emails with co-counsel re: deposition prep. | 1 | $650 | $650 |
| Charles Herd | 8/26/2025 | receive and review Defendant's Notice of Removal and related documents; discuss same with co-counsel, and effect of pending trial setting, whether to ask state or federal court for prompt hearing and to keep trial date; receive and review notice of cancellation of Dr. Cayias' deposition; emails with co-counsel re: further handling. | 1.4 | $650 | $910 |
| Charles Herd | 8/27/2025 | receive and review court notice re: remand; emails with co-counsel re: same and no legitimate basis for removal. | 0.3 | $650 | $195 |
| Charles Herd | 8/29/2025 | receive and review notice of Magistrate Judge selection, Disclosure of Interested Parties Clerk's Notice, and Pretrial Conference Order; emails with co-counsel re: same and emergency motion before J. Haney; email from defense counsel re: recent pleadings and orders. | 0.6 | $650 | $390 |
| Charles Herd | 9/1/2025 | meet with co-counsel, discuss case status, request for remand, trial scheduling issues, and further handling. | 0.3 | $650 | $195 |
| Charles Herd | 9/2/2025 | receive and review recused order, reassigned to J. Hittner; emails with co-counsel re: case status, further handling, request for prompt remand, and motion for remand. | 0.3 | $650 | $195 |
| Charles Herd | 9/4/2025 | emails with co-counsel re: fee reports to be prepared and filed. | 0.2 | $650 | $130 |
| Charles Herd | 9/5/2025 | emails from defense counsel re: Motion to Compel hearing postponed. | 0.1 | $650 | $65 |
| Marissa Edwards | 9/11/2025 | begin drafting attorney's Declaration. | 0.5 | $145 | $73 |
| Charles Herd | 9/12/2025 | prepare and edit HLF fee document and attorney's Declaration re: same. | 1.1 | $650 | $715 |
| Marissa Edwards | 9/12/2025 | revise and finalize attorney's Declaration per attorney's revisions; draft HLF fee document; revise and finalize same; file same. | 1.5 | $145 | $218 |
| | | **Total:** | **7.3** | | **$3,735** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| *Defendants.* | | |

**DECLARATION OF PATRICK O'HARA**

Pursuant to 28 U.S.C. § 1746, I, Patrick O'Hara, declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously.

2. I have been licensed to practice law in the State of Texas since 2007. I am a member in good standing of the Northern, Southern, and Eastern Districts of Texas, and the United States Supreme Court. I am a/an/the owner of O'Hara Law Firm, P.C.

3. O'Hara Law Firm, P.C. was retained by the following Plaintiffs/Intervenors to represent them in the above captioned lawsuit: Roy Robinson ("Plaintiff").

4. The following members of my firm performed work on this matter. Our respective website bios containing our experience, honors, and other credentials can be found at:

   https://oharaattorney.com

5. My Texas Bar number is 24060353, and my billing rate for this matter is $650 per hour. I have represented clients for over seventeen years in personal injury lawsuits and wrongful death lawsuits. I own the O'Hara Law Firm. My hourly rate is a reasonable and customary rate for someone with my experience, background and accomplishments.

6. Legal tasks were also undertaken by our paralegal Imana Shabazz with a billing rate of $150 per hour. Imani Shabazz has had more than five years of experience as a litigation paralegal working closely with our team during most of that time.

7. The above hourly rates are reasonable based on the attorneys' and paralegal's skills,



**Exhibit 2-E**

experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys and staff of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

8. These fees are necessary, reasonable, and are incurred in relation to our work for Plaintiffs/Intervenors in connection with Defendants' removal and this Motion to Remand.

9. This fee request covers the services performed from August 26, 2025, through September 10, 2025, as well as anticipated fees for any reply and hearing preparation and presentation on the motion to remand.

10. The fees charged in this case are customarily charged in this area for the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorneys due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; the "undesirability" of the case; and awards in similar cases.

11. I spent **0.2 hours** preparing for the deposition of Plaintiff's expert that Defendants noticed for August 27, 2025. I spent **1.1 hours** reviewing Defendants' motion to remove, correspondence, and documents relating to the removal. I anticipate that an additional **6 hours** of my time will be needed and incurred to complete the remand phase of this lawsuit – in reviewing the draft of our motion to remand, reviewing any responses thereto, and attending any hearing that may take place on the issue.

12. Among other factors considered in determining the reasonableness of such fee, the following specific factors have been considered, including:

    a. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    b. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

    c. The fee customarily charged in the locality for similar legal services;

    d. The amount involved and the results obtained;

    e. The time limitations imposed by the client or by the circumstances;

    f. The nature and length of the professional relationship with the client;

    g. The experience, reputation and ability of the lawyer or lawyers performing the services; and

    h. Whether the fee is fixed or contingent on results obtained or uncertainty of

collection before the legal services have been rendered.

13. My fees are reasonable and necessary in light of the non-exclusive factors identified by the Texas Supreme Court in ***Arthur Andersen & Co., v. Perry Equipment Construction***, 945 S.W.2d 812, 818 (Tex. 1997). Those factors include:

    a. Performing unrelated and unnecessary tasks;

    b. The time and labor required;

    c. The novelty and difficulty of the questions involved;

    d. The skill required to perform the legal service properly;

    e. The fee customarily charged in the locality for similar legal services;

    f. The amount involved;

    g. The experience, reputation and ability of the lawyer or lawyers performing the services;

    h. Whether the fee is fixed or contingent on results obtained;

    i. The uncertainty of collection before the legal services have been rendered; and

    j. The results obtained.

14. A statement of the legal services I provided in this case on this issue, identifying the date the service was provided, the activity type, a description of such services, the staff performing such services, the reasonable, usual and customary hourly fee charged for such person's work, the time spent and the reasonable and necessary charge for such service is included within this affidavit and incorporated throughout by reference for all purposes.

15. Reasonableness of the Fee in this Case:

    a. First, and most important to my analysis, are the fees customarily charged in Harris County, Texas for similar legal services. *See* Tex. Disc. R.Prof. Conduct 1.04(b)(3). In my experience, these market forces, more than any other factors, help set lawyer's hourly rates. In my expert opinion, the attorney's fees incurred in connection with the referenced tasks are consistent with the fees customarily charged in Harris County, Texas for similar legal services.

    b. Second, the fees incurred in connection with the referenced tasks are reasonable given the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(1).

    c. Third, the fees incurred in connection with the referenced tasks are reasonable given that my acceptance of the matter and undertaking the tasks as outline herein

precluded me from accepting other employment or working on other matters. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(2).

d. Fourth, the fees incurred in connection with the referenced tasks are reasonable given my experience, reputation, and ability. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(7). I am qualified by training, experience, and reputation to deserve the hourly rates charged in connection with the referenced tasks.

e. Fifth, the fees incurred were reasonable given the amount involved and the results I expect to obtain. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(4). Other factors set out in the applicable professional rule also support the reasonableness of the fees charged in connection with the referenced tasks. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(5)-(6). In determining reasonable attorney's fees in this case, I considered the total hours of time actually incurred by myself/ the Amaro Law Firm.

16. The total amount paid for services thus far is zero. However, the total amount of hours the O'Hara Law Firm has expended and will reasonably need to expend until the date of the hearing on this matter is **7.3 hours**, and the attorneys' fees being sought for the O'Hara Law Firm's services is **$4,745.00**

EXECUTED in **Houston, Harris** County, State of Texas, on the 10th day of September, 2025.

Dale

**Patrick O'Hara**

MELODY J COOK
Notary ID #124653393
My Commission Expires
August 18, 2027

NOTARY PUBLIC STATE OF TEXAS

Melody J. Cook
Notary Public of Texas

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| *Defendants.* | | |

**DECLARATION OF HAMILTON G. RUCKER**

Pursuant to 28 U.S.C. § 1746, I, Hamilton G. Rucker, declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously herewith.

2. I have been licensed to practice law in the State of Texas since 2009. My Texas Bar Number is 24067850. I am a member in good standing of the Southern District of Texas, State Bar of Texas, and the New York State Bar. I have represented clients in personal injury civil litigation, including aviation litigation, throughout my career. I have represented clients across Texas and various states nationwide in personal injury cases similar to the case at bar. I am the owner and founder of Hamilton Rucker, PC and have been practicing law in Texas as a solo practitioner since May 2009.

3. Hamilton Rucker, P.C. was retained by Kyle Williams to represent him in connection with injuries he sustained. during an on the job toxic exposure. My billing rate for this matter is $650.00 per hour, based on several factors, including but not limited to the factors such as those listed in Rule 1.04 of the Texas Rules of Professional Conduct. A fee of $650.00 per hour for my attorney's fees is a reasonable hourly fee for Hamilton Rucker, P.C. to charge in this matter for an attorney with my level of experience, skill, education, training and background, and is comparable to rates charged by attorneys of a comparable level who do comparable work in the Houston area and the Southern District of Texas. I have been retained by the Harris County Attorney's Office at a rate of $1,000 per hour; the rate was approved by Texas Attorney General Ken Paxton.

4. Defendants filed their removal on or about August 26, 2025. Prior to Defendants' removal of the case, Plaintiffs offered their expert witness (John Cayias, Ph.D.) for deposition to take place on August 27, 2025. I incurred time preparing for this deposition and visiting



**Exhibit 2-F**

with the expert prior to his deposition. In total, I spent 1.5 hours preparing for his deposition.

5. The night before the deposition, Defendants informed Plaintiffs/Intervenors' counsel that they had removed the case to federal court and would not be proceeding with the deposition. We offered to go forward with the deposition, but Defendants responded that they were not going forward with the deposition now that the case was in federal court. The total time I spent preparing for this deposition was **2.5 hours**.

6. The fees charged in this case are customarily charged in this area for the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorneys due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; and awards in similar cases. The tasks performed and the costs incurred were all reasonably and necessarily incurred on Plaintiffs' behalf in the case. The fees incurred reflect tasks that were performed competently and efficiently.

7. Accordingly, the total amount of hours the I have reasonably and necessarily expended on behalf of Plaintiffs in this matter preparing for the deposition Defendants' unilaterally cancelled the evening before the deposition is 2.5 hours, and the attorney's fees being sought by Hamilton Rucker, P.C.'s services is **$1,625.00**.

EXECUTED in Houston, Harris County, State of Texas, on the 15th day of September, 2025.

____________________________________

**Hamilton G. Rucker**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Chaumeika Lavaughn Bussey, et al.,** | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | **CIVIL ACTION NO. 4:25-cv-004037** |
| **v.** | § | |
| | § | |
| **Union Carbide Corporation, et al.,** | § | |
| | § | |
| ***Defendants.*** | | |

**DECLARATION OF BYRON C. ALFRED, ESQ.**

Pursuant to 28 U.S.C. § 1746, I, Byron C. Alfred, Esq., declare under penalty of perjury that the following is true and correct, based upon my involvement in the above-captioned case and review of the time records and materials for my law firm in this file:

1. I am competent to make this declaration. I have personal knowledge of the facts and information stated below, which are all true and correct. I submit this declaration in support of *Plaintiffs' Motion to Remand and for Expedited Consideration* ("Motion to Remand"), filed contemporaneously.

2. I have been licensed to practice law in the State of Texas since 2013. I have been Board Certified in Personal Injury Trial Law since 2020. I am a member in good standing of the Southern District of Texas. I am the Owner of The Alfred Firm, which has offices in Houston, Texas.

3. Curtis Bickers, who is an Attorney at The Alfred Firm, has been licensed to practice law in the State of Texas since 2005. Curtis has been Board Certified in Personal Injury Trial Law since 2010. Curtis is a member in good standing of the Southern District of Texas.

4. George W. Gore is also an Attorney at The Alfred Firm and has been licensed to practice law in the State of Texas since 2001. George is a member in good standing of the Southern District of Texas.

5. I have represented clients in personal injury civil litigation throughout my

entire career, with a primary focus on catastrophic injury and wrongful death cases. In that time, I have represented clients across Texas and in various states nationwide. My co-counsel, Curtis Bickers and George Gore, have each represented clients in catastrophic injury and wrongful death matters, both plaintiffs and defendants, for more than 20 years, respectively.

6. The Alfred Firm was retained by the following to represent them in the above captioned lawsuit in connection with the claims they have against various Defendants: Felicia Sheppard, as Representative of the Estate of Sidarieus Lozano, Deceased, Lexus Paul, as Next Friend of N.L., L.L., and S.L., Minors, and Cynthia Richardson, and Kyle Williams, ("Plaintiffs").

7. The lawyers working with me on this case and their respective website bios can be found at:

   Byron C. Alfred https://www.alfredfirm.com/byron-alfred/

   Curtis Bickers https://www.alfredfirm.com/curtis-bickers/

   George Gore https://www.alfredfirm.com/george-gore/

8. My Texas Bar number is 24084507, and my billing rate for this matter is $700.00 per hour. Based on several factors, including but not limited to the factors such as those listed in Rule 1.04 of the Texas Rules of Professional Conduct, a fee of $700.00 per hour for my attorney's fees is a reasonable hourly fee for The Alfred Firm to charge in this matter. The aforementioned hourly rate of $700 is reasonable based on my skills, experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

9. Curtis Bickers' Texas Bar number is 24048352, and his billing rate for this matter is $675.00. Based on several factors, including but not limited to the factors such as those listed in Rule 1.04 of the Texas Rules of Professional Conduct, a fee of $675.00 per hour for Curtis Bickers' attorney's fees is a reasonable hourly fee for The Alfred Firm to charge in this matter. Mr. Bickers' aforementioned hourly rate of $675 is reasonable based on his skills, experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

10. George Gore's Texas Bar number is 24029582 and his billing rate for this matter is $600. Based on several factors, including but not limited to the factors such as those listed in Rule 1.04 of the Texas Rules of Professional Conduct, a fee of $600.00 per hour for George Gore's attorney's fees is a reasonable hourly fee for The Alfred Firm to charge in this matter. Mr. Gore's aforementioned hourly rate of $600 is reasonable based on his skills, experience, education, training and background, and accomplishments in the area of wrongful death and personal injury litigation, and comparable to rates charged by attorneys of a comparable level who do comparable work in the Houston area and the Southern District of Texas.

11. Defendants filed their removal on or about August 26, 2025. At that time, I began working along with my co-counsel, Curtis Bickers and George Gore, to assess the merits of Defendants' motion. In doing this work, we studied Defendants' motion, researched relevant case law, and crafted internal memoranda relating to the same. After discussing the outcome of my Firm's research with lawyers also representing plaintiffs in this case, I worked along with Curtis Bickers to compile a timeline to support Plaintiffs responsive briefing. The work described above took place over 4 business days. The total time I spent undertaking the above referenced tasks was **10 hours**. Curtis Bickers also spent **10 hours** researching and drafting an evidentiary timeline to support our responsive briefing. George Gore spent **6 hours** researching relevant case law and drafting an inter-office memorandum for reference. These fees were necessary, reasonable, and were incurred in relation to The Alfred Firm's work for Plaintiffs in connection with Defendants' removal and this Motion to Remand.

12. Prior to Defendants' removal of the case, Plaintiffs offered their expert witness (John Cayias, Ph.D.) for deposition to take place on August 27, 2025. Curtis Bickers I incurred time preparing for this deposition and visiting with the expert prior to his deposition. In total, I spent 4.5 hours preparing for his deposition. Curtis Bickers and I spent an additional 1 hour visiting with the expert prior to his deposition. The night before the deposition, Defendants informed Plaintiffs/Intervenors' counsel that they had removed the case to federal court and would not be proceeding with the deposition. We offered to go forward with the deposition, but Defendants responded that they were not going forward with the deposition now that the case was in federal court. The total time I spent on this deposition was **5.5 hours**. Curtis Bickers spent **1 hour** working on this deposition.

13. The fees charged in this case are customarily charged in this area for the

time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of employment by our attorneys due to the acceptance of the case; the customary fixed and/or contingent fee; the time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of our attorneys; the "undesirability" of the case; and awards in similar cases.

14. The tasks performed and the costs incurred were all reasonably and necessarily incurred on Plaintiffs' behalf in the case. The fees incurred reflect tasks that were performed competently and efficiently.

15. Among other factors considered in determining the reasonableness of such fee, the following specific factors have been considered, including:

    a. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    b. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

    c. The fee customarily charged in the locality for similar legal services;

    d. The amount involved and the results obtained;

    e. The time limitations imposed by the client or by the circumstances;

    f. The nature and length of the professional relationship with the client;

    g. The experience, reputation and ability of the lawyer or lawyers performing the services; and

    h. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

16. My fees and the fees of Curtis Bickers and George Gore are reasonable and necessary in light of the non-exclusive factors identified by the Texas Supreme Court in ***Arthur Andersen & Co., v. Perry Equipment Construction***, 945 S.W.2d 812, 818 (Tex. 1997). Those factors include:

    a. Performing unrelated and unnecessary tasks;

b. The time and labor required;

c. The novelty and difficulty of the questions involved;

d. The skill required to perform the legal service properly;

e. The fee customarily charged in the locality for similar legal services;

f. The amount involved;

g. The experience, reputation and ability of the lawyer or lawyers performing the services;

h. Whether the fee is fixed or contingent on results obtained;

i. The uncertainty of collection before the legal services have been rendered; and

j. The results obtained.

17. A statement of the legal services my Firm has provided in this case on this issue, identifying the date the service was provided, the activity type, a description of such services, the staff performing such services, the reasonable, usual and customary hourly fee charged for such persons' work, the time spent and the reasonable and necessary charge for such service is included within this affidavit and incorporated throughout by reference for all purposes.

18. Reasonableness of the Fee in this Case:

a. First, and most important to my analysis, are the fees customarily charged in Harris County, Texas for similar legal services. *See* Tex. Disc. R.Prof. Conduct 1.04(b)(3). In my experience, these market forces, more than any other factors, help set lawyer's hourly rates. In my expert opinion, the attorney's fees incurred in connection with the referenced tasks are consistent with the fees customarily charged in Harris County, Texas for similar legal services.

b. Second, the fees incurred in connection with the referenced tasks are reasonable given the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(1).

c. Third, the fees incurred in connection with the referenced tasks are reasonable given that my acceptance of the matter and undertaking the tasks as outline herein precluded Me, Curtis Bickers and George Gore from accepting other employment or working on other matters. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(2).

d. Fourth, the fees incurred in connection with the referenced tasks are reasonable given the respective experience, reputation, and ability of myself, Curtis Bickers, and George Gore. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(7). Curtis Bicker, George Gore, and I are qualified by training, experience, and reputation to deserve the hourly rates charged in connection with the referenced tasks.

e. Fifth, the fees incurred were reasonable given the amount involved and the results my Firm expects to obtain. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(4). Other factors set out in the applicable professional rule also support the reasonableness of the fees charged in connection with the referenced tasks. *See* Tex. Disc. R. Prof. Conduct 1.04(b)(5)-(6). In determining reasonable attorney's fees in this case, I considered the total hours of time actually incurred by myself/ the Amaro Law Firm.

19. I anticipate that an additional **6 hours** of my time at $700.00 per hour ($4,200.00**),** an additional **3 hours** of Curtis Bickers' time at $675 per hour ($2,025.00), and an additional **3 hours** of George Gore's time at $600 per hour ($1,800.00) will be needed and incurred to complete the remand phase of this lawsuit – in reviewing the draft of our motion to remand, reviewing any responses and replies thereto, and attending any hearing that may take place on the issue.

20. The total amount paid for the services so far is $0.00. However and accordingly, the total amount of hours The Alfred Firm has reasonably and necessarily expended (and will expend up to a hearing on this issue) on behalf of Plaintiffs in this matter from August 26, 2025, to the date of the hearing on this matter, is

a. **21.5 hours** of Byron C. Alfred's time at $700 per hour ($15,050.00);

b. **14 hours** of Curtis Bickers's time at $675 per hour ($9,450.00); and

c. **9 hours** of George Gore's time at $600 per hour ($5,400.00).

21. The total attorney's fees being sought for The Alfred Firm's services is **$29,900.00**.

EXECUTED in Houston, Harris County, State of Texas, on the 12th day of September, 2025.

______________________________
**Byron C. Alfred**